# EXHIBIT A

**FOURTH AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**MERCURY PUBLIC AFFAIRS LLC**

      **THIS FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "**Agreement**"), dated as of December 31, 2013, is made and entered into by and among **MPA HOLDINGS INC.**, a Delaware corporation (the "**Class A Member**"), **HIGH STAKES HOLDINGS CO. LLC**, a Delaware limited liability company (the "**Class B Member**"), **MERCURY PUBLIC AFFAIRS LLC**, a Delaware limited liability company (the "**Company**"), and the individuals set forth on **Annex A** attached hereto (individually, a "**Principal**" and collectively, the "**Principals**").  The Class A Member and the Class B Member are referred to herein collectively as the "**Members**" and individually a "**Member**". Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article XII.

      **WHEREAS**, the Members desire to enter into this Agreement to (i) supersede all prior limited liability company agreements of the Company, (ii) recapitalize the membership interests of the Company into Class A Units and Class B Units, (iii) provide for the management of the Company and its affairs and the conduct of the Company's business, (iv) set forth the respective rights, powers and interests of the Members with respect to the Company and their respective membership interests in the Company, and (v) promote their interests and those of the Company by making provisions in this Agreement to govern their relations as Members.

      **NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members do hereby agree as follows:

**ARTICLE I**

**FORMATION OF LIMITED LIABILITY COMPANY**

      **Section 1.1**   <u>**Formation**</u>.  The Company was formed as a limited liability company under the laws of the State of Delaware by the filing with the Secretary of State of Delaware of the Certificate of Formation (as such certificate may be amended from time to time, the "**Certificate**").

      **Section 1.2**   <u>**Purpose**</u>.  The Company may engage in any lawful business of every kind and character for which a limited liability company may be organized under the Delaware Limited Liability Company Act (as amended from time to time, the "**Act**") or any successor statute.  The Company shall have all of the powers provided for a limited liability company under the Act.

Section 1.3    **Offices; Registered Agent**.   The principal place of business of the Company shall be 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, or such other principal place of business as the Managing Member (as defined in Section 4.1) may from time to time determine.  The Company may have, in addition to such office, such other offices and places of business at such locations, both within and without the State of Delaware, as the Managing Member may from time to time determine or the business and affairs of the Company may require.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person (as defined in Section 12.1) as the Managing Member may designate from time to time in the manner provided by law.

Section 1.4    **Filings and Foreign Qualification**.   Upon the request of the Managing Member, the Members shall promptly execute and deliver all such certificates and other instruments conforming hereto as shall be necessary for the Managing Member to accomplish all filing, recording, publishing and other acts appropriate to comply with all requirements for the formation and operation of a limited liability company under the laws of the State of Delaware and for the qualification and operation of a limited liability company in all other jurisdictions where the Company shall propose to conduct business.

Section 1.5    **Term**.   The Company commenced on the date the Company initially filed its Certificate with the Secretary of State of Delaware and shall continue in existence, unless sooner terminated in accordance with the provisions of this Agreement.

## ARTICLE II

## MEMBERS; MEMBERSHIP UNITS

Section 2.1    **Members and Membership Units**.

(a)    Percentage Interests. The membership interests in the Company owned by the Class A Member immediately prior to the date hereof shall be converted effective as of the date hereof into 550 Class A Membership Units with the terms, rights, and obligations set forth herein (the **"Class A Units"**).  In addition, the Company shall be authorized to issue, and shall issue, as of the date hereof 450 Class B Membership Units, with the terms, rights, and obligations set forth herein (the **"Class B Units"**).  As of the date hereof, all of the Class B Units shall be issued to the Class B Member.  Each Membership Unit (as defined in Section 12.1) shall have a percentage interest in the Company (**"Percentage Interest"**) equal to $1/10^{th}$ of one percent (0.1%), such that the Class A Units, in the aggregate, shall have a Percentage Interest of 55%, and the Class B Units, in the aggregate, shall have a Percentage Interest of 45%.  The percentage interest in capital of a Member in the Company (a Member's **"Capital Percentage Interest"**) shall equal the percentage that such Member's Capital Account at such time is of the aggregate Capital Accounts of all Members at such time (but not in excess of 100%).

(b)    Class A Units. Each Class A Unit shall represent an interest in the Company that is designated as a Class A Unit of the Company, which shall have the powers, preferences, rights, and restrictions set forth in this Agreement for the Class A Units (including the right to distributions provided in Section 3.4).

2

(c)     <u>Class B Units</u>.  Each Class B Unit shall represent an interest in the Company that is designated as a Class B Unit of the Company, which shall have the powers, preferences, rights, and restrictions set forth in this Agreement for the Class B Units (including the right to distributions provided for in Section 3.4). The Class B Units being issued to the Class B Member are intended to be treated as "profits interests" within the meaning of Revenue Procedure 93-27 as clarified by Revenue Procedure 2001-43 for U.S. federal income tax purposes (or pursuant to any subsequent authority). Class B Units shall have no voting rights and the Class B Units shall be terminated in their entirety in accordance with the provisions of Articles VIII and IX hereof.

(d)     <u>Other Unit Characteristics</u>.     The Members and their respective Membership Units, in the aggregate, are set forth on Schedule A hereto, and the Members shall have the rights to allocation of Profits, Losses, distributions, and other relevant items as set forth herein.

**Section 2.2     Redemption of Membership Units**.   In the event a Member sells, transfers, assigns, pledges or otherwise disposes of all or a portion of its Membership Units in accordance with Section 9.1 hereof, then effective as of the date of such sale, transfer, assignment, pledge or disposition, as the case may be, and subject to compliance with Section 9.1 hereof, such Member shall automatically cease to be a Member in the Company as to such transferred Membership Units.

**Section 2.3     Additional Members and Membership Units**.   Except as otherwise provided in this Agreement, additional Persons may be admitted to the Company as Members and Membership Units may be created and issued to such Persons only upon the written approval of the Managing Member and only upon such terms and conditions as the Managing Member shall approve; provided, however, in the event that any of the foregoing actions referenced in this sentence would adversely affect the rights or privileges of the Class B Member in a material manner with respect to (x) the allocation of Operating Profits and Losses and the distribution of Operating Cash Flow as set forth in Sections 3.3 and 3.4 hereof (including, without limitation, any action that would result in the reduction of the Class B Member's Percentage Interest of 45%), or (y) the determination and payment, if any, of the Aggregate Bonus Amount (as defined in Section 12.1), then any such action shall require the prior written consent of the Class B Member. The Members agree to execute an amendment to this Agreement in accordance with Section 13.4 to reflect the transfer and reallocation of Membership Units upon the occurrence of such event.  The terms of admission or issuance may specify the creation of different classes or groups of Members having different rights, powers and duties.  The creation of any new class or group of Members shall be indicated in an amendment to this Agreement in accordance with Section 13.4 hereof and such amendment shall indicate the different rights, powers and duties of the classes or groups of Members.

**Section 2.4     Liability of Member**.   Except as expressly provided under the Act, no Member shall be liable for the debts, liabilities, contracts or other obligations of the Company except to the extent of any unpaid Capital Contributions (as defined in Section 12.1), that the Member has agreed in writing to make to the Company; and in all events, a Member shall be liable and obligated to make payments of its Capital Contributions only as and when such payments are due in accordance with the terms of this Agreement, and no Member shall be

required to make any loans to the Company.  Subject to the limitations and conditions provided for in Article X hereof and the Act, the Company shall indemnify and hold harmless a Member in the event a Member becomes liable, notwithstanding the preceding sentence, for any debt, liability, contract or other obligation of the Company except to the extent expressly provided in the preceding sentence.

  **Section 2.5** **Limitations on Members**.  Other than as specifically provided for in this Agreement or the Act (including, without limitation, Section 4.1), no Member, acting in its capacity as such, shall: (a) be permitted to take part in the business or control of the business or affairs of the Company; (b) have any voice in the management or operation of any Company property; or (c) have the authority or power to act as agent for or on behalf of the Company or any other Member, to do any act which would be binding on the Company or any other Member, or to incur any expenditures, debts, liabilities or obligations on behalf of or with respect to the Company or any other Member.

