# EXHIBIT C

# AMENDED AND RESTATED
# SHARED SERVICES AGREEMENT

This **AMENDED AND RESTATED SHARED SERVICES AGREEMENT** (this "**Agreement**") is made as of April 28, 2017, by and among **DAS HOLDINGS INC.** ("**DASH**"), **KIERAN MAHONEY** ("**Mahoney**"), **KIRILL GONCHARENKO** ("**Goncharenko**"), **MICHAEL MCKEON** ("**McKeon**"), **THOMAS DOHERTY** ("**Doherty**"), **FABIAN NUNEZ** ("**Nunez**"), **MIKE DUHAIME** ("**DuHaime**"), **VIN WEBER** ("**Weber**"), **STEFAN FRIEDMAN** ("**Friedman**"), **MORRIS REID** ("**Reid**"), **ASHLEY WALKER** ("**Walker**") and **MIKE SOLIMAN** ("**Soliman**"; and together with Mahoney, Goncharenko, McKeon, Doherty, Nunez, DuHaime, Weber, Friedman, Reid and Walker, individually a "**Principal**" and collectively, the "**Principals**").

## W I T N E S S E T H:

**WHEREAS**, DASH and certain Principals previously entered into that certain Shared Services Agreement, dated as of December 31, 2013 (the "**Original SSA**"), pursuant to which the Principals are permitted pursuant to the terms of the Original SSA to form certain entities in which no member of the Omnicom Group (as defined below) is an equity holder (each such entity hereinafter referred to as a "**Newco**"), and which are owned in part by, or are operated within, limited liability companies owned in part by all or some of the Principals (each an "**MSG Venture LLC**"), for the purpose of providing certain governmental relations and consultative communications services to its clients;

**WHEREAS**, the parties hereto acknowledge and agree that the following existing Newcos shall be subject to the provisions of this Agreement: Newco Digital, High Stakes 11 LLC, High Stakes 12 LLC, High Stakes 14 LLC, High Stakes 15 LLC, High Stakes 16 LLC, High Stakes 19 LLC and Knight Devils LLC, and that all such Newcos shall be listed from time to time on **Annex I** hereto;

**WHEREAS**, the DAS Group of Companies Division ("**DAS**") of Omnicom Group Inc. ("**Omnicom**" and, together with DAS and the other Affiliates (as defined in Section 6.5 hereof) of Omnicom, the "**Omnicom Group**") has permitted key personnel of Mercury Public Affairs LLC, a Delaware limited liability company ("**MPA**"), including all or some of the Principals, to be owners of MSG Venture LLCs and to perform services on behalf of each Newco, and the Principals have agreed to pursue and operate each Newco in accordance with the terms and conditions set forth herein;

**WHEREAS**, pursuant to certain Management Services Agreements (collectively, the "**Management Services Agreements**"), MPA is the exclusive provider of certain (x) services including grassroots, polling, advertising, government relations and consulting services (provided, however, that MPA may not be the exclusive provider of such services when specifically required otherwise by a client) and (y) administrative, business and financial management services, including without limitation, human resources, information technology, billing and collection services, accounting, bookkeeping, reporting and payroll, and at the discretion of the Board of

1

Managers of MPA, risk management and legal support services, to (1) the Newcos and (2) clients of such Newcos; and

**WHEREAS**, the parties hereto now desire to amend and restate the Original SSA in its entirety as set forth herein.

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. Term; Termination of Agreement.

    1.1   The term of this Agreement shall commence on the date hereof and shall continue for so long as any Newco remains in existence and subject to the terms hereof (the "**Term**").

    1.2   This Agreement may be terminated by DASH upon the occurrence of a material default or material breach of this Agreement by the Principals, which default or breach is not cured by the defaulting or breaching party within 30 days following written notice by DASH to the Principals (which shall describe in reasonable detail the default or breach in question). If at the end of such 30-day period such default or breach is still continuing, this Agreement shall then be terminable by DASH.  The term of this Agreement shall also terminate upon the written agreement of all parties hereto. For purposes of clarification, if a Principal's employment with MPA is terminated at any time for any reason or no reason, then such Principal immediately and without further action by any party hereto shall cease to be a party to this Agreement and from and after such time shall have no rights hereunder; provided, for the avoidance of doubt, this sentence shall not affect any rights such Principal might have pursuant to separate agreements with any MSG Venture LLCs.

2. Formation of Newcos.

    2.1   In the event that after the date hereof all or some of the Principals desire to form an additional Newco, they shall submit a written business proposal (a "**Newco Plan**") to the Chief Executive Officer of DAS, currently Dale A. Adams (the "**DAS CEO**") and the President of DAS, currently John Doolittle (the "**DAS President**"), describing in sufficient detail (a) the purpose for forming such Newco; (b) the geographic region in which such Newco is to be located and operated; it being acknowledged and agreed that a Newco may not be located in or operated from an international region or area in which no member of the Omnicom Group has an existing business presence (the "**Geographic Criteria**"); (c) the business to be transacted by such Newco, which business shall be limited to the provision of governmental relations and consultative communications services to clients; (d) such Newco's projected financial performance for its first full year of operations; (e) to the extent known, the identity of the principal clients proposed to be serviced by such Newco during its first full year of operations and (f) any owners of the proposed Newco (other than the Principals and the applicable MSG Venture LLC(s)) and the key personnel involved in the management of such Newco (collectively, the "**Key Personnel**"), including with respect to such Key Personnel (i) a breakdown of initial ownership interests, (ii) reasonably detailed biographies, (iii) the HR-related information typically required by members of the

Omnicom Group in connection with offers of employment and (iv) if requested by DASH after receipt of items (i) through (iii), the results of background checks of Key Personnel conducted using a reputable company (for example, Kroll, Inc.).  DASH shall have a period of 15 days after receipt of a complete Newco Plan containing the information required pursuant to this Section 2.1 including, if requested by DASH, the results of background checks on applicable Key Personnel (the "**Acceptance Period**"), to advise the Principals in writing whether or not such Newco Plan has been accepted by DASH and whether or not the Principals may proceed with the formation of such Newco and, if DASH does not accept the Newco Plan, the reasons for such rejection.  If DASH fails to notify the Principals of its rejection or approval within the Acceptance Period, DASH shall be deemed to have approved the Newco Plan, effective as of the end of such Acceptance Period.  Notwithstanding the foregoing, DASH and the applicable Principals may instead agree, at any time during the Acceptance Period, to pursue the operations of the proposed Newco as a division or business unit of MPA instead of as a Newco pursuant to the terms and conditions hereof.

2.2     DASH hereby acknowledges and agrees that it may only reject a properly submitted Newco Plan and prohibit the formation of the proposed Newco and the commencement of the business to be conducted by such Newco for one of the following reasons: (a) MPA's then-forecasted profit margin for the current calendar year (as set forth in MPA's most recent financial reforecast provided to DAS, consistent with past practice) is less than 25%, (b) the purpose or parties involved with such Newco would reasonably be expected to materially injure the reputation, business or business relationships of DASH or its Affiliates, (c) in the reasonable judgment of the DAS CEO, it is not in the best interests of the Omnicom Group to be associated with the Newco for reasons related to the character of the proposed Key Personnel or clients of such Newco, (d) the proposed Newco fails to meet the Geographic Criteria, or (e) if any of the proposed Key Personnel of a Newco are, or were in the 12 months prior to receipt of the Newco Plan, an employee of or consultant to MPA.  If a Newco Plan is rejected by DASH pursuant to the terms set forth in this Agreement, each of the Principals hereby agrees that such Newco shall not be pursued in any manner at any time following such rejection.

2.3     The Principals shall deliver to the DAS CEO and the DAS President within 10 business days of each Newco's formation a detailed statement of the initial capitalization of each such Newco, including without limitation, a description of the aggregate amount of the Principals' initial capital investments.

2.4     The Principals agree that (a) they shall cause all future Newcos approved by DASH pursuant to Section 2.1 above to enter into a Management Services Agreement with MPA in form and substance mutually acceptable to DASH, MPA and the applicable Principals within fifteen (15) days following the later of (i) approval of the Newco Plan for such Newco and (ii) the formation of such Newco, provided, however, that the Principals shall not be in breach of this provision in the event that DASH's approval of a Management Services Agreement is delayed for reasons outside of the Principals' control, (b) each Newco shall be operated independently within its own legal entity and shall be completely separate from the operations of MPA in all respects unless consented to in writing in advance by the DAS CEO in the applicable Management Services Agreement for such Newco, including, without limitation, with respect to employee benefit plans, which shall be maintained separately from MPA's benefit plans such that no Newco

employee is covered by an MPA benefit plan, (c) unless DASH gives its prior consent otherwise, each Newco shall only provide governmental relations and consultative communications services to its clients, (d) unless DASH gives its prior consent otherwise, which consent shall not be unreasonably withheld, each Newco shall be located in and operated from the geographic region detailed in the applicable Newco Plan; provided, however, that in no event shall any Newco be relocated to a geographic region that does not meet the Geographic Criteria, (e) no Key Personnel of a Newco shall have been an employee of or consultant to MPA at any time in the 12 months prior to the formation of such Newco and (f) the Principals will endeavor to have all employees and independent contractors of each Newco be employed or engaged directly by such Newco and not by MPA; provided, however, if doing so is not reasonably possible, then following receipt of the DAS CEO's prior written consent, such employees or independent contractors may be employed or retained by MPA and may be eligible to receive the employee benefits offered by MPA, and all appropriate costs and charges associated therewith paid by MPA shall be reimbursed by such Newco. In addition, the parties hereto agree that each approved Newco shall be entitled to license the name "Mercury Public Affairs" in connection with the operations of its business pursuant to a license agreement on terms mutually acceptable to DASH, MPA and the applicable Principals.

2.5   In the event a proposed Newco is not rejected by DASH in accordance with Section 2.1 above, and the applicable Principals proceed with the formation and operation of such Newco, (i) the ownership of such Newco by such Principals, as detailed in the applicable Newco Plan, shall be deemed consented to by DASH, and (ii) DASH, MPA and the applicable Principals agree to discuss in good faith appropriate amendments to each such applicable Principal's Employment Agreement and/or Protective Covenant Agreement by and between such Principal and MPA in order to allow such applicable Principal to operate such Newco.

3.   <u>Consideration Due to DASH</u>.

3.1   (a) In consideration for DASH's and MPA's agreement to permit certain key personnel of MPA to perform services to any Newco or any clients of any Newco, the Principals shall cause each Newco to pay to MPA (on behalf of DASH) a management fee equal to 20% of AP (as defined below) <u>times</u> PBT (as defined below) calculated in accordance with this Section 3 (the "**DAS Fee**").

(b)   The term "**AP**" shall mean the applicable MSG Venture LLC's ownership percentage in the applicable Newco. The term "**PBT**" for any relevant period shall mean the consolidated net income (loss) of each Newco and its subsidiaries, if any, before provision for all federal, state and local income taxes for such period, determined in accordance with United States generally accepted accounting principles, consistently applied ("**GAAP**").

(c)   The first DAS Fee payment with respect to any Newco (the "**Initial DAS Fee Payment**") shall not become due and payable until such time as (i) cumulative PBT for all prior periods, beginning on the date of such Newco's formation, minus (ii) the aggregate amount of the Principals' initial capital investment in such Newco, is a positive number as of the end of a calendar year (the "**Initial Positive PBT**"), at which point the Initial DAS Fee Payment calculation of PBT shall be based on the Initial Positive PBT amount. After the Initial DAS Fee

4

Payment, the DAS Fee shall be payable based on each calendar year's PBT without taking into account or giving credit for any prior year's negative PBT calculation. For the sake of clarity, no DAS Fee shall be payable for any calendar year in which PBT is negative.

3.2   On or before March 31 of each calendar year, the Principals shall cause each Newco to deliver to the DAS CEO and the DAS President a report which shall include (i) an unaudited statement of income for the immediately preceding calendar year (or partial calendar year, if the Newco was formed in that year), (ii) the PBT for such period and/or calendar year, and, if the Initial DAS Fee Payment has not yet been made, the cumulative PBT from the formation of the Newco until the end of such period and/or calendar year, and (iii) the calculation of the DAS Fee for such period and/or calendar year (each such report, an "**Annual Report**"). Each Annual Report shall be accompanied by a payment of the DAS Fee, if applicable. If DASH does not agree that the Annual Report correctly states the applicable PBT or DAS Fee calculation for the period under examination, then within 90 days of DASH's receipt of such Annual Report, DASH shall give written notice to the Principals of any exceptions thereto (in reasonable detail describing the nature of the disagreement asserted). If DASH and the Principals reconcile their differences, the Annual Report shall be adjusted accordingly and shall thereupon become binding, final and conclusive upon all of the parties hereto. If such reconciliation involves an increase in the DAS Fee, the applicable Newco shall within 10 days of such reconciliation pay to MPA the additional DAS Fee amount. If the dispute cannot be resolved, such dispute shall be settled by a court of competent jurisdiction pursuant to Section 6.6 of this Agreement. If DASH provides notice to the Principals of its acceptance of an Annual Report, or does not provide notice of any exceptions thereto within 90 days of DASH's receipt of such report, the Annual Report shall thereupon become binding, final and conclusive upon all of the parties hereto. The date on which an Annual Report becomes binding, final and conclusive pursuant to the terms of this Section 3.2 shall be known as the "**Final Annual Report Date**". DASH shall have the right after receipt of any Annual Report to cause the financial statements of such Newco to be audited through auditors of its choosing and at its sole cost. In addition, DASH shall have the right to have its representatives (including but not limited to its accountants and internal auditing staff) examine the books and records of each Newco upon reasonable advance notice and during reasonable business hours, and to copy such portions thereof as such representatives deem necessary or desirable.

4.   Put and Call Rights

4.1   (a) For a period of 90 days following each Final Annual Report Date (the "**Put/Call Period**"), in the event that (i) PBT (as finally determined pursuant to Annual Reports in accordance with Section 3.2 above) of any Newco for each of the two consecutive calendar years immediately preceding such Final Annual Report Date is equal to or greater than $1,000,000, disregarding any DAS Fees paid during such calendar years (the "**PBT Milestone**"), and (ii) the Principals are in material compliance with the terms of this Agreement, then the Principals shall have the right (but not the obligation) (a "**Newco Put Right**") to cause such Newco to sell to DASH or one of its Affiliates all (or substantially all) of the assets of such Newco and certain mutually agreed upon and disclosed liabilities of such Newco (the "**Put/Call Business**"). During a Put/Call Period, in the event that (i) a Newco has achieved the PBT Milestone and (ii) such Newco has been in existence for at least seven years from its date of formation, then DASH shall

5

have the separate right (but not the obligation) (a "**Newco Call Right**") to purchase, either by itself or through one of its Affiliates, and the Principals at such time shall cause such Newco to sell, the Put/Call Business. If, following the achievement of a PBT Milestone, (x) the Principals do not exercise a Newco Put Right and (y) DASH does not exercise a Newco Call Right during the applicable Put/Call Period, such Newco Put Right and Newco Call Right shall terminate, and may not again be exercised with respect to such Newco until the achievement of another PBT Milestone (it being understood that if the PBT of such Newco is equal to or greater than $1,000,000 for the year immediately following a year in which a PBT Milestone was achieved (but for which no Newco Call Right or Newco Put Right was exercised), and the Principals remain in material compliance with the terms of this Agreement, then the PBT Milestone will have again been achieved and the Put/Call Period shall begin again following the Final Annual Report Date with respect to such following year). For the sake of clarity, following such termination of the Newco Put Right and the Newco Call Right, the DAS Fees with respect to such Newco will continue to be due and payable.

(b) The Principals may exercise the Newco Put Right with respect to an applicable Newco upon the delivery of written notice of exercise (a "**Newco Put Notice**") to DASH at any time during the Put/Call Period. The purchase price for the purchase and sale of such Put/Call Business upon the exercise of a Newco Put Right shall be equal to the Formula Amount (as defined in Section 4.2(a) hereof) and shall include (i) a payment as of the closing of such purchase and sale in an amount equal to approximately 33% of the projected Formula Amount as determined by DASH in its sole reasonable discretion (the "**Closing Payment**"), and (ii) an interim payment following a determination, made by DASH in its sole reasonable discretion, of PP PBT (as defined in Section 4.2(c) hereof) for YP + 1 (as defined in Section 4.2(e) hereof), in an amount equal to approximately 67% of the revised projected Formula Amount, less the Closing Payment (the "**Interim Payment**"). Upon receipt of the Newco Put Notice, DASH or one of its Affiliates, at DASH's discretion (the "**Purchasing Entity**") shall be obligated to purchase from the applicable Newco, and the Principals shall be obligated to cause such Newco to sell to the Purchasing Entity, the Put/Call Business at the Formula Amount.

(c) DASH may exercise the Newco Call Right with respect to an applicable Newco upon the delivery of written notice of exercise (a "**Newco Call Notice**") to the Principals at any time during the Put/Call Period. The purchase price for the purchase and sale of such Put/Call Business upon the exercise of a Newco Call Right shall be equal to the Formula Amount and shall include a Closing Payment and an Interim Payment, as described in Section 4.1(b). Upon receipt of the Newco Call Notice, the Principals shall be obligated to cause the applicable Newco to sell to the Purchasing Entity, and the Purchasing Entity shall be obligated to purchase from the applicable Newco, the Put/Call Business at the Formula Amount.

(d) Notwithstanding the foregoing, DASH shall not be required to purchase the Put/Call Business pursuant to this Section 4.1 (whether through a Newco Put Right or a Newco Call Right) if (i) DASH reasonably determines that the Purchasing Entity is legally prohibited from doing so under applicable law, (ii) such purchase will result in DASH's becoming insolvent, or (iii) DASH is not reasonably satisfied with the results of its due diligence investigation of the Put/Call Business; in which case DASH shall provide notice to the Principals to such effect. If DASH determines it is not required to purchase the Put/Call Business pursuant to subsection (iii)

herein, it shall include in such notice a summary of those diligence items that led to such decision, and the Principals shall have 60 days to cure all of the defects summarized in the notice, if curable. Upon the giving of notice pursuant to subsections (i) or (ii) of this Section 4.1(d) above, the Principals shall be permitted at such time to sell the Put/Call Business to a third party, subject to the terms of this Section 4.  For the sake of clarity, in the event that DASH does not purchase the Put/Call Business pursuant to the provisions of this Section 4.1(d), the DAS Fees with respect to such Newco will continue to be due and payable until such time, if any, that such Newco and/or Put/Call Business is sold to a third party in accordance with the terms of this Section 4.

(e)     Any purchase agreement executed by the parties with respect to a Put/Call Business shall contain customary representations, warranties, covenants and indemnities regarding the Put/Call Business, as if such parties were unaffiliated.  The financial results of any Put/Call Business acquired by DASH or its Affiliates will be consolidated (or otherwise combined) with the financial results of MPA for the purpose of the profits interest granted under MPA's limited liability company agreement.

4.2     For purposes of this Agreement:

(a)     "**Formula Amount**" shall mean the product of:

$$AM \times \frac{(PP\ PBT\ for\ YP) + (PP\ PBT\ for\ YP+1) + (PP\ PBT\ for\ YP+2)}{3}$$

(b)     "**AM**" shall mean the applicable multiple used for calculation of the Formula Amount and shall equal 4.5.

(c)     "**PP PBT**" or "**Purchase Price PBT**" shall mean the consolidated net income (loss) of the Put/Call Business before provision for all foreign, federal, state and local income taxes for such period, determined in accordance with GAAP; provided, that in making such determinations (such terms in (i) through (xi) below to be further described, as necessary, in the applicable purchase agreement):

(i)     neither the proceeds from nor any dividends or refunds with respect to, nor any increases in the cash surrender value of, any life insurance policy under which the Purchasing Entity or any Affiliate is the named beneficiary or otherwise entitled to recovery, shall be included as income, and the premium expense or any other expense related to any such life insurance policy shall not be treated as an expense;

(ii)    inter-company management fees charged by the Omnicom Group to the Put/Call Business and the DAS Fee(s), if applicable, shall not be treated as an expense;

(iii)   any indemnity payments made by a purchaser indemnified party to any seller indemnified party shall not be treated as an expense (as such terms shall be further defined in the applicable purchase agreement);

(iv)   any losses of a purchaser indemnified party which give rise to an indemnity payment pursuant to the indemnification provisions of the applicable purchase agreement and

7

which are assumed by the Principals or the Newco or as to which such purchaser indemnified party has been reimbursed (by offset or payment in cash), shall not be treated as an expense, and there shall be excluded from income any amount received by such purchaser indemnified party pursuant thereto;

(v) the fees and expenses of (1) any DASH-appointed accountants used in preparing the determinations used in calculating PP PBT and performing the related audit and (2) any audit performed in connection with the Sarbanes-Oxley Act of 2002, as amended or modified from time to time, or any successor statute, and any rules and regulations promulgated thereunder, in excess of the normal and customary expenses incurred for such services by such Put/Call Business, shall not be treated as an expense;

(vi) the income (loss) of any subsidiary of the Purchasing Entity whose results of operations are required to be consolidated with that of the Put/Call Business under GAAP shall be included only in proportion to the Purchasing Entity's direct or indirect ownership in such subsidiary;

(vii) any extraordinary or unusual gains or losses and/or gains or losses from the sale of any capital assets used by the Put/Call Business in its operations after the closing of the purchase (as opposed to assets acquired in the ordinary course of the business of the Put/Call Business for resale or other disposition) shall be excluded from income;

(viii) any write-off or amortization of goodwill arising out of the purchase of the assets of the Put/Call Business shall not be treated as an expense;

(ix) interest charges (whether generated from loans relating to the payment of management fees, dividend payments, working capital or otherwise), or interest payments, or accruals between a member of the Omnicom Group, on the one hand, and the Put/Call Business, on the other hand, shall be treated as an expense or income; provided, however, interest on loans to the Purchasing Entity to finance the payment of any of the purchase price payments or indemnity payments shall not be treated as an expense;

(x) any expenses of the Purchasing Entity prior to or after the closing incurred in connection with the negotiation, preparation and execution of the purchase agreement and related documents (including, without limitation, the fees and disbursements of the Purchasing Entity's attorneys and accountants and any broker's or finder's fees payable by the Purchasing Entity) shall not be treated as an expense; and

(xi) for any service rendered or provided to the Put/Call Business by a member of the Omnicom Group, the Put/Call Business shall be charged at the rates agreed to by such Omnicom Group member and the representative of the Principals identified in the purchase agreement; provided, however, it is agreed that Omnicom will provide property, casualty and professional insurance coverage to the Put/Call Business under its umbrella policy, and from time to time other services on a group basis which replace or supersede a current service of the Put/Call Business, and in such event the Put/Call Business will be charged for such insurance and other services on the same basis as all other Omnicom Group companies who are covered

by such insurance or receiving such services; and all charges permitted by this clause (xi) shall be treated as an expense.

(d)  "**YP**" shall mean the calendar year in which the sale and purchase of the Put/Call Business is consummated.

(e)  "**YP+1**" shall mean the calendar year immediately following YP.

(f)  "**YP+2**" shall mean the calendar year immediately following YP+1.

4.3  The closing following the exercise of a Newco Put Right or Newco Call Right shall be held at the offices of DASH within 90 days after the delivery of the Newco Put Notice or Newco Call Notice, as applicable, or at such other time and date as the relevant parties shall otherwise mutually agree.  At such closing, the parties shall execute a purchase agreement in form and substance reasonably acceptable to DASH and the Principals reflecting such purchase.  The transfer of the assets that comprise the Put/Call Business pursuant to this Section 4 shall be free and clear of all claims, liens and encumbrances, except as otherwise provided in such purchase agreement.  Following such closing, the DAS Fee enumerated in Section 3.1 will no longer be due or payable with respect to the Put/Call Business.

4.4  (a) In the event that (i) the Principals are in material compliance with the terms of this Agreement and (ii) a Newco has not achieved the PBT Milestone within five years from the date of its formation (the "**Threshold Date**"), and the Principals desire to sell such Newco to a third party, the Principals shall first cause such Newco to offer to sell to DASH or one of its Affiliates (a "**ROFO Offer**"), all (or substantially all) of the assets of such Newco (the "**Offered Business**").  The applicable Newco may exercise the ROFO Offer upon the delivery of written notice of exercise (an "**Offer Notice**") to DASH at any time following the Threshold Date.  The purchase price for the purchase and sale of such Offered Business upon the exercise of a ROFO Option (as defined below) shall be equal to the Formula Amount and shall include a Closing Payment and an Interim Payment, as described in Section 4.1(b).  Upon receipt of the Offer Notice, DASH shall have the option (the "**ROFO Option**"), but not the obligation, to purchase the Offered Business at the Formula Amount.  The ROFO Option shall be exercisable by written notice (the "**ROFO Acceptance Letter**") from DASH to the Principals and the applicable Newco, given within 30 days following receipt by DASH of the Offer Notice (the "**Offer Period**").  Upon the giving of the ROFO Acceptance Letter, DASH or one of its Affiliates shall be obligated to purchase from the applicable Newco, and the Principals shall be obligated to cause such Newco to sell to DASH or one of its Affiliates, the Offered Business at the Formula Amount.  The parties hereto acknowledge and agree that if DASH has received an Offer Notice and it has not exercised the ROFO Option within the Offer Period, the Principals shall be entitled (subject to the remainder of this Section 4.4) for a period of six months from the expiration of the Offer Period (or, if DASH provides notice to the Principals prior to the expiration of the Offer Period that it does not intend to exercise the ROFO Option, six months from the Principals' receipt of such notice) to sell such Newco to one or more third parties.  If no sale is made, or no definitive purchase agreement regarding such sale is executed, within such six month period, the sale of such Newco will again become subject to compliance with this Section 4.4(a).  If, following the

Threshold Date, a Newco achieves the PBT Milestone, then this Section 4.4(a) shall no longer apply to such Newco.

(b)     The closing following the exercise of the ROFO Option shall be held at the offices of DASH within 90 days after the delivery of the ROFO Acceptance Letter, or at such other time and date as the relevant parties shall otherwise mutually agree.  At such closing, the parties shall execute a purchase agreement in form and substance reasonably acceptable to DASH and the Principals reflecting such purchase.  The transfer of the assets that comprise the Offered Business shall be free and clear of all claims, liens and encumbrances.  Following such closing, the DAS Fee enumerated in Section 3.1 will no longer be due or payable with respect to the Offered Business.

(c)     The Principals shall not be permitted to sell any Newco, or all or substantially all of a Newco's assets, to any party outside of the Omnicom Group, unless (i) consented to in writing in advance by the DAS CEO, (ii) as set forth in Section 4.4(a) or (iii) as set forth in Section 4.1(d) (each, a "**Permitted Third Party Sale**").

(d)     In no event shall a Permitted Third Party Sale be made to an Omnicom Competitor without DASH's prior written consent, which consent shall be given in DASH's sole discretion but the timing of which shall not be unreasonably delayed.  An "**Omnicom Competitor**" shall mean any of WPP plc, Publicis Groupe S.A., The Interpublic Group of Companies, Dentsu Inc., MDC Partners Inc., Cheil Worldwide Inc., Hakuhodo Inc. or Havas S.A., or any of their subsidiaries or Affiliates.

(e)     Upon consummation of a Permitted Third Party Sale, such sold Newco's license of the name "Mercury Public Affairs" (as described in Section 2.4) or any other intellectual property of MPA, and any related license agreements entered into in connection therewith, shall be immediately terminated and of no further force and effect.

(f)     Upon consummation of a Permitted Third Party Sale, the DAS Fee enumerated in Section 3.1 will no longer be due or payable with respect to such Newco.

(g)     Following consummation of a Permitted Third Party Sale, MPA shall not, and shall not permit any of its employees to, render any services to such sold Newco (or any successors or assigns to any portion of such sold Newco's business) or the purchasers thereof.

(h)     Neither the Principals nor any other employee of MPA, nor any entities owned or controlled by any of such individuals, shall retain any ownership, or rights of future ownership, in a Newco (or any successors or assigns to any portion of such sold Newco's business) following a Permitted Third Party Sale of such Newco, provided, however, that nothing herein shall prohibit the Principals from retaining the right to receive purchase price payments, including earn-out payments, in connection with a Permitted Third Party Sale.

5.     Indemnification.  Each of the Principals hereby agrees to indemnify and hold harmless, and to cause each Newco to indemnify and hold harmless, DASH and its Affiliates (the "**Indemnified Parties**"), from and against, and to pay and reimburse the Indemnified Parties, for

any and all liabilities, claims, causes of action, damages, demands, losses, costs or expenses, including reasonable legal and accounting fees, incurred by the Indemnified Parties by reason of, arising out of, or resulting from (i) any action or failure to act, including the negligence or willful misconduct, of any Principal or any Newco relating to the operations of any Newco and (ii) any liability or obligation incurred by a Principal or any Newco which relates to the operations of any Newco; provided, however, it is understood that DASH and its Affiliates shall not be entitled to be indemnified for claims by any Person relating to or in connection with the provision of the (x) Outside Services (as defined in the Management Services Agreements) by MPA to the clients of Newco or (y) Administrative Services (as defined in the Management Services Agreements) by MPA to Newco.

6. Miscellaneous.

6.1 This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be modified, amended or terminated, except in writing signed by each party hereto. Any prior agreements (including, without limitation, that certain Agreement dated as of January 1, 2010 and the Original SSA), promises, negotiations or representations not expressly set forth in this Agreement are of no force and effect. Except as may otherwise be provided herein, the terms and provisions of this Agreement shall not be deemed to modify or amend the terms of any other agreements to which any of the parties hereto are signatories, and the terms and provisions of any other agreements to which the parties hereto are signatories shall not be deemed to modify or amend the terms of this Agreement.

6.2 No waiver of any breach or default hereunder shall be considered valid unless in writing and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

6.3 If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein.

6.4 Except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of DASH, its successors and assigns, and the Principals, their respective heirs, executors, administrators and personal representatives. This Agreement may not be transferred, assigned, pledged or hypothecated by any party hereto. Any purported such transfer, assignment, pledge, or hypothecation shall be void and ineffective. Notwithstanding the foregoing, DASH may assign this Agreement to any of its Affiliates without the consent of any other party hereto.

6.5 "**Person**" shall mean and include an individual, a company, a joint venture, a corporation (including any non-profit corporation), an estate, an association, a trust, a general or limited partnership, a limited liability company, a limited liability partnership, an unincorporated organization and a government or other department or agency thereof. An "**Affiliate**" of any

Person shall mean any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

   6.6  This Agreement, and all issues or matters related to this Agreement, shall be governed by, enforced under, and construed in accordance with the laws of the State of New York without regard to any conflicts or conflicts of law principles in the State of New York that would result in the application of the law of any other jurisdiction.  Each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any court of the State of New York located in New York County in any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby, and agrees that any such action, suit or proceeding shall be brought only in such court.  Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

   6.7  Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to any other party shall be in writing and shall be deemed to have been given (a) upon personal delivery, if delivered by hand or courier, (b) three days after the date of deposit in the mails, postage prepaid, or (c) the next business day if sent by a prepaid overnight courier service, and in each case at the respective addresses set forth below or such other address as such party may have fixed by notice:

 If to DASH, addressed to:

  c/o Omnicom Group Inc.
  437 Madison Avenue
  New York, New York 10022
  Attention:  General Counsel

  <u>with a copy to (which shall not constitute notice)</u>:

  Davis & Gilbert LLP
  1740 Broadway
  New York, New York 10019
  Attention:  Brad J. Schwartzberg, Esq.

If to the Principals, addressed to:

c/o Mercury Public Affairs LLC
509 Guisando de Avila
Suite 100
Tampa, FL 33613
Attention: Kieran Mahoney

with a copy to (which shall not constitute notice):

Moses & Singer LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Attention: Jeffrey M. Davis, Esq.

Any party may change the address to which notices are to be sent by giving notice of such change of address to the other parties in the manner herein provided for giving notice.

6.8 This Agreement may be signed in two or more counterparts, all of which taken together constitute one instrument. Counterparts delivered by facsimile, PDF or other electronic format shall be deemed originals.

*Signature Page Follows*

13

1781176.22 22728-0005-003

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Shared Services Agreement as of the day and year first above written.

**DAS HOLDINGS INC.**

By: _____
Name: Craig Gosi
Title: Secretary

**THE PRINCIPALS:**

_____
**Kieran Mahoney**

_____
**Kirill Goncharenko**

_____
**Michael McKeon**

_____
**Thomas Doherty**

_____
**Fabian Nunez**

_____
**Mike DuHaime**

_____
**Vin Weber**

_____
**Stefan Friedman**

_____
**Morris Reid**

_____
**Ashley Walker**

_____
**Michael Soliman**

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Shared Services Agreement as of the day and year first above written.

**DAS HOLDINGS INC.**

By: _____
     Name:
     Title:

**THE PRINCIPALS:**

_____
**Kieran Mahoney** *(signed)*

_____
**Kirill Goncharenko**

_____
**Michael McKeon**

_____
**Thomas Doherty**

_____
**Fabian Nunez**

_____
**Mike DuHaime**

_____
**Vin Weber**

_____
**Stefan Friedman**

_____
**Morris Reid**

_____
**Ashley Walker**

_____
**Michael Soliman**

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Shared Services Agreement as of the day and year first above written.

**DAS HOLDINGS INC.**

By: _____
   Name:
   Title:

**THE PRINCIPALS:**

_____
**Kieran Mahoney**

*/s/ Kirill Goncharenko*
**Kirill Goncharenko**

*/s/ Michael McKeon*
**Michael McKeon**

*/s/ Thomas Doherty*
**Thomas Doherty**

*/s/ Fabian Nunez*
**Fabian Nunez**

*/s/ Mike DuHaime*
**Mike DuHaime**

_____
**Vin Weber**

*/s/ Stefan Friedman*
**Stefan Friedman**

*/s/ Morris Reid*
**Morris Reid**

*/s/ Ashley Walker*
**Ashley Walker**

*/s/ Michael Soliman*
**Michael Soliman**

*Signature Page – Amended and Restated Shared Services Agreement*

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended and Restated Shared Services Agreement as of the day and year first above written.

**DAS HOLDINGS INC.**

By: _____
      Name:
      Title:

**THE PRINCIPALS:**

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Michael McKeon

_____
Thomas Doherty

_____
Fabian Nunez

___*[signed]*_____
Mike DuHaime

___*[signed]*_____
Vin Weber

_____
Stefan Friedman

_____
Morris Reid

_____
Ashley Walker

_____
Michael Soliman

*Signature Page – Amended and Restated Shared Services Agreement*

Acknowledged and Agreed:

**MERCURY PUBLIC AFFAIRS LLC**

By: _____*/s/ J. Craig Sangi*_____
Name: Craig Gang
Title: Secretary

**Annex I**

1. Newco Digital
2. High Stakes 11 LLC (Newco International)
3. High Stakes 12 LLC (Newco Mexico)
4. High Stakes 14 LLC (Newco Tennessee)
5. High Stakes 15 LLC (Newco San Francisco)
6. High Stakes 16 LLC (Newco Ohio)
7. High Stakes 19 LLC (Newco Louisiana)
8. Knight Devils LLC (Newco Pennsylvania)