# EXHIBIT E

## EMPLOYMENT AGREEMENT

**AGREEMENT** made as of this 31st day of December, 2013, by and between **MERCURY PUBLIC AFFAIRS LLC**, a Delaware limited liability company (the "**Company**"), and **FABIAN NUNEZ** (the "**Executive**").

### W I T N E S S E T H:

**WHEREAS**, entering into this Agreement is a condition of closing under a certain Asset Purchase Agreement of even date herewith (the "**Purchase Agreement**") pursuant to which the Company acquired substantially all of the assets, subject to certain of the disclosed liabilities and the ongoing business of Nunez LLC, a Delaware limited liability company ("**Nunez**");

**WHEREAS**, the Company wishes to ensure the Executive's employment with the Company from and after the closing under the Purchase Agreement, and the Executive wishes to accept such employment, upon the terms and conditions hereinafter set forth; and

**NOW, THEREFORE**, in consideration of the promises and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. **Employment**

    The Company agrees to employ the Executive during the Term specified in paragraph 2, and the Executive agrees to accept such employment, upon the terms and conditions hereinafter set forth.

2. **Term**

    Subject to the provisions contained in paragraphs 6 and 7, the Executive's employment pursuant to this Agreement by the Company shall be for a term commencing on the date hereof and expiring on the close of business on December 31, 2016 (the "**Initial Term**"); provided, however, the term of the Executive's employment by the Company shall continue for an indefinite period thereafter unless and until either party shall give to the other 90 days advance written notice of expiration of the term (a "**Notice of Termination**") (the Initial Term and the period, if any, thereafter, during which the Executive's employment shall continue are collectively referred to as the "**Term**").  A termination of employment by the giving of a Notice of Termination under this paragraph 2 shall not be deemed to be a termination without Cause under paragraph 6(c) hereof. Any Notice of Termination given under this paragraph 2 shall specify the date of expiration (which may not be earlier than the close of business on December 31, 2016) and may be given at any time on or after September 30, 2016.  The Company shall have the right at any time during such 90 day notice period, to relieve the Executive of his offices, duties and responsibilities and to place him on a paid leave-of-absence status, provided that during such notice period the Executive shall remain a full-time employee of the Company

and shall continue to receive his then current salary compensation and other benefits as provided in this Agreement. The date on which the Executive ceases to be employed by the Company, regardless of the reason therefore is referred to in this Agreement as the "**Termination Date**".

### 3.    **Duties and Responsibilities**

(a)    Title. During the Term, the Executive shall have the position of Partner of the Company. The Executive shall report to the Chief Executive Officer of the Company, currently Kieran Mahoney (the "**Designated Officer**"), at such times and in such detail as the Designated Officer shall reasonably require.

(b)    Duties. The Executive shall perform such executive and managerial duties and responsibilities that are customary to his office and are reasonably necessary to the operations of the Company and as may be reasonably assigned to him from time to time by or under the authority of the Board of Managers of the Company (the "**Board**") and/or the Designated Officer, consistent with his position as designated in paragraph 3(a).

(c)    Responsibilities. The Executive (i) will use his best efforts to cause the Company to comply on a timely basis with all budgetary and reporting requirements reasonably requested by the Designated Officer, the Board, and/or the management of Omnicom Group Inc. ("**Omnicom**"), and the Diversified Agency Services Division of Omnicom ("**DAS**"), (ii) will, at all times, perform his duties and responsibilities in a manner consistent with the policies set forth in the "Grant of Authority" of Omnicom, as from time to time in effect (the "**Grant of Authority**") and the Omnicom Code of Conduct, as from time to time in effect (the "**Omnicom Code of Conduct**"), and the parameters of the then-current approved profit plan and capital expenditure budget of the Company, (iii) except as permitted by the Grant of Authority or authorized by the Designated Officer or the Board, will not incur obligations on behalf of the Company other than in the ordinary course of business or enter into any transaction on behalf of the Company not in the ordinary course of business, (iv) will operate the business of the Company and its subsidiaries to participate in Omnicom Capital Inc.'s cash management system (or any successor system) and Omnicom's Sarbanes Oxley compliance program and, at Omnicom's direction, in Omnicom's other corporate programs as from time to time in effect, which programs shall include without limitation, the Fidelity 401(k) Plan, the ADP payroll system, Omnicom's health and welfare and HRIS systems, Microsoft Business Solutions and Hyperion and Microsoft software purchasing programs, and (v) will not take any action to prevent the Company from abiding by the dividend, management fee and other corporate policies of DAS and Omnicom, as from time to time in effect.

(d)    Scope of Employment. The Executive's employment by the Company shall be full-time and exclusive, and during the Term, the Executive agrees that he will (i) devote all of his business time and attention, his best efforts, and all of his skill and ability to promote the interests of the Company; (ii) carry out his duties in a competent manner and serve the Company faithfully and diligently under the direction of the Board and the Designated Officer; and (iii) work with other employees of the Company, DAS and Omnicom in a professional manner. Notwithstanding the foregoing, the Executive shall be permitted to engage in charitable and civic activities and manage his personal passive investments, provided that such service or

passive investments are not in a company which transacts business with the Company or engages in business competitive with that conducted by the Company (or, if such company does transact business with the Company, or does engage in a competitive business, it is a publicly held corporation and the Executive's participation is limited to owning less than 1/4 of 1% of its outstanding shares), and further provided that such activities (individually or collectively) do not materially interfere with the performance of his duties or responsibilities under this Agreement. Without limiting the generality of the immediately preceding sentence of this paragraph 3(d), and notwithstanding anything to the contrary in this Agreement, it is agreed that the Executive may (A) participate in certain speaking engagements sponsored by or in connection with (x) Univision and (y) any other Person so long as the Executive does not receive in excess of $100 per such speaking engagement set forth in this clause (y) and (B) render certain services on behalf of (and only on behalf of) one particular telecommunications company currently based in the United States, currently listed on the New York Stock Exchange and currently a client of the Executive (the **"Excluded Client"**) from the date hereof through December 31, 2015 (collectively, the **"Permitted Service"**); provided, however, the activities of the Executive in connection with the Permitted Service may not interfere with the Executive's duties and responsibilities as set forth in this paragraph 3; and provided further, however, that such Permitted Service (i) does not otherwise violate the provisions of this Agreement, (ii) other than with respect to the Excluded Client, does not involve the provision of any services related to the Restricted Business (as defined in paragraph 8 hereof), (iii) involves minimal time and effort on the part of the Executive and minimal use of the Company's resources, (iv) does not relate to any of the Company's clients, (v) does not disclose any information, strategies or other confidential information of the Company or its clients, and (vi) does not use any Company or Omnicom related names or references.

      (e)    <u>Office Location</u>.  During the Term, the Executive's services hereunder shall be performed at the primary offices of the Company, currently in Sacramento, California, subject to necessary travel requirements of his position and duties hereunder.

**4.**    **<u>Compensation</u>**

      As compensation for his services hereunder, during the Term, the Company shall pay the Executive in accordance with its normal payroll practices, an annualized base salary of $500,000; provided, however, that the then annual rate of direct salary compensation may be increased by or under the authority of the Designated Officer in accordance with the then salary review policy of DAS, at such time and within the guidelines and budgetary procedures of DAS.

**5.**    **<u>Expenses; Fringe Benefits</u>**

      (a)    <u>Expenses</u>.  The Company agrees to pay or to reimburse the Executive for all reasonable, ordinary, necessary and documented business or entertainment expenses incurred during the Term in the performance of his services hereunder in accordance with the policy of the Company as from time to time in effect.  The Executive, as a condition precedent to obtaining such payment or reimbursement, shall provide to the Company any and all statements, bills or receipts evidencing the travel or out-of-pocket expenses for which the Executive seeks

payment or reimbursement, and any other information or materials, as the Company may from time to time reasonably require.

(b)     Benefit Plans.  During the Term, the Executive and, to the extent eligible, his dependents, shall be eligible to participate in and receive all benefits under any welfare benefit plans and programs (including without limitation, medical, disability, group life and business travel insurance plans and programs) provided by the Company to its senior executives and, without duplication, its employees generally, subject, however, to the generally applicable eligibility and other provisions of the various plans and programs in effect from time to time. The Executive understands and agrees that nothing contained herein shall prevent the Company from modifying or discontinuing any benefit plan or program in which the Executive may participate during the Term.

(c)     Retirement Plans.  During the Term, the Executive shall be entitled to participate in all retirement plans and programs (including without limitation any profit sharing/401(k) plan) provided by the Company to its senior executives and, without duplication, its employees generally, subject, however, to the generally applicable eligibility and other provisions of the various plans and programs in effect from time to time.  In addition, during the Term, the Executive shall be entitled to receive fringe benefits and perquisites in accordance with the plans, practices, programs and policies of the Company from time to time in effect which are made available to the senior executives of the Company generally and, without duplication, to its employees generally.

(d)     Vacation.  The Executive shall be entitled to 4 weeks of vacation in accordance with the Company's policy, to be taken at such times as shall not, in the reasonable judgment of the Designated Officer, materially interfere with the Executive's fulfillment of his duties hereunder, and shall be entitled to as many holidays, sick days and personal days as are in accordance with the Company's policy then in effect generally for its employees.

6.     **Termination**

(a)     Termination for Cause.  The Company, by or under the direction of the Board or the Designated Officer, shall be entitled to terminate the Term at the time and to discharge the Executive for Cause effective upon the giving of written notice.  The term **"Cause"** shall be limited to the following grounds:

(i)     the Executive's failure or refusal (x) to materially perform his duties and responsibilities as set forth in paragraph 3 hereof, (y) to abide by the reasonable directives of the Board and/or the Designated Officer, or (z) to devote all of his business time and attention exclusively to the business and affairs of the Company in accordance with the terms hereof, in each case if such failure or refusal is not cured (if curable) within 20 days after written notice thereof to the Executive by the Company;

(ii)     the willful misappropriation of the funds or property of the Company;

(iii)    the use of alcohol or illegal drugs, materially interfering with the performance of the Executive's obligations under this Agreement, continuing after written warning;

(iv)    the indictment, arrest or conviction in a court of law for, or the entering of a plea of guilty to, no contest to or nolo contendere to, a felony or any crime involving moral turpitude, bribery, fraud, dishonesty, embezzlement, theft, or engaging in any act which is a violation of any law or regulation protecting the rights of employees;

(v)    the material nonconformance with the significant standard business practices and policies of the Company, DAS and Omnicom, including without limitation, policies against bribery, racial or sexual discrimination or harassment, the Grant of Authority and the Omnicom Code of Conduct;

(vi)    the commission in bad faith by the Executive of any act which materially injures or could reasonably be expected to materially injure the reputation, business or business relationships of the Company or any Affiliate (as defined in paragraph 21);

(vii)    the gross or habitual misconduct or gross or habitual negligence by the Executive in the performance of his duties; and

(viii)    any breach (not covered by any of the clauses (i) through (vii) above) of any material provision of this Agreement, if such breach is not cured (if curable) within 20 days after written notice thereof to the Executive by the Company.

Any notice required to be given by the Company pursuant to clause (i) or (viii) above shall specify the nature of the claimed breach and the manner in which the Company requires such breach to be cured (if curable).  If the Executive is terminated for Cause and a court of competent jurisdiction determines that "Cause" as defined herein was not present, then such termination for Cause shall be deemed a termination without Cause pursuant to paragraph 6(c) and the Executive's rights and remedies will be governed by paragraph 7(b), in full satisfaction and in lieu of any and all other or further remedies the Executive may have.

(b)    Termination for Good Reason.  Provided that the Executive is not then otherwise in breach of this Agreement, the Executive shall be entitled to terminate this Agreement and the Term hereunder for "Good Reason" at any time during the Term by written notice to the Company not more than 30 days after the occurrence of the event constituting such Good Reason or the expiration of any notice period to cure such event (if curable), whichever is later.  **"Good Reason"** shall be limited to (i) a material reduction of the Executive's duties and responsibilities or the assignment of duties which are materially inconsistent with his position as set forth in paragraph 3 above, which action is not reversed by the Company within 20 days after written notice thereof to the Company by the Executive that the Executive's employment shall

terminate for "Good Reason" unless such breach is cured (if curable) within 20 days after such written notice; (ii) the material reduction of the Executive's title, which action is not reversed by the Company within 20 days after written notice thereof to the Company by the Executive that the Executive's employment shall terminate for "Good Reason" unless such breach is cured (if curable) within 20 days after such written notice; and (iii) a breach by the Company of a material provision of this Agreement, which breach remains uncured (if curable) for a period of 20 days after written notice of such breach from the Executive to the Company (such notice to specify the nature of the claimed breach and the manner in which the Executive requires such breach to be cured).  In the event that the Executive terminates his employment for Good Reason and a court of competent jurisdiction determines that Good Reason as defined herein was not present, then such termination for Good Reason shall be deemed a termination for Cause and the Executive's rights and remedies will be governed by paragraph 7(a), in full satisfaction and in lieu of any and all other or further remedies the Executive may have.

(c)     <u>Termination without Cause</u>.  The Company, by direction of the Board or the Designated Officer, shall have the right at any time during the Term to terminate the employment of the Executive without Cause by giving written notice to the Executive setting forth a Termination Date.

(d)     <u>Termination for Death or Disability</u>.  In the event of the Executive's death, the Termination Date shall be the date of the Executive's death.  If the Executive shall be unable to perform his duties hereunder by virtue of illness or physical or mental incapacity or Disability (from any cause or causes whatsoever) in substantially the manner and to the extent required hereunder prior to the commencement of such Disability (all such causes being herein referred to as **"Disability"**) and the Executive shall fail to perform such duties for periods aggregating 180 days, whether or not continuous, in any continuous period of 270 days, the Company shall have the right to terminate the Executive's employment hereunder as at the end of any calendar month during the continuance of such Disability upon at least 30 days' prior written notice to him.

7.     <u>**Effect of Termination of Employment**</u>.

(a)     <u>Termination of the Executive's employment by the Company for Cause; by the Executive without Good Reason; by reason of Death or Disability; or pursuant to a Notice of Termination</u>.  In the event of the termination of the employment of the Executive (1) by the Company for Cause, (2) by the Executive without Good Reason, (3) by reason of death or Disability, or (4) by the giving of a Notice of Termination under paragraph 2 hereof (whether by the Company or the Executive), the Executive (or in the case of his death or Disability, his estate or personal representative) shall be entitled to the following payments and benefits, subject to any appropriate offsets, as permitted by applicable law, for debts or money due to the Company or a Company Affiliate (collectively, **"Offsets"**):

(i)     unpaid salary through, and any unpaid reimbursable expenses outstanding as of, the Termination Date; and

(ii)     all benefits, if any, that had accrued to the Executive through the Termination Date under the plans and programs described in paragraphs 5(b) and

(c) above, or any other applicable plans and programs in which he participated as an employee of the Company, in the manner and in accordance with the terms of such plans and programs; it being understood that any and all rights that the Executive may have to severance payments by the Company shall be determined and solely based on the terms and conditions of this Agreement and not based on the Company's severance policy then in effect.

In the event of the termination of the employment of the Executive (1) by the Company for Cause, (2) by the Executive without Good Reason, (3) by reason of death or Disability, or (4) pursuant to a Notice of Termination, except as provided in this paragraph 7(a), any obligations under the Purchase Agreement and such rights granted by the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), the Company shall have no further liability to the Executive or the Executive's heirs, beneficiaries or estate for damages, compensation, benefits, severance, indemnities or other amounts of whatever nature, directly or indirectly, arising out of or otherwise related to this Agreement and the Executive's employment or cessation of employment with the Company.

(b)     Termination by the Company without Cause or by the Executive for Good Reason. In the event of (i) a termination by the Company without Cause, or (ii) a termination by the Executive for Good Reason, the Executive shall be entitled to the following payments and benefits, subject to any Offsets:

(i)     as liquidated damages, his applicable salary compensation when otherwise payable through the following period: (x) December 31, 2016 if the Termination Date occurs on or prior to September 30, 2016; or (y) 90 days from the Termination Date, if the Termination Date occurs after September 30, 2016;

(ii)     any unpaid reimbursable expenses outstanding as of the Termination Date;

(iii)     all benefits, if any, that had accrued to the Executive through the Termination Date under the plans and programs described in paragraphs 5(b) and (c) above, or any other applicable benefit plans and programs in which he participated as an employee of the Company, in the manner and in accordance with the terms of such plans and programs; it being understood that any and all rights that the Executive may have to severance payments by the Company shall be determined and solely based on the terms and conditions of this Agreement and not based on the Company's severance policy then in effect; and

(iv)     provided that the Executive timely elects COBRA coverage, the Company shall reimburse the Executive for the employer-share of such COBRA coverage, so that the Executive will pay the same amount as if the Executive had remained employed by the Company, until the earlier of (x) the end of the period in which the Executive receives payments under clause (i) of this paragraph 7(b) or (y) 18 months. Thereafter, the Executive may continue COBRA for the remaining period applicable by law at his sole expense. Notwithstanding the

foregoing, if the Executive is eligible to receive health coverage from a subsequent employer, the Company's obligations as described herein shall cease.

In connection with a termination by the Company without Cause or termination by the Executive for Good Reason, except as provided in this paragraph 7(b) and the Purchase Agreement and the rights granted by COBRA, the Company shall have no further liability to the Executive or the Executive's heirs, beneficiaries or estate for damages, compensation, benefits, severance, indemnities or other amounts of whatever nature, directly or indirectly, arising out of or otherwise related to this Agreement and the Executive's employment or cessation of employment with the Company.  From time to time, during the period the Executive is entitled to receive health benefits under clause (iv) above, the Executive shall advise the Company when and if he is entitled to receive health coverage under the benefit plans of any employer other than the Company.  In the event the Executive fails to supply such information, the obligations of the Company under clause (iv) of this paragraph 7(b) shall terminate.  The making of any severance payments and providing the other benefits as provided in this paragraph 7(b) is conditioned upon the Executive signing and not revoking a separation agreement (the **"Separation Agreement"**), substantially in the form and to the effect of **Exhibit A** attached hereto, prepared by the Company which includes a general release of the Company and all Company Affiliates and its and their respective successors and assigns, officers, directors, managers, employees, agents, attorneys and representatives, of any claims (including claims of discrimination) relating to the Executive's employment with the Company or the termination thereof, including, without limitation, Section 1542 of the Civil Code of California with respect to the Company.  If the Executive breaches any provisions of the Separation Agreement or the provisions of paragraph 8 of this Agreement, in addition to any other remedies at law or in equity available to it, the Company may cease making any further payments and providing the other benefits provided for in this paragraph 7(b), without affecting its rights under this Agreement or the Separation Agreement.

8.   **Protective Covenants**

(a)   <u>Definitions</u>.  As used in this paragraph 8, the following terms shall have the meanings set forth below:

(i)   **"Company"** means the Company and its predecessors and each of their respective subsidiaries, if any, and each Affiliate of the Company operating within the Mercury Public Affairs group of companies.

(ii)   **"Client"** means any Person (as defined below) to whom, at any time during the period that the Executive was in the employ of the Company, the Company (x) rendered services or (y) made a Pitch.

(iii)   **"Person"** means and includes an individual, a company, a joint venture, a corporation (including any non-profit corporation), an estate, an association, a trust, a general or limited partnership, a limited liability company, a limited liability partnership, an unincorporated organization and a government or other department or agency thereof.

(iv)    **"Pitch"** means a new business presentation or similar offering of services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch.

(v)    **"Restricted Client"** means (x) anyone who was a Client of the Company on the Termination Date or at any time during the one-year period immediately preceding the Termination Date, and (y) any prospective Client to whom the Company made a Pitch at any time during the one-year period prior to, or the six month period immediately following, the Termination Date, *but with respect to any Pitch made after the Termination Date, only if* the Executive participated in or had a supervisory responsibility or other involvement in the discussions with the prospective Client preceding the Pitch and/or participated in the preparation of the Pitch and/or the actual Pitch. In addition, if the Restricted Client is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a **"Client Group"**), the term "Restricted Client" as used herein shall include each entity, division and operating unit of the Client Group where the same management group of the Client Group has the decision making authority or significant influence with respect to contracting for services of the type rendered by the Company.

(vi)    **"Restricted Business"** means the business of rendering government relations, public affairs, state lobbying and strategic communications services.

(vii)    **"Restricted Territory"** means the United States and any other geographic area throughout the world in which the Company conducts the Restricted Business and/or services the Clients.

(viii)    **"Restricted Period"** means the period during the Term and ending on the later of (A) December 31, 2018 and (B) two years after the Termination Date.

(b)    Restrictions on Certain Activities.  The Executive acknowledges (i) that his entering into this Agreement is incident to the purchase of substantially all of the assets, subject to certain disclosed liabilities, and the ongoing business of Nunez, including but not limited to 100% of its goodwill by the Company pursuant to the Purchase Agreement, and therefore is an integral part of the transactions contemplated by the Purchase Agreement; (ii) that the business and the industry in which Nunez competed and the Company competes is highly competitive; (iii) that his responsibilities and duties required and continue to require his involvement in all aspects of the business of Nunez and the Company, he has participated in and will continue to participate in the servicing of Clients and/or the solicitation of prospective clients, through which, among other things, the Executive has obtained and will continue to obtain knowledge of the "know-how" and business practices of the Company and Nunez, in which matters the Company has a substantial proprietary interest; (iv) that his employment

hereunder requires the performance of services which are special, unique, extraordinary and intellectual in character, and his senior position placed him and will continue to place him in a position of confidence and trust with the Clients and employees of the Company; (v) that as a key executive he has participated in and will continue to participate in the solicitation and hiring of executives and other employees of the Company and that his senior position has put him, and will put him in a position of becoming very familiar with the talents, needs, capabilities and characteristics of such employees and executives; and (vi) that his rendering of services to the Clients and his supervisory responsibilities involving employees of the Company and Nunez necessarily required and will continue to require the disclosure to the Executive of Confidential Information (as defined in paragraph 8(c) hereof) of the Company. In the course of the Executive's employment, the Executive had, has and will continue to develop a personal relationship with the Clients of the Company and a knowledge of those Clients' affairs and requirements, and the relationship of Nunez and the Company with its established clientele will therefore be placed in the Executive's hands in confidence and trust. The Executive consequently acknowledges that it is a legitimate interest of the Company, and reasonable and necessary for the protection of the Confidential Information, goodwill and business of the Company, which is valuable to the Company, that the Executive make the covenants contained herein and that the Company would not have entered into this Agreement and the Company would not have entered into the Purchase Agreement unless the covenants set forth in this paragraph 8 were contained in this Agreement. Accordingly, the Executive agrees that he will not, as an individual, employee, consultant, independent contractor, partner, shareholder, member or in association with any other Person, except on behalf of the Company, directly or indirectly, and regardless of the Executive continuing to be employed by the Company, or the reason for the Executive ceasing to be so employed by the Company:

> (i)  during the Term, solicit business on behalf of, render any services to, engage in, guaranty any obligations of, extend credit to, or have any ownership interest or other affiliation in, any business or other endeavor, which is engaged in the Restricted Business in the Restricted Territory; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the Executive from (x) owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business and (y) servicing the Excluded Client in accordance with the terms and conditions set forth in paragraph 3(d) hereof;

> (ii)  during the Restricted Period, in the Restricted Territory, solicit, render services to or for, or accept from, anyone who is a Restricted Client, any Restricted Business of the type performed by the Company, or persuade or attempt in any manner to persuade any Restricted Client to cease to do any business of the type performed by the Company, or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with the Company, whether or not the relationship between the Company and such Restricted Client was originally established in whole or in part through the Executive's efforts;

(iii)     during the Restricted Period, be employed in the Restricted Territory by a Restricted Client to solicit or render services of the type performed by the Company;

(iv)     during the Restricted Period, solicit for employment as an employee or retain as a consultant, any individual who is then or at any time during the one-year period prior to the Termination Date was, an employee of or exclusive consultant to, the Company or, persuade or attempt to persuade any such employee of or exclusive consultant to the Company to leave the employ of the Company, or to become employed as an employee or retained as a consultant by any other Person; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of the Company shall not be deemed to be a breach of this provision; and

(v)     during the Term and thereafter, use or authorize the use of the name "Nunez" (other than in any manner unrelated to and dissimilar with the Restricted Business), "Mercury Public Affairs", or any other brand or name associated with DAS and/or Omnicom, or any variation thereof, as the whole or part of any trade name or style for any Person *other than* the Company or an Affiliate of the Company.

(c)     Confidential Information.  The Executive has acquired and will continue to acquire and have access to confidential or proprietary information about Nunez, the Company and their respective Clients, including but not limited to, trade secrets, methods, models, marketing campaigns, financial information and records, computer software programs, passwords, access to computer files, budgets, concepts, strategies, Client contacts, creative policies and ideas, and information about or received from Clients and other companies with which the Company does business.   The foregoing shall be collectively referred to as **"Confidential Information"**.  The Executive is aware that the Confidential Information is not readily available to the public and accordingly, the Executive also agrees that he will not at any time (whether during the Term or after termination of this Agreement), disclose to anyone (other than his counsel in the course of a dispute arising from the alleged disclosure of Confidential Information or as required by law) any Confidential Information, or utilize such Confidential Information for his own benefit, or for the benefit of third parties or in such a manner as would cause the Company to be in violation of any contract with any current or former Client or in violation of any law of any state of the United States or any foreign jurisdiction where the Company does business.   The Executive agrees that the foregoing restrictions shall apply whether or not any such information is marked "confidential" and regardless of the form of the information.  The term "Confidential Information" does not include information which (i) is or becomes generally available to the public other than by breach of this provision; (ii) the Executive learns from a third party who is not under an obligation of confidence to Nunez, the Company or a Client of the Company or (iii) is required to be disclosed pursuant to any applicable law or court order.   If the Executive becomes legally required to disclose any Confidential Information, he will provide the Company with prompt notice thereof so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with

the provisions of this paragraph 8(c) to permit a particular disclosure. If such protective order or other remedy is not obtained, or the Company waives compliance with the provisions of this paragraph 8(c) to permit a particular disclosure, the Executive will furnish only that portion of the Confidential Information which he is legally required to disclose and, at the Company's expense, will cooperate with the efforts of the Company to obtain a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information. The Executive further agrees that all memoranda, disks, files, notes, records or other documents, whether in electronic form or hard copy (collectively, the "**Material**") compiled by him or made available to him during his employment with Nunez and/or the Company (whether or not the Material constitutes or contains Confidential Information), and in connection with the performance of his duties hereunder, shall be the property of the Company and shall be delivered to the Company on the termination of the Executive's employment with the Company or at any other time upon request. Except in connection with the Executive's employment with the Company, the Executive agrees that he will not make or retain copies or excerpts of the Material.

(d)     <u>Remedies</u>. If the Executive commits a breach or is about to commit a breach, of any of the provisions of paragraphs 8(b) or (c), the Company shall have the right to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company, the exact amount of which will be impossible or difficult to ascertain and that monetary damages alone will not provide an adequate remedy to the Company. In addition, the Company may take all such other actions and remedies available to it under law or in equity and shall be entitled to such damages as it can show it has sustained by reason of such breach or threatened breach.

(e)     <u>Acknowledgements</u>. The parties acknowledge that (i) the type and periods of restriction imposed in the provisions of paragraphs 8(b) and (c) are fair and reasonable and are reasonably required to protect and maintain the proprietary interests of the Company described above, other legitimate business interests of the Company and the goodwill associated with the business of the Company, including without limitation, the business and goodwill acquired by the Company pursuant to the Purchase Agreement; (ii) the Executive has engaged and will continue to engage in the Company's business throughout the geographic areas where the Company and its Clients do business; (iii) the time, scope, geographic area and other provisions of this paragraph 8 have been specifically negotiated by sophisticated parties, represented by legal counsel, and are given as an integral part of the transactions contemplated by the Purchase Agreement; and (iv) because of the nature of the service business engaged in by the Company and the fact that the Clients can be and are serviced by the Company wherever such Clients are located, the Restricted Territory is based upon the geographic territories in which the Company conducts its business, services the Clients, markets its services to potential new Clients and renders its services in respect of the Restricted Business which such services are disseminated throughout the Restricted Territory. If any of the covenants contained in paragraphs 8(b) and (c), or any part thereof, shall be determined by any court or other tribunal of competent jurisdiction to be unenforceable by reason of it extending for too great a period of time or over too great a geographical area or by reason of it being too extensive in any other respect, the parties agree that (x) such covenant shall be interpreted to extend only over the maximum period of time for

which it may be enforceable and/or over the maximum geographical areas as to which it may be enforceable and/or over the maximum extent in all other respects as to which it may be enforceable, all as determined by the court making such determination, and (y) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made. Each of the covenants and agreements contained in this paragraph 8 (collectively, the **"Protective Covenants"**) is separate, distinct and severable. All rights, remedies and benefits expressly provided for in this paragraph 8 are cumulative and are not exclusive of any rights, remedies or benefits provided for by law or in this paragraph 8 or otherwise, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived). The existence of any claim, demand, action or cause of action of the Executive against the Company (and/or its Affiliates), whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of each Protective Covenant or any other provision of this paragraph 8. The unenforceability of any Protective Covenant shall not affect the validity or enforceability of any other Protective Covenant or any other provision or provisions of this paragraph 8. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which the Executive is in violation of any of such Protective Covenants, and all such restrictions shall automatically be extended by the period of the Executive's violation of any such restrictions. The Executive acknowledges that the Company and the Executive intend to and hereby confer jurisdiction to enforce the covenants contained in this paragraph 8 upon the courts of any jurisdiction within the geographical scope of such covenants. In the event that the courts of any one or more of such jurisdictions shall hold such covenants wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the Company's right to the relief provided above in the courts of any other jurisdictions within the geographical scope of such covenants, as to breaches of such covenants in such other respective jurisdictions, the above covenants as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants. Prior to accepting employment with any Person during the Term or any period thereafter that the Executive is subject to the restrictions set forth in paragraph 8(b) above, the Executive shall notify the prospective employer in writing of his obligations under such provisions and shall simultaneously provide a copy of such written notice to the Company.

### 9.     **Intellectual Property**

The Executive agrees that all materials created or modified by him during the Term, including, without limitation, all works of authorship, inventions, processes, ideas, methods, concepts and other tangible and intangible materials (collectively, **"Work Product"**), shall be "work for hire" and that the Company shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire", the Executive hereby assigns ownership of all such Work Product to the Company and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company. The Executive hereby appoints the Company as his attorney-in-fact with the limited power to execute assignments of such Work Product. The Executive acknowledges

and agrees that the Company has hereby notified the Executive that the assignment provided for in this paragraph 9 shall not apply to any invention that qualifies fully for exemption from assignment under the provisions of Section 2870 of the California Labor Code, a copy of which is attached hereto as **Annex I**. The Executive hereby agrees to advise the Company promptly in writing of any inventions that he believes meet the criteria set forth in Section 2870.

### 10.    Enforceability

The failure of any party at any time to require performance by another party of any provision hereunder shall in no way affect the right of that party thereafter to enforce the same, nor shall it affect any other party's right to enforce the same, or to enforce any of the other provisions in this Agreement; nor shall the waiver by any party of the breach of any provision hereof be taken or held to be a waiver of any subsequent breach of such provision or as a waiver of the provision itself.

### 11.    Assignment

The Company and the Executive agree that the Company shall have the right to assign this Agreement, and, accordingly, this Agreement shall inure to the benefit of, and may be enforced by, any and all successors and assigns of the Company, including, without limitation, by asset assignment, stock sale, merger, consolidation or other corporate reorganization. The Company and the Executive agree that the Executive's rights and obligations under this Agreement are personal to the Executive, and the Executive shall not have the right to assign or otherwise transfer his rights or obligations under this Agreement, and any purported assignment or transfer shall be void and ineffective. The rights and obligations of the Company hereunder shall be binding upon and run in favor of the successors and assigns of the Company.

### 12.    Modification

This Agreement may not be orally canceled, changed, modified or amended, and no cancellation, change, modification or amendment, or waiver of any rights shall be effective or binding, unless in writing and signed by the parties to this Agreement, and approved in writing by the Chief Executive Officer of DAS, currently Dale A. Adams, or his designee.

### 13.    Severability; Survival

If any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same effect as though the invalid or unenforceable part had been severed and deleted or reformed to be enforceable. The respective rights and obligations of the parties hereunder shall survive the termination of the Executive's employment to the extent necessary to the intended preservation of such rights and obligations.

14. **Life Insurance**

The Executive agrees that the Company and/or one of its Affiliates shall have the right to obtain life insurance on the Executive's life in an amount determined by one of the Company's Affiliates, at the sole expense of the Company or the applicable Affiliate, as the case may be, and with the Company or the applicable Affiliate as the sole beneficiary thereof.  The Executive shall (a) cooperate fully in obtaining such life insurance, (b) sign any necessary consents, applications and other related forms or documents and (c) at the Company's expense, take any reasonably required medical examinations.

15. **Notice**

Any notice, request, instruction or other document to be given hereunder by any party hereto to another party shall be in writing and shall be deemed effective (a) upon personal delivery, if delivered by hand, or (b) three days after the date of deposit in the mails, postage prepaid if mailed by certified or registered mail, or (c) on the next business day, if sent by prepaid overnight courier service, addressed as follows:

If to the Executive:

Fabian Nunez
1331 Belfast Drive
Los Angeles CA 90069

with a copy to (which shall not constitute notice):

Moses & Singer LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Attention: Jeffrey M. Davis, Esq.

If to the Company:

c/o Omnicom Group Inc.
437 Madison Avenue
New York, New York 10022
Attention: General Counsel

with a copy to (which shall not constitute notice):

Davis & Gilbert LLP
1740 Broadway
New York, New York 10019
Attention: Evan D. Weiner, Esq.

Any party may change the address to which notices are to be sent by giving notice of such change of address to the other party in the manner herein provided for giving notice.

**16.    Applicable Law**

The interpretation and construction of this Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Agreement), shall be governed by the laws of the State of California without regard to any conflicts or choice of laws provisions of the State of California that would result in the application of the law of any other jurisdiction. . Except as set forth in paragraph 8, each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Eastern District of California or any court of the State of California located in Sacramento County in any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby, and agrees that any such action, suit or proceeding shall be brought only in such court. Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**17.    No Conflict**

The Executive represents and warrants that he is not subject to any agreement, instrument, order, judgment or decree of any kind, or any other restrictive agreement of any character, which would prevent him from entering into this Agreement or which would be breached by the Executive upon his performance of his duties pursuant to this Agreement.

**18.    Entire Agreement**

This Agreement, together with the Purchase Agreement (and the Exhibits and Schedules thereto), the General Assignment, Bill of Sale and Assumption Agreement and the Protective Covenant Agreement of even date herewith (collectively, the **"Operative Documents"**), constitutes the sole, exclusive and only agreements of the parties hereto pertaining to the subject matter hereof, contains all of the covenants, conditions and agreements between the parties, express or implied, whether by statute or otherwise, and sets forth the respective rights, duties and obligations of each party to the other party as of the date hereof.    Any prior agreements (including without limitation that certain Updated Outlines of Employment Agreement, dated October 13, 2008, between the Company and the undersigned as well as any oral agreements or extensions relating thereto), promises, negotiations or representations not expressly set forth in the Operative Documents are of no force and effect; provided, however, nothing contained in this Agreement shall affect any confidentiality agreements, non-solicitation/non-servicing agreements or any other type of restrictive covenant agreement that the Executive enters into with Omnicom or one of its Affiliates. No oral understandings, oral statements, oral promises or oral inducements exist.

19. **Headings**

       The headings contained in this Agreement are for reference purposes only, and shall not affect the meaning or interpretation of this Agreement.

20. **Withholdings**

       The Company may withhold from any amounts payable under this Agreement such federal, state or local taxes as shall be required to be withheld pursuant to any applicable law or regulation.

21. **Affiliate Defined**

       The term **"Affiliate"** of any Person shall mean any other Person, that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

22. **Counterparts**

       This Agreement may be executed in two or more counterparts, or by facsimile transmission, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

23. **No Strict Construction**

       The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto.  The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.

24. **Purchase Agreement**

       The parties hereto understand and agree that a breach of the Purchase Agreement by the Company shall not be deemed a breach of this Agreement by the Company or constitute Good Reason under this Agreement.

25. **Legal Counsel**

       The provisions of this Agreement have been specifically negotiated by sophisticated parties, represented by experienced legal counsel.  The parties to this Agreement have had the opportunity to discuss the provisions of the Agreement with legal counsel, and enter into this Agreement only after such discussions.

26.    <u>409A</u>

(a)    As determined by the Company, to the extent any provision of this Agreement, or any other agreement with the Company, constitutes a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Internal Revenue Code of 1986, as amended (the "**Code**"), which provides payments to the Executive upon his "separation from service" within the meaning of Section 409A(a)(2)(A)(i) of the Code, and the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code at the time of such separation, then any such payment shall commence, to the extent such payment exceeds or is otherwise not eligible for treatment as a separation payment under Treas. Reg. 1.409A-1(b)(9)(iii), on the date that is six months after the date of the Executive's separation from service and any amounts withheld during such six-month period shall be paid once benefits commence. The right to a series of installment payments hereunder is treated as a right to a series of separate payments.  Subject to the six-month delay described immediately above, if the Executive is required by the terms of this Agreement to sign a release or waiver in order to receive such pay, then such pay shall commence on the first normal payroll date occurring after the 60th day following the Executive's separation from service, provided that such pay is conditioned upon the release or waiver being executed and delivered by the Executive to the Company, and the applicable revocation period expiring, within such 60-day period.

(b)    To the extent the Executive is entitled to receive taxable reimbursements and/or in-kind benefits, the following provisions apply: (i) the Executive shall receive such reimbursements and benefits for the period set forth in this Agreement and, if no such period is specified, the Executive shall receive such reimbursements and benefits during the Term, (ii) the amount of such reimbursements and benefits the Executive receives in one year shall not affect amounts provided in any other year, (iii) such  reimbursements must be made by the last day of the year following the year in which the expense was incurred, and (iv) such reimbursements and benefits may not be liquidated or exchanged for any other reimbursement or benefit.

(c)    No acceleration of any payments the Executive is entitled to, including payments made during the bridging period, if any, under this Agreement, shall be permitted if it would cause the Executive to incur a tax under Section 409A of the Code.

(d)    To the extent the provisions of this Agreement or any other nonqualified deferred compensation arrangement in which the Executive participates may be subject to Section 409A of the Code, such provisions may be limited, construed and interpreted in accordance with Section 409A of the Code and any applicable guidance issued with respect thereto by the Department of Treasury or Internal Revenue Service.  Any provision in this Agreement or any other nonqualified deferred compensation arrangement in which the Executive participates that is inconsistent with Section 409A of the Code may be deemed to be amended to comply with Section 409A of the Code and to the extent such provision cannot be amended to comply therewith, such provision shall be null and void, provided that any such provision so made null and void shall not reduce the amount of payments ultimately to be made. No provision in this Agreement or any other nonqualified deferred compensation arrangement in which the Executive participates shall be interpreted or construed to directly or indirectly transfer any

liability for a failure to comply with Section 409A of the Code from the Executive or any other individual to the Company, or any other individual or entity affiliated with the Company.

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement as of the day and year first above written.

**MERCURY PUBLIC AFFAIRS LLC**

By: _____
    Name: LOUIS F. JANUZZI
    Title: Assistant Secretary

_____
**Fabian Nunez**

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement as of the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
       Name:
       Title:

_____
       Fabian Nunez

**Annex I**
**to Employment**
**Agreement**

<u>Labor Code Section 2870</u>

Employment agreements; assignment of rights

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his rights in an invention to his employer shall not apply to an invention that the employee developed entirely on his own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(i)     relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(ii)     result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**Exhibit A**

## SEPARATION AGREEMENT AND GENERAL RELEASE[1]

This confirms the following understandings and agreements between Mercury Public Affairs LLC, a Delaware limited liability company (the **"Company"**), and _____ (hereinafter referred to as **"you"** or **"your"**).

1.     (a)     Your employment with the Company pursuant to the Employment Agreement between the Company and you dated December 31, 2013, as such Employment Agreement may have been amended from time to time (the **"Employment Agreement"**), terminated effective _____  ___, 20__ (the **"Termination Date"**). You hereby confirm your removal as of the Termination Date from any position you held as an employee, officer, director or manager of the Company or any of its parents, subsidiaries or affiliates. This agreement will become effective on the Effective Date (as defined in paragraph 12 hereof) only if not revoked by you as permitted under paragraph 12 hereof.

2.     The Company shall pay you the payments and benefits set forth in Section 7(b) of the Employment Agreement in accordance with its terms. Except as otherwise specifically set forth in this Separation Agreement and General Release (hereinafter also referred to as the **"Separation Agreement"**), from and after the Termination Date you shall no longer be entitled to any further compensation or any monies (including severance payments) from the Company or any of its affiliates or to receive any of the benefits made available to you during your employment at the Company.

3.     (a)     As used in this Separation Agreement, the term **"claims"** shall include all claims, covenants, warranties, promises, undertakings, actions, suits, causes of action, obligations, debts, attorneys' fees, accounts, judgments, losses and liabilities, of whatsoever kind or nature, in law, equity or otherwise.

(b)     For and in consideration of the payments and benefits referenced in paragraph 2 above, and other good and valuable consideration, you, for and on behalf of yourself and your heirs, administrators, executors, and assigns, effective the Effective Date, do fully and forever release, remise and discharge the Company and its direct and indirect parents, subsidiaries and affiliates, together with their respective officers, directors, partners, shareholders, members, managers, employees and agents (collectively, the **"Group"**) from any and all claims which you had, may have had, or now have against the Company or any other member of the Group, for or by reason of any matter, cause or thing whatsoever, including any claim arising out of or attributable to your employment or the termination of your employment with the Company, including but not limited to claims of breach of contract, wrongful termination, unjust dismissal, defamation, libel or slander, or under any federal, state or local law dealing with discrimination based on age, race, sex, national origin, handicap, religion, disability or sexual preference. This release of claims includes, but is not limited to, all claims arising under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Civil Rights Act of

---

[1] SUBJECT TO CHANGES BASED UPON CHANGES IN LAW AND FACT.

1991, the Equal Pay Act, the California Fair Employment and Housing Act, the California Labor Code, and all other federal, state and local labor and anti-discrimination laws, the common law and any other purported restriction on an employer's right to terminate the employment of employees. This release also covers any claims alleging personal damages, wrongful discharge, or any other claim, including those based on contract or tort, whether founded in common law or otherwise.

(c)     You are expressly waiving all rights afforded to you by Section 1542 of the Civil Code of the State of California ("**Section 1542**") with respect to the Company or any member of the Group. Section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." Notwithstanding the provisions of Section 1542 and for the purpose of implementing a full and complete release, you expressly acknowledge that this Agreement is intended to include all claims, if any, which you do not know or suspect to exist in your favor and that this Agreement extinguishes those claims. This release does not release any rights preserved or created under the terms of this Agreement. You specifically release all claims under the Age Discrimination in Employment Act (the "**ADEA**") relating to your employment and its termination.

(d)     You represent that you have not filed or permitted to be filed against the Group, individually or collectively, any charges, complaints or lawsuits and you covenant and agree that you will not file or permit to be filed any lawsuits at any time hereafter with respect to the subject matter of this Separation Agreement and claims released pursuant to this Separation Agreement (including, without limitation, any claims relating to the termination of your employment), except as may be necessary to enforce this Separation Agreement or to seek a determination of the validity of the waiver of your rights under the ADEA. Nothing in this Separation Agreement shall be construed to prohibit you from filing a charge with or participating in any investigation or proceeding conducted by the Equal Employment Opportunity Commission ("**EEOC**") or a comparable state or local agency. Notwithstanding the foregoing, you agree to waive your right to recover monetary damages in any charge, complaint, or lawsuit filed by you or by anyone else on your behalf. Except as otherwise provided in this paragraph, you will not voluntarily participate in any judicial proceeding of any nature or description against any member of the Group that in any way involves the allegations and facts that you could have raised against any member of the Group as of the Effective Date.

4.     You are specifically agreeing to the terms of this release because the Company has agreed to pay you money and other benefits to which you were not otherwise entitled and has provided such other good and valuable consideration as specified herein. The Company has agreed to provide this money and other benefits because of your agreement to accept it in full settlement of all possible claims you might have or ever had, and because of your execution of this Separation Agreement.

5.     Notwithstanding any other provision of this Separation Agreement, you will retain any rights and obligations that you may have as an indirect equityholder of Nunez LLC, a Delaware limited liability company ("**Nunez LLC**"), under that certain Asset Purchase Agreement by and among you, Nunez LLC, the Company and the other signatories thereto.

6.     Upon termination of your employment, or at any other time requested by the Company, you agree to return to the Company all Company property, including without limitation, mailing lists, reports, files, memoranda, records, computer hardware, software, credit cards, door and file keys, computer access codes or disks and instructional manuals, and other physical or personal property which you received or prepared or helped prepare in connection with your employment with the Company, and that you will not retain any copies, duplicates, reproductions or excerpts thereof.

7.     This Separation Agreement does not amend, modify, waive or affect in any way the Company's rights or your duties, obligations or restrictions under (i) Sections 8 or 9 of the Employment Agreement and (ii) the Protective Covenant Agreement dated December 31, 2013 entered into by you for the benefit of the Company (the **"Protective Covenant Agreement"**).

8.     You agree that you will not encourage or cooperate or otherwise participate or confer with any current or former employee of the Company or any other member of the Group, individually or collectively, or any potential plaintiff, to commence any legal action or make any claim against the Company or any member of the Group with respect to such person's employment or termination of employment with or by the Company or its affiliates; provided, however, that nothing in this Separation Agreement shall prohibit you from cooperating with the EEOC or a comparable state or local agency.  You will cooperate with the Company and its counsel in connection with any investigation, administrative proceeding or litigation relating to any matter in which you were involved or of which you have knowledge as a result of your employment with the Company.

9.     You agree to maintain the confidentiality of this Separation Agreement and to refrain from disclosing or making reference to its terms, except as required by law or with your accountant or attorney, but only after obtaining agreement from the persons who learn of such information to also treat it confidentially.

10.     You agree that you shall not make, or cause to be made, any statement or communicate any information (whether oral or written) that disparages or reflects negatively on the Company or any member of the Group; provided, however, that nothing in this paragraph shall prohibit you from making truthful statements as required by law or legal process.  The Company agrees that it will not authorize the dissemination of any statement or the communication of any information (whether written or oral) that disparages you.

11.     The Company (and you as to Paragraph 10) shall be entitled to have the provisions of paragraphs 3, 6, 7, 8, 9 and 10 specifically enforced through injunctive relief, without having to prove the adequacy of the available remedies at law, and without being required to post bond or security, it being acknowledged and agreed that such breach will cause irreparable injury to the Company and that money damages will not provide an adequate remedy to the Company.  Moreover, you understand and agree that if you breach any provisions of this Separation Agreement, the Protective Covenant Agreement or Section 8 of the Employment Agreement, in addition to any other remedies at law or in equity available to it, the Company may cease making any further payments and providing the other benefits provided for in Section 7(b) of the Employment Agreement, recover any payments made to you or on your behalf under Section 7(b) of the Employment Agreement, and shall be reimbursed by you for all its reasonable

attorneys' fees and costs incurred by it arising out of any such breach. The remedies set forth in this paragraph 11 shall not apply to any challenge to the validity of the waiver and release of your rights under the ADEA. If you challenge the validity of the waiver and release of your rights under the ADEA, then the Company's right to attorneys' fees and costs shall be governed by the provisions of the ADEA, so that the Company may recover such fees and costs if the lawsuit is brought by you in bad faith. Any such action permitted to the Company by this paragraph, however, shall not affect or impair any of your obligations under this Separation Agreement, including without limitation, the release of claims in paragraph 3 hereof. You further agree that nothing herein shall preclude the Company from recovering attorneys' fees, costs or any other remedies specifically authorized under applicable law.

12.     You acknowledge that you have read this Separation Agreement in its entirety, fully understand its meaning and are executing this Separation Agreement voluntarily and of your own free will with full knowledge of its significance. You acknowledge and warrant that you have had the opportunity to consider for twenty-one (21) days the terms and provisions of this Separation Agreement and that you have been advised by the Company to consult with an attorney prior to executing this Separation Agreement. You may execute this Separation Agreement prior to the conclusion of the twenty-one (21) day period, and if you elect to do so, you acknowledge that you have done so voluntarily. You shall have the right to revoke this Separation Agreement for a period of seven (7) days following your execution of this Separation Agreement, by giving written notice of such revocation to the Company in accordance with Section 15 of the Employment Agreement. This Separation Agreement shall not become effective until the eighth day following your execution of it (the **"Effective Date"**).

13.     If any one or more of the provisions of this Separation Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby. Moreover, if any one or more of the provisions contained in this Separation Agreement is held to be excessively broad as to duration, scope, activity or subject, such provisions will be construed by limiting and reducing them so as to be enforceable to the maximum extent compatible with applicable law.

14.     Nothing herein shall be deemed to constitute an admission of wrongdoing or of any violation of any federal, state or local law or any contractual or other obligations by the Company or any other member of the Group. Neither this Separation Agreement nor any of its terms shall be used as an admission or introduced as evidence as to any issue of law or fact in any proceeding, suit or action, other than an action to enforce this Separation Agreement.

15.     This Separation Agreement may be executed in two or more counterparts, or by facsimile transmission, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

16.     The interpretation and construction of this Separation Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Separation Agreement), shall be governed by the laws of the State of California without regard to any conflicts or choice of laws provisions of the State of California that would result in the application of the law of any other jurisdiction. Each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Eastern District of California or

any court of the State of California located in Sacramento County in any action, suit or proceeding arising out of or relating to this Separation Agreement or any of the transactions contemplated hereby, and agrees that any such action, suit or proceeding shall be brought only in such court.  Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS SEPARATION AGREEMENT.

17.     The Company may withhold from any amounts payable under this Separation Agreement such federal, state or local taxes as shall be required to be withheld pursuant to any applicable law or regulation.

18.     The language used in this Separation Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto.  The provisions of this Separation Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.

19.     Except as set forth herein, the terms contained in this Separation Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior negotiations, representations or agreements relating thereto whether written or oral.  You represent that in executing this Separation Agreement, you have not relied upon any representation or statement not set forth herein.  No amendment or modification of this Separation Agreement shall be valid or binding upon the parties unless in writing and signed by both parties.  You acknowledge that you have been represented by an attorney in connection with the preparation and execution of this Agreement.

Accepted and agreed to by:


**Mercury Public Affairs LLC**

By:_____

Date:_____


_____

**[NAME]**

Date:_____