# EXHIBIT K

_____

**ASSET PURCHASE AGREEMENT**

**by and among**

**MERCURY PUBLIC AFFAIRS LLC,**

**NEWCO NEW JERSEY LLC,**

**MSGDMNSM VENTURES II LLC,**

**MICHAEL DUHAIME,**

**FABIAN NUNEZ,**

**KIERAN MAHONEY,**

**KIRILL GONCHARENKO,**

**MICHAEL MCKEON**

**and**

**THOMAS DOHERTY**

_____

Dated March 20, 2015

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated March 20, 2015, by and among **MERCURY PUBLIC AFFAIRS LLC**, a Delaware limited liability company (the "**Purchaser**"), **NEWCO NEW JERSEY LLC**, a Delaware limited liability company (the "**Company**"), **MSGDMNSM VENTURES II LLC**, a Delaware limited liability company ("**Holdco**"), **MICHAEL DUHAIME ("DuHaime"), FABIAN NUNEZ** ("**Nunez**"), **KIERAN MAHONEY** ("**Mahoney**"), **KIRILL GONCHARENKO** ("**Goncharenko**"), **MICHAEL MCKEON** ("**McKeon**") and **THOMAS DOHERTY** ("**Doherty**"; and together with DuHaime, Nunez, Mahoney, Goncharenko and McKeon, collectively, the "**Principals**"; and individually, a "**Principal**").

## W I T N E S S E T H :

**WHEREAS**, the Company wishes to sell, and the Purchaser wishes to purchase, substantially all of the assets of the Company, subject to certain disclosed liabilities, upon the terms and subject to the conditions of this Agreement (such assets and liabilities collectively referred to hereinafter as the "**Acquired Business**");

**WHEREAS**, as of the date hereof, (x) DuHaime owns 50% of the issued and outstanding membership interests in the Company, (y) Holdco owns 50% of the issued and outstanding membership interests in the Company and (z) the Principals collectively own in excess of 94% of the issued and outstanding membership interests in Holdco and are actively involved in the management and operations of the Company, and accordingly, Holdco and the Principals are in a position to make certain representations, warranties and covenants in respect of the Company and/or the Acquired Business;

**WHEREAS**, goodwill has been valued and considered as an important component of this Agreement;

**WHEREAS**, the Principals acknowledge that the Company engages in the business of rendering state lobbying, advocacy advertising, crisis management communications, digital communications, governmental relations, grassroots/grasstops, integrated campaign management, international consulting, litigation communications, market and public opinion research, media and public relations and political consulting services (the "**Business**");

**WHEREAS**, (x) DuHaime acknowledges that the execution and delivery by him of the Employment Agreement referred to in Section 5.3 hereof, and (y) Holdco and each Principal acknowledges that the execution and delivery by Holdco and each Principal of the Protective Covenant Agreements referred to in Section 5.4 hereof, in each case, are an integral part of and incident to the transactions contemplated by this Agreement; and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

**ARTICLE I**

**SALE OF THE ASSETS**

**Section 1.1    Assets Transferred**.  On the terms and subject to the conditions set forth in this Agreement, except for the Excluded Assets set forth in Section 1.2, the Company will sell, transfer, convey, assign and deliver to the Purchaser, and the Purchaser will purchase, on the Closing Date (as defined in Section 2.3), all of the Company's right, title and interest in, to and under the following assets, properties and rights of the Company, as the same exist on the Closing Date (collectively, the "**Assets**"), free and clear of all Liens (as defined in Section 9.16):

(i)    Balance Sheet Assets.  All of the assets, properties and rights of the Company reflected on the Balance Sheet referred to in Section 3.4, as modified or changed between the Balance Sheet Date (as defined in Section 3.4) and the Closing Date without violation of the provisions of Section 3.23 (the "**Balance Sheet Assets**");

(ii)    Cash.  All cash on hand or in bank deposits, and all certificates of deposit (the "**Cash**");

(iii)    Real Property Leases.  (A) The real property leases, subleases, licenses and other occupancy agreements (including without limitation, any modification, amendment or supplement thereto) listed on **Schedule 3.7.2** as to which the Company is the lessor or sublessor and (B) the real property leases, subleases, licenses and other occupancy agreements (including without limitation, any modification, amendment or supplement thereto) listed on **Schedule 3.7.2** as to which Holdco or MSGDMNSM Ventures III LLC, a Delaware limited liability company ("**MSG III**") (on behalf of the Company), as the case may be, is the lessee or sublessee, together with any options to purchase the underlying property and leasehold improvements thereon, and in each case all other rights, subleases, licenses, permits, deposits and profits appurtenant to or related to such real property leases, subleases, licenses and other occupancy agreements (the leases, subleases, licenses and other occupancy agreements described in subclauses (A) and (B) are collectively referred to herein as the "**Real Property Leases**");

(iv)    Inventory.  All inventories of work-in-process, active job orders, office and other supplies, and other accessories related thereto, which are used or held for use by the Company, together with all rights of the Company against suppliers of such inventories (the "**Inventory**");

(v)    Accounts Receivable.  All trade accounts receivable and all notes, bonds and other evidences of indebtedness of and rights to receive payments arising out of sales or services rendered, including without limitation, any rights of the Company with respect to any third party collection procedures or any other actions or proceedings which have been commenced in connection therewith, together with the proceeds in respect of any such accounts receivable (the "**Accounts Receivable**");

(vi)    Tangible Personal Property.  All furniture, fixtures, equipment, machinery and other tangible personal property (other than Inventory), including but not limited to, the

items listed on **Schedule 1.1(vi)**, including without limitation, any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person (as defined in Section 9.3) (the "**Tangible Personal Property**");

(vii) <u>Personal Property Leases</u>.   (A) The leases or subleases (including without limitation, any modification, amendment or supplement thereto) of Tangible Personal Property (including but not limited to those listed on **Schedule 3.8**) as to which the Company is the lessor or sublessor  and (B) the leases or subleases (including without limitation, any modification, amendment or supplement thereto) of Tangible Personal Property (including but not limited to those listed on **Schedule 3.8**) as to which the Company is the lessee or sublessee, together with any options to purchase the underlying property (the leases and subleases described in subclauses (A) and (B) are collectively referred to herein as the "**Personal Property Leases**");

(viii) <u>Client List</u>.   The Company's current and prospective client list and customer data (the "**Client List**");

(ix) <u>Contracts</u>.   All of the Company's existing agreements, commitments, leases, licenses, evidences of indebtedness running in favor of the Company, mortgages running in favor of the Company, indentures running in favor of the Company, security agreements running in favor of the Company, instruments or other contracts (other than the Real Property Leases, the Personal Property Leases, Permits (as defined below) and the Accounts Receivable) to which the Company is a party, including without limitation, contracts with clients (and the right to service such clients), purchase orders, media commitments and the other agreements listed on **Schedule 3.8** other than any agreement by and between Holdco or the Principals, on the one hand, and the Company, on the other hand (the "**Contracts**");

(x) <u>Prepaid Expenses</u>.   All prepaid expenses, other than prepaid property and casualty insurance (the "**Prepaid Expenses**");

(xi) <u>Intangible Personal Property</u>.   All Intellectual Property of the Company (as defined in Section 3.14) (including without limitation, the Company's and/or the Acquired Business' goodwill therein) and all rights, privileges, claims, causes of action and options relating or pertaining to the business of the Company, the Acquired Business or the Assets, including but not limited to, the name "Newco New Jersey" (or any variation thereof), and the business processes and practices of the Company (the "**Intangible Personal Property**");

(xii) <u>Permits</u>.   All transferable permits, licenses, and other governmental certificates, authorizations and approvals, including applications therefor (the "**Permits**");

(xiii) <u>Security Deposits</u>.   All security deposits deposited by or on behalf of the Company as lessee or sublessee under the Real Property Leases or other security deposits relating to the Acquired Business (the "**Security Deposits**");

4

(xiv)   Books and Records.   All books and records of the Company relating to the Acquired Business, including but not limited to, financial statements, journals, ledgers, correspondence, customer records, employment records for current employees, books of account and accountant's and attorney's work papers (the "**Books and Records**");

(xv)   Goodwill.   All of the goodwill associated with the Acquired Business (the "**Goodwill**"); and

(xvi)   Other Assets.   All other assets and properties of every kind and nature owned or held by the Company, or in which the Company has an interest, known or unknown, fixed, unfixed, choate or inchoate, accrued, absolute, contingent, or otherwise, whether or not specifically referred to in this Agreement (the "**Other Assets**").

Section 1.2   **Excluded Assets**.   Notwithstanding anything to the contrary in this Agreement, the following assets and properties and rights of any kind (the "**Excluded Assets**") shall be excluded from and shall not constitute Assets transferred to the Purchaser: (i) the minute book and other documents of the Company relating to its organization, maintenance and existence (but the Principals shall provide the Purchaser with copies of the foregoing prior to the Closing (as defined in Section 2.3)); (ii) payments made and to be made to the Company, and other rights of the Company, under this Agreement; (iii) the Insurance Policies (as defined in Section 3.13) and rights thereunder; provided, however, proceeds of Insurance Policies which relate to claims based on events occurring prior to the Closing shall not be an Excluded Asset if the proceeds cover an Assumed Liability or relate to a purchased Asset; (iv) any tax refunds relating to periods prior to the Closing; (v) the rights of the Company in, to and under all contracts and agreements related to any Excluded Asset or Retained Liability (as defined in Section 1.4); (vi) all claims, rights or causes of action related to any Excluded Asset or Retained Liability; (vii) any non-transferable or non-transferred Permit; (viii) all marketable securities; (ix) the Company's bank account at Bank of America, Account No.: 898070687157; (x) all Plans (as defined in Section 3.19.1); and (xi) all of the Company's assets, rights and interests with respect to the Company's operations in Pennsylvania, including without limitation, as specifically set forth on **Schedule 1.2**.

Section 1.3   **Assumed Liabilities**.   In connection with the sale, transfer, conveyance, assignment and delivery of the Assets pursuant to this Agreement, on the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser will assume on the Closing Date and agrees to pay, perform and discharge when due the following obligations of the Company only to the extent that such obligations are not overdue or delinquent on the Closing Date without regard to any grace period and without the incurrence of any increase in amounts due (the "**Assumed Liabilities**"), and no others:

(i)   Balance Sheet Obligations.   Unless such liability is specifically retained under Section 1.4, all obligations of the Company with respect to liabilities reflected or reserved against on the Balance Sheet, as modified or changed between the Balance Sheet Date and the Closing Date in the ordinary course of business without violation of Section 3.23 and accrued for on the Closing Balance Sheet (as defined in Section 2.1.4(i));

5

(ii)   Real Property Lease Obligations.  All obligations of the Company under the Real Property Leases arising and to be performed only on or after the Closing Date, and excluding any obligations under the Real Property Leases arising or to be performed prior to the Closing Date except for the dollar amounts accrued for on the Closing Balance Sheet, if any, and included as a current liability for purposes of determining Closing Date Working Capital;

(iii)   Personal Property Lease Obligations.  All obligations of the Company under the Personal Property Leases arising and to be performed only on or after the Closing Date, and excluding any obligations under the Personal Property Leases arising or to be performed prior to the Closing Date except for the dollar amounts accrued for on the Closing Balance Sheet, if any, and included as a current liability for purposes of determining Closing Date Working Capital; and

(iv)   Obligations under Contracts and Permits.  All obligations of the Company under the Contracts and Permits arising and to be performed only on or after the Closing Date, and excluding any obligations thereunder arising or to be performed prior to the Closing Date except for the dollar amounts accrued for on the Closing Balance Sheet, if any, and included as a current liability for purposes of determining Closing Date Working Capital.

The assumption of the Assumed Liabilities by the Purchaser shall not enlarge any rights of third parties under contracts or arrangements with the Purchaser or the Company.

**Section 1.4    Retained Liabilities**.  Except for the Assumed Liabilities, the Purchaser shall not assume by virtue of this Agreement or the transactions contemplated hereby, and shall have no liability for, any liabilities of the Company of any kind, character or description whatsoever (the "**Retained Liabilities**").  Without limiting the generality of the foregoing, the Purchaser shall not assume the following:

(i)   any liability or obligation of the Company arising out of or in connection with the negotiation and preparation of this Agreement and consummation and performance of the transactions contemplated hereby, including without limitation, legal and accounting fees, brokerage commissions, finder's fees or similar fees or commissions, and income, sales or other liability for Taxes (as defined in Section 3.11) so arising;

(ii)   any liability or obligation of the Company arising from the failure of the Company to perform or discharge any of its agreements contained in this Agreement;

(iii)   any liability or obligation of the Company which was required to be disclosed to the Purchaser pursuant to this Agreement and which was not so disclosed;

(iv)   any liability or obligation of the Company with respect to any Insurance Policies or Plans;

(v)   any liability or obligation of the Company to Holdco or the Principals;

6

(vi)     any obligation of the Company for Taxes;

(vii)    any liability or obligation to (x) any Affected Employees who do not remain employees of the Purchaser following the Closing Date as a result of the transactions contemplated by this Agreement and (y) any former employees of the Company;

(viii)   any claim, cause of action, proceeding or other litigation (whether brought against the Company, the Purchaser or any Principal before or after the Closing) arising, in whole or in part, from the conduct of the business of the Company and/or the Acquired Business prior to or after the Closing, except as a result of the non-fulfillment by the Purchaser of the Assumed Liabilities;

(ix)     any liability or obligation of the Company relating to any debt for borrowed money;

(x)      any liability or obligation of the Company relating to any Excluded Assets, including without limitation, liabilities or obligations relating to the Company's operations in Pennsylvania ; and

(xi)     any liability or obligation of the Company incurred by or accruing to the Company after the Closing Date, except as a result of the non-fulfillment by the Purchaser of Assumed Liabilities.

The Company shall discharge in a timely manner or shall make adequate provision for all of the Retained Liabilities, provided that the Company shall have the ability to contest, in good faith, any such claim of liability asserted in respect thereof by any Person.

## ARTICLE II

### PURCHASE PRICE AND CLOSING

**Section 2.1     Purchase Price**.  In full consideration for the purchase by the Purchaser of the Assets, the purchase price (the "**Purchase Price**"), shall be calculated and paid by the Purchaser to the Company as follows:

2.1.1   Payments.  The term PBT shall have the meaning given to such term in Section 2.1.2.  The terms Closing Date Working Capital, Working Capital Threshold, Annual Determination and Special Determination shall have the meanings given to such terms in Sections 2.1.3(i), 2.1.3(ii), 2.1.4(ii) and 2.1.4(i), respectively, below.

(i)      Closing Payments.  On the Closing Date, a payment in the amount of $2,850,000 (the "**CP**").

(ii)     Working Capital Payment.  If the Closing Date Working Capital, as finally determined pursuant to the procedures set forth in Section 2.1.4, is less than the Working Capital Threshold, as finally determined pursuant to the procedures set forth in Section 2.1.4, then within five business days after the Special Determination and any adjustments

7

thereto shall have become binding on the parties pursuant to the procedures set forth in Section 2.1.4, the Company shall pay the Purchaser the difference between the Working Capital Threshold and the Closing Date Working Capital (such difference between the Working Capital Threshold and the Closing Date Working Capital being referred to herein as the "**Working Capital Shortfall**").  If the Company fails to pay the Working Capital Shortfall to the Purchaser, in addition to any other legal remedies available to it, the Purchaser shall have the right to offset such amount against any future Purchase Price payments to the Company.  If the Closing Date Working Capital, as finally determined pursuant to the procedures set forth in Section 2.1.4, is greater than the Working Capital Threshold, as finally determined pursuant to the procedures set forth in Section 2.1.4, then within five business days after the Special Determination and any adjustments thereto shall have become binding on the parties pursuant to the procedures set forth in Section 2.1.4, the Purchaser shall pay the Company the difference between the Closing Date Working Capital and the Working Capital Threshold (such difference between the Working Capital Threshold and the Closing Date Working Capital being referred to herein as the "**Excess Working Capital**"); provided, however, to the extent any such Excess Working Capital consists of Accounts Receivable, such portion of the Excess Working Capital shall only be paid by the Purchaser to the Company promptly following collection by the Purchaser of such Accounts Receivable.  Any amount paid pursuant to this Section 2.1.1(ii) shall be referred to as the "**Working Capital Payment**".

(iii)    <u>First Interim Payment</u>.  Within five business days after the Annual Determination for calendar year 2015 shall have become binding on the parties as provided in Section 2.1.4, the First Interim Payment ("**FIP**"), calculated as follows:

$$FIP = \{55\% \times \{5 \times \frac{(2015\ PBT)}{3}\}\} - \{CP\}$$

(iv)    <u>Second Interim Payment</u>.    Within five business days after the Annual Determination for calendar year 2016 shall have become binding on the parties as provided in Section 2.1.4, the Second Interim Payment ("**SIP**"), calculated as follows:

$$SIP = \{55\% \times \{5 \times \frac{(2015\ PBT + 2016\ PBT)}{3}\} - \{CP + FIP\}$$

(iv)    <u>Final Payment</u>.  Within five business days after the Annual Determination for calendar year 2017 shall have become binding on the parties as provided in Section 2.1.4, the Final Payment ("**FP**"), calculated as follows:

$$FP = \{55\% \times \{5 \times \frac{(2015\ PBT + 2016\ PBT + 2017\ PBT)}{3}\} - \{CP + FIP + SIP\}$$

(vi)    <u>No Negative Amounts</u>.  If the calculation of FIP, SIP or FP as the case may be, results in an amount which is less than zero, such Purchase Price component shall be deemed to be zero and accordingly, the amount of the FIP, SIP or FP, as the case may be, included in any Purchase Price calculation, shall be zero.

1644095.7 05337-0001-398

2.1.2   <u>PBT</u>.   The term **"PBT"** shall mean the consolidated net income (loss) of the Acquired Business before provision for all federal, state and local income taxes for such period, determined in accordance with United States generally accepted accounting principles consistently applied ("**GAAP**"); provided, that in making such determinations:

(i)      neither the proceeds from nor any dividends or refunds with respect to, nor any increases in the cash surrender value of, any life insurance policy under which the Purchaser or any Affiliate (as defined in Section 9.5), is the named beneficiary or otherwise entitled to recovery, shall be included as income, and the premium expense or any other expense related to any such life insurance policy shall not be treated as an expense;

(ii)     inter-company management fees charged by Omnicom Group Inc., a New York corporation ("**Omnicom**"), The DAS Group of Companies Division of Omnicom ("**DAS**") or any Affiliate of Omnicom (collectively, the "**Omnicom Group**") to the Acquired Business, shall not be treated as an expense;

(iii)    any indemnity payments made by a Purchaser Indemnified Party (as defined in Section 8.2) to any Company Indemnified Party (as defined in Section 8.3) shall not be treated as an expense;

(iv)     any Losses (as defined in Section 8.2) of a Purchaser Indemnified Party which give rise to an indemnity payment pursuant to the indemnification provisions of Section 8.2 and which are assumed by the Principals, Holdco or the Company or as to which such Purchaser Indemnified Party has been reimbursed (by offset or payment in cash), shall not be treated as an expense, and there shall be excluded from income any amount received by such Purchaser Indemnified Party pursuant thereto;

(v)      the fees and expenses of (1) the Accountants (as defined in Section 2.1.4) in preparing the Annual Determination and performing the related audit and (2) any audit performed in connection with the Sarbanes-Oxley Act of 2002, as amended or modified from time to time, or any successor statute, and any rules and regulations promulgated thereunder, in excess of $15,000, in the aggregate, in any calendar year, shall not be treated as an expense;

(vi)     the income (loss) of any subsidiary of the Purchaser whose results of operations are required to be consolidated with that of the Acquired Business under GAAP shall be included only in proportion to the Purchaser's direct or indirect ownership in such subsidiary;

(vii)    any extraordinary or unusual gains or losses and/or gains or losses from the sale of any capital assets used by the Acquired Business in its operations after Closing (as opposed to assets acquired in the ordinary course of the business of the Acquired Business for resale or other disposition) shall be excluded from income;

(viii)   any write-off or amortization of goodwill arising out of the purchase of the Assets hereunder shall not be treated as an expense;

(ix)     interest charges (whether generated from loans relating to the payment of management fees, dividend payments, working capital or otherwise), or interest payments, or accruals between any member of the Omnicom Group, on the one hand, and the Acquired Business, on the other hand, shall be treated as an expense or income; provided, however, interest on loans to the Purchaser to finance the payment of any of the Purchase Price payments or indemnity payments shall not be treated as an expense;

(x)     any expenses of the Purchaser prior to or after the Closing incurred in connection with the negotiation, preparation and execution of this Agreement and the other documents to be delivered at the Closing hereunder (including without limitation the fees and disbursements of its attorneys and accountants (other than as set forth in Section 2.1.2(v) and any brokers or finder's fees) shall not be treated as an expense; and

(xi)     for any service rendered or provided to the Acquired Business thereof by the Omnicom Group  (it being understood that except as provided below, no such service shall be rendered or provided without the consent of the Representative), the Acquired Business shall be charged at the rates agreed to by such Omnicom Group member and the Representative; provided, however, it is agreed that Omnicom will provide property, casualty and professional insurance coverage to the Acquired Business under its umbrella policy, tax preparation, internal audit services, and from time to time other services on a group basis which replace or supercede a current service of the Acquired Business, and in such event the Acquired Business will be charged for such insurance and other services on the same basis as all other Omnicom Group companies who are covered by such insurance or receiving such services; and all charges permitted by this clause (xi) shall be treated as an expense.

2.1.3    <u>Other Definitions</u>.

(i)     "**Closing Date Working Capital**" shall mean the current assets of the Acquired Business included within the Assets acquired by the Purchaser less the current liabilities of the Acquired Business included within the Assumed Liabilities, in each case determined in accordance with GAAP immediately after the Closing.

(ii)     "**Working Capital Threshold**" shall mean $1.00.

2.1.4    <u>Accounting Procedures</u>.

(i)     The Purchaser shall cause either the Chief Financial Officer of DAS (the "**DAS CFO**"), or an independent accounting firm chosen by the Purchaser (the "**Accountants**"), such determination to be made by the Purchaser in its sole discretion, as soon as practicable after the Closing Date, to prepare in accordance with GAAP, a report containing a balance sheet of the Acquired Business as of the closing of business on the Closing Date (the "**Closing Balance Sheet**"), together with a statement of the DAS CFO or the Accountants, as the case may be, based upon such report which (x) states that such balance sheet was prepared in accordance with this Agreement, (y) sets forth the Closing Date Working Capital and (z) sets forth all adjustments

required to be made to such balance sheet in order to make the calculation of the Closing Date Working Capital (the "**Special Determination**"). The Purchaser shall have the option, in its sole discretion, to audit or to instruct the Accountants to audit the Closing Balance Sheet and to determine the scope of such audit.  If the Representative (as defined in Section 9.18) does not agree that the Special Determination correctly states the Closing Date Working Capital, the Representative shall promptly (but not later than 30 days after the delivery to the Representative of the Special Determination) give written notice to the Purchaser of any exceptions thereto (in reasonable detail describing the nature of the disagreement asserted).  If the Representative and the Purchaser reconcile their differences, the Closing Date Working Capital calculation shall be adjusted accordingly and shall thereupon become binding, final and conclusive upon all of the parties hereto and enforceable in a court of law.  If the dispute relates to an accounting issue and if the Representative and the Purchaser are unable to reconcile their differences in writing within 20 days after written notice of exceptions is delivered to the Purchaser (the "**Reconciliation Period**"), the accounting items in dispute shall be submitted to a mutually acceptable accounting firm (other than the Accountants) selected from any of the four largest accounting firms in the United States in terms of gross revenues (the "**Independent Auditors**") for final determination.  The Closing Date Working Capital calculation shall be deemed adjusted in accordance with the determination of the Independent Auditors and shall become binding, final and conclusive upon all of the parties hereto and enforceable in a court of law.  The Independent Auditors shall consider only the accounting items in dispute and shall be instructed to act within 20 days (or such longer period as the Representative and the Purchaser may agree) to resolve all accounting items in dispute.  If the dispute involves a non-accounting issue and such dispute cannot be reconciled within the Reconciliation Period, the dispute shall be settled by a court of competent jurisdiction.  If the Representative does not give written notice of any exception within 30 days after the delivery to the Representative of the Special Determination or if the Representative gives written notification of the Representative's acceptance of the Closing Date Working Capital prior to the end of such 30 day period, the Closing Date Working Capital set forth in the Special Determination shall thereupon become binding, final and conclusive upon all the parties hereto and enforceable in a court of law. The Purchaser shall instruct the DAS CFO or the Accountants, as the case may be, to deliver a copy of the Special Determination to the Representative not later than 120 days after the Closing Date; provided, however, any delay of the DAS CFO or the Accountants to meet such timetable shall impose no liability on the part of the Purchaser.

(ii)     The Purchaser shall cause either the DAS CFO or the Accountants, such determination to be made by the Purchaser in its sole discretion, as soon as practicable after the end of each of calendar years 2015, 2016 and 2017, to prepare in accordance with GAAP, a report containing a profit and loss statement of the Acquired Business as of the close of business on December 31 of each such calendar year, in each case together with a statement of the DAS CFO or the Accountants, as the case may be, based upon such report which (x) states that it was prepared in accordance with this Agreement, (y) sets forth for the period under examination the applicable calculation of PBT and (z) sets forth all adjustments required to be made to such financial statements in order to make the calculations required under this Section 2.1 (the "**Annual Determination**").  The Purchaser shall have the option, in its sole discretion, to audit or to instruct the Accountants to audit the annual financial statements and to determine the scope of such audit.  The Purchaser shall instruct the DAS CFO or the Accountants, as the case may be, to deliver a copy of each such Annual Determination to the Representative not later than 120 days

after the end of the period to which such Annual Determination relates; provided, however, any delay of the DAS CFO or the Accountants, as the case may be, to meet such timetable shall impose no liability on the part of the Purchaser.

(iii)    If the Representative does not agree that any Annual Determination correctly states the applicable PBT calculation for the period under examination, the Representative shall promptly (but not later than 30 days after the delivery of such Annual Determination to him) give written notice to the Purchaser of any exceptions thereto (in reasonable detail describing the nature of the disagreement asserted).  If the Representative and the Purchaser reconcile their differences, the Annual Determination shall be adjusted accordingly and shall thereupon become binding, final and conclusive upon all of the parties hereto and enforceable in a court of law.  If the dispute relates to an accounting issue and if the Representative and the Purchaser are unable to reconcile their differences in writing within the Reconciliation Period, the accounting items in dispute shall be submitted to the Independent Auditors for final determination, and the Annual Determination shall be deemed adjusted in accordance with the determination of the Independent Auditors and shall become binding, final and conclusive upon all of the parties hereto and enforceable in a court of law.  The Independent Auditors shall consider only the accounting items in dispute and shall be instructed to act within 20 days (or such longer period as the Representative and the Purchaser may agree) to resolve all accounting items in dispute. If the dispute involves a non-accounting issue and such dispute cannot be reconciled within the Reconciliation Period, the dispute shall be settled by a court of competent jurisdiction.  If the Representative does not give written notice of any exception within 30 days after the delivery of an Annual Determination or if the Representative gives written notification of the Representative's acceptance of an Annual Determination prior to the end of such 30 day period, such Annual Determination shall thereupon become binding, final and conclusive upon all the parties hereto and enforceable in a court of law.

(iv)    If the Independent Auditors are for any reason unable or unwilling to perform the services required of it under this Section 2.1, then the Purchaser and the Representative agree to select another accounting firm from among the four largest accounting firms in the United States in terms of gross revenues to perform the services to be performed under this Section 2.1 by the Independent Auditors.  If the Purchaser and the Representative fail to select the Independent Auditors as required by clause (i) above within seven days after the expiration of the Reconciliation Period or fail to select another accounting firm within seven days after it is determined that the Independent Auditors will not perform the services required, either the Purchaser or the Representative may request the Judicial Arbitration and Mediation Services, Inc. ("**JAMS**") located in New York, New York to appoint an independent firm of certified public accountants to perform the services required under this Section 2.1 by the Independent Auditors. The fees of JAMS shall be shared equally by the Purchaser and the Principals.  For purposes of this Section 2.1 the term "Independent Auditors" shall include such other accounting firm chosen in accordance with this clause (iv).

(v)    The Independent Auditors shall determine the party (i.e., the Purchaser or the Representative) whose asserted position as to the calculation of the Closing Date Working Capital or PBT for the period under examination before the Independent Auditors is furthest from the determination of the Closing Date Working Capital or PBT, as the case may be, by the Independent Auditors, which non-prevailing party shall pay the fees and expenses of the

12

Independent Auditors and shall reimburse the prevailing party for the portion of the fees of JAMS previously paid by it.

2.1.5   <u>Examination of Books and Records</u>.  The books and records of the Company and its subsidiaries, if any, shall be made available during normal business hours upon reasonable advance notice at the principal office of the Company or the Purchaser, as the case may be, to the parties hereto, the Accountants and the Independent Auditors to the extent required to determine the calculations required under Section 2.1.  The Principals, on the one hand, and the Purchaser, on the other hand, shall make available to the other party and their representatives (including auditors) any back-up materials generated by them to support a position that is contrary to the position taken by the other party.

2.1.6   <u>Separate Division</u>.  The parties hereto agree that during the period commencing on the Closing Date through and including December 31, 2017 (the "**Earn-Out Period**"), the Purchaser will operate and manage the Acquired Business as a separate division of the Purchaser (the "**Mercury New Jersey Division**").  The Purchaser shall maintain a separate profit and loss statement with respect to the Mercury New Jersey Division during the Earn-Out Period.

**Section 2.2     Payment of the Purchase Price**.  Payment of each component of the Purchase Price shall be made by the Purchaser by direct wire transfer to the account of the Company, as set forth on **Schedule 2.2**, or such other account(s) as the Representative may direct by written notice to the Purchaser given pursuant to this Agreement.  Each of FIP, SIP and FP shall be deemed to include imputed interest to the extent required by the Internal Revenue Code of 1986, as amended (the "**Code**").

**Section 2.3     Closing**.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution and delivery of this Agreement at 10:00 A.M. on the date hereof, at the offices of Davis & Gilbert LLP, 1740 Broadway, New York, New York 10019 or by the exchange of documents and instruments by mail, courier, electronic transmission, telecopy and wire transfer to the extent mutually acceptable to the parties hereto (such date is herein referred to as the "**Closing Date**").

**Section 2.4     Further Assurance; Post Closing Cooperation**. All transactions at the Closing shall be deemed to have taken place simultaneously.  At the Closing, the Purchaser shall deliver to the Company one or more written instruments of assumption in such form as the Company or its counsel shall reasonably request to effect the assumption by the Purchaser as required by this Agreement of all of the Assumed Liabilities.  Holdco and/or the Company will, from time to time, at the request of the Purchaser, whether at or after the Closing Date, execute and deliver such other and further instruments of conveyance, assignment, transfer and consent as the Purchaser or its counsel may reasonably require for the more effectual conveyance, assignment and transfer of the Assets to the Purchaser and Holdco and/or the Company will assist the Purchaser in the collection and reduction to possession of the Assets.  Following the Closing, upon reasonable advance notice, each party will afford the other party, its counsel and its accountants, during normal business hours, reasonable access to the books, records and other data relating to the Company in its possession with respect to periods prior to the Closing and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting

party in connection with (i) the preparation of tax returns, (ii) the determination or enforcement of rights and obligations under this Agreement, (iii) compliance with the requirements of any Governmental or Regulatory Authority (as defined in Section 3.1.2), (iv) the determination or enforcement of the rights and obligations of any party entitled to indemnification under Article VIII, (v) any actual or threatened action or proceeding, and (vi) the verification of the acquired Assets and Assumed Liabilities.

> **Section 2.5**   **Third Party Consents**.   Anything in this Agreement to the contrary notwithstanding, (i) in the event an assignment or purported assignment to the Purchaser of any Personal Property Lease, Real Property Lease, Contract or Permit, or any claim, right or benefit arising thereunder or resulting therefrom, without the consent of other parties thereto, would constitute a breach thereof or would not result in the Purchaser receiving upon and after the Closing all of the rights of the Company, Holdco or MSG III thereunder, and (ii) if any such consent has not been obtained by the Closing and the Purchaser nevertheless has elected to proceed with the Closing, such Personal Property Lease, Real Property Lease, Contract or Permit shall be deemed not to have been assigned by the Company, Holdco and/or MSG III to the Purchaser (provided, however, that the obligations thereunder shall be deemed to have been assumed by the Purchaser, as between the Purchaser, on the one hand, and the Company, Holdco and/or MSG III, as the case may be, on the other hand).   In those circumstances, if requested by the Purchaser, the Principals, Holdco and the Company will use their best efforts after the Closing to obtain any such consent.   If such consent is not obtained and is required to effectively assign a Personal Property Lease, Real Property Lease, Contract or Permit to the Purchaser, the Company, Holdco and the Principals will cooperate with the Purchaser in any reasonable arrangement to provide the Purchaser with the full claims, rights and benefits under any such Personal Property Lease, Real Property Lease, Contract or Permit, including without limitation, enforcement at the sole cost of and for the benefit of the Purchaser of any and all rights of the Company, Holdco and/or MSG III against a third party thereto arising out of the breach or cancellation by such third party or otherwise, and any amount received by the Company, Holdco and/or MSG III in respect of such unassigned Personal Property Lease, Real Property Lease, Contract or Permit shall be held for and paid over to the Purchaser.

## ARTICLE III

## REPRESENTATIONS OF THE COMPANY, HOLDCO AND THE PRINCIPALS

> A.   Each of Holdco and the Principals severally represents and warrants to and with the Purchaser as follows:

> **Section 3.1**     **Execution and Validity of Agreements; Restrictive Documents**.

> 3.1.1   <u>Execution and Validity</u>.  Such Principal has the full legal right and capacity to enter into this Agreement and to perform his obligations hereunder.  This Agreement has been duly and validly executed and delivered by such Principal and, assuming due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of such Principal, enforceable against such Principal in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting

creditors' rights generally or by general equitable principles.  Holdco has the full limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder.  This Agreement has been duly and validly executed and delivered by Holdco and, assuming due authorization, execution and delivery by the other parties thereto, constitutes a legal, valid and binding obligation of Holdco, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or by general equitable principles.

3.1.2   No Restrictions.  There is no suit, action, claim, or, to the knowledge of such Principal, investigation or inquiry by any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision ("**Governmental or Regulatory Authority**"), and no legal, administrative or arbitration proceeding pending or, to the knowledge of such Principal, threatened against Holdco or such Principal or any of his or its respective assets or properties with respect to the execution, delivery and performance of this Agreement or the transactions contemplated hereby or any other agreement entered into by Holdco or such Principal in connection with the transactions contemplated hereby.

3.1.3   Non-Contravention.  The execution, delivery and performance by Holdco of its or such Principal of his respective obligations hereunder and the consummation of the transactions contemplated hereby, will not as of the Closing Date (a) result in the violation by Holdco or such Principal of any statute, law, rule, regulation or ordinance (collectively, "**Laws**"), or any judgment, decree, order, writ, permit or license (collectively, "**Orders**"), of any Governmental or Regulatory Authority, applicable to Holdco or such Principal or any of its or his respective assets or properties, or (b) conflict with, result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, or require Holdco or such Principal to obtain any consent, approval or action of, make any filing with or give any notice to, or result in or give to any Person any right of payment or reimbursement, termination, cancellation, modification or acceleration of, or result in the creation or imposition of any Lien upon any of the assets or properties of Holdco or such Principal, under any of the terms, conditions or provisions of any contracts or permits to which Holdco or such Principal is a party or by which Holdco or such Principal or any of his or its respective properties are bound.

3.1.4   Approvals and Consents.  No consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority or Person is necessary or required under any of the terms, conditions or provisions of any Law or Order of any Governmental or Regulatory Authority or any contract or permit to which Holdco or such Principal is a party or any of its or his respective assets or properties are bound for the execution and delivery of this Agreement by Holdco or such Principal, the performance by Holdco or such Principal of its or his respective obligations hereunder or the consummation of the transactions contemplated hereby.

B.  Holdco, the Company and the Principals, jointly and severally, represent and warrant to and with the Purchaser, as follows:

**Section 3.2    Execution and Validity; Existence and Good Standing**.

1644095.7 05337-0001-398

3.2.1   <u>Execution and Validity</u>.  The Company has the full limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement by the Company and the consummation by it of the transactions contemplated hereby have been duly authorized by all required company action on behalf of the Company.  This Agreement has been duly and validly executed and delivered by the Company and, assuming due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or by general equitable principles.

3.2.2   <u>Existence and Good Standing</u>.  The Company was duly organized and is validly existing and in company and tax good standing under the laws of the State of Delaware, with the full limited liability company power and authority to own its property and to carry on its business all as and in the places where such properties are now owned or operated or such business is now being conducted.  The Company is duly qualified, licensed or admitted to do business and is in good company and tax standing in the jurisdictions set forth on **Schedule 3.2**, which are the only jurisdictions in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary.

**Section 3.3**   **<u>Subsidiaries and Investments</u>**.  The Company does not own any capital stock or other equity or proprietary or ownership interest in any Person.

**Section 3.4**   **<u>Financial Statements and No Material Changes</u>**.  **Schedule 3.4(A)** sets forth (a) the unaudited balance sheet with respect to the Acquired Business as at December 31, 2014 and the related unaudited statement of income for the calendar year then ended, and (b) the unaudited balance sheet of Company and its subsidiaries, if any, as at February 28, 2015 (the "**Balance Sheet**") and the related unaudited statement of income for the two months then ended.  Such financial statements have been prepared in accordance with GAAP throughout the periods indicated except as set forth on **Schedule 3.4(B)**.  Each balance sheet fairly presents the financial condition of the Acquired Business and/or the Company and its subsidiaries, if any, as applicable, at the respective date thereof, and reflects all claims against and all debts and liabilities of the Acquired Business and/or the Company and its subsidiaries, if any, as applicable, fixed or contingent, as at the respective date thereof, required to be shown thereon under GAAP and the related statements of income fairly present the results of income for the respective periods indicated.  Since February 28, 2015 (the "**Balance Sheet Date**"), there has been no material adverse change in the assets or liabilities, or in the business or condition, financial or otherwise, or in the results of operations of the Company and/or the Acquired Business.  Holdco and the Principals acknowledge and agree that, notwithstanding the fact that the Purchaser conducted financial due diligence on the Company and the Acquired Business, the Purchaser shall in no way (i) be deemed to be prejudiced by the fact that it (and/or its Affiliates) assisted in the preparation of the financial statements referenced above and (ii) be prevented from asserting any claims related to such financial statements, including, without limitation, with respect to breaches of representations and warranties, including fraud.

**Section 3.5**   **<u>Books and Records</u>**.  All accounts, books, ledgers and official and other records, of whatsoever kind, material to the business of the Company and/or the Acquired

Business have been maintained by or on behalf of the Company, have been properly and accurately kept and completed in all material respects, and there are no material inaccuracies or discrepancies of any kind contained or reflected therein. The Company does not have any of its records, systems, controls, data or information recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not now under the exclusive ownership and possession of the Company. The Principals have delivered to the Purchaser complete and correct copies of the Certificate of Formation and the Limited Liability Company Agreement of the Company, with all amendments thereto, applicable for all periods during the Company's existence.

Section 3.6    **Title to Properties; Encumbrances**.  The Company has good and valid title to, or enforceable leasehold interests in or valid rights under contract to use, all the Assets free and clear of all Liens, except for Liens set forth on **Schedule 3.6**.  The property, plant and equipment included in the Assets, whether owned or otherwise contracted for by the Company, are in a state of good maintenance and repair (ordinary wear and tear excepted) and are adequate and suitable for the purposes for which they are presently being used.  The Assets constitute all the assets of the Company and/or the Acquired Business necessary to conduct the Business as currently conducted by the Company and/or the Acquired Business.

Section 3.7    **Real Property**.

3.7.1    Owned Real Property.  The Company does not own any real property (including ground leases) or hold a freehold interest in any real property or any option or right of first refusal or first offer to acquire any real property and the Company is not obligated by Contract or otherwise to purchase any real property.

3.7.2    Leased Real Property.  **Schedule 3.7.2** contains an accurate and complete list of all Real Property Leases, including without limitation, any modification, amendment or supplement thereto and any other related document or agreement executed or entered into by the Company (including, without limitation, any Real Property Lease which the Company has subleased or assigned to another Person and as to which the Company remains liable).  Each Real Property Lease set forth on **Schedule 3.7.2** (or required to be set forth on **Schedule 3.7.2**) is valid, binding and in full force and effect; all rents and additional rents and other sums, expenses and charges due thereunder to date on each such Real Property Lease have been paid; and the lessee has been in peaceable possession since the commencement of the original term of such Real Property Lease and no waiver, indulgence or postponement of the lessee's obligations thereunder has been granted by the lessor.  There exists no default or event of default by the Company or to the knowledge of the Principals, by any other party to any Real Property Lease; and there exists no occurrence, condition or act (including the purchase of the Assets hereunder) which, with the giving of notice, the lapse of time or the happening of any further event or condition, would become a default or event of default by the Company under any Real Property Lease or which would require the consent of any Person, and there are no outstanding claims of breach or indemnification or notice of default or termination of any Real Property Lease.  The Company holds the leasehold estate on all the Real Property Leases free and clear of all Liens except as set forth on **Schedule 3.7.2** and any mortgagees' liens on the real property in which such leasehold estate is located.  The real

property leased by the Company is in a state of good maintenance and repair, is adequate and suitable for the purposes for which it is presently being used, and there are no material repair or restoration works likely to be required in connection with any of the leased real properties. The Company is in physical possession and actual and exclusive occupation of the whole of each of its leased properties. The Company does not owe any brokerage commission with respect to any of the Real Property Leases.

Section 3.8    Contracts. Schedule 3.8 hereto contains an accurate and complete list of the following Contracts (whether written or oral, but indicating which Contracts are oral) to which the Company is currently a party or by which any of the Assets are bound: (a) all Plans, (b) any Personal Property Lease with a fixed annual rental of $10,000 or more, (c) any Contract relating to capital expenditures which involves payments of $25,000 or more in any single transaction or series of related transactions, (d) any Contract relating to the making of a loan or advance to or investment in, any other Person, (e) any Contract evidencing or relating in any way to indebtedness for money borrowed or to be borrowed, whether directly or indirectly, by way of loan, purchase money obligation, guarantee (other than the endorsement of negotiable instruments for collection in the ordinary course of business), conditional sale, purchase or otherwise, (f) any management service, employment, consulting, independent contractor or similar type of Contract which is not cancelable by the Company without penalty or other financial obligation within 30 days, (g) any Contract prohibiting or limiting the Company's freedom to engage in any line of business or to compete with any other Person, including, without limitation, any agreements limiting the ability of the Company or any of its Affiliates to take on competitive accounts during or after the term thereof, (h) any collective bargaining or union agreement, (i) any Contract between the Company, on the one hand, and any officer or director or equity holder of the Company, on the other hand, not covered by subsection (f) above (including indemnification agreements), (j) any secrecy or confidentiality agreement (other than standard confidentiality agreements in computer software license agreements or agreements with clients, vendors, employees or independent contractors entered into in the ordinary course of business), (k) any agreement with respect to any Intellectual Property (as defined in Section 3.14) other than "shrink-wrap" and similar end-user licenses, (l) any agreement with a client required to be listed on Schedule 3.16, (m) any agreement, indenture or other instrument which contains restrictions with respect to the payment of distributions in respect of its equity, (n) any joint venture agreement involving a sharing of profits not covered by clauses (a) through (m) above, (o) any Contract (not covered by another subsection of this Section 3.8) which involves $25,000 or more over the unexpired term thereof and is not cancelable by the Company without penalty or other financial obligation within 30 days; provided, however, Contracts of a similar nature which individually do not involve $25,000 but in the aggregate involve $25,000 or more over the unexpired term shall also be set forth on Schedule 3.8, (p) any Contract with a media buying service; provided, however, commitments to purchase media in the ordinary course of business do not have to be set forth on Schedule 3.8, and (q) agreement between the Company, on the one hand, and the Principals, on the other hand. Each Contract to which the Company is a party or otherwise bound, whether or not required to be set forth on Schedule 3.8, is in full force and effect, and there exists no default or event of default by the Company or to the knowledge of the Principals, by any other party, or occurrence, condition, or act (including the purchase of the Assets hereunder) which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default or event of default

thereunder by the Company, and there are no outstanding claims of breach or indemnification or notice of default or termination of any such Contract.

**Section 3.9**     **Non-Contravention; Approvals and Consents**.

3.9.1     Non-Contravention.  The execution, delivery and performance by the Company of its obligations under this Agreement and the consummation of the transactions contemplated hereby will not (a) violate, conflict with or result in the breach of any provision of the Certificate of Formation or Limited Liability Company Agreement (or other comparable documents) of the Company, (b) result in the violation by the Company of any Laws or Orders of any Governmental or Regulatory Authority applicable to the Company or any of its assets or properties, or (c) if the consents and notices set forth in **Schedule 3.9.2** are obtained, given or waived, conflict with, result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, or require the Company to obtain any consent, approval or action of, make any filing with or give any notice to, or result in or give to any Person any right of payment or reimbursement, termination, cancellation, modification or acceleration of, or result in the creation or imposition of any Lien upon any of the Assets under any of the terms, conditions or provisions of any Contract to which the Company is a party or by which the Company or any of its assets or properties are bound.

3.9.2     Approvals and Consents.  Except as set forth on **Schedule 3.9.2**, no consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority or other Person is necessary or required under any of the terms, conditions or provisions of any Law or Order of any Governmental or Regulatory Authority or any Contract to which the Company is a party, or by which its assets or properties are bound for the execution and delivery of this Agreement by the Company, the performance by the Company of its obligations hereunder or the consummation of the transactions contemplated hereby.

**Section 3.10**     **Litigation**.  Except as set forth on **Schedule 3.10**, there is no action, suit, claim or proceeding, or to the knowledge of the Principals, investigation or inquiry at law or in equity by any Person, or any arbitration or any administrative or other proceeding by or before any Governmental or Regulatory Authority, pending or, to the knowledge of the Principals, threatened, against the Company and/or the Acquired Business with respect to this Agreement or the transactions contemplated hereby, or any other agreement entered into by the Company in connection with the transactions contemplated hereby, or against or affecting the Company, the Acquired Business or the Assets, and, to the knowledge of the Principals, no acts, facts, circumstances, events or conditions occurred or exist which are a basis for any such action, proceeding or investigation.  The Company is not subject to any Order entered in any lawsuit or proceeding. **Schedule 3.10** also sets forth with respect to each such pending or threatened action, suit or proceeding listed thereon, the amount of costs, expenses or damages the Company has incurred to date and reasonably expects to incur through the conclusion thereof.

**Section 3.11**     **Taxes**.  The Company has timely filed, or caused to be filed, taking into account any valid extensions of due dates, completely and accurately, all federal, state, local and foreign (if any) tax or information returns (including estimated tax returns) required under the statutes, rules or regulations of such jurisdictions to be filed by it.  The term "**Taxes**" means

19

taxes, duties, charges or levies of any nature imposed by any taxing or other Governmental or Regulatory Authority, including without limitation income, gains, capital gains, surtax, capital, franchise, capital stock, value-added taxes, taxes required to be deducted from payments made by the payor and accounted for to any tax authority, employees' income withholding, back-up withholding, withholding on payments to foreign Persons, social security, national insurance, unemployment, worker's compensation, payroll, disability, real property, personal property, sales, use, goods and services or other commodity taxes, business, occupancy, excise, customs and import duties, transfer, stamp, and other taxes (including interest, penalties or additions to tax in respect of the foregoing), and includes all taxes payable by the Company pursuant to Treasury Regulations §1.1502-6 or any similar provision of state, local or foreign law.  All Taxes shown on said returns to be due and all other Taxes due and owing (whether or not shown on any Tax return) have been paid and all additional assessments received prior to the date hereof have been paid or are being contested in good faith, in which case, such contested assessments are set forth on **Schedule 3.11.**  The Company has collected all sales, use, goods and services or other commodity Taxes required to be collected and remitted or will remit the same to the appropriate taxing authority within the prescribed time periods.  The Company has withheld all amounts required to be withheld on account of Taxes from amounts paid to employees, former employees, directors, officers, service providers, members, residents and non-residents and remitted or will remit the same to the appropriate taxing authorities within the prescribed time periods.  The amount set up as an accrual for Taxes (aside from any reserve for deferred Taxes established to reflect timing differences between book and Tax accrual) on the Balance Sheet (as opposed to the notes thereto) is sufficient for the payment of all unpaid Taxes of the Company, whether or not disputed, for all periods ending on and prior to the date thereof.  The tax accrual workpapers on which such accrual for Taxes (accruing separately for each type of Tax, Taxing jurisdiction and Taxable year, each such separate liability being a "**Specific Tax Liability**") is based, if any, are attached hereto on **Schedule 3.11** and each specific accrual reflected in such workpapers is sufficient for payment of all Taxes with respect to each Specific Tax Liability.  Since the Balance Sheet Date, the Company has not incurred any liabilities for Taxes other than in the ordinary course of the business of the Company consistent with past custom and practice, except such Taxes as arise from the transactions contemplated hereby.  To the knowledge of the Principals, no Principal, member, manager, director or officer (or employee responsible for Tax matters) of the Company expects any authorities to assess the Principals or the Company for any additional Taxes (in the case of the Principals, only Taxes with respect to the operations or assets of the Company) for any period for which Tax returns have been filed.  The Principals have delivered to the Purchaser correct and complete copies of all federal, state and local income tax returns filed with respect to the Company for all taxable periods that are requested by the Purchaser.  Except as set forth on **Schedule 3.11**, none of the federal, state or local income tax returns of the Company (or the Principals with respect to Company items) have ever been audited by the Internal Revenue Service (the "**IRS**") or any other Governmental or Regulatory Authority. No examination of any return of the Company is currently in progress, and none of the Principals or the Company has received notice of any proposed audit or examination.  No deficiency in the payment of Taxes by the Company for any period has been asserted in writing by any taxing authority and remains unsettled at the date of this Agreement. The Company has not received notice of a claim by any Governmental or Regulatory Authority in any jurisdiction where the Company does not file Tax returns that the Company is or may be subject to taxation by that jurisdiction.  Neither the Principals nor the Company has made any agreement, waiver or other

arrangement providing for an extension of time with respect to the assessment or collection of any Taxes against it. The Company has not been a member of an affiliated group filing consolidated federal income tax returns nor has it been included in any combined, consolidated or unitary state or local income tax return. Since its formation and at all times thereafter, the Company has been a disregarded entity or a tax partnership, for federal, Delaware, and all other state and local income Tax purposes, and, accordingly, the Company has not been required to pay federal, state or local Tax based on gross or net income and such status shall remain in full force and effect until at least through the Closing Date, and none of the Principals, the Company or any other employee of the Company will take any action that would change such status effective for any period through the Closing Date. Neither the Company nor the Purchaser will be required as a result of a change in accounting method of the Company for any period ending on or before the Closing Date to include any adjustment under Section 481 of the Code (or any similar provision of state, local or foreign income tax law) in income for any period ending after the Closing Date, excluding any change which may be required by law in connection with this transaction. The Company has not entered into any Tax sharing or indemnification agreement with any party. At no point has the Company held any interests in real property that might be subject to tax, or might subject the transfer of the shares of such entity to tax under Section 897 of the Code. The Company has not taken any Tax position that could give rise to a penalty under any of Sections 6662, 6662A or 6663 of the Code. Neither the Purchaser nor the Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) "closing agreement" as described in Code Section 7121 (or any corresponding or similar provision of state, local, or foreign income tax law); (ii) installment sale or open transaction disposition made on or prior to the Closing Date; or (iii) prepaid amount received on or prior to the Closing Date.

Section 3.12   **Liabilities**. Except as set forth on the Balance Sheet, the Company does not have any outstanding claims, liabilities or indebtedness of any nature whatsoever, whether accrued, absolute or contingent, determined or undetermined, asserted or unasserted, and whether due or to become due (collectively in this Section 3.12, "**Liabilities**"), other than (i) Liabilities specifically disclosed in any Schedule hereto; (ii) Liabilities under Contracts of the type required to be disclosed by the Company or the Principals on any Schedule and so disclosed or which because of the dollar amount or other qualifications are not required to be listed on such Schedule; and (iii) Liabilities incurred in the ordinary course of business and consistent with past practice of the Company since the Balance Sheet Date not involving borrowings by the Company.

Section 3.13   **Insurance**. **Schedule 3.13** contains a true and complete list (including the names and addresses of the insurers, the names of the Persons to whom such insurance policies have been issued, the expiration dates thereof, the annual premiums and payment terms thereof, whether it is a "claims made" or an "occurrence" policy and a brief description of the interests insured thereby) of all liability, property, workers' compensation and other insurance policies currently in effect that insure the property, assets or business of the Acquired Business, the Company or its employees (other than self-obtained insurance policies by such employees). Each insurance policy listed on **Schedule 3.13** (collectively, the "**Insurance Policies**") is valid and binding and in full force and effect, all premiums due thereunder have been paid and the Company has not received any notice of cancellation or termination in respect of any such

Insurance Policy or default thereunder.  The Principals believe such Insurance Policies are placed with financially sound and reputable insurers, and in light of the nature of the Company's business, assets and properties, are in amounts and have coverage that are reasonable and customary for Persons engaged in such business and having such assets and properties.  The Company, or to the knowledge of the Principals, the Person to whom such policy has been issued has not received notice that any insurer under any Insurance Policies is denying liability with respect to a claim thereunder or defending under a reservation of rights clause.  Except as set forth on **Schedule 3.13,** within the last two years, the Company has not filed for any claims exceeding $25,000 against any of its insurance policies, exclusive of automobile and health insurance policies.  None of such Insurance Policies shall lapse or terminate by reason of the transactions contemplated by this Agreement and all such Insurance Policies shall continue in effect after the Closing Date for the benefit of the Purchaser.  The Company has not received any notice of cancellation of any Insurance Policy.  The Company has not received written notice from any of its insurance carriers that any premiums will be materially increased in the future or that any insurance coverage relating to an Insurance Policy will not be available in the future on substantially the same terms now in effect.  The Company has not been refused any insurance or required to pay higher than normal or customary premiums, nor has its coverage been limited by any insurance carrier to which it has applied for insurance during the last three years.

>      **Section 3.14   Intellectual Properties**.

>      3.14.1  <u>Definitions</u>.  For purposes of this Agreement, the following terms have the following definitions:

>           **"Intellectual Property"** shall include, without limitation, any or all of the following and all rights associated therewith: (a) all domestic and foreign patents, and applications therefor, and all reissues, reexaminations, divisions, renewals, extensions, continuations and continuations-in-part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements; (c) trade secrets, confidential and proprietary information, know how, technology, customer lists, financial and marketing data, business and marketing plans, databases, rights of privacy and publicity, and all documentation relating to any of the foregoing; (d) all copyrights, copyright registrations and applications therefor, unregistered copyrights, the content of all World Wide Web sites of a Person and all other rights corresponding thereto throughout the world; (e) all mask works, mask work registrations and applications therefor; (f) all industrial designs and any registrations and applications therefor; (g) all trade names, corporate names, logos, trade dress, common law trademarks and service marks, trademark and service mark registrations and applications therefor and all goodwill associated therewith; (h) any and all Internet domain names and Web sites (including all software and applications, and all components and/or modules thereof), used in connection therewith; and (i) all computer software including all source code, object code, firmware, development tools, files, records and data, all media on which any of the foregoing is recorded, and all documentation related to any of the foregoing.

>           **"Intellectual Property of the Company"** shall mean any Intellectual Property that is owned by the Company, including Registered IP and Unregistered IP.  For the avoidance of doubt, Intellectual Property of the Company does not include Off-the-Shelf Software (as defined in Section 3.14.2).

"**Licensed Intellectual Property**" means any Intellectual Property owned by another Person that is used by the Company and/or the Acquired Business in the operation of the Business, including Off-the-Shelf Software, but excluding rights in or to materials created for clients, to the extent to which such (x) client is the first owner of copyright in such materials or (y) the materials are subject to a written assignment of copyright in favor of clients of the Company.

3.14.2 <u>Representations</u>.  **Schedule 3.14.2** hereto contains an accurate and complete list of all (a) patents, patent applications, registered trademarks, pending applications for registration(s) of trademark(s), registered service marks, domain names, pending applications for registration(s) of service mark(s), logos, registered copyrights and pending applications for registration(s) of copyright(s) which are owned by the Company, if any (the "**Registered IP**"), (b) all unregistered trademarks, unregistered service marks and material unregistered copyrights which are owned by the Company, if any (the "**Unregistered IP**") and (c) Licensed Intellectual Property that is material to the operation of the Business and/or the Acquired Business, other than widely distributed off-the-shelf applications subject to shrink-wrap and similar non-negotiated end-user license agreements ("**Off-the-Shelf Software**").  The registrations and applications of the Registered IP listed on **Schedule 3.14.2** are in the name of the Company, and are valid, in proper form, all necessary registration and renewal fees in connection with such registrations have been made and all necessary documents and certificates in connection with such registrations have been filed with the relevant patent and Internet domain name, copyright and trademark authorities in the United States or other jurisdictions where the Business is conducted for the purposes of maintaining such Intellectual Property registrations, and applications therefor, and no actions (including filing of documents or payments of fees) are due within ninety (90) days after the Closing.  No registration, or application therefor, for any of the Registered IP has lapsed, expired, or been abandoned, and to the knowledge of the Principals, no such registrations, or applications therefor, are the subject of any opposition, interference, cancellation, or other legal, quasi-legal, or governmental proceeding pending before any governmental, registration, or other authority in any jurisdiction.  Except as set forth on **Schedule 3.14.2**, (i) the Company is the sole and exclusive owner of all rights, title and interest in and to the Intellectual Property of the Company, free and clear of all Liens, (ii) no Person has any rights to use any of the Intellectual Property of the Company, (iii) the Company has not granted to any Person, or authorized any Person to retain, any ownership in the Intellectual Property of the Company, and (iv) all Licensed Intellectual Property in the Company's possession or used in the operation of the Business and/or the Acquired Business has been properly licensed from the owner of such Intellectual Property, and the Company possesses all license agreements, certificates or documentation sufficient to substantiate such rights, and, to the knowledge of the Principals, the Company is in compliance with, and has not in the past violated, such license agreements.  Except as set forth on **Schedule 3.14.2**, the consummation of the transactions contemplated hereby will not result in any loss or impairment of the Company's or the Acquired Business' rights to own or use any Intellectual Property of the Company or Licensed Intellectual Property, nor will such consummation require the consent of any third party in respect of any Intellectual Property of the Company or Licensed Intellectual Property. To the knowledge of the Principals, the operation of the Business and/or the Acquired Business and use of all Intellectual Property therein does not infringe the Intellectual Property of any other Person. There are no proceedings pending or, to the knowledge of the Principals, threatened against the

Company with respect to the Intellectual Property, or with respect to any other Intellectual Property, alleging the infringement or misappropriation by the Company of any Intellectual Property of any Person, and the Company has not received written notice from any Person that the operation of the Business and/or the Acquired Business infringes the Intellectual Property of any Person.  There are no claims pending or, to the knowledge of the Principals, threatened challenging the validity of any Intellectual Property of the Company or any Intellectual Property used by the Company in the conduct of the Business and/or the Acquired Business.  The Company has not entered into or is otherwise bound by any consent, forbearance or any settlement agreement which limits the rights of the Company to use the Intellectual Property of the Company.  To the knowledge of the Principals, no Person is infringing or misappropriating any of the Intellectual Property of the Company. All Intellectual Property of the Company was either developed (a) by employees of the Company within the scope of such employee's employment duties; or (b) by independent contractors or other third parties who have assigned all of their rights therein to the Company pursuant to a written agreement, and all such employees, independent contractors, and other third parties have waived, pursuant to a written agreement, their moral rights in all such Intellectual Property in favor of the Company.  Except as set forth on **Schedule 3.14.2**, the Intellectual Property of the Company does not contain any software licensed under terms which require, as a condition of the use, modification, or distribution of such software, that other software incorporated into, derived from, or distributed with such software: (x) be disclosed or distributed in source code form; (y) be licensed under terms that permit making derivative works; or (z) be redistributable at no charge to subsequent licensees. Except as otherwise set forth on **Schedule 3.14**, the Company Owned IP does not include any software that is distributed as open source software (e.g., Linux), including software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar to any of the following: (i) GNU's General Public License (Version 2 or Version 3) (GPL) or Lesser GPL (Version 2.1) (LGPL); (ii) the Mozilla Public License (Version 1.1); (iii) the BSD License; and (iv) the Apache License (Version 2.0).  No source code for any computer software that is Company Owned IP has been delivered or licensed by the Company to any escrow agent or other Person who is or was not an employee or contractor of the Company. The Company is not under an obligation to deliver or license the source code for any computer software that is Company Owned IP to any escrow agent or other Person who is not an employee or contractor of the Company.  The transactions contemplated herein and will not obligate the Company to deliver or license any source code for any computer software that is Company Owned IP to any other Person who is not an employee or contractor of the Company.

3.14.3 <u>Privacy and Security</u>.  All information or data of any kind possessed by the Company, including but not limited to, personally identifiable information collected from any source, including consumers ("**PII**"), aggregate or anonymous information collected from any source, including consumers ("**Non-PII**") and employee data, whether collected online or offline (collectively, "**Data**"), has been collected, by the Company or any other Person, and is being maintained, stored, processed and used by the Company in compliance with all Laws and Orders. The Company has at all times presented a privacy policy ("**Privacy Policy**") to consumers prior to the collection of any PII or Non-PII online.  The Privacy Policy, and any other representations, marketing materials and advertisements that address privacy issues and the treatment of Data, accurately and completely describe the Company's information collection and use practices, and no such notices or disclosures have been inaccurate, misleading or deceptive.  The Company has

not collected or received any PII online from children under the age of 13 without verifiable parental consent or directed any of its websites to children under the age of 13 through which such PII could be obtained. The Company has stored and maintained all Data in a secure manner, using commercially reasonable physical and technical measures, to ensure the integrity and security of the Data and to prevent loss, alteration, corruption, misuse and unauthorized access to such Data. To the knowledge of the Principals, there has been no unauthorized use, access to or disclosure of any Data. The Company has not received any claims, notices or complaints regarding its information practices or use of Data. The Company has not received any written notice from a Governmental Entity or consumer advocacy organization challenging, questioning or inquiring about the Company's Data collection or usage practices. The Company is in material compliance with all guidelines and policies that relate to the Company's business and which are set forth by applicable industry associations and self-regulatory guidelines. The consummation of the transactions contemplated herein will not result in any loss or impairment of the rights to own or use any Data, nor will such consummation require the consent of any third party in respect of any Data.

**Section 3.15   Compliance with Laws; Permits**.

3.15.1 <u>Compliance</u>.   The Company is, and the business of the Company and/or the Acquired Business has been conducted (and the Principals have caused the business of the Company and/or the Acquired Business to be conducted), in compliance with all applicable Laws and Orders, except in each case (other than with respect to compliance with environmental Laws and Orders relating to the regulation or protection of the environment ("**Environmental Laws and Orders**")) where the failure to so comply would not reasonably be expected to have a Material Adverse Effect (as defined below), including without limitation: (a) all Laws and Orders promulgated by the Federal Trade Commission or any other Governmental or Regulatory Authority; (b) all Environmental Laws and Orders; (c) all Laws and Orders relating to labor, civil rights, and occupational safety and health laws, worker's compensation, employment and wages, hours and vacations, or pay equity; and (d) all Laws and Orders relating to "pay for play" legislation and/or regulations. The Company has not been charged with, or, to the knowledge of the Principals, threatened with or under any investigation with respect to, any charge concerning any violation of any Laws or Orders. The term "**Material Adverse Effect**" shall mean any material and adverse effect on the results of operations, business, prospects, assets or financial condition of the Company and/or the Acquired Business.

3.15.2 <u>Permits</u>.   The Company has all Permits required by any Governmental or Regulatory Authority for the operation of the Business, the Acquired Business and the use of the Assets as presently operated or used except where the failure to have such Permits would not reasonably be expected to have a Material Adverse Effect. All of the Permits are in full force and effect and no action or claim is pending, nor to the knowledge of the Principals is threatened, to revoke or terminate any such Permit or declare any such Permit invalid in any material respect.

**Section 3.16   Client Relations**. **Schedule 3.16** sets forth (a) the 20 largest clients of the Company and/or the Acquired Business taken as a whole (measured by revenues), and the revenues from each such client and from all clients (in the aggregate) for the calendar years ending December 31, 2013 and December 31, 2014 and (b) the clients projected to be the 20 largest clients

(measured by revenues) of the Company and/or the Acquired Business based on the Company's and/or the Acquired Business' current profit plan for the twelve months ending December 31, 2015, together with the estimated revenues from each such client and all clients (in the aggregate) for such period.  The Principals and the Company do not warrant that the estimated revenues set forth on **Schedule 3.16** will prove to be accurate; provided, however, they do represent that they were made in good faith and on a reasonable basis.  No client of the Company and/or the Acquired Business has advised the Company or any Principal that it is (x) terminating or considering terminating the handling of its business, in whole or in part by the Company and/or the Acquired Business or (y) planning to reduce its future spending with the Company and/or the Acquired Business in any material manner, and to the knowledge of the Principals (without making any special inquiry of any clients), no client has orally advised the Company or any Principal of any of the foregoing events.

Section 3.17 <u>**Accounts Receivable; Work-in-Process; Accounts Payable**</u>.  The amount of all work-in-process, Accounts Receivable, unbilled invoices (including without limitation unbilled invoices for services and out-of-pocket expenses) and other debts due or recorded in the records and books of account of the Company as being due to the Company and reflected on the Balance Sheet and the Closing Balance Sheet represent or will represent valid obligations arising from sales actually made or services actually performed in the ordinary course of business and will be good and collectible in full in the ordinary course of business (less the amount of any provision, reserve or similar adjustment therefor reflected on the Balance Sheet and the Closing Balance Sheet), and none of the Accounts Receivable or other debts (or Accounts Receivable arising from any such work-in-process or unbilled invoices) is or will be subject to any counterclaim or set-off except to the extent of any such provision, reserve or adjustment. The accounts payable set forth on the Balance Sheet, and the accounts payable incurred since the Balance Sheet Date through the Closing Date, represent trade payables resulting from bona fide transactions incurred in the ordinary course of business.  There has been no change since the Balance Sheet Date in the amount or aging of the work-in-process, Accounts Receivable, unbilled invoices, or other debts due to the Company and/or the Acquired Business, or the reserves with respect thereto, or accounts payable of the Company and/or the Acquired Business, which would have a Material Adverse Effect.

Section 3.18   <u>**Employment Relations**</u>. (a) The Company and/or the Acquired Business is not engaged in any unfair labor practice; (b) no unfair labor practice complaint against the Company and/or the Acquired Business is pending before any Governmental or Regulatory Authority; (c) there is no organized labor strike, dispute, slowdown or stoppage actually pending or to the knowledge of the Principals threatened against or involving the business of the Company and/or the Acquired Business; (d) there are no labor unions representing or, to the knowledge of the Principals, attempting to represent the employees of the Company and/or the Acquired Business; (e) no claim or grievance nor any arbitration proceeding arising out of or under any collective bargaining agreement is pending against the Acquired Business, the Company or any Principal and to the knowledge of the Principals, no such claim or grievance has been threatened; (f) no collective bargaining agreement is currently being negotiated by the Company and/or the Acquired Business; and (g) neither the Company nor the Acquired Business has experienced any work stoppage or similar organized labor dispute during the last three years.  Except as set forth on **Schedule 3.18**, there is no legal action, suit, proceeding or claim pending or, to the

knowledge of the Principals, threatened between the Company and/or the Acquired Business, on the one hand, and any employees or former employees of the Company and/or the Acquired Business, agents or former agents of the Company and/or the Acquired Business, job applicants or any association or group of any employees of the Company and/or the Acquired Business, on the other hand.

**Section 3.19   Employee Benefit Matters**.

3.19.1   List of Plans.   Except for such other employee benefit plans as may be made available, sponsored or provided by the Purchaser or any ERISA Affiliates to the employees of the Purchaser, **Schedule 3.8** to this Agreement sets forth an accurate and complete list of all employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), each foreign benefit plan, and all bonus, incentive, deferred compensation, stock option, restricted stock, stock appreciation rights, phantom stock rights, retiree medical or life insurance, supplemental retirement, nonqualified trusts, severance or other benefit plans, programs or arrangements, and all termination, severance or other Contracts, whether formal or informal, whether or not set forth in writing, whether covering one Person or more than one Person, and whether or not subject to any of the provisions of ERISA, which are or have been maintained within the preceding three years, contributed to, sponsored by or participated in by the Company or any ERISA Affiliate (as defined in Section 3.19.3) in connection with the Acquired Business or which benefit any current or former employee of the Company or any ERISA Affiliate or any current or former employee of the Purchaser who provides or provided services on behalf of the Acquired Business (each such item being referred to herein individually, as a "**Plan**" and collectively, as the "**Plans**").   For purposes of this Agreement, "foreign benefit plan" means each material plan, program or agreement contributed to, sponsored by, maintained by or participated in by either the Company or any ERISA Affiliate or the Acquired Business or any other Person that is maintained outside of the United States, or that covers primarily employees residing or working outside of the United States, and which would be treated as a Plan had it been a material United States plan, program or agreement.   Neither the Principals nor the Company has expressly or impliedly made any commitment, whether legally enforceable or not, (i) to create or cause to exist any Plan not set forth on **Schedule 3.8** or (ii) to modify, change or terminate any Plan.

3.19.2   Severance.   Except as set forth on **Schedule 3.19.2**, no employment agreement or other Contract to which the Company is a party or bound, (a) provides for the payment of or obligates the Company to pay separation, severance, termination retention, change-of-control, or similar-type benefits to any Person; or (b) obligates the Company to pay separation, severance, termination, retention, change-of-control or similar-type benefits as a result of any transaction contemplated by this Agreement or as a result of a "change in control," within the meaning of such term under Section 280G of the Code, either alone or in conjunction with any subsequent occurrence.

3.19.3   Multi-Employer Plans and Multiple Employer Plans.   Except for such other employee benefit plans as may be made available, sponsored or provided by the Purchaser or any ERISA Affiliates to the employees of the Purchaser, neither the Company nor any ERISA Affiliate in connection with the Acquired Business has maintained, contributed to or participated in a multi-employer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) or a multiple

1644095.7 05337-0001-398

employer plan subject to Sections 4063 and 4064 of ERISA, within the preceding three years, nor has any current or potential obligations or liabilities, including withdrawal, reorganization or successor liabilities, regarding any such plan.  As used herein, the term "**ERISA Affiliate**" means any Person that is or has been a member of a controlled group of organizations (within the meaning of Sections 414(b), (c), (m) or (o) of the Code) of which the Company is a member.

3.19.4  <u>Welfare Benefit Plans</u>.  Except as required under Section 601 through 609 of ERISA, Section 4980B of the Code or any similar state law ("**COBRA**"), to the knowledge of the Principals, neither the Company nor any ERISA Affiliate, in connection with the Acquired Business, has made any promises, commitments or oral or written representations to provide, and is not obligated to provide (i) health benefits (including without limitation through insurance) to any retired or former employees of the Company or any ERISA Affiliate or their respective dependents beyond termination of employment, or (ii) life insurance or other post-employment benefits to any retired or former employees of the Company or any ERISA Affiliate or their respective dependents beyond termination of employment.

3.19.5  <u>409A</u>.  With respect to each arrangement involving the Company that is a nonqualified deferred compensation plan, within the meaning of Section 409A of the Code (a "**409A Plan**"), no event has occurred and no condition exists, that could subject anyone, including any Person, to any tax, fine, penalty or other liability under Section 409A of the Code ("**409A Liability**").  To the knowledge of the Principals, none of the transactions contemplated by this Agreement could, directly or indirectly, subject anyone or any Person to any 409A Liability.

3.19.6  <u>Compliance</u>.  To the knowledge of the Principals, neither the Principals nor the Company has done anything, or failed to do anything, which would cause any Purchaser Plan not to be operated in any material respect in accordance with its terms or with applicable Laws.

**Section 3.20   Interests in Customers, Suppliers, Etc**.  Except as set forth on **Schedule 3.20**, (x) neither the Principals nor any Person controlled by any Principal nor (y) to the knowledge of the Principals (without making any inquiry of any member of the Related Group, as hereinafter defined), any officer, director, manager or employee of the Company, any parent, brother, sister, child or spouse of any such officer, director or employee of the Company, the Acquired Business or the Principals (collectively, the "**Related Group**"), or any Person controlled by anyone in the Related Group:

(i)      owns, directly or indirectly, any interest in (excepting for ownership, directly or indirectly, of less than 1/4 of 1% of the issued and outstanding shares of any class of securities of a publicly held and traded company), or received or has any right to receive payments from, or is an officer, director, employee, agent or consultant of, any Person which is, or is engaged in business as, a competitor, lessor, lessee, supplier, distributor, sales agent, customer or client of the Company and/or the Acquired Business;

(ii)      owns, directly or indirectly, in whole or in part, any tangible or intangible property (including, but not limited to Intellectual Property), used in the conduct of the business of the Company and/or the Acquired Business, other than immaterial personal items owned and used by employees at their work stations; or

(iii)    has any cause of action or other claim whatsoever against, or owes any amount to, the Company and/or the Acquired Business, except for claims in the ordinary course of business such as for accrued vacation pay, accrued benefits under employee benefit plans, and similar matters and agreements existing on the date hereof.

Section 3.21   **Bank Accounts and Powers of Attorney**.  Set forth on **Schedule 3.21** is an accurate and complete list showing (a) the name and address of, and account information for, each bank in which the Company has an account, credit line or safe deposit box and the names of all Persons authorized to draw thereon or to have access thereto, and (b) the names of all Persons, if any, holding powers of attorney from the Company and a summary statement of the terms thereof.

Section 3.22   **Compensation of Employees**.  Schedule 3.22 is an accurate and complete list showing: (a) the names and positions of all employees and exclusive consultants of the Purchaser who provide services on behalf of the Company and/or the Acquired Business and who are compensated at an annualized rate of $50,000 or more, together with a statement of the current annual salary, and the annual salary, bonus and incentive compensation paid or payable with respect to calendar years 2013 and 2014, and a statement of the projected annual salary, bonus and incentive compensation payable with respect to the calendar year ending December 31, 2015, and the material fringe benefits of such employees and exclusive consultants not generally available to all employees who provide such services on behalf of the Company and/or the Acquired Business; (b) all bonus and incentive compensation paid or payable (whether by agreement, custom or understanding) to any employee of the Purchaser who provides services on behalf of the Company and/or the Acquired Business not listed in clause (a) above for services rendered to the Company and/or the Acquired Business during the calendar years 2013 and 2014; (c) the names of all retired employees, if any, of the Purchaser who provide services on behalf of the Company and/or the Acquired Business and who are receiving or entitled to receive any healthcare or life insurance benefits or any payments from the Company or the Purchaser not covered by any pension plan to which the Company and/or the Acquired Business is a party, their ages and current unfunded pension rate, if any; and (d) a description of the current severance and vacation policy of the Company. The Company has not, because of past practices or previous commitments with respect to its employees, established any rights on the part of any of its employees, or any employees of the Purchaser who provide services on behalf of the Company and/or the Acquired Business, to additional compensation with respect to any period after the Closing Date (other than wage increases in the ordinary course of business).

Section 3.23   **No Changes Since the Balance Sheet Date**.  Since the Balance Sheet Date through the date hereof, except as specifically stated on **Schedule 3.23**, neither the Company nor the Acquired Business has (i) incurred any liability or obligation of any nature (whether accrued, absolute, contingent or otherwise), except in the ordinary course of business, (ii) permitted any of the Assets to be subjected to any Lien, (iii) sold, transferred or otherwise disposed of any Assets except in the ordinary course of business, (iv) made any capital expenditure or commitment therefor which individually or in the aggregate exceeded $25,000, (v) declared or paid any dividends or made any distributions or dividend payments on any of its respective equity interests or equity participation rights, or redeemed, purchased or otherwise acquired (or committed to do so) any of its respective equity interests, or any option, warrant or other right to purchase or acquire

29

any of its respective equity interests or equity participation rights, (vi) made any bonus or profit sharing distribution, (vii) increased or prepaid its indebtedness for borrowed money, except current borrowings under credit lines listed on **Schedule 3.8,** or made any loan to any Person other than to any employee for normal travel and expense advances, (viii) written down the value of any work-in-process, or written off as uncollectible any notes or Accounts Receivable, except write-downs and write-offs in the ordinary course of business, none of which individually or in the aggregate, were material to the Company and/or the Acquired Business, (ix) granted any increase in the rate of wages, salaries, bonuses or other remuneration of any employee who, whether as a result of such increase or prior thereto, received aggregate compensation from the Company at an annual rate of $50,000 or more, or except in the ordinary course of business to any other employees, (x) entered into any employment or exclusive consulting agreement which is not cancelable by the Company (and will not be cancelable by the Company) without penalty or other financial obligation within 30 days, (xi) canceled or waived any claims or rights of material value, (xii) made any change in any method of accounting procedures, (xiii) otherwise conducted the Business or entered into any transaction, except in the usual and ordinary manner and in the ordinary course of its business, (xiv) amended or terminated any agreement which is material to its business, (xv) renewed, extended or modified any Real Property Lease or any Personal Property Lease, except in the ordinary course of business, (xvi) adopted, amended or terminated any Plan or (xvii) agreed, whether or not in writing, to do any of the actions set forth in any of the above clauses.

**Section 3.24   Corporate Controls**.  To the knowledge of the Principals, no officer, authorized agent, employee, consultant or any other Person while acting on behalf of the Company and/or the Acquired Business, has, directly or indirectly: used any funds (including without limitation any corporate funds) for unlawful contributions, gifts, or other unlawful expenses relating to political activity; made any unlawful payment to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns from any funds (including without limitation any corporate funds); violated any "pay for play" legislation and/or regulations; established or maintained any unlawful or unrecorded fund of corporate monies or other assets; made any false or fictitious entry on its books or records; participated in any racketeering activity; or made any bribe, rebate, payoff, influence payment, kickback, or other unlawful payment, or other payment of a similar or comparable nature, to any Person, private or public, regardless of form, whether in money, property, or services, to obtain favorable treatment in securing business or to obtain special concessions, or to pay for favorable treatment for business secured or for special concessions already obtained, and neither the Company nor the Acquired Business has participated in any illegal boycott or other similar illegal practices affecting any of its actual or potential customers.

**Section 3.25   Brokers**.  Except as set forth on **Schedule 3.25**, no broker, finder, agent or similar intermediary has acted on behalf of Holdco, the Principals or the Company in connection with this Agreement or the transactions contemplated hereby, and no brokerage commissions, finder's fees, consulting fees or similar fees or commissions are payable by Holdco, the Company or the Principals in connection therewith based on any agreement, arrangement or understanding with any of them.

**Section 3.26   Forecasts and Projections**.  All of the forecasts and projections delivered by the Principals to the Purchaser or any of its Affiliates in connection with the transactions

contemplated hereby were made on a reasonable basis and in good faith; provided, however, Holdco, the Company and the Principals do not represent that any forecasted or projected results will be achieved.

Section 3.27    Repayment of Loans.  All indebtedness of the Principals to the Company or in connection with the Acquired Business has been repaid in full, other than routine travel expense advances in the ordinary course of business and consistent in amount with past practice.

Section 3.28    Copies of Documents.  The Principals have caused to be made available for inspection and copying by the Purchaser and its advisers, true, complete and correct copies of all documents referred to in this Article III or in any Schedule.  Summaries of all oral contracts contained on **Schedule 3.8** are complete and accurate in all material respects.

## ARTICLE IV

## REPRESENTATIONS OF THE PURCHASER

The Purchaser represents, warrants and agrees to and with the Company, Holdco and the Principals as follows:

Section 4.1    Existence and Good Standing.  The Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, with full limited liability company power and authority to own its property and to carry on its business all as and in the places where such properties are now owned or operated or such business is now being conducted.

Section 4.2    Execution and Validity of Agreement.  The Purchaser has the full limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement by the Purchaser and the consummation by it of the transactions contemplated hereby have been duly authorized by all required action on behalf of the Purchaser, and this Agreement has been duly and validly executed and delivered by the Purchaser and, assuming due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or by general equitable principles.

Section 4.3    Litigation.  There is no action, suit, proceeding at law or in equity by any Person, or any arbitration or any administrative or other proceeding by or before (or to the knowledge of the Purchaser, any investigation by), any Governmental or Regulatory Authority pending or, to the knowledge of the Purchaser, threatened against the Purchaser or any of its properties or rights with respect to this Agreement or the transactions contemplated hereby.

Section 4.4    Non-Contravention; Approvals and Consents.

4.4.1    Non-Contravention.  The execution, delivery and performance by the Purchaser of its obligations hereunder and the consummation of the transactions contemplated hereby will not

1644095.7 05337-0001-398

(a) violate, conflict with or result in the breach of any provision of the Certificate of Formation or the Limited Liability Company Agreement (or comparable charter documents) of the Purchaser, or (b) result in the violation by the Purchaser of any Laws or Orders of any Governmental or Regulatory Authority applicable to the Purchaser or any of its assets or properties, or (c) result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, or require the Purchaser to obtain any consent, approval or action of, make any filing with or give any notice to, or result in or give to any Person any right of payment or reimbursement, termination, cancellation, modification or acceleration of, or result in the creation or imposition of any Lien upon any of the assets or properties of the Purchaser, under any of the terms, conditions or provisions of any Contract to which the Purchaser is a party or by which the Purchaser or any of its assets or properties are bound.

      4.4.2   <u>Approvals and Consents</u>.  No consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority or other public or private third party is necessary or required under any of the terms, conditions or provisions of any Law or Order of any Governmental or Regulatory Authority or any Contract to which the Purchaser is a party or by which the Purchaser or any of its assets or properties are bound for the Purchaser's execution and delivery of this Agreement, the performance by the Purchaser of its obligations hereunder or the Purchaser's consummation of the transactions contemplated hereby.

      **Section 4.5**   **<u>Brokers</u>**.  No broker, finder, agent or similar intermediary has acted on behalf of the Purchaser in connection with this Agreement or the transactions contemplated hereby, and no brokerage commissions, finder's fees, consulting fees or similar fees or commissions are payable by the Purchaser in connection therewith based on any agreement, arrangement or understanding between them.

## ARTICLE V

## ACTIONS BY HOLDCO, THE COMPANY AND THE PRINCIPALS

      Simultaneously herewith:

      **Section 5.1**   **<u>Certified Resolutions; Good Standing Certificates</u>**.   The Principals, Holdco and the Company shall have delivered to the Purchaser (a) copies of the resolutions of (1) the members of the Company and (2) the members of Holdco, each authorizing the execution, delivery and performance by the Company and Holdco, respectively, of this Agreement and the transactions contemplated hereby, certified by one of the Company's officers or Holdco's officers, as the case may be; (b) a copy of the Company's Certificate of Formation, including all amendments, certified by the Delaware Secretary of State and a copy of Holdco's Certificate of Formation, including all amendments, certified by the Delaware Secretary of State; (c) a certificate from the Delaware Secretary of State that the Company is in good standing in such state and a certificate from the Delaware Secretary of State that Holdco is in good standing in such state; and (d) a certificate from the appropriate authority of each state in which the Company and Holdco is qualified as a foreign company to do business to the effect that the Company and Holdco is in good standing in such state.

**Section 5.2**     **Required Approvals and Consents**.  The Company, Holdco and the Principals shall have obtained or given, at no expense to the Purchaser, and there shall not have been withdrawn or modified, any consents or approvals or other actions listed on **Schedule 3.9.2** hereof (including without limitation, obtaining all consents, approvals and/or waivers required under the Contracts listed on **Schedule 3.8** in order to permit the consummation of the transactions contemplated by this Agreement without causing or resulting in a default, event of default, acceleration event or termination event under any of such documents and without entitling any party to any of such documents to exercise any other right or remedy adverse to the interests of the Purchaser or the Company thereunder).  Each such consent or approval shall be in form satisfactory to counsel for the Purchaser.

**Section 5.3**     **Employment Agreement**. DuHaime shall have entered into the Employment Agreement with the Purchaser substantially in the form and to the effect of **Exhibit A** hereto.

**Section 5.4**     **Protective Covenant Agreement**. Holdco and each of the Principals shall have entered into the Protective Covenant Agreements with the Purchaser substantially in the form and to the effect of **Exhibit B** hereto.

**Section 5.5**     **General Assignment, Bill of Sale and Assumption Agreement**. The Company shall have executed and delivered the General Assignment, Bill of Sale and Assumption Agreement, substantially in the form and to the effect of **Exhibit C** hereto.

**Section 5.6**     **Proceedings**. All proceedings to be taken in connection with the transactions contemplated by this Agreement and all documents incident thereto must be reasonably satisfactory in form and substance to the Purchaser and its counsel, and the Purchaser shall have received copies of all such documents and other evidences as it or its counsel reasonably requested to establish the consummation of such transactions and the taking of all proceedings in connection therewith.

## ARTICLE VI

## ACTIONS BY THE PURCHASER

Simultaneously herewith:

**Section 6.1**     **Certified Resolutions**.  The Purchaser shall have delivered to the Company and the Principals (a) a copy of the resolutions of the managing member of the Purchaser, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby, certified by one of its officers; (b) a copy of the Purchaser's Certificate of Formation, including all amendments, certified by the Delaware Secretary of State; and (c) a certificate from the Delaware Secretary of State that the Purchaser is in good standing in such state.

**Section 6.2**     **Employment Agreement**.  The Purchaser shall have entered into the Employment Agreement referred to in Section 5.3.

33

**Section 6.3**   **Protective Covenant Agreements**.  The Purchaser shall have entered into the Protective Covenant Agreements referred to in Section 5.4.

**Section 6.4**   **General Assignment, Bill of Sale and Assumption Agreement**.  The Purchaser shall have executed and delivered the General Assignment, Bill of Sale and Assumption Agreement referred to in Section 5.5.

**Section 6.5**   **Proceedings**.   All proceedings to be taken in connection with the transactions contemplated by this Agreement, and all documents incident thereto must be reasonably satisfactory in form and substance to the Principals and the Company and their counsel and the Principals and the Company shall have received copies of all such documents and other evidences as they or their counsel may reasonably request to establish the consummation of such transactions and the taking of all proceedings in connection therewith.

## ARTICLE VII

## OTHER AGREEMENTS

**Section 7.1**   **Operations**. The operations of the Acquired Business shall be conducted to (i) participate in the overall cash management program of Omnicom, and abide by Omnicom's dividend and management fee policies as from time to time in effect; (ii) comply on a timely basis with the financial reporting and budgeting procedures of DAS and Omnicom as from time to time in effect, which procedures require the approval of annual profit and capital expenditure plans; (iii) operate within Omnicom's "Grant of Authority" policy and the Omnicom Code of Conduct, each as from time to time in effect, which written policies have been provided to the Principals prior to the date hereof; (iv) operate generally within the parameters of the current profit plan, expense allocation and capital expenditure budget of the Purchaser as approved by Omnicom; and (v) operate in accordance with the Fourth Amended and Restated Limited Liability Company Agreement of the Purchaser dated as of December 31, 2013 (as may be amended from time to time), including without limitation, Section 11.3 therein.

**Section 7.2**   **Agreements Regarding Employees After Closing**. All employees of the Acquired Business who provide services on behalf of the Company and/or the Acquired Business effective as of the Closing Date, and who do not terminate their employment in connection with the transactions contemplated hereby (the "**Affected Employees**"), will be employed by the Purchaser with the same per annum salaries, or hourly rates of pay under which such Affected Employees were employed by the Acquired Business immediately prior to the Closing Date (other than as may be provided in the Employment Agreements referred to in Section 5.3), but nothing herein contained shall be deemed to create an employment contract between the Purchaser and/or any of its Affiliates and any such Affected Employee.   If any Affected Employee shall be deemed to have been terminated solely by reason of the consummation of this Agreement, all liability for severance benefits or damages, if any, shall be borne by the Company.  Notwithstanding anything to the contrary contained in this Agreement, Affected Employees shall be employees at will (unless a written employment agreement to the contrary has been entered into with such Affected Employee or expressly assumed by the Purchaser) and nothing express or implied in this Agreement will obligate the Purchaser to provide continued employment to any such Affected Employee for any specific period of time

following the Closing Date. The Purchaser will be the sole judge of the number, identity and qualifications of employees necessary for the conduct of its business operations and reserves the right to take any personnel action it deems necessary or desirable with respect to Affected Employees. The Purchaser shall be under no obligation to keep in effect any employee pension or welfare benefit plan or other benefit arrangement or any other plan or arrangement with respect to any Affected Employee after the Closing Date and may amend or terminate any such plan or arrangement in whole or in part, and may modify any provision thereof, including any provision dealing with eligibility, levels or types of benefits, deductibles or co-payment obligations, or any other right, feature or characteristic.

      **Section 7.3**    **Change of Name; Use of Name**. At or promptly following the Closing, the Principals shall cause the Company to execute appropriate documents to change its name to a name dissimilar to "Newco New Jersey" and promptly thereafter shall file any necessary documents to reflect the name change with the Delaware Secretary of State and the appropriate authorities in the other states in which it is qualified to do business. The parties hereto acknowledge and agree that from and after the Closing, none of Holdco, the Company or any Principal shall use or authorize the use of the name "Newco New Jersey", "Mercury", or any other brand or name associated with DAS and/or Omnicom, or any variation thereof, as the whole or part of any trade name or style for any Person *other than* the Purchaser or an Affiliate of the Purchaser.

      **Section 7.4**    **Tax Liability**. To the extent that the transfer of any Assets by the Company and/or the Acquired Business to the Purchaser gives rise to sales or sales and use tax liability or other transfer, purchase or recordation documentary tax and fees (collectively, "**Sales Taxes**"), the Purchaser shall promptly pay such Sales Taxes to the appropriate tax authorities.

      **Section 7.5**    **Successor Employer**. If applicable, the Purchaser agrees that it shall elect treatment as a "successor employer" for withholding tax purposes with respect to calendar year 2015.

      **Section 7.6**    **Allocation of the Purchase Price**. The allocation of the Purchase Price for Tax purposes shall be made by the Purchaser and the Company by mutual agreement in accordance Section 1060 of the Code and relevant regulations issued by the Department of the Treasury interpreting the Code within a reasonable time after the determination of the Closing Balance Sheet and the final determination of the Special Determination, it being understood that the parties hereto agree that the CP, as adjusted by the Working Capital Payment, and the Assumed Liabilities (to the extent constituting Purchase Price for income Tax purposes) shall be paid for cash, accounts receivable, other current assets, and other assets other than goodwill and going concern value, to the extent of the value of each of the foregoing, in the order listed above, and that only any remainder of the CP and/or deemed assumed liabilities not so allocated shall be allocable to goodwill and/or going concern value, and that FIP, SIP and FP shall be allocated solely to goodwill and/or going concern value. The parties hereto agree that (x) all Accounts Receivable, work-in-process or similar assets shall be valued at their respective book values on the Closing Balance Sheet as determined in accordance with GAAP and (y) all tangible assets shall be treated as purchased for their respective tax bases in the hands of the Company. Each party hereto shall file their respective Tax returns consistently with such allocation.

     **Section 7.7**    __Tax Returns__.  The Company shall prepare or cause to be prepared and file or cause to be filed all Tax returns for the Company.  The Company shall permit the Purchaser prior to filing to review and comment on each such Tax return to the extent filed on or after the Closing Date for any period either ending on or before, or including, the Closing Date and no such Tax Returns shall be filed without the consent of the Purchaser, which consent shall not be unreasonably withheld or delayed.

     **Section 7.8**    __Tax Cooperation__.   The Purchaser, the Company, Holdco and the Principals shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax returns pursuant to Sections 7.6 or 7.7 or any other Tax returns relating to the Acquired Business, regardless of whether the period in question with respect to such filings falls before or after the Closing Date, the operations of the Company and/or the Acquired Business, and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Company and the Principals agree (i) to retain all books and records with respect to Tax matters pertinent to the Company and/or the Acquired Business (including books and records related to Tax items passed through the Company to Holdco and/or the Principals) relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Purchaser, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (ii) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, the Purchaser, the Principals, Holdco or the Company, as the case may be, shall, at its option, either (a) continue the retention or (b) allow the other party to take possession of such books and records.

     **Section 7.9**    __Management of the Company__.  The parties hereto understand and agree that under the terms of the Employment Agreement referred to in Section 5.3 being entered into by DuHaime, such individual's employment with the Purchaser may be terminated by the Purchaser with or without "Cause" (as defined in such Employment Agreement) pursuant to the terms and conditions of such Employment Agreement and that such individual may terminate his employment with the Purchaser for "Good Reason" (as defined in such Employment Agreement).   Accordingly, each of the parties hereto agrees that if (a) the employment of DuHaime terminates, regardless of the reason therefor, at any time during the Earn-Out Period), or (b) there are changes in the management team or the Board of Managers of the Purchaser, no party to this Agreement shall have the right to make a claim that such cessation of employment or change in the management team or the Board of Managers of the Purchaser (x) constitutes a breach by the Purchaser of this Agreement, (y) resulted in an adverse effect on the Purchase Price hereunder forming the basis for a claim against the Purchaser or any of its Affiliates, or (z) constitutes an event forming the basis for such party to dispute any calculation required to be made pursuant to the accounting procedures set forth in Section 2.1.4 hereof.

**Section 7.10   Corporate Initiatives**.  The parties hereto agree that the operations of the Acquired Business will be operated to participate in the following Omnicom programs as in effect from time to time: (i) property, casualty and professional insurance coverage under the Omnicom umbrella policies, (ii) tax preparation and internal audit services, (iii) Omnicom Capital Inc. treasury cash management system (or any successor system), and in connection therewith will be credited or charged with interest, as the case may be, on the same basis as all other wholly-owned Omnicom subsidiaries participating therein, and (iv) Sarbanes-Oxley compliance programs. In addition, the parties hereto agree that Omnicom shall have the option to require the Acquired Business to participate in all or some of the following Omnicom corporate plans, programs and initiatives as in effect from time to time (whether currently in existence or hereinafter created), and in such event the Principals shall cause the Acquired Business to so participate: (i) Fidelity 401(k), (ii) payroll, health, welfare and human resources information systems, (iii) Microsoft Business Solutions and Hyperion accounting systems, and (iv) Microsoft software purchasing programs. The Acquired Business shall be charged for its participation in any such program, plan or initiative on a basis consistent with the cost charged to other Omnicom companies participating therein.

**Section 7.11   Employee Benefit Plans**.  The Principals agree that the Purchaser may take any and all actions deemed necessary and appropriate following the Closing to enable the Purchaser and its subsidiaries, if any, with respect to the Acquired Business, to meet their respective obligations under the Patient Protection and Affordable Care Act and any applicable regulations thereunder.

**Section 7.12   Restricted Activities**.  During the Earn-Out Period, the Purchaser agrees that it will not take any of the following actions without the prior consent of the Representative:

(i)   causing the Mercury New Jersey Division to enter into any line of business not related to the Acquired Business or ceasing any line of business then being conducted by the Mercury New Jersey Division;

(ii)   any sale, lease or disposition of all or any significant part of the Assets used solely in connection with the operation of the Mercury New Jersey Division;

(iii)   causing the Mercury New Jersey Division to be operated and managed within a group of companies other than the Mercury Public Affairs group of companies; and

(iv)   the relocation of the principal office of the Mercury New Jersey Division currently located in Westfield, New Jersey, to a location outside of Union or Essex Counties in New Jersey.

**Section 7.13   Termination of Certain Agreements**.  The parties hereto hereby agree to terminate and cancel the following agreements, effective immediately, such that each such agreement shall hereafter have no force or effect: (i) License Agreement, dated in 2010, between the Purchaser and the Company, and (ii) Management Services Agreement, dated in 2010, between the Purchaser and the Company.

## ARTICLE VIII

## SURVIVAL; INDEMNITY

**Section 8.1    Survival**.    Notwithstanding any right of any party hereto fully to investigate the affairs of any other party, and notwithstanding any knowledge of facts determined or determinable pursuant to such investigation or right of investigation, each party hereto shall have the right to rely fully upon the representations, warranties, covenants and agreements of the other parties contained in this Agreement and the Schedules, if any, furnished by any other party pursuant to this Agreement, or in any certificate or document delivered at the Closing by any other party.   Subject to the limitations set forth in Section 8.6, the respective representations, warranties, covenants and agreements of the Principals, Holdco, the Company and the Purchaser contained in this Agreement shall survive the Closing.

**Section 8.2    Obligation of Holdco, the Company and the Principals to Indemnify**.

8.2.1    General Indemnity.    Subject to the limitations contained in Sections 8.6.1 and 8.6.2, Holdco, the Company and each of the Principals, hereby agrees, jointly and severally, to indemnify the Purchaser and its Affiliates, stockholders, officers, directors, employees, agents, representatives and successors, permitted assignees of the Purchaser and their Affiliates (individually, a "**Purchaser Indemnified Party**" and collectively, the "**Purchaser Indemnified Parties**") against, and to protect, save and keep harmless the Purchaser Indemnified Parties from, and to pay on behalf of or reimburse the Purchaser Indemnified Parties as and when incurred for, any and all liabilities (including liabilities for Taxes), obligations, losses, damages, penalties, demands, claims, actions, suits, judgments, settlements, penalties, interest, out-of-pocket costs, expenses and disbursements (including reasonable costs of investigation, and reasonable attorneys', accountants' and expert witnesses' fees) of whatever kind and nature (collectively, "**Losses**"), that may be imposed on or incurred by any Purchaser Indemnified Party as a consequence of, in connection with, incident to, resulting from or arising out of or in any way related to or by virtue of: (a) any misrepresentation, inaccuracy or breach of any warranty or representation contained in Article III.B hereof or in any certificate delivered by Holdco, the Company or the Principals at the Closing; (b) any action, demand, proceeding, investigation or claim by any third party (including any Governmental or Regulatory Authority) against or affecting any Purchaser Indemnified Party which may give rise to or evidence the existence of or relate to a misrepresentation or breach of any of the representations and warranties of Holdco, the Company and the Principals contained in Article III.B hereof or in any certificate delivered by Holdco, the Company or the Principals at the Closing; (c) any breach or failure by Holdco, the Company or the Principals to comply with, perform or discharge any obligation, agreement or covenant by Holdco, the Company or the Principals contained in this Agreement; (d) any liability or obligation or any assertion against any Purchaser Indemnified Party, arising out of or relating, directly or indirectly, to any Excluded Asset or any Retained Liability or other liability arising, in whole or in part, out of the ownership or operation of the assets or business of the Company and/or the Acquired Business prior to the Closing, notwithstanding the fact that certain of the Company's operations, services and administrative back-office functions have been administered by the Purchaser and certain of the Contracts and the Real Property Leases have been entered into by the Purchaser, Holdco or MSG III, as the case may be, instead of the Company; (e) any litigation or claim disclosed on **Schedule 3.10** to this Agreement; (f) any liability or obligation or

any assertion against any Purchaser Indemnified Party, arising out of or relating, directly or indirectly, to any violation of any "pay for play" legislation and/or regulations; and (g) any liability or obligation set forth on **Schedule 8.2.1(g)**.

8.2.2   <u>Special Indemnity</u>.   Subject to the limitations contained in Sections 8.6.1 and 8.6.2, Holdco and each of the Principals hereby severally agrees to indemnify the Purchaser Indemnified Parties against, and to protect, save and keep harmless the Purchaser Indemnified Parties from, and to assume liability for, the payment of all Losses that are imposed on or incurred by any Purchaser Indemnified Party as a consequence of, in connection with, incident to, resulting from or arising out of or in any way related to or by virtue of: (a) any misrepresentation, inaccuracy or breach of a representation or warranty by Holdco or such Principal contained in Article III.A hereof; and (b) any action, demand, proceeding, investigation or claim by any third party (including any Governmental or Regulatory Authority) against or affecting any Purchaser Indemnified Party which may give rise to or evidence the existence of or relate to a misrepresentation or breach of any of the representations and warranties of Holdco or such Principal contained in Article III.A hereof or in any certificate delivered by such Principal at the Closing.   Any claim for indemnity made under this Section 8.2.2 shall not be construed as a claim under Section 8.2.1 hereof even if a Purchaser Indemnified Party could have made a claim under Section 8.2.1 hereof in respect of the same matters.

8.2.3   <u>Losses</u>.   The term **"Losses"** as used in this Agreement is not limited to matters asserted by third parties against a Purchaser Indemnified Party but includes Losses incurred or sustained by a Purchaser Indemnified Party in the absence of third party claims.

**Section 8.3   <u>Obligation of the Purchaser to Indemnify</u>**.   Subject to the limitations set forth in Section 8.6.3 hereof, the Purchaser hereby agrees to indemnify Holdco, the Company and the Principals (individually a **"Company Indemnified Party"** and collectively, the **"Company Indemnified Parties"**) against, and to protect, save and keep harmless the Company Indemnified Parties from, and to pay on behalf of or reimburse the Company Indemnified Parties as and when incurred for, any and all Losses that may be imposed on or incurred by the Company Indemnified Parties as a consequence of, in connection with, incident to, resulting from or arising out of or in any way related to or by virtue of: (a) any misrepresentation, inaccuracy or breach of any warranty or representation of the Purchaser contained in Article IV hereof or in any certificate delivered by the Purchaser at the Closing; (b) any action, demand, proceeding, investigation or claim by any third party (including any Governmental or Regulatory Authority) against or affecting any Company Indemnified Party which may give rise to or evidence the existence of or relate to a misrepresentation or breach of any of the representations and warranties of the Purchaser contained in Article IV hereof or in any certificate delivered by the Purchaser at the Closing; (c) any breach or failure by the Purchaser to comply with, perform or discharge any obligation, agreement or covenant by the Purchaser contained in this Agreement; or (d) any liability or obligation or any assertion against any Company Indemnified Party arising out of or relating, directly or indirectly, to any Assumed Liability.

**Section 8.4**      **Indemnification Procedures**.

8.4.1   Non-Third Party Claims.

(a)      If any Person entitled to indemnification under this Agreement (an "**Indemnified Party**") asserts a claim for indemnification which does not involve a Third Party Claim (as defined in Section 8.4.2) (a "**Non-Third Party Claim**"), against which a Person is required to provide indemnification under this Agreement (an "**Indemnifying Party**"), the Indemnified Party shall give written notice to the Indemnifying Party (the "**Non-Third Party Claim Notice**"), which Non-Third Party Claim Notice shall (i) describe the claim in reasonable detail, and (ii) indicate the amount (estimated, if necessary, and to the extent feasible) of the Losses that have been or may be suffered by the Indemnified Party.

(b)      The Indemnifying Party may acknowledge and agree by written notice (the "**Non-Third Party Acknowledgement of Liability**") to the Indemnified Party to satisfy the Non-Third Party Claim within 30 days of receipt of the Non-Third Party Claim Notice. If the Indemnifying Party disputes the Non-Third Party Claim, the Indemnifying Party shall provide written notice of such dispute (the "**Non-Third Party Dispute Notice**") to the Indemnified Party within 30 days of receipt of the Non-Third Party Claim Notice (the "**Non-Third Party Dispute Period**"), setting forth a reasonable basis of such dispute.  If the Indemnifying Party shall fail to deliver the Non-Third Party Acknowledgement of Liability or Non-Third Party Dispute Notice within the Non-Third Party Dispute Period, the Indemnifying Party shall be deemed to have acknowledged and agreed to pay the Non-Third Party Claim in full and to have waived any right to dispute the Non-Third Party Claim. Once the Indemnifying Party has acknowledged and agreed to pay any Non-Third Party Claim pursuant to this Section 8.4.1, or once any dispute under this Section 8.4.1 has been finally resolved in favor of indemnification by a court or other tribunal of competent jurisdiction, subject to the provisions of Section 8.6, the Indemnifying Party shall pay the amount of such Non-Third Party Claim to the Indemnified Party within 10 days of the date of acknowledgement or resolution, as the case may be, to such account and in such manner as is designated in writing by the Indemnified Party.

8.4.2   Third-Party Claims.

(a)      If any Indemnified Party asserts a claim for indemnification or receives notice of the assertion of any claim or of the commencement of any action or proceeding by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement in respect of which such Indemnified Party is entitled to indemnification under this Agreement by an Indemnifying Party (a "**Third Party Claim**"), the Indemnified Party shall give written notice to the Indemnifying Party (the "**Third Party Claim Notice**") within 20 days after asserting or learning of such Third Party Claim (or within such shorter time as may be necessary to give the Indemnifying Party a reasonable opportunity to respond to such claim). The Third Party Claim Notice shall (i) describe the claim in reasonable detail, and (ii) indicate the amount (estimated, if necessary, and to the extent feasible) of the Losses that have been or may be suffered by the Indemnified Party. The Indemnifying Party must provide written notice to the Indemnified Party that it is either (i) assuming responsibility for the Third Party Claim or (ii) disputing the claim for indemnification against it (the "**Indemnification Notice**"). The Indemnification Notice must be provided by the Indemnifying Party to the Indemnified Party within 20 days after receipt of the

Third Party Claim Notice or within such shorter time as may be necessary to give the Indemnified Party a reasonable opportunity to respond to such Third Party Claim (the "**Indemnification Notice Period**").

(b)     If the Indemnifying Party provides an Indemnification Notice to the Indemnified Party within the Indemnification Notice Period that it assumes responsibility for the Third Party Claim, the Indemnifying Party shall conduct at its expense the defense against such Third Party Claim in its own name, or if necessary in the name of the Indemnified Party. The Indemnification Notice shall specify the counsel it will appoint to defend such claim ("**Defense Counsel**"); provided, however, that the Indemnified Party shall have the right to approve the Defense Counsel, which approval shall not be unreasonably withheld or delayed.  If the Indemnifying Party fails to give the Indemnification Notice within the Indemnification Notice Period, the Indemnified Party shall have the right to conduct the defense and to compromise and settle such Third Party Claim without the prior consent of the Indemnifying Party and subject to the provisions of Section 8.6, the Indemnifying Party will be liable for all Losses paid or incurred in connection therewith.

(c)     If the Indemnifying Party provides in the Indemnification Notice that it disputes the claim for indemnification against it, the Indemnified Party shall have the right to conduct the defense and to compromise and settle such Third Party Claim, without the prior consent of the Indemnifying Party. Once such dispute has been finally resolved in favor of indemnification by a court or other tribunal of competent jurisdiction or by mutual agreement of the Indemnified Party and Indemnifying Party, subject to the provisions of Section 8.6, the Indemnifying Party shall within 10 days of the date of such resolution or agreement, pay to the Indemnified Party all Losses paid or incurred by the Indemnified Party in connection therewith.

(d)     If the Indemnifying Party delivers an Indemnification Notice pursuant to which it elects to conduct the defense of the Third Party Claim, the Indemnifying Party shall be entitled to have the exclusive control over the defense of the Third Party Claim and the Indemnified Party will cooperate in good faith with and make available to the Indemnifying Party such assistance and materials as it may reasonably request, all at the expense of the Indemnifying Party. The Indemnified Party shall have the right at its expense to participate in the defense assisted by counsel of its own choosing.  The Indemnifying Party will not settle the Third Party Claim or cease to defend against any Third Party Claim as to which it has (x) delivered an Indemnification Notice and (y) assumed responsibility for the Third Party Claim, without the prior written consent of the Indemnified Party, if, as a result of such settlement or cessation of defense, (i) injunctive relief or specific performance would be imposed against the Indemnified Party, or (ii) such settlement or cessation would lead to liability or create any financial or other obligation on the part of the Indemnified Party for which the Indemnified Party is not entitled to indemnification hereunder.

(e)     If an Indemnified Party refuses to consent to a bona fide offer of settlement which the Indemnifying Party wishes to accept, which provides for a full release of the Indemnified Party and its Affiliates relating to the Third Party Claims underlying the offer of settlement and solely for a monetary payment, the Indemnified Party may continue to pursue such matter, free of any participation by the Indemnifying Party, at the sole expense of the Indemnified Party. In

41

such an event, the obligation of the Indemnifying Party shall be limited to the amount of the offer of settlement which the Indemnified Party refused to accept plus the reasonable costs and expenses of the Indemnified Party incurred prior to the date the Indemnifying Party notified the Indemnified Party of the offer of settlement.

(f)     Notwithstanding clause (d) above, the Indemnifying Party shall not be entitled to control, but may participate in, and the Indemnified Party shall be entitled to have sole control over, the defense or settlement of (x) that part of any Third Party Claim (i) that seeks a temporary restraining order, a preliminary or permanent injunction or specific performance against the Indemnified Party, or (ii) to the extent such Third Party Claim involves criminal allegations against the Indemnified Party or (y) the entire Third Party Claim (i) if such Third Party Claim would impose liability on the part of the Indemnified Party in an amount which is greater than the amount as to which the Indemnified Party is entitled to indemnification under this Agreement or (ii) that if unsuccessful, would set a precedent that would have a material adverse effect on, the business or financial condition of the Indemnified Party.  In the event the Indemnified Party retains control of the Third Party Claim, the Indemnified Party will not settle the subject claim without the prior written consent of the Indemnifying Party, which consent will not be unreasonably withheld or delayed.

(g)     A failure by an Indemnified Party to give timely, complete or accurate notice as provided in this Section 8.4 will not affect the rights or obligations of any party hereunder except and only to the extent that, as a result of such failure, any party entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise directly and materially damaged as a result of such failure to give timely notice.

Section 8.5     <u>Right of Offset</u>.  Without limiting any other rights or remedies available to it, the Purchaser shall be entitled, subject to the limitations set forth in Section 8.6, to offset any claim for indemnity made pursuant to Section 8.2 and in accordance with Section 8.4, against any payment of the Purchase Price due under Section 2.1; provided, however, the Purchaser may only exercise such right of offset in respect of claims relating to Losses actually incurred by a Purchaser Indemnified Party (in which case the amount of such offset shall be the amount of such actual Loss) or claims actually asserted by a third party (in which case the amount of the offset shall not exceed the Purchaser's good faith estimate of the amount of indemnifiable Losses that will ultimately be payable to a Purchaser Indemnified Party in respect of such claims). If any such claims for indemnity are resolved in favor of the Company by mutual agreement or otherwise, or if the amount withheld exceeds the amount ultimately payable to a Purchaser Indemnified Party in respect of such claim, the Purchaser shall pay to the Company the excess amount withheld with respect to such claim, together with interest thereon for the period such amount has been withheld at a rate equal to the published prime rate of interest of J.P. Morgan Chase in New York, in effect from time to time during the relevant period.

Section 8.6     <u>Limitations On and Other Matters Regarding Indemnification</u>.

8.6.1   <u>Indemnity Cushion and Cap</u>.  Subject to Section 8.6.5, the Principals, Holdco and the Company shall not have any liability to any Purchaser Indemnified Party with respect to Losses arising out of any of the matters referred to in Section 8.2 until such time as the amount of such

liability shall exceed $25,000 in the aggregate (in which case Holdco, the Company or the Principals, as the case may be, shall be liable for all Losses in excess of $25,000). Notwithstanding anything to the contrary herein, subject to Section 8.6.5 below, the maximum aggregate liability of Holdco, the Company and the Principals for indemnity payments under Section 8.2 shall be an amount equal to the sum of the CP, FIP, SIP and FP, as determined from time to time hereunder (each, an "**Interim Cap**"), but subject to increase as additional components of the Purchase Price are ultimately determined pursuant to this Agreement, and without giving effect to Section 8.6.4 of this Agreement (as ultimately so increased, the "**Final Cap**"); provided, however, that any Losses which remain unpaid at any time as provided under this Agreement as a result of an Interim Cap may thereafter be paid, subject to subsequent Interim Caps and the Final Cap, including, without limitation in accordance with Section 8.5 hereof, but in all events subject to the Final Cap as the Final Cap shall be ultimately determined. Notwithstanding the foregoing, each Principal's maximum aggregate liability for indemnity payments pursuant to Section 8.2.1 and Section 8.2.2, as the case may be, subject to Section 8.6.5 below, shall be such Principal's allocable share of the total Purchase Price payable pursuant to Section 2.1 of this Agreement.

8.6.2   <u>Termination of Indemnification Obligations of Holdco, the Company or the Principals</u>. Subject to Section 8.6.5, the obligation of Holdco, the Company or the Principals to indemnify under Section 8.2 hereof shall terminate on March 31, 2017, except as to matters as to which any Purchaser Indemnified Party has made a claim for indemnification on or prior to such date, in which case the right to indemnification with respect thereto shall survive the expiration of such period until such claim for indemnification is finally resolved and any obligations with respect thereto are fully satisfied.

8.6.3   <u>Termination of Indemnification Obligations of the Purchaser</u>. Subject to Section 8.6.5, the obligation of the Purchaser to indemnify under Section 8.3 hereof shall terminate on March 31, 2017, except as to matters as to which any Company Indemnified Party has made a claim for indemnification on or prior to such date, in which case the right to indemnification with respect thereto shall survive such period until such claim for indemnification is resolved and any obligations with respect thereto are fully satisfied.

8.6.4   <u>Treatment</u>. Any indemnity payments by an Indemnifying Party to an Indemnified Party under this Article VIII shall be treated by the parties as an adjustment to the Purchase Price.

8.6.5   <u>Exceptions</u>. Each of the limitations set forth above in this Section 8.6 shall in no event (a) apply to any Losses incurred by a Purchaser Indemnified Party which relate, directly or indirectly, to (i) any fraudulent acts, willful misconduct or intentional breaches committed by Holdco, the Company or the Principals; (ii) any breach of a representation or warranty contained in Section 3.1, 3.6, 3.11, 3.12, 3.19 or 3.25 or any other provision hereof relating to Taxes; (iii) any indemnification obligation under Sections 8.2.1(c), 8.2.1(d), 8.2.1(e), 8.2.1(f) or 8.2.1(g); and (iv) the obligations of the Principals, Holdco and the Company set forth in Section 9.1 to pay certain expenses; or (b) apply to any Losses incurred by a Company Indemnified Party which relate, directly or indirectly, to (i) any fraudulent acts or willful misconduct committed by the Purchaser; (ii) any indemnification obligation under Section 8.3(c) and 8.3(d); and (iii) the Purchaser's obligations set forth in Section 9.1 to pay certain expenses.

8.6.6   <u>Tax and Insurance Effects</u>.  If the Taxes payable by the Purchaser are actually reduced (net of any related Tax increases and taking into account the Tax consequences to the Indemnified Party of the receipt of any indemnity payment due and payable by the Indemnifying Party under this Article VIII) below that which, but for the Loss, would have been payable, as determined in the sole, good faith discretion of the Purchaser, then (i) to the extent such reduction has taken place prior to the payment of any indemnity payment, such payment shall be appropriately decreased in respect thereof and (ii) to the extent such reduction shall take place after the time any indemnity payment has been made, the Purchaser shall pay to the Company the amount of such net Tax reduction within a reasonable time after such higher Taxes would otherwise have been paid. Any amounts otherwise required to be paid by an Indemnifying Party under this Article VIII shall be net of any insurance proceeds received by the Indemnified Party so long as such proceeds are provided by third party carriers and not in connection with self-insurance; it being understood that each party hereto shall use its commercially reasonable efforts to pursue all reasonable remedies against such applicable third party carriers.

**ARTICLE IX**

**MISCELLANEOUS**

**Section 9.1**   <u>**Expenses**</u>.  Except as otherwise provided in this Agreement, each of the Purchaser, on the one hand, and the Principals, Holdco and the Company, on the other hand, shall pay its or his own expenses relating to the transactions contemplated by this Agreement, including, without limitation, the fees and expenses of their respective counsel, financial advisors and accountants.

**Section 9.2**   <u>**Governing Law**</u>.  The interpretation and construction of this Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Agreement), shall be governed by the laws of the State of New York without regard to any conflicts or choice of laws provisions of the State of New York that would result in the application of the law of any other jurisdiction. Each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any court of the State of New York located in New York County in any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby, and agrees that any such action, suit or proceeding shall be brought only in such court. Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 9.3**   <u>**"Person" Defined**</u>.  **"Person"** shall mean and include an individual, a company, a joint venture, a corporation (including any non-profit corporation), an estate, an association, a trust, a general or limited partnership, a limited liability company, a limited liability partnership, an unincorporated organization and a government or other department or agency thereof.

44

Section 9.4    **"Knowledge" Defined.**  Where any representation and warranty contained in this Agreement is expressly qualified by reference to the knowledge of the Principals, such term shall be limited to the actual knowledge of any executive officer of Holdco or the Company or any of the Principals, and unless otherwise stated such knowledge that would have been discovered by any of them after reasonable inquiry.  Where any representation and warranty contained in this Agreement is expressly specified by reference to the knowledge of the Purchaser, as the case may be, such term shall be limited to the actual knowledge of the executive officers of the Purchaser and unless otherwise stated, such knowledge that would have been discovered by such executive officers after reasonable inquiry.

Section 9.5    **"Affiliate" Defined**.  As used in this Agreement, an **"Affiliate"** of any Person, shall mean any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such Person.

Section 9.6    **Captions.**  The Article and Section captions used herein are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

Section 9.7    **Publicity.**  Subject to the provisions of the next sentence, no party to this Agreement shall, and the Representative shall insure that no representative of Holdco or the Company shall, issue any press release or other public document or make any public statement relating to this Agreement or the matters contained herein without obtaining the prior approval of the Purchaser and the Representative.  Notwithstanding the foregoing, the foregoing provision shall not apply to the extent that the Purchaser or Omnicom is required to make any announcement relating to or arising out of this Agreement by virtue of the federal securities laws of the United States or the rules and regulations promulgated thereunder or other rules of the New York Stock Exchange, or any announcement by any party or the Company pursuant to applicable law or regulations.

Section 9.8    **Notices.**    Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to any other party shall be in writing and shall be deemed to have been given (a) upon personal delivery, if delivered by hand or courier, (b) three days after the date of deposit in the mails, postage prepaid, or (c) the next business day if sent by a prepaid overnight courier service, and in each case at the respective addresses set forth below or such other address as such party may have fixed by notice:

If to the Purchaser, addressed to:

c/o Omnicom Group Inc.
437 Madison Avenue
New York, New York 10022
Attention:  General Counsel

with a copy to (which shall not constitute notice):

Davis & Gilbert LLP
1740 Broadway
New York, New York 10019

Attention:  Evan D. Weiner, Esq.

If to Holdco, the Company or the Principals, addressed to:

c/o Mercury Public Affairs LLC
14502 N. Dale Mabry Hwy, Suite 104
Tampa, FL 33618
Attention: Kieran Mahoney

with a copy to (which shall not constitute notice):

Moses & Singer LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Attention:  Jeffrey M. Davis, Esq.

Any party may change the address to which notices are to be sent by giving notice of such change of address to the other parties in the manner herein provided for giving notice.

Section 9.9    **Parties in Interest.**  This Agreement may not be transferred, assigned, pledged or hypothecated by any party hereto, other than by operation of law.  Any purported such transfer, assignment, pledge, or hypothecation (other than by operation of law) shall be void and ineffective.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 9.10   **Severability.**  If any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same effect as though the void or unenforceable part had been severed and deleted.

Section 9.11   **Counterparts.**   This Agreement may be executed in two or more counterparts, each of which taken together shall constitute one instrument. Signatures to this Agreement delivered by facsimile or in .pdf or other electronic format shall be acceptable and binding and treated in all respects as having the same effect as an original signature.

Section 9.12   **Entire Agreement.**  This Agreement, together with the Schedules  hereto, and the Employment Agreement, the Protective Covenant Agreements and the General Assignment, Bill of Sale and Assumption Agreement (collectively, the "**Operative Documents**"), constitutes the sole, exclusive and only agreements of the parties hereto pertaining to the subject matter hereof, contains all of the covenants, conditions and agreements between the parties, express or implied, whether by statute or otherwise, and sets forth the respective rights, duties and obligations of each party to the other parties as of the date hereof.  Any prior agreements, promises, negotiations or representations not expressly set forth in the Operative Documents are of no force and effect; provided, however, nothing contained in this Agreement shall affect any confidentiality agreements, non-solicitation/non-servicing agreements or any

46

other type of restrictive covenant agreement that any Principal, Holdco or the Company enters into with Omnicom or one of its Affiliates. No oral understandings, oral statements, oral promises or oral inducements exist.

Section 9.13 **Amendments.**  This Agreement may not be amended, supplemented or modified orally, but only by an agreement in writing signed by the Purchaser and the Representative.

Section 9.14 **Third Party Beneficiaries; Control by Omnicom.**  Each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the parties hereto and their respective successors and assigns as permitted under Section 9.9. All decisions and determinations to be made by the Purchaser and/or a Purchaser Indemnified Party under this Agreement shall be made by Omnicom (or its designee, as evidenced in a writing delivered to the Company and the Representative) in the name of and on behalf of the Purchaser and/or such other Purchaser Indemnified Party.

Section 9.15 **Use of Terms.**  Whenever the context so requires or permits, all references to the masculine herein shall include the feminine and neuter, all references to the neuter herein shall include the masculine and feminine, all references to the plural shall include the singular and all references to the singular shall include the plural.

Section 9.16 **"Liens" Defined.**  With respect to any asset, a **"Lien"** shall mean (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance of any kind, charge or security interest in, on or of such asset (including, without limitation, any liens imposed in favor of any governmental or taxing authority, including, without limitation, liens relating to Taxes), (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (other than an operating lease) (or any financial lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

Section 9.17 **No Strict Construction; Representation by Counsel**.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto.  The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.  Each of the parties acknowledges that it has been represented by an attorney in connection with the preparation and execution of this Agreement.

Section 9.18 **Representative**.  Each of the Principals by execution of this Agreement appoints Mahoney (the **"Representative"**) as his exclusive agent and attorney-in-fact to give and receive notices and communications with respect to the provisions of Sections 2.1.4 and 8.4 of this Agreement, and to agree to, negotiate, enter into settlements or compromises of matters arising under such Sections of this Agreement, and to take any and all actions necessary or appropriate in the judgment of the Representative to be taken on behalf of the Principals under such Sections.  Such agency is irrevocable and coupled with an interest; provided, however, the

1644095.7 05337-0001-398

Representative shall have no authority to act on behalf of any Principal with respect to an indemnity claim under Section 8.2.2. Notwithstanding the foregoing, upon the death or incapacity of Mahoney, or his ceasing to be an employee of the Purchaser, Goncharenko shall serve as successor Representative and shall notify the Purchaser of such succession in writing, provided he is then an employee of the Purchaser. If Goncharenko is unable to serve as successor Representative or in the event he is no longer an employee of the Purchaser, the Principals shall elect a successor Representative who is then an employee of the Purchaser. The Representative must be an employee of the Purchaser. Notwithstanding the foregoing, no bond shall be required of the Representative and the expenses of the Representative shall be paid for by the Principals. Notices or communications to or from the Representative shall constitute notice to or from the Principals in respect of matters relating to Sections 2.1.4 and 8.4 of this Agreement. The Principals for and among themselves agree that the Representative shall be bound to act in accordance with the decision of a majority in interest among the Principals based on their respective ownership of the equity interests in Holdco; provided, however, as between the Representative and the Purchaser, a decision, act, consent or instruction of the Representative shall constitute a decision of all the Principals, and shall be final, binding and conclusive upon each Principal, and the Purchaser may rely upon any decision, act, consent or instruction of the Representative as being the decision, act, consent or instruction of each Principal.

      **Section 9.19    Signature Requirements**. Any agreement and/or document which require the signature of the Purchaser in connection with the transactions contemplated hereby shall be signed by the DAS CFO or his designee.

48

**IN WITNESS WHEREOF,** the parties hereto have executed this Asset Purchase Agreement, on the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____

        Louis F. Januzzi
        **Assistant Secretary**

MSGDMNSM VENTURES II LLC

By: _____

        **Name: Kieran Mahoney**
        **Title: Principal**

NEWCO NEW JERSEY LLC

By: _____

        **Name: Michael DuHaime**
        **Title: Managing Director**

_____

        **Michael DuHaime**

_____

        **Fabian Nunez**

_____

        **Kieran Mahoney**

_____

        **Kirill Goncharenko**

_____

        **Michael McKeon**

_____

        **Thomas Doherty**

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement, on the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
         Louis F. Januzzi
         Assistant Secretary

MSGDMNSM VENTURES II LLC

By: _____
         Name: Kieran Mahoney
         Title: Principal

NEWCO NEW JERSEY LLC

By: _____
         Name: Michael DuHaime
         Title: Managing Director

_____
         Michael DuHaime

_____
         Fabian Nunez

_____
         Kieran Mahoney

_____
         Kirill Goncharenko

_____
         Michael McKeon

_____
         Thomas Doherty

**IN WITNESS WHEREOF,** the parties hereto have executed this Asset Purchase Agreement, on the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
              Louis F. Januzzi
              Assistant Secretary

MSGDMNSM VENTURES II LLC

By: _____
              Name: Kieran Mahoney
              Title: Principal

NEWCO NEW JERSEY LLC

By: _____
              Name: Michael DuHaime
              Title: Managing Director

_____
              Michael DuHaime


_____
              Fabian Nunez


_____
              Kieran Mahoney


_____
              Kirill Goncharenko


_____
              Michael McKeon


_____
              Thomas Doherty

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement, on the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
    Louis F. Jammal
    Assistant Secretary

MSGDMNEM VENTURES II LLC

By: _____
    Name: Kieran Mahoney
    Title: Principal

NEWCO NEW JERSEY LLC

By: _____
    Name: Michael DuHaime
    Title: Managing Director

_____
    Michael DuHaime

_____
    Fabian Núñez

_____
    Kieran Mahoney

_____
    Kirill Goncharenko

_____
    Michael McKeon

_____
    Thomas Doherty

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase
Agreement, as the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
        Louis J. Jannani
        Assistant Secretary

MOGODNUM VENTURES II LLC

By: _____
        Name: Shawn Mahoney
        Title: Principal

NEWCO NEW JERSEY LLC

By: _____
        Name: Michael DuBaine
        Title: Managing Director


_____
        Michael DuBaine


_____
        Feldon Nunez


_____
        Shawn Mahoney


_____
        Kirill Goncharenko


_____
        Michael McKern


_____
        Thomas Doherty

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement, on the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
Louis F. Januzzi
Assistant Secretary

MSGDMNSM VENTURES II LLC

By: _____
Name: Kieran Mahoney
Title: Principal

NEWCO NEW JERSEY LLC

By: _____
Name: Michael DuHaime
Title: Managing Director

_____
Michael DuHaime

_____
Fabian Nunez

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Michael McKeon

_____
Thomas Doherty

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement, on the day and year first above written.

MERCURY PUBLIC AFFAIRS LLC

By: _____
       Louis F. Jimenez
       Assistant Secretary

MSGDMNSM VENTURES II LLC

By: _____
       Name: Kieran Mahoney
       Title: Principal

NEWCO NEW JERSEY LLC

By: _____
       Name: Michael DuHaime
       Title: Managing Director

_____
Michael DuHaime

_____
Fabian Nunez

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Michael McKeon

_____
Thomas Doherty