**ARTICLE III**

**CAPITAL CONTRIBUTIONS; ALLOCATIONS AND DISTRIBUTIONS**

  **Section 3.1** **Capital Account; Capital Contributions**.  The Members recognize that, for federal, state, and local income tax purposes, the issuance of the Class A Units and Class B Units shall be treated as the entry into a partnership between the Class A Member and the Class B Member in which (a) the Class A Member is deemed to contribute 100% of the assets currently owned by the Company in exchange for the Class A Units in a transaction in which the liabilities of the Company (the "**Company Liabilities**") on the date hereof are deemed assumed by the Company; and (b) the Class B Member receives the Class B  Units for no contribution of property, but, instead, only the provision to the Company by the Class B Member (or its members) of services to the Company.  Accordingly, the Members understand that the initial Capital Account of the Class A Member shall be the excess of the fair market value of the assets over the Company Liabilities on the date hereof and the initial Capital Account of the Class B Member shall be zero ($0).  No Member shall be obligated to make any additional Capital Contributions. No interest shall accrue on any Capital Contribution.  The Capital Accounts of the Members shall be further computed in accordance with Section 6.2 below.   No interest shall accrue on any Capital Contribution.

  **Section 3.2** **Withdrawal and Return of Capital Contribution**.  No Member shall have the right to receive or withdraw its Capital Contribution except to the extent, if any, that any distribution made pursuant to the express terms of this Agreement may be considered as such by law or as expressly provided for in this Agreement.

  **Section 3.3** **Allocation of Profits and Losses**.

    (a)  Except as otherwise provided in this Section 3.3, all Operating Profits and Losses of the Company shall be allocated and charged to the Class A Member and the Class B Member in accordance with their Percentage Interests; provided, however, solely with respect to calendar year 2013, items of income, gain, deduction, and loss during the 2013 Stub Period shall

4

be allocated among the Members so as to give the same result to the Class B Member as would have been the case had the Class B Member been a Member of the Company since January 1, 2013; provided that, in addition, $400,000 of Operating Profits for 2013 that would, under the immediately preceding portion of this sentence, have been allocated to the Class A Member shall instead be allocated to the Class B Member.

(b)     All Capital Transaction Profits and Losses, and any other Profits and Losses other than Operating Profits and Losses, shall be allocated and charged solely to the Class A Member.

(c)     In the case of any property contributed to the Company by any Member which at the time of contribution has an adjusted tax basis which differs from its fair market value, items of Profits, Losses, income, gain and deduction for income tax purposes shall be allocated as required under Section 704(c) of the Code to take into account such difference using such method as set forth in Treasury Regulation Section 1.704-3 as shall be decided in the sole discretion of the Class A Member.  If the Gross Asset Value of any Company asset is adjusted pursuant to clauses (ii) or (iii) of the definition thereof, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted Gross Asset Value and its Gross Asset Value immediately before the adjustment in the same manner as under Section 704(c) of the Code.

(d)     Subject to Section 3.3(c) above, any item of taxable income, gain, loss or deduction of the Company (as well as any credits or the basis of property to which such credits apply) as determined for federal income tax purposes shall be allocated in the same manner as the corresponding income, gain, loss, or deduction is allocated under either Section 3.3(a) or Section 3.3(b), as applicable.  Allocations pursuant to this Section 3.3(d) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, Capital Transaction Profits, other items, or distributions pursuant to any provision of this Agreement.

(e)     <u>Annual Allocations and Limitations</u>.

(1)     In the event a Member unexpectedly receives in any taxable year any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) which causes or increases an Adjusted Capital Account Deficit (as defined in Section 12.1) of such Member, items of Company income and gain shall be specially allocated to such Member in such taxable year (and, if necessary in subsequent taxable years), in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible.

(2)     Notwithstanding the provisions of Section 3.3(a), in no event shall Losses of the Company be allocated to a Member if such allocation would result in such Member having an Adjusted Capital Account Deficit at the end of any taxable year.  All Losses in excess of the limitation set forth in this Section 3.3(e)(2) shall be allocated to the Members with positive balances in their Adjusted Capital Accounts, as a class pro rata in proportion to such positive balances.  In addition, no item of taxable loss or deduction, and no portion of any Loss or

Operating Loss, shall be allocated to any Member to the extent the use of such loss would be suspended for such year under Section 704(d) of the Code, even if such allocation would not result in such Member having an Adjusted Capital Account Deficit.

(3)     The respective interests of the Members in the Profits or Losses or items thereof shall remain as set forth above unless changed by amendment to this Agreement or by an assignment of a Membership Unit authorized by the terms of this Agreement; provided, however, that if the Managing Member reasonably determines that the allocations of Profits or Losses or any item of income, gain, loss, or deduction under this Section 3.3 (other than Sections 3.3(c) or (d)) does not satisfy the requirements of Section 704(b) of the Code or the Treasury Regulations thereunder, then, notwithstanding anything to the contrary contained in this Agreement, Profits and Losses (or such other items) shall be allocated in such manner as the Managing Member shall reasonably determine to be required by Section 704(b) of the Code and the Treasury Regulations thereunder.   The allocations set forth in Sections 3.3(e)(1), the preceding sentence of this Section 3.3(e)(3), and Section 3.3(f) (the **"Regulatory Allocations"**) are intended to comply with certain requirements of Treasury Regulations promulgated under Section 704 of the Code.  The Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gain, loss, and deduction to each Member so that, to the extent possible, and to the extent permitted by Treasury Regulations, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each Member if the Regulatory Allocations had not been made.

(f)     <u>Other Annual Allocations</u>.   The following special allocations shall be made in the following order:

(1)     Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 3.3, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.   The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 3.3(f)(1) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(2)     Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 3.3, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount

equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 3.3(f)(2) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(3)     Nonrecourse Deductions for any fiscal year shall be specially allocated among the Members in proportion to their Capital Percentage Interests.

(4)     Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations (it being understood that any amount loaned to the Company by any Member or an Affiliate (as defined in Section 12.1) of such Member, or any amount loaned by a third party and guaranteed by a Member or an Affiliate of such Member shall be deemed to be Member Nonrecourse Debt loaned by the applicable Member, and any deductions attributable to use of the proceeds of such debt shall be deemed to be Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt).

(5)     For purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, the Members' interests in Company profits are in proportion to their Capital Percentage Interests.

(6)     To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Members shall endeavor to treat distributions of funds as having been made from the proceeds of a Company Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

(7)     For purposes of determining the character (as ordinary income or capital gain) of any Profits or items thereof allocated to the Members pursuant to this Section 3.3, such portion of Profits or items thereof that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members.  This Section 3.3(f)(7) shall not alter the amount of allocations among the Members pursuant to this Section 3.3, but merely the character of income so allocated.

(g)     The Members are aware of the income tax consequences of the allocations described, and hereby agree to be bound by the provisions of Section 3.3 in reporting their respective shares of Company income and loss for income tax purposes.  Each Member agrees that he or it will not take any position with respect to any Company item in any tax return, refund

claim, or other document filed with any tax authority, or on an audit of the Member's tax returns, that is inconsistent with the positions taken by the Company on its tax returns.

(h)     It is the intention of the Company and its Members that the Company be taxed as a partnership for all purposes of the Code and similar income tax laws.

(i)     All matters concerning the valuation of securities, the allocation of profits, gains and losses among the Members, including the taxes on those profits, gains and losses, and accounting procedures, not specifically and expressly provided for by the terms of this Agreement, shall be determined in good faith by Managing Member, whose determination shall be final, binding and conclusive upon all of the Members.

**Section 3.4     <u>Distributions</u>**.

(a)     Subject to the making of the Tax Distributions (as defined in clause (c) below), to the extent permitted by the Act, the Managing Member, in accordance with the dividend policy of Omnicom Group Inc. (**"Omnicom"**) and the Diversified Agency Services Division (**"DAS"**) of Omnicom, shall distribute any Operating Cash Flow to the Members pro rata in accordance with their Percentage Interests, such that 100% of the Operating Cash Flow available for distribution (as determined by the Managing Member based upon the then current financial reports of the Company) for each calendar quarter shall be distributed to the Members, generally in arrears, provided, however, solely with respect to calendar year 2013 (subject to the making of Tax Distributions), the Operating Cash Flow for the 2013 Stub Period shall be distributed (i) 100% to the Class B Member until the Class B Member has received the amount it would have received had it been a Member since January 1, 2013, and (ii) thereafter to the Members pro rata in accordance with their Percentage Interests; provided that, in addition, $400,000 of the distribution of Operating Cash Flow for 2013 that would, under the immediately preceding clause (ii), have been made to the Class A Member shall instead be made to the Class B Member.  For years after 2013, Operating Cash Flow shall be distributed to the Members pro rata in accordance with their Percentage Interests. Subject to the making of the Tax Distributions, such distributions shall be made on a quarterly basis after the end of the applicable calendar quarter in respect of which the distribution is made. The Managing Member shall have the right to make additional distributions of Operating Cash Flow at such times as determined by the Managing Member.

(b)     Subject to the making of the Tax Distributions, all Capital Transaction Cash Flow shall be distributed 100% to the Class A Member.

(c)     Notwithstanding anything in this Agreement to the contrary, in preference to any other distributions pursuant to this Section 3.4, the Managing Member shall cause the Company to distribute cash of the Company to the Members on a quarterly (or other reasonable) basis at least sufficient for each Member (and the Class A Predecessor) to meet such Member's required federal, state and local income tax payments in respect of such Member's distributive share of the Company's taxable income for the current or the prior fiscal year calculated at the maximum aggregate personal tax rates for New York City, New York State and federal individual taxpayers (which tax payments shall include (i) estimated tax payments in respect of

the current fiscal year and (ii) any remaining payments of income tax on account of the prior fiscal year not funded out of Tax Distributions in respect of estimated payments for such prior fiscal year and (iii) amounts taken into account by the Class A Predecessor in respect of the Company for periods prior to the 2013 Stub Period) (the "**Tax Distributions**").  For purposes hereof, if a Member is a "pass-through" entity for income tax purposes, the Tax Distributions required hereby shall be made in amounts which are at least sufficient to meet the tax payment requirements of the stockholders or members of such Member in respect of their allocated Profits hereunder.  For purposes of calculating distributions under Sections 3.4(a) and (b) to be made to any Member, Tax Distributions to such Member shall be treated as distributions to such Member under Section 3.4(a) or (b), depending on whether they relate to tax liability associated with Operating Profit (the "**OP Tax Distributions**") or Capital Transaction Profit, respectively, as determined in the sole discretion of the Managing Member.

(d)     Any distribution of cash prior to the end of the fiscal year in which such cash came into possession of the Company shall be treated as a non-interest-bearing loan (a "**draw**") from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent distribution to the Member receiving such draw pursuant to this Section 3.4(d) by the lesser of (i) the entire amount otherwise distributable to the Member receiving such draw, and (ii) the entire amount of any unpaid draws pursuant to this Section 3.4(d).

(e)     All amounts withheld pursuant to the Code and Treasury Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 3.4 for all purposes under this Agreement.  The Managing Member is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any Federal, state, or local government any amounts required to be so withheld pursuant to the Code and Treasury Regulations or any provisions of any other Federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.  Notwithstanding any other provision in this Agreement, prior to the making of any such distribution, the Managing Member in its sole discretion may require the delivery to the Managing Member from each or any potential distributee such evidence as the Managing Member may reasonably request evidencing the absence of any third-party claims with respect to such potential distribution.

## ARTICLE IV

## MEMBERS

**Section 4.1    Management of the Company**. Except to the extent otherwise provided for herein, the powers of the Company shall be exercised by and under the authority of, and the business and affairs of the Company shall be managed under, the direction of the Class A Member (the "**Managing Member**"), and in accordance with the Omnicom "Grant of Authority" from time to time in effect.  In furtherance of the foregoing, each Class B Member acknowledges and agrees that no annualized base salary of an employee of the Company may be increased to

an amount greater than or equal to $500,000 without the prior written consent of the Class A Member.

Section 4.2    **Action By Written Consent**. Any action taken by the Managing Member may be taken by written consent, setting forth the action so taken, and shall be signed by the Managing Member. A telegram, telex, cablegram or similar transmission by the Managing Member, or a photocopy, pdf, facsimile or similar reproduction of a writing signed by the Managing Member, shall be regarded as signed by the Managing Member for purposes of this Section 4.2.

## ARTICLE V

## OFFICERS AND EMPLOYEES

Section 5.1    **Officers**. The Managing Member may designate one or more individuals to serve as officers of the Company. The Company shall have such officers as the Managing Member may from time to time determine. Any two or more offices may be held by the same individual. An officer of the Company shall have the duties and responsibilities consistent with his position and shall perform such duties and responsibilities as shall from time to time be prescribed or delegated to him by the Managing Member, subject to the terms of any employment agreement with the Company to which such officer may be a party. The Managing Member hereby designates Kieran Mahoney as Chief Executive Officer of the Company, Kirill Goncharenko as a Principal of the Company, Bibi W. Rahim as Controller of the Company, Deborah E. Zangara as Secretary of the Company, and Jennifer L. Schatzman, Louis F. Januzzi and Kathleen M. Jones each as Assistant Secretary of the Company.

## ARTICLE VI

## ACCOUNTING AND TAX MATTERS; REPORTS; BANKING

Section 6.1    **Books and Records**. At all times during the continuance of the Company, the Company shall maintain, at its principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business in accordance with generally accepted accounting principles, consistently applied ("**GAAP**") from year to year. Such books of account, together with a copy of this Agreement and of the Certificate, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each Member and its duly authorized representative for any purpose reasonably related to such Member's interest as a Member of the Company.

Section 6.2    **Capital Accounts**. An individual capital account (the "**Capital Account**") shall be maintained by the Company for each Member as provided below:

(a)    Each Member's Capital Contributions when made shall be credited to such Member's Capital Account. The Capital Account of each Member shall, except as

otherwise provided in this Agreement, be (i) credited with the amount of cash and the fair market value of any property contributed to the Company by such Member or its predecessor in interest (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), (ii) credited with the amount of any item of taxable income or gain and the amount of any item of income or gain exempt from tax allocated to such Member or its predecessor in interest for federal income tax purposes, (iii) debited by the amount of any item of deduction or loss allocated to such Member or its predecessor in interest for federal income tax purposes, (iv) debited by such Member's (or such predecessor's) allocable share of expenditures of the Company not deductible in computing the Company's taxable income and not properly chargeable as capital expenditures, including any nondeductible book amortization of capitalized costs, and (v) debited by the amount of cash or the fair market value of any property distributed to such Member or its predecessor in interest (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code).  Immediately prior to any distribution of property by the Company, the Members' Capital Accounts shall be adjusted, as required by Treasury Regulation 1.704-1(b)(2).

(b)     Any adjustments of basis of Company property provided for under Sections 734 and 743 of the Code and comparable provisions of state law (resulting from an election under Section 754 of the Code or comparable provisions of state law) shall not affect the Capital Accounts of the Members except to the extent required by Treasury Regulation § 1.704-1(b)(2)(iv)(m), and the Members' Capital Accounts shall be debited or credited pursuant to the terms of this Section 6.2 as if no such election had been made.

(c)     It is the intention of the parties that the Capital Account of each Member be kept in the manner required under Treasury Regulation § 1.704-1(b)(2)(iv).

(d)     Capital Accounts shall be adjusted, in a manner consistent with this Section 6.2, to reflect any adjustments in items of Company Profits, Losses, income, gain or deduction that result from amended returns filed by the Company or pursuant to an agreement by the Company with the Internal Revenue Service or a final court decision.

**Section 6.3     Tax Returns.**  The Managing Member shall prepare or cause to be prepared and timely file all federal, state and local income and other tax returns and reports as may be required as a result of the business of the Company.

**Section 6.4     Tax Matters Person**. The Managing Member shall be the tax matters person ("**TMP**") under Section 6231 of the Code.  The TMP shall inform each other Member of all significant tax matters that may come to its attention (including, without limitation, any tax audits of the Company) and shall forward to each other Member copies of all written communications it may receive in that capacity.  Nothing in this Section 6.4 shall limit the ability of any Member to take any action in its individual capacity with respect to tax audit matters that is left to the determination of an individual Member under Sections 6221 through 6233 of the Code or under any similar state or local provision.  The TMP shall be entitled to the indemnification provided by the Company as set forth in Article X.

**Section 6.5**     **Tax Elections**.  The Company shall:

(a)     Elect the fiscal year ending December 31 as the Company's fiscal year;

(b)     Elect the accrual method of accounting and partnership tax treatment;

(c)     Elect, in accordance with Sections 195 and 709 of the Code and applicable Treasury Regulations and comparable state law provisions, to treat all organization costs of the Company as deferred expenses amortizable over 180 months;

(d)     Elect under Section 754 of the Code to adjust the basis of the Company's assets pursuant to Sections 734 and 743 of the Code; and

(e)     Elect with respect to such other federal, state and local tax matters as the Managing Member shall determine from time to time.

**Section 6.6**     **Bank Accounts; Investment of Company Funds**.   The Managing Member shall cause one or more accounts to be maintained in the name of the Company in one or more banks, which accounts shall be used for the payment of expenditures incurred in connection with the business of the Company and in which shall be deposited any and all receipts of the Company.  All amounts shall be and shall remain the property of the Company and shall be received, held and disbursed for the purposes specified in this Agreement.  There shall not be deposited in any of such accounts any funds other than funds belonging to the Company, and no other funds shall in any way be commingled with such funds.  The Managing Member may invest or cause to be invested the Company funds in any manner which the Managing Member deems appropriate, in its discretion.

**Section 6.7**     **Signature of Negotiable Instruments**.  All bills, notes, checks or other instruments for the payment of money shall be signed or countersigned by such officer, officers, agent or agents, and in such manner, as are permitted by this Agreement and as from time to time may be prescribed by resolution (whether general or special) of the Managing Member.

## ARTICLE VII

## COVENANTS OF THE MEMBERS

**Section 7.1**     **Independent Accountants**.  The Managing Member shall be entitled to appoint the independent public accountants of the Company.

**Section 7.2**     **Corporate Initiatives**.  The Members agree that Omnicom shall have the option to require the Company to participate in all or some of its corporate plans, programs and initiatives as currently in existence or hereafter created.  Such programs shall include, without limitation: (i) property, casualty and professional insurance coverage under the Omnicom umbrella and other insurance policies, (ii) tax preparation and internal audit services, (iii) Fidelity 401(k) Plan, (iv) ADP payroll system, (v) Omnicom's health and welfare and HRIS systems, (vi) Sarbanes Oxley compliance programs in effect from time to time, (vii) Microsoft

Business Solutions and Hyperion accounting systems and (viii) Microsoft software purchasing programs. The Company and its subsidiaries shall be charged for their participation in any such program, plan or initiative on a basis consistent with the costs charged to other Omnicom companies participating therein. In addition, the Company will participate in the Omnicom Capital Inc. treasury cash management system (or any successor system) and will be credited or charged with interest, as the case may be, on the same basis as all other majority-owned Omnicom subsidiaries participating therein.

**Section 7.3**     <u>**Protective Covenants**</u>.

(a)     The Class B Member acknowledges that by virtue of its ownership of Membership Units of the Company it will be placed in a position of confidence and trust with the clients and employees of the Company. Each of the Principals acknowledges that by virtue of his or her involvement in the day-to-day operations of the Company and/or his or her ownership of equity interests in the Class B Member, as the case may be, he or she will be placed in a position of confidence and trust with the clients and employees of the Company. Accordingly, the Class B Member and each Principal agrees that it, he or she will not directly or indirectly:

(i)     during the Restricted Period, solicit, render services to or for, or accept from, anyone who is a Restricted Client, any business of the type performed by the Company, or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with the Company;

(ii)     during the Restricted Period, be employed by a Restricted Client to solicit or render services of the type performed by the Company;

(iii)     during the Restricted Period, employ as an employee or retain as a consultant any Person who is then or at any time during the Ownership Period or the Involvement Period, as the case may be, was, an employee of or exclusive consultant to the Company; or persuade or attempt to persuade any employee of or exclusive consultant to the Company to leave the employ of the Company or to become employed as an employee or retained as a consultant by any other Person; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of the Company shall not be deemed to be a breach of this provision; and

(iv)     unless otherwise agreed to in writing by the Class A Member and the Class B Member, during the Restricted Period and thereafter, use or authorize the use of the name "Mercury Public Affairs", or any other brand or name associated with the Company, Omnicom and/or DAS, or any variation thereof, as the whole or part of any trade name or style for any Person *other than* the Company or an Affiliate of the Company.

13

(b) <u>Definitions</u>. As used throughout this Section 7.3, the following terms shall have the meanings set forth below:

(i) **"Client"** means any Person to whom at any time during the Ownership Period or the Involvement Period, as the case may be, the Company rendered services or made a Pitch.

(ii) **"Involvement Period"** means, as to a Principal, the period for so long as a Principal is involved with the day-to-day operations of the Company and/or owns equity interests in the Class B Member, as applicable.

(iii) **"Ownership Period"** means, as to the Class B Member, the period for so long as the Class B Member owns, directly or indirectly, any Membership Units of the Company (including, but not limited to, the right to vote, directly or indirectly, any Membership Unit, or consent, directly or indirectly, to the taking of any actions).

(iv) **"Pitch"** means a new business presentation or similar offering of specific services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch.

(v) **"Restricted Client"** means (x) anyone who is a Client of the Company during the Ownership Period or such Principal's Involvement Period, as the case may be, and (y) any prospective Client to whom the Company made a Pitch at any time during the one-year period prior to, or the six month period immediately following, the Class B Member's or such Principal's Termination Date, as the case may be, *but with respect to any Pitch made after such Termination Date, only if* the Class B Member or such Principal, as the case may be, participated in or had a supervisory responsibility or other involvement in the discussions with the prospective Client preceding the Pitch and/or participated in the preparation of the Pitch and/or the actual Pitch. In addition, if the Restricted Client is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a **"Client Group"**), the term "Restricted Client" as used herein shall include each entity, division and operating unit of the Client Group where the same management group of the Client Group has the decision making authority or significant influence with respect to contracting for services of the type rendered by the Company.

(vi) **"Restricted Period"** means the period during the Ownership Period or the Involvement Period, as the case may be, and for a period of two years thereafter.

(vii) **"Termination Date"** means the last day of the Ownership Period or the Involvement Period, as the case may be.

(c)    <u>Acknowledgements</u>.    The Class B Member and each Principal acknowledges that (i) the type and periods of restriction imposed in the provisions of this Section 7.3 are fair and reasonable and are reasonably required in order to protect and maintain the proprietary interests of the Company, other legitimate business interests of the Company, and the goodwill associated with the business of the Company; and (ii) the time, scope, geographic area and other provisions of this Section 7.3 have been specifically negotiated by sophisticated commercial parties, represented by legal counsel.  It is further understood and agreed that the Clients of the Company may be serviced from any location and accordingly it is reasonable that the covenants set forth herein are not limited by narrow geographic area but generally by the location of such Clients and potential Clients.  In the event that any covenant contained in this Agreement shall be determined by any court or other tribunal of competent jurisdiction to be unenforceable by reason of its extending for too great a period of time or over too great a geographical area or by reason of its being too extensive in any other respect, (x) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which it may be enforceable, all as determined by such court or other tribunal making such determination, and (y) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made.  In the event any provision of this Section 7.3 is found to be void and unenforceable by a court or other tribunal of competent jurisdiction, the remaining provisions of this Section 7.3 shall nevertheless be binding upon the parties hereto with the same effect as though the void or unenforceable part had never been a part hereof or had been severed and deleted or reformed to be enforceable.  Each of the covenants and agreements contained in this Section 7.3 (collectively, the **"Protective Covenants"**) is separate, distinct and severable.  All rights, remedies and benefits expressly provided for in this Section 7.3 are cumulative and are not exclusive of any rights, remedies or benefits provided for by law, this Section 7.3 or otherwise, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived).  The existence of any claim, demand, action or cause of action that the Class B Member or any Principal has against the Company, whether predicated on this Section 7.3 or otherwise, shall not constitute a defense to the enforcement of each Protective Covenant or any other provision or provisions of this Agreement.  The unenforceability of any Protective Covenant shall not affect the validity or enforceability of any other Protective Covenant or any other provision or provisions of this Agreement.  The temporal duration of the Protective Covenants shall not expire, and shall be tolled during any period in which a court or tribunal having equity jurisdiction determines that the Class B Member and/or a Principal is in violation of any of the Protective Covenants, and all restrictions shall automatically be extended by the period of the Class B Member's and/or such Principal's violation of any such restrictions.

(d)    <u>Confidential Information</u>.    During the Ownership Period or the Involvement Period, as the case may be, the Class B Member and each Principal acknowledges that it, he or she will acquire and have access to confidential or proprietary information about the Company and/or its Clients (the **"Confidential Information"**). The Class B Member and each Principal is aware that the Confidential Information is not readily available to the public and accordingly, agrees that it, he or she will not at any time (whether during or after the Restricted

Period), disclose to anyone (other than its, his or her counsel in the course of a dispute arising from the alleged disclosure of Confidential Information or as required by law) any Confidential Information, or utilize such Confidential Information for its, his or her own benefit, or for the benefit of third parties. The Class B Member and each Principal agrees that the foregoing restrictions shall apply whether or not any such information is marked "confidential" and regardless of the form of the information. The term **"Confidential Information"** does not include information which (i) is or becomes generally available to the public other than by breach of this provision, (ii) the Class B Member or a Principal learns from a third party who is not under an obligation of confidence to the Company or a Client of the Company or (iii) is required to be disclosed pursuant to any applicable law or court order. In the event that the Class B Member or a Principal becomes legally required to disclose any Confidential Information, it, he or she will provide the Company with prompt notice thereof so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Section 7.3(d) to permit a particular disclosure. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the provisions of this Section 7.3(d) to permit a particular disclosure, the Class B Member and each Principal agrees that it, he or she will furnish only that portion of the Confidential Information which it, he or she is legally required to disclose and, at the Company's expense, will cooperate with the efforts of the Company to obtain a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

(e)     <u>Specific Performance</u>. If the Class B Member or a Principal commits a breach or is about to commit a breach, of any of the provisions of this Section 7.3, the Company and/or the Class A Member shall have the right to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and/or the Class A Member and that money damages will not provide an adequate remedy. In addition, each of the Company and/or the Class A Member may take all such other actions and remedies available to it under law or in equity and shall be entitled to such damages as it can show it has sustained by reason of such breach.

## ARTICLE VIII

## DISSOLUTION, LIQUIDATION AND TERMINATION

**Section 8.1     <u>Dissolution</u>**.  The Company shall be dissolved upon the first to occur of (i) the affirmative vote or written consent of the Class A Member or (ii) or the entry of a decree of judicial dissolution under the Act.  As promptly as possible following the occurrence of either of the foregoing events effecting the dissolution of the Company, the Class A Member shall execute a statement of intent to dissolve, in such form as shall be prescribed by the Secretary of State of Delaware.

**Section 8.2     <u>Liquidation</u>**.  Upon dissolution of the Company, the Class A Member shall appoint a liquidating trustee, who shall immediately commence to wind up the Company's

16

affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. After making payment or provision for all debts and liabilities of the Company, if determined to be necessary under the circumstances by the Class A Member, the Members' Capital Accounts shall be adjusted by debiting or crediting each Member's Capital Account with the share of the hypothetical gains or losses resulting from the assumed sale of all remaining assets of the Company for cash at their respective fair market values as of the date of dissolution of the Company so as to result, as closely as possible, in a Capital Account balance for the Class B Member (immediately before the distribution to the Members provided for in this Section 8.2 and assuming that all Company Liabilities have been paid in full) equal to the amount specified for the Class B Member in the penultimate sentence of this Section 8.2; it being the intention and agreement of the Members and the Company that all liquidating proceeds constitute Capital Transaction Cash Flow and should thus be distributed in their entirety to the Class A Member. The liquidating trustee shall then by payment of cash or property make distributions to the Class A Member in accordance with the positive balance in the Capital Account of such Member. Any distribution to the Members in liquidation of the Company shall be made by the later of the end of the taxable year in which the liquidation occurs or 90 days after the date of such liquidation. Notwithstanding any provisions in this Agreement to the contrary, no Member shall be obligated to restore a deficit balance in its Capital Account at any time. The proceeds of liquidation shall be distributed, as realized, in the manner provided in the Act, subject to this Section 8.2. The Members shall continue to share Profits and Losses during liquidation in the same proportions, as specified in Section 3.3 hereof, as before liquidation; provided, however, that the Class A Member shall in its good faith discretion allocate items of income, gain, deduction, and loss for the year of liquidation (and for earlier years if necessary to the extent then possible) such that, as of the time immediately before the distribution in liquidation and on the assumption all Company liabilities are paid in full, the Class B Member shall have a Capital Account Balance equal to, but not in excess of, the excess of (a) any Operating Profits allocated to the Class B Member over (b) amounts previously distributed to the Class B Member. With respect to this provision, the term "liquidation" shall have the same meaning as set forth in Treasury Regulation §1.704-1(b)(2)(ii) as in effect at such time, provided that the events specified in Section 9.1 shall not be deemed a "liquidation".

Section 8.3    **Termination**. The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in this Article VIII, and the Certificate shall have been canceled in the manner required by the Act.

Section 8.4    **Claims of the Members**. Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

## ARTICLE IX

## RESTRICTIONS ON TRANSFERS

**Section 9.1** **Assignment by Member**.   Except as otherwise provided in this Agreement, the Class B Member shall not have the right to sell, transfer, assign, pledge or otherwise dispose of, in whole or in part, all or any portion of its Membership Units without the prior written consent of the Class A Member, which consent may be withheld in its sole and absolute discretion for any or no reason. Any purported transfer by the Class B Member of all or any of its Membership Units, any purported assignment by the Class B Member of any of its rights under this Agreement, and any purported delegation by the Class B Member of any of its duties or obligations under this Agreement (which shall in no way relieve the Class B Member of responsibility for the performance of any such duties and obligations), in contravention of any of the provisions of this Agreement, will be null and void ab initio and of no force and effect. The Class A Member may, at any time and without consent, assign or transfer, in whole or in part, its Membership Units to any third party; provided, however, in connection with an assignment or transfer by the Class A Member of all or a majority of its Membership Units to a third party that is not an Affiliate of the Class A Member (a **"Transfer"**), such Transfer shall be prohibited unless such third party agrees in writing to preserve and maintain in full all of the rights and privileges of, and the obligations to, the Class B Member, as provided for herein; provided further, however, that in the event the consent of such third party is not obtained, such Transfer shall not be prohibited if otherwise consented to by the Class B Member. In the event of (x) a Transfer in which the third party does not agree in writing to preserve and maintain in full all of the rights and privileges of, and obligations to, the Class B Member, as provided for herein, but such Transfer is otherwise consented to by the Class B Member, the Class B Units shall be cancelled and terminated in their entirety and the Class B Member shall have no continuing rights, privileges or obligations with respect to the Company (other than the Class B Member's right to a distribution of any excess, as of the time of such Transfer, of (a) any Operating Profits previously allocated to the Class B Member over (b) amounts distributed to the Class B Member through the date of such Transfer) or (y) any Transfer, the Class B Member shall take all actions reasonably required by the Class A Member or any acquirer of the Membership Units, including without limitation the execution of (a) a release of any claims against the Company, other than claims relating to any (1) compensation of any Principal with respect to his employment with the Company, (2) reimbursement of appropriate expenses to any Principal and (3) distributions of Operating Cash Flow in accordance herewith with respect to the Class B Member, in each case accrued and owing through the date of such release, and (b) such agreements and instruments reasonably necessary and customary to provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Transfer.  For purposes of this Agreement, (x) in the event of an assignment or transfer of any of the Class A Member's Membership Units to any third party, the term **"Class A Member"** as used in this Agreement shall mean such third party and (y) any and all proceeds from any assignment or transfer of Membership Units shall constitute Capital Transaction Cash Flow and should thus be distributed in their entirety to the Class A Member.

# ARTICLE X

# INDEMNIFICATION

**Section 10.1    Indemnification of Managers and Members**.   The Company shall indemnify and advance expenses to a Person who was or is threatened to be made a named defendant or respondent in a proceeding because the individual is or was a Manager or Member to the fullest extent permitted or authorized by the laws of the State of Delaware as if the Company was a corporation organized under the laws of Delaware.  This indemnification provision shall inure to each of the Managers and Members of the Company, and other Persons serving at the request of the Company (as provided in this Article), and in the event of any such Person's death shall extend to such Person's legal representatives; but such rights shall not be exclusive of any other rights to which such Person may be entitled.

**Section 10.2    Others**.  The Company with the approval of the Managing Member may indemnify and advance expenses to an officer, employee or agent of the Company to the same extent that it is required to indemnify and advance expenses to Managers or Members under this Agreement or by statute.   The Company with the approval of the Managing Member may indemnify and advance expenses to Persons who are not or were not officers, employees or agents of the Company but who are or were "serving at the request of the Company" (as defined in Section 10.5(d)) as a director, officer, partner, manager, member, venturer, proprietor, trustee, employee, agent or similar functionary of another limited liability company, corporation, partnership, employee benefit plan, or other enterprise or entity (individually, an **"Other Entity"**) to the same extent that the Company is required to indemnify and advance expenses to Managers or Members under this Article or by statute.

**Section 10.3    Insurance and Other Arrangements**.  The Company may purchase and maintain insurance or establish and maintain another arrangement on behalf of any individual who is or was a Manager, officer, employee, Member or agent of the Company or who is or was serving at the request of the Company as a director, officer, partner, manager, member, venturer, proprietor, trustee, employee, agent or similar functionary of an Other Entity, against or in respect of any liability asserted against him and incurred by him in such a capacity or arising out of his status as such an individual, whether or not the Company would have the power to indemnify him against that liability under this Agreement or by statute.  If the insurance or other arrangement is with a Person that is not regularly engaged in the business of providing insurance coverage, the insurance or other arrangement may provide for payment of a liability with respect to which the Company would not have the power to indemnify the Person only if including coverage for the additional liability has been approved by the Managing Member.  Without limiting the power of the Company to purchase, procure, establish or maintain any kind of insurance or other arrangement, the Company may, for the benefit of persons indemnified by the Company, (a) create a trust fund; (b) establish any form of self-insurance; (c) secure its indemnity obligation by grant of a security interest or other lien on the assets of the Company; or (d) establish a letter of credit, guaranty or surety arrangement.  The insurance or other arrangement may be purchased, procured, maintained or established within the Company or with any insurer or other Person deemed appropriate by the Managing Member regardless of whether all or part of the stock or other securities of the insurer or

19

other Person are owned in whole or part by the Company.  In the absence of fraud, the judgment of the Managing Member as to the terms and conditions of the insurance or other arrangement and the identity of the insurer or other Person participating in an arrangement shall be conclusive and the insurance or arrangement shall not be voidable and shall not subject the Managing Member to liability, on any ground, regardless of whether Managing Member participating in the approval is the beneficiary of the insurance or arrangement.

Section 10.4     **Report to Members**.  Any indemnification of or advance of expenses to a Manager or Member in accordance with this Article or the provisions of any statute shall be reported in writing to the Managing Member within the 12-month period immediately following the date of the indemnification or advance.

Section 10.5     **Definitions**.  For purposes of this Article X:

(a)     The term **"expenses"** includes court costs and attorneys' fees;

(b)     The term **"proceeding"** means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, any appeal in such an action, suit or proceeding, and any inquiry or investigation that could lead to such an action, suit or proceeding;

(c)     The term **"Manager"** means any Person who is or was a Manager of the Company and any Person who, while a Manager of the Company, is or was serving at the request of the Company as a director, officer, partner, manager, member, venturer, proprietor, trustee, employee, agent or similar functionary of an Other Entity;

(d)     The term **"serving at the request of the Company"** as used above shall include any service as a manager, director, officer, employee or agent of the Company or where any such person performs duties on or otherwise involves services with respect to an employee benefit plan, or the participants or beneficiaries of the employee benefit plan sponsored by the Company.  Excise taxes assessed on a Person with respect to an employee benefit plan pursuant to applicable law are deemed fines.  Action taken or omitted to be taken by a Person with respect to an employee benefit plan in the performance of his duties for a purpose reasonably believed by him to be in the interest of the participants and beneficiaries of the plan is deemed to be for a purpose which is not opposed to the best interests of the Company.

Section 10.6     **Severability**.  The provisions of this Article are intended to comply with the Act.  To the extent that any provision of this Article authorizes or requires indemnification or the advancement of expenses contrary to such statute or the Certificate, the Company's power to indemnify or advance expenses under such provision shall be limited to that permitted by such statute and the Certificate and any limitation required by such statute or the Certificate shall not affect the validity of any other provision of this Article X.

Section 10.7     **Nonexclusivity of Rights**.     The right to indemnification and the advancement and payment of expenses conferred in this Article X shall not be exclusive of any other right that a Member, Manager or other Person indemnified pursuant hereto may have or

hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement or otherwise.

## ARTICLE XI

## ADDITIONAL AGREEMENTS

**Section 11.1** **"Mercury Public Affairs" Name**.  The Members hereby agree that, unless otherwise agreed to in writing by the Class A Member and the Class B Member, all right, title and interest in the trade name "Mercury Public Affairs" or any variation thereof, belongs to the Company and/or its Affiliates and cannot be transferred without the prior written consent of the Class A Member.

**Section 11.2** **Ownership of the Class B Member**.  The membership interests of the Class B Member (the **"Executive Interests"**) are owned as of the date hereof by the Principals. The parties hereto agree that unless consented to in writing by the Class A Member, (i) no additional Persons may be admitted to the Class B Member as members and (ii) no Executive Interests shall be issued, sold, transferred, assigned, pledged or otherwise disposed of, in whole or in part, directly or indirectly, to any Person other than a Principal or the Class B Member.

**Section 11.3** **Aggregate Bonus Amount**.  The Aggregate Bonus Amount for any calendar year shall be an amount equal to 20% of the Company's Operating Profits (before the payment of the Aggregate Bonus Amount for such calendar year) for such calendar year; provided, however, in the event the Company's profit margin for any such calendar year (after the payment of the Aggregate Bonus Amount for such calendar year), as determined in the sole discretion of the Chief Financial Officer of DAS, is less than 20%, then the Aggregate Bonus Amount for such calendar year shall be reduced to an amount which, after taking into account such reduction, shall result in the Company's profit margin for such calendar year, as determined in the sole discretion of the Chief Financial Officer of DAS, being equal to 20%. The Members acknowledge and agree that, subject to the prior written consent of the Class A Member, which such consent shall not be unreasonably withheld or delayed, for any calendar year commencing with calendar year 2013, the Class B Member shall determine how the Aggregate Bonus Amount is allocated among employees of the Company. The Aggregate Bonus Amount shall generally be paid to employees in the calendar year immediately following the calendar year in respect of which the Aggregate Bonus Amount is payable. Each of the Principals hereby agrees that in the event the employment of any Principal with the Company is terminated for any reason whatsoever such Principal shall immediately withdraw as a member from the Class B Member and such Principal shall no longer be able to participate in any allocation of any Aggregate Bonus Amount (commencing with the calendar year in which such termination of employment occurs).

# ARTICLE XII

# OTHER DEFINITIONS

**Section 12.1    Other Definitions**.  When used herein, the following terms shall have the following meanings:

"**2013 Stub Period**" means the period commencing on the date hereof and ending on the close of business on December 31, 2013.

"**Adjusted Capital Account Deficit**" with respect to any Member means the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is otherwise treated as being obligated to restore under Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)    Debit to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Adjusted Capital Account**" with respect to any Member shall mean such Member's Capital Account, increased or decreased to reflect the adjustments set forth in clauses (i) and (ii) of the definition of Adjusted Capital Account Deficit.

"**Affiliate**" of any Person shall mean any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such Person.

"**Capital Contribution**" shall mean the contribution of a Member and any subsequent contributions of capital, whether in the form of cash or property, made by such Member to the Company as set forth in Article III.

"**Capital Transaction**" shall mean a sale, lease or other disposition of any asset (including any business) of the Company, including by sale, merger, consolidation, reorganization or combination, or a borrowing against any asset (including any business) of the Company to the extent proceeds thereof are, in the sole discretion of the Class A Member, deemed available for distribution to Members.

"**Capital Transaction Cash Flow**" shall mean the cash generated by a Capital Transaction.

22

"**Capital Transaction Profits and Losses**" shall mean the gain or loss from a Capital Transaction, computed by making such appropriate allocation of direct and/or indirect costs as the Class A Member makes in its sole reasonable discretion, all after appropriate adjustment for items (if any) specifically allocated pursuant to this Agreement.

"**Class A Predecessor**" shall mean DAS Holdings Inc.

"**Company Minimum Gain**" shall have the meaning for "**Partnership Minimum Gain**" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.

"**Depreciation**" means for each fiscal year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for Federal income tax purposes with respect to an asset for such fiscal year, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such fiscal year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for Federal income tax purposes of an asset at the beginning of such fiscal year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Class A Member.

"**Gross Asset Value**" with respect to any asset means the asset's adjusted basis for Federal income tax purposes, except as follows:

(i)     Subject to the final sentence of this definition, the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by reference to Section 3.1 and Section 6.2(a).

(ii)    The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined under Section 3.3(i), as of the following times: (a) the acquisition of additional Membership Units by any new or existing Member in exchange for a Capital Contribution or in connection with the grant of a Membership Unit in the Company as consideration for the performance of services to or for the benefit of the Company; (b) the distribution by the Company to a Member of property as consideration for a Membership Unit; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);  provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Class A Member reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined under Section 3.3(i); and

(iv)    The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and clause (vi) of the definition of Profits and Losses herein; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Class A Member determines that an adjustment pursuant to clause (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Member**" shall mean any Person having all of the rights of a holder of a Membership Unit in the Company either originally upon formation of the Company or by acquiring such interest in accordance with this Agreement.

"**Member Nonrecourse Debt**" shall have the meaning for "Partner Nonrecourse Debt" set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" shall-mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" shall have the meaning set forth in Section 1.704-2(i)(2) of the Treasury Regulations.

"**Membership Units**" shall mean the Class A Units and/or Class B Units, as applicable.

"**Nonrecourse Deductions**" shall have the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"**Nonrecourse Liability**" shall have the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Operating Cash Flow**" for any calendar quarter, shall mean the sum of (A) the amount by which (I) cash generated by the operations of the Company for such calendar quarter, less any such cash that constitutes Capital Transaction Cash Flow, exceeds (II) an amount deemed reasonably necessary by the Class A Member to be reserved from such cash to provide adequate working capital in accordance with past practices (including, without limitation, provision for the

repayment in full of any amount then owing by the Company to the Class A Member or any Affiliate thereof) or otherwise as determined by the Class A Member as not appropriately distributable to Members for such calendar quarter (which the Members agree shall include, among other items, a 100% cash reserve against any accounts receivable of the Company outstanding at the end of such calendar quarter that, at the time of any distribution of Operating Cash Flow, shall be then unpaid) plus (B) any cash (apart from Capital Transaction Cash Flow) held in reserve (or otherwise not distributed) in calendar quarters prior to such calendar quarter that, in the sole discretion of the Class A Member, may be released from reserves or otherwise be distributed; provided, however, Operating Cash Flow for any calendar quarter shall be reduced by an appropriate allocation to any such calendar quarter (such allocation to be made in the sole reasonable discretion of the Class A Member) of the aggregate amount of all bonus payments paid to the employees of the Company in respect of the calendar year in which such calendar quarter falls (any such aggregate annual amount shall be referred to herein as the "**Aggregate Bonus Amount**") (such that the aggregate Operating Cash Flow for each calendar year shall be reduced by the aggregate amount of the Aggregate Bonus Amount).   Notwithstanding the foregoing, in determining Operating Cash Flow:

(i)     intercompany management fees charged by Omnicom, DAS or any Affiliate of Omnicom or DAS or any of its affiliates, to the Company and any of its subsidiaries, shall not be taken into account;

(ii)    for any service rendered or provided to the Company or any subsidiary thereof by Omnicom or any of its Affiliates (Omnicom and its Affiliates are collectively called the "**Omnicom Group**"), the Company or its subsidiaries, if any, shall be charged at the rates agreed to by such Omnicom Group member and all such charges shall be taken into account in determining Operating Cash Flow;

(iii)   the Company and its subsidiaries, if any, will participate in Omnicom's cash management program and interest charges (whether generated from loans relating to the payment of management fees, dividend payments, working capital or otherwise), or interest payments or accruals between any member of the Omnicom Group, on the one hand, and the Company or its subsidiaries, if any, on the other hand, shall be taken into account in determining Operating Cash Flow for the calendar quarter in which such charges are incurred or accrued (regardless of when paid);

(iv)    any (1) fees and expenses of outside accountants performing an audit of the Company individually, and (2) allocable charges in respect of fees and expenses of outside accountants performing an audit of the Omnicom Group (as opposed to the Company individually), up to an aggregate of $60,000 in any calendar year with respect to (1) and (2) of this clause (iv), shall be taken into account in determining Operating Cash Flow; but any such fees and expenses, or any such allocable charges in respect of any such fees and expenses, as the case may be, in any case in excess of $60,000 in any calendar year, shall not be taken into account in determining Operating Cash Flow (with, in any case, appropriate pro-ration of

25

such included and excluded amounts to the calendar quarters of any such calendar year, such pro-ration to be made by the Class A Member in its sole discretion);

(v)     the operating cash flow (determined in accordance with the principles of the determination of the Operating Cash Flow of the Company hereunder) of any subsidiary of the Company shall be taken into account in determining Operating Cash Flow only in proportion to the Company's direct or indirect ownership in such subsidiary; and

(vi)    any expenses of the Company incurred in connection with the negotiation, preparation and execution of this Agreement (or any amendment, modification or waiver with respect to this Agreement) and any other documents to be delivered in connection herewith or therewith (including, without limitation, the fees and disbursements of its attorneys and accountants and any brokers' or finders' fees) shall not be taken into account in determining Operating Cash Flow.

"**Operating Profits and Losses**" shall mean Profits and Losses (as defined below), but computed excluding any Capital Transaction Profits and Losses.

"**Person**" shall mean and include an individual, a company, a joint venture, a partnership, a limited partnership, a limited liability company, a trust, an estate, a corporation, a custodian, a trustee, an executor, an administrator, a nominee or an entity in a representative capacity, an unincorporated organization and a government or other department or agency thereof.

"**Profits and Losses**", shall mean, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss, and items during periods prior to the 2013 Stub Period shall be computed in accordance with the same principles even though it is recognized that during such periods the Company was not a partnership for tax purposes), with the following adjustments:

(i)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(iii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to clauses (ii) or (iii) of the definition of "Gross Asset Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition thereof;

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Unit, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for the purposes of computing Profits or Losses; and

(vii)     Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Sections 3.3(e)(1), 3.3(e)(3) or 3.3(f) shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.3(e)(1), 3.3(e)(3) or 3.3(f) shall be determined by applying rules analogous to those set forth in clauses (i) through (vii) above.

"**Treasury Regulations**" shall mean final regulations issued by the Department of the Treasury interpreting the Code.

## ARTICLE XIII

## MISCELLANEOUS

**Section 13.1     Manner of Giving Notice**.  Whenever under the provisions of the Act, the Certificate or this Agreement, notice is required to be given to the Company or any Member of the Company, and no provision is made as to how such notice shall be given, it shall not be construed to mean only personal notice, but any such notice may be given in writing (a) three days after the date of deposit in the mails, postage prepaid and return receipt requested, (b) transmitted by wire, telex or telefax (with receipt confirmed), (c) delivered by hand or (d) sent by overnight or express mail or expedited delivery service; in each case addressed as follows:

If to the Class A Member, to:

MPA Holdings Inc.
c/o Diversified Agency Services
437 Madison Avenue
New York, New York 10022
Attention: General Counsel

<u>with a copy to</u>:

Davis & Gilbert LLP
1740 Broadway
New York, New York 10019
Attention: Evan D. Weiner, Esq.

If to the Class B member, to:

c/o Mercury Public Affairs LLC
14502 N. Dale Mabry Hwy, Suite 104
Tampa, FL 33618
Attention: Kieran Mahoney

<u>with a copy to</u>:

Moses & Singer LLP
405 Lexington Avenue
New York, New York 10174
Attention: Jeffrey M. Davis, Esq.

If to the Company, to:

Mercury Public Affairs LLC
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Attention: Kieran Mahoney

<u>with a copy to</u>:

Davis & Gilbert LLP
1740 Broadway
New York, New York 10019
Attention: Evan D. Weiner, Esq.

or to such other address or fax number as hereafter shall be designated in writing by the applicable party sent in accordance herewith or in the records of the Company.

**Section 13.2**   **Waiver of Notice**.   Whenever any notice is required to be given to any Member of the Company under the provisions of the Act, the Certificate or this Agreement, a waiver thereof in writing signed by the Person or Persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 13.3**   **No Company Seal**.   The Company shall not have a Company seal, and no agreement, instrument or other document executed on behalf of the Company that would otherwise be valid and binding on the Company shall be invalid or not binding on the Company solely because no Company seal is affixed thereto.

**Section 13.4**   **Amendment or Modification**.   Except as provided in this Section 13.4, the power to adopt, alter, amend or repeal this Agreement is vested solely in the Managing Member. No amendment shall be made to the terms or rights of the Class B Units with respect to Sections 2.1, 3.3, 3.4, 7.3, 11.3, 12.1 and this 13.4, without the consent of the Class B Member.

**Section 13.5**   **Binding Effect**.   Subject to the restrictions on transfer and assignment set forth in Article IX of this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective successors and permitted assigns.

**Section 13.6**   **Governing Law; Severability**.   This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware without regard to the principles of conflict of laws thereof.   In the event of a direct conflict between the provisions of this Agreement and any provision in the Certificate or any mandatory provision of the Act, the applicable provisions of the Certificate or the Act shall control.   If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

**Section 13.7**   **Counterparts**.   This Agreement may be executed by the parties hereto in any number of counterparts, and by facsimile transmission, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

**Section 13.8**   **Entire Agreement**.   This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and supersedes all other limited liability company agreements of the Company entered into prior to the date hereof.

**IN WITNESS WHEREOF,** the undersigned have executed this Fourth Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

**MERCURY PUBLIC AFFAIRS LLC**

By: _____
      **Name:**
      **Title:**

**MPA HOLDINGS INC.**

By: _____
      **Name:** Louis F. Januzzi
      **Title:** Assistant Secretary

**HIGH STAKES HOLDINGS CO. LLC**

By: _____
      **Name:**
      **Title:**

**THE PRINCIPALS**

_____
**Kieran Mahoney**

_____
**Kirill Goncharenko**

_____
**Fabian Nunez**

_____
**Michael McKeon**

_____
**Thomas Doherty**

_____
**Adam Mendelsohn**

**IN WITNESS WHEREOF,** the undersigned have executed this Fourth Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____

     Name:   Louis F Januzzi
     Title:    Assistant Secretary

MPA HOLDINGS INC.


By: _____

     Name:
     Title:

HIGH STAKES HOLDINGS CO. LLC


By: _____

     Name:
     Title:

THE PRINCIPALS


_____
Kieran Mahoney


_____
Kirill Goncharenko


_____
Fabian Nunez


_____
Michael McKeon


_____
Thomas Doherty


_____
Adam Mendelsohn

IN WITNESS WHEREOF, the undersigned have executed this Fourth Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
    Name:
    Title:

MPA HOLDINGS INC.

By: _____
    Name:
    Title:

HIGH STAKES HOLDINGS CO. LLC

By: _____
    Name: Kieran Mahoney
    Title: Principal

THE PRINCIPALS,

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Adam Mendelsohn

**IN WITNESS WHEREOF,** the undersigned have executed this Fourth Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

**MERCURY PUBLIC AFFAIRS LLC**

By: _____
      Name:
      Title:

**MPA HOLDINGS INC.**

By: _____
      Name:
      Title:

**HIGH STAKES HOLDINGS CO. LLC**

By: _____
      Name:
      Title:

**THE PRINCIPALS :**

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Adam Mendelsohn

IN WITNESS WHEREOF, the undersigned have executed this Fourth Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
    Name:
    Title:

MPA HOLDINGS INC.

By: _____
    Name:
    Title:

HIGH STAKES HOLDINGS CO. LLC

By: _____
    Name:
    Title:

THE PRINCIPALS (

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Adam Mendelsohn

IN WITNESS WHEREOF, the undersigned have executed this Fourth Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
      Name:
      Title:

MPA HOLDINGS INC.

By: _____
      Name:
      Title:

HIGH STAKES HOLDINGS CO. LLC

By: _____
      Name:
      Title:

THE PRINCIPALS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Adam Mendelsohn

**IN WITNESS WHEREOF,** the undersigned have executed this Fourth Amended and Restated Limited Liability Company Agreement as of the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
         Name:
         Title:

MPA HOLDINGS INC.

By: _____
         Name:
         Title:

HIGH STAKES HOLDINGS CO. LLC

By: _____
         Name:
         Title:

THE PRINCIPALS

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Adam Mendelsohn

Vin Weber

[Fourth Amended and Restated Limited Liability Company Agreement]

## SCHEDULE A

| MEMBERS: | PERCENTAGE INTERESTS | INITIAL CAPITAL PERCENTAGE INTERESTS |
|---|---|---|
| MPA Holdings Inc. (Class A Member) | 55% | 100% |
| High Stakes Holdings Co. LLC (Class B Member) | 45% | 0% |
| TOTAL: | 100% | 100% |

**Annex  A**

**Principals**

Fabian Nunez

Kieran Mahoney

Kirill Goncharenko

Michael McKeon

Thomas Doherty

Adam Mendelsohn

Mike Duhaime

Vin Weber