# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MERCURY PUBLIC AFFAIRS LLC, and MPA HOLDINGS INC.<br><br>                                Plaintiffs,<br><br>   -against-<br><br>FABIAN NUNEZ, and KIRILL GONCHARENKO,<br><br>                          Defendants. | Case No. 1:21-cv-8300<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Mercury Public Affairs LLC ("Mercury") and its controlling member MPA Holdings Inc. ("MPA Holdings") (collectively, "Plaintiffs") by their attorneys, for their complaint against Defendants Fabian Nunez and Kirill Goncharenko (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1.     This case is about Defendants, two highly paid executives and former principals of Plaintiff Mercury, and their unlawful scheme to harm Mercury and further line their own pockets.  Having been paid millions of dollars by Mercury, and having promised in multiple written contracts not to solicit Mercury's employees or clients, Defendants have now broken those promises.  Defendants have resigned from Mercury, set up a new business, and are in the process of stripping Mercury's California office of its employees and clients.  "All of our clients are coming with us," the Los Angeles Times reported one of Defendants' colleagues at the new company as saying today.  This lawsuit is brought in this Court because the applicable contracts provide for New York courts as the "exclusive" forum and for New York law to apply.  It seeks to enforce the contractual provisions that the parties agreed to, for which Mercury negotiated and paid handsomely, and which Defendants have openly breached.

1

2.      Mercury is in the business of providing public affairs and government relations consulting services.  Over twenty years ago, Defendant Goncharenko and his business associates founded Mercury.  Several years later, Defendant Nunez joined.  In Mercury's early years, Defendant Goncharenko quickly realized Mercury needed a larger platform and outside investment to grow.  He found that platform through a relationship with Omnicom Group Inc. ("Omnicom"), a global leader in marketing and communications based in New York.  In or around 2003, Defendant Goncharenko and his partners successfully obtained an investment from Omnicom which, through a subsidiary, purchased a majority stake in Mercury.

3.      Over the course of the next several years, Defendant Goncharenko and his partners sold 100 percent of Mercury to certain Omnicom subsidiaries.  Omnicom paid nearly $30 million to acquire Mercury, with payments starting in 2003 and continuing until 2010.  Omnicom's stake in Mercury was ultimately consolidated within Plaintiff MPA Holdings.  Later, Omnicom paid millions to purchase Defendant Fabian Nunez's company.  Indeed, Defendants personally received nearly $10 million in connection with these and related transactions.  In short, Defendants needed the support of Omnicom to run the Mercury business and they were happy to take Omnicom's substantial investment.

4.      Throughout their relationship with Omnicom, Defendants reaped considerable benefits.  They were principals, officers, and employees of Mercury (and at times, part owners of the business).  They were each paid millions of dollars in salary, bonuses and profit-sharing distributions to run the business, with only a few basic, sensible restrictions on their operational activities—restrictions necessary to ensure that all businesses within the Omnicom umbrella operated ethically, profitably, and with integrity.

5.      Unfortunately, Defendants took unfair advantage of the considerable leeway they

received from Omnicom during the relationship. Within a few years, they began to routinely complain that the millions of dollars in compensation they were receiving was somehow not enough. Defendants also complained that Mercury needed to aggressively expand, and brought proposals to Omnicom to create multiple Mercury "satellite" offices in several jurisdictions. Plaintiffs indulged Defendants, took their proposals seriously, and worked hard to create a good-faith working environment for all parties.

6.      But Defendants would not relent. Soon they sought to ***regain*** their equity in Mercury—equity they had long sold years prior for considerable personal profit. Wanting to compromise, Omnicom and Mercury once again came up with a solution that it thought would keep Defendants happy. Even though they no longer controlled Mercury through any ownership stake, Defendants and several of their colleagues were given a ***45 percent profits*** stake in Mercury's business—up from zero percent at the time. Omnicom also agreed, at continued insistence by Defendants, to allow them to pursue alternative markets which could ultimately be rolled into the Mercury business. Notably, Omnicom allowed Defendants to start and operate so-called new public affairs operations (called "NewCos") in various jurisdictions. If a NewCo met certain profitability benchmarks and other commercial standards, Defendants could trigger a sale of the NewCo to Omnicom. This arrangement gave Defendants room to explore reaching new markets and industries; provided them a trial period to turn a profit and run their "NewCo" businesses to conform with certain ethical and profitability standards; and set up a mechanism whereby Defendants could reap the fruits of their success through a sale of their business into the corporate family of which Mercury was already a part. Several NewCos were founded through this process, and Defendants had a full and fair opportunity to test drive their expansion dreams and funded the operations of these NewCos at their own expense.

7.      But Mercury was concerned—and recent developments have proven those concerns well-founded—that Defendants could abuse this freedom and try to strike out on their own in competition with Mercury.  To specifically guard against this possibility and protect its business interests, Mercury and Defendants entered into several written protective covenant agreements (collectively, the "Protective Covenants").  Through these Protective Covenants, Defendants agreed that following any termination of their employment at Mercury, *they would not solicit business or employment relationships with Mercury's existing clients or employees*. The Protective Covenants were eminently reasonable.  They largely permit Defendants to continue working unrestricted in the public affairs industry—even after leaving Mercury—only prohibiting them for a limited period of time *from soliciting Mercury's clients and employees*.

8.      But Defendants did not care about their contractual obligations or their fiduciary duties to Mercury.  They cared primarily about their own bank accounts.  Plaintiffs are informed and believe that, in around early 2021, Defendants began secretly plotting with one another and other Mercury employees about an exit plan.  Then, in early October 2021, Defendants executed a pre-planned campaign designed to cripple Mercury and harm its business.  They each submitted self-serving resignation letters containing defamatory and personal allegations against Omnicom and its executives.  Then, shortly after they resigned, approximately *two dozen Mercury employees* and *eleven long-term Mercury clients* submitted formal separation notices to Mercury.

9.      Defendants also filed a pre-emptive action in California state court on October 1, 2021, the same day the resigned seeking to "declare" some, but not all, of the Protective Covenants unenforceable.  *See Nunez et al. v. Mercury Public Affairs LLC, et al.*, Case No. 21STCV36104 (Cal. Super. Ct.).  That lawsuit lacks merit and is simply procedural

gamesmanship to avoid this Court.  The operative agreements provide for an "***exclusive***" New York forum and applying New York law to the parties' dispute, which Defendants failed to point out to the California court.

10.    More troublingly, even before Defendants resigned, they registered at least three entities under the operating name "Actum," which is the new haven for the business and employees they stole—and otherwise intend to steal—from Mercury.[1]  Through Actum, Defendants essentially and admittedly intend to do precisely what the Protective Covenants prohibit:  siphon Mercury's employees and its clients.  But Defendants' contractual obligations and fiduciary duties stand in the way.  They must be enjoined from successfully completing their scheme.

**PARTIES**

11.    Plaintiff Mercury Public Affairs LLC is a limited liability company organized under the laws of Delaware.  Its members are (a) Plaintiff MPA Holdings Inc., a Delaware corporation, which owns a 100 percent of the capital interests in Mercury, and (b) High Stakes Holdings Co. LLC, a Delaware limited liability company, which owns a 45 percent profits interest stake in Mercury.

12.    Plaintiff MPA Holdings is a wholly owned subsidiary of Omnicom.

13.    Defendant Fabian Nunez is an individual who resides in California, is a former Mercury principal, and is a former member of High Stakes.

14.    Defendant Kirill Goncharenko is an individual who resides in California, is a former Mercury principal, and is a former member of High Stakes.

---

[1] Plaintiffs are aware of three Actum entities:  Actum I LLC, Actum CA OPCO LLC, and Actum UK OPCO LLC, all of which are limited liabilities companies registered in Delaware.  In this Complaint, Plaintiffs refer to Defendants' unlawful competitor venture as "Actum."

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 over this action because there is complete diversity of the parties and the amount in controversy exceeds the statutory minimum of $75,000, which is inclusive of significant damages Plaintiffs seek from Defendants for their material breaches of the Protective Covenants and the loss of business and employees Defendants have already unlawfully procured.

16.     This Court also has personal jurisdiction over Defendants for several reasons. Most notably, this suit arises, in material part, from the relevant Protective Covenants Defendants signed, which contain valid and enforceable forum selection clauses that state:  "each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any court of the State of New York located in New York County in any action, suit, or proceeding arising out of or relating to [the particular Protective Covenant agreement], and agrees that any such action, suit or proceeding shall be brought only in such court." (Exs. G, H, I, J).

17.     This Court's personal jurisdiction over Defendants also arises from Defendants' suit-related contacts with New York, which include, *inter alia*, the fact that Defendants solicited Plaintiffs' investments in Mercury through Omnicom which is a New York entity.  Defendants, indeed, also maintain a material presence in New York, and on information and belief, have unlawfully solicited clients with material New York connections.

18.     For similar reasons, venue is also proper in this district pursuant to the aforementioned forum selection clauses, which generally state in relevant part:  "Each party [*i.e.*, including Defendants] hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any [] action [brought in New York]."

(Exs. G, H, I, J).

19.     **FACTUAL ALLEGATIONS**

20.     Mercury is a professional services firm that operates within the Omnicom corporate structure.  It provides sophisticated crisis management, public affairs, and government relations services to a variety of clients in industries spanning from entertainment, sports and media, to technology and infrastructure, and food and hospitality, among others.  Until recently, Mercury employed well over 150 professionals across sixteen offices.

21.     Mercury's history and the background of this dispute are summarized below.

**A.     Mercury Is Founded In 1999 And Eventually Sold To An Omnicom Subsidiary**

22.     Mercury was originally founded as a government affairs consulting business in 1999 by Defendant Goncharenko and his business partners.  Defendant Nunez joined several years later.

23.     On October 1, 2003, Mercury found an investor in Omnicom, a New York advertising, media and marketing holding company well known for its public relations expertise, among other services.  Around that time, Defendant Goncharenko and his partners began selling a majority stake in Mercury to Public Relations Development LLC ("PRD"), a Delaware limited liability company and an Omnicom subsidiary, which initially bought a 70 percent interest in Mercury.  On March 31, 2008, DAS Holdings Inc. ("DAS Holdings"), another Omnicom subsidiary, purchased the remaining 30 percent of Mercury.  Shortly thereafter, DAS Holdings' and PRD's interests were consolidated into Plaintiff MPA Holdings, so that MPA Holdings owned 100 percent of Mercury.

24.     After Omnicom's acquisition of Mercury, Defendant Goncharenko stayed onboard, entered into an employment agreement with the company, and was given extremely

7

favorable compensation.

25.      Defendant Goncharenko initially received a base salary of $400,000 per year, non-inclusive of incentive-based compensation and benefits, in addition to millions of dollars in compensation for sale of his equity interests.[2]  That compensation grew dramatically over time. By 2020, Defendant Goncharenko received an annual salary of $500,000, plus a cash bonus of $422,000, and a profit-sharing distribution of approximately $1.7 million, totaling approximately $2.6 million.

**B.      After Years Of Agitating, Defendants Successfully Solicit So-Called "NewCo" Arrangements And Are *Re*-Made Part-Owners of Mercury**

26.      Beginning in approximately 2008, Defendants began expressing displeasure with their compensation and role at Mercury.  Notably, they complained that Mercury, by virtue of being owned by Omnicom, was allegedly too risk-averse.  With no clear framework, Defendants made several proposals expressing a desire to expand Mercury's business aggressively to new markets and new industries.

27.      Consequently, the parties entered an arrangement whereby (1) Defendants would share in the after tax profits of Mercury through their membership in High Stakes; and (2) Defendants would have the right to start certain "NewCo" public affairs operations that were independent of Mercury—and, importantly, that would not conflict with Mercury's business— but with the ***option*** for those NewCos to be brought into the Mercury and Omnicom fold.

28.      Of course, there were risks with this arrangement for Mercury and Omnicom. Thus, it was imperative that Mercury protect its business, its clients, and its employees.  As was made clear to Defendants—and to which they expressly agreed in writing—the NewCo

---

[2] Defendants' employment agreements required them to give at least 90-days' notice of resignation.

arrangement would under no circumstances expose Mercury to the prospect of future unfair competition. Mercury was not going to agree to the effective creation, by its own principals, of a direct competitor in the public affairs market. Accordingly, to protect Mercury's existing and future business interests from Defendants using NewCo firms to compete with Mercury, the parties entered into multiple limited protective covenant agreements (*i.e.*, the Protective Covenants) that, critically, explicitly restricted Defendants from soliciting Mercury's clients and employees for a ***two-year*** period if Defendants' employment at Mercury were ever to end.

### 1. Initial Protective Covenants & Early NewCo Activities

29. Consistent with the early arrangements through which Mercury and its Omnicom affiliates permitted NewCo activities, several NewCos were approved. Omnicom also purchased several NewCos, including an entity named "Nunez LLC," a Delaware limited liability company started by Defendant Nunez. As a result of this particular acquisition, Defendants collectively received approximately $8 million.

30. In consideration of Mercury's good-faith pursuit of Defendants' requests to start NewCos, including Nunez LLC, and in explicit acknowledgment of Mercury's need to protect its business, Defendants executed several Protective Covenants. As relevant here, those covenants are contained in five contracts: (a) the 2013 Protective Covenant Agreement for Defendant Goncharenko (Ex. G); (b) the 2013 Protective Covenant Agreement for Defendant Nunez (Ex. I); (c) the 2015 Protective Covenant for Defendant Goncharenko (Ex. H); (d) the 2015 Protective Covenant for Defendant Goncharenko (Ex. J); and (e) the Mercury limited liability company agreement, *i.e.*, the Mercury LLC Agreement, as amended in 2017, which governs the operation of Mercury (Exs. A, B). These Protective Covenants were necessary to protect Mercury's interests from competition from Defendants and their NewCos.

31. In particular, these agreements prohibit, among other things, Defendants from

9

soliciting certain clients or employees from Mercury for a limited period of time after

Defendants tenure with Mercury ends.  The 2013 Protective Covenant, for both Defendants, for

example, provides:

> **Protective Covenant Agreement.**  I hereby covenant and agree that I will not, as an individual, employee, consultant, independent contractor, partner, shareholder, member or in association with any other Person, except on behalf of the Company, directly or indirectly, and regardless of my continuing to be employed by the Company or the reason for my ceasing to be so employed by the Company:
>
> . . .
>
> (ii) during the Restricted Period [*i.e.*, two years], in the Restricted Territory [*i.e.*, areas where Mercury operates], **solicit, render services to or for, or accept from, anyone who is a Restricted Client, any Restricted Business[3] of the type performed by the Company, or persuade or attempt in any manner to persuade any Restricted Client to cease to do any business of the type performed by the Company, or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with the Company,** whether or not the relationship between the Company and such Restricted Client was originally established in whole or in part through my efforts;
>
> . . .
>
> (iv) during the Restricted Period, **solicit for employment as an employee or retain as a consultant, any individual who is then or at any time during the one-year period prior to the Termination Date was, an employee of or exclusive consultant to, the Company or, persuade or attempt to persuade any such employee of or exclusive consultant to the Company to leave the employ of the Company, or to become employed as an employee or retained as a consultant by any other Person**; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of the Company shall not be deemed to be a breach of this provision; and

---

[3] The Protective Covenants define "Restricted Business" as "the business of rendering government relations, public affairs, state lobbying and strategic communications services." (Exs. G, I).

10

(Exs. G, I (emphases added)).

32.     "Restricted Client" is defined in the 2013 Protective Covenants as "anyone who was a Client of [Mercury] on the last date of [Defendants'] employment with [Mercury] . . . or at any time during the one-year period immediately preceding the Termination Date [of Defendants]" or any "prospective Client to whom [Mercury] made a Pitch at any time during the one-year period prior to, or the six month period immediately following, the Termination Date, but with respect to any Pitch made after the Termination Date, only if [Defendants] participated in or had a supervisory responsibility or other involvement in the discussions with the prospective Client preceding the Pitch and/or participated in the preparation of the Pitch and/or the actual Pitch."  (Exs. G, I).

33.     The 2013 Protective Covenants also provide that "all issues or matters related to th[e] Agreement[s] shall be governed by, enforced under, and construed in accordance with the laws of the State of New York," and require that all suits arising under the contract be brought in New York, including in the Southern District.  (*Id.*)

## 2.     New Jersey NewCo LLC And Additional 2015 Protective Covenants

34.     Similar to the 2013 acquisition of Nunez LLC, on March 20, 2015, pursuant to an asset purchase agreement, Mercury acquired substantially all of the assets of NewCo New Jersey LLC, a Delaware limited liability company, which was another NewCo operation identified by Defendants.

35.     Once again, and as a further condition of Mercury's acquisition of NewCo New Jersey, LLC, the Defendants entered into individual Protective Covenants with Mercury, *i.e.*, the 2015 Protective Covenant Agreements between Mercury and each of Defendants Goncharenko and Nunez.  These agreements are substantially similar to the 2013 Protective Covenants.  (*See* Exs. H, J).  They strictly prohibit Defendants from taking certain clients or employees from

11

Mercury for limited period of time after Defendants employment at Mercury ends.

36.     And, like the 2013 Protective Covenants, the 2015 agreements mandate the application of New York law and provide a New York as the appropriate forum.

### 3.     The 2017 "NewCo Agreement" And Amendment To The Mercury LLC Agreement In Connection With NewCo Activities

37.     Roughly two years after Mercury's acquisition of New Jersey NewCo LLC, on April 27, 2017, Defendants came to Mercury with additional plans.  By this point, Defendants had become even more aggressive about their growth plans.  Yet once again, Mercury engaged with Defendants in good faith and sought to further formalize the NewCo arrangement.

38.     In that vein, on April 28, 2017, Omnicom subsidiary DAS Holdings, and Defendants and their fellow Mercury Principals, entered into the Amended and Restated Shared Services Agreement ("NewCo Agreement"), which is the relevant NewCo Agreement in force as of this filing.[4]  The NewCo Agreement:  (a) permitted Defendants to ask DAS Holdings for permission to start a NewCo in a new market; (b) prescribed a more detailed process for Defendants on how they could gain approval from DAS Holdings for a NewCo, as well as the standards that had to be met to gain such approval; (c) set forth the permissible reasons such approval could be withheld; and (d) clearly laid out the circumstances under which DAS Holdings could purchase or could refuse to purchase a NewCo.  The NewCo Agreement superseded prior similar agreements.  Specifically:

a.     The NewCo Agreement laid out the process Defendants had to follow in crafting business plans to submit to DAS Holdings.  In relevant part, if Defendants wanted approval

---

[4] The NewCo Agreement was an amendment of a contract executed in 2010 and later amended in 2013.  However, for purposes of this action and for ease of reference, the 2017 version is the operative contract.

for a NewCo, they needed to submit a proposal describing "(a) the purpose for forming such [NewCo]; (b) the geographic region in which such [NewCo] is to be located and operated; . . . (c) the business to be transacted by such [NewCo], which business shall be limited to the provision of governmental relations and consultative communications services to clients; (d) such [NewCo's] projected financial performance for its first full year of operations; (e) to the extent known, the identity of the principal clients proposed to be serviced by such [NewCo] during its first full year of operations and (f) any owners of the proposed [NewCo]."  (Ex. C at § 2.1.)

  b. The agreement also set out reasons why DAS Holdings could reject a NewCo plan exercising its reasonable judgment, including without limitation, if the NewCo was "not in the best interests of the Omnicom Group" or would "materially injure the reputation, business or business relationships of [DAS Holdings] or its Affiliates."  (*Id.* at § 2.2.)

  c. Finally, the NewCo Agreement also required each approved NewCo to pay Mercury a "management fee" according to a prescribed formula, and importantly, set out a process by which the NewCo would be sold to DAS Holdings or one of its affiliates— potentially to be worked into the Mercury business.[5]

39. In consideration of, and concurrent with, the NewCo Agreement, on April 28, 2017, the parties amended the Mercury LLC Agreement, adding various provisions which gave Mercury some measure of control over who could be admitted into its business.

40. Most importantly, the Mercury LLC Agreement, as amended, contains a

---

[5] The parties to the NewCo Agreement agreed that "all issues or matters related to this Agreement shall be governed by, enforced under, and construed in accordance with the laws of the State of New York."  It also includes a forum selection clause requiring that suits arising under the contract be brought in New York.

Protective Covenant binding High Stakes and its members, including Defendants. In particular, the Mercury LLC Agreement protective covenant prohibits Defendants from soliciting certain clients or employees from Mercury for limited period of time after Defendants employment at Mercury ends. It provides in relevant part:

> (a) . . . **[High Stakes and its members, including Defendants] agree[] that it, [they] will not directly or indirectly**:
>
> (i) during the Restricted Period, **solicit, render services to or for, or accept from, anyone who is a Restricted Client, any business of the type performed by [Mercury], or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with [Mercury]**;
>
> . . .
>
> (iii) during the Restricted Period, **employ as an employee or retain as a consultant any Person who is then or at any time during the Ownership Period or the Involvement Period, as the case may be, was, an employee of or exclusive consultant to [Mercury]; or persuade or attempt to persuade any employee of or exclusive consultant to [Mercury] to leave the employ of the Company or to become employed as an employee or retained as a consultant by any other Person**; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of [Mercury] shall not be deemed to be a breach of this provision[.]

(Ex. A (emphases added).)[6]

41. In late 2018, Defendants founded the so-called "California NewCo." The California NewCo is the second largest of Defendants' NewCos, with nearly 10 employees and over $5 million in annual revenue. Defendants obtained approval to operate the NewCo, but did

---

[6] At this point, the then-current version of the Mercury LLC Agreement was amended to provide High Stakes a 45 percent profits stake in the company.

*not* attempt to sell it to DAS Holdings, keeping it for themselves.[7]

### C.   Defendants Conspire To Destroy Mercury, Poach Its Clients And Employees, And Attempt To Avoid The Jurisdiction Of This Court By Suing Preemptively In California

42.   Defendants were unable to sell certain of their NewCos and thus grew frustrated and vengeful.  They began conspiring how to break themselves from Mercury and exact maximum pain on Mercury and its associated entities by poaching as many clients and as much talent as possible to make as much money as possible in a new independent venture.

43.   Specifically, Defendants secretly planned to work with another High Stakes member and Mercury Principal to depart and operate a business separate from Mercury, taking other key Mercury employees with them.  Defendants then carefully selected and solicited perceived "loyal" Mercury employees, and covertly contacted representatives at Mercury's clients to prod them to "jump ship" and work with Defendants.

44.   So brazen was Defendants' conduct that while they were still helping to operate the Mercury business, they ***proceeded to set up their competing enterprise called Actum***.  (*See* Ex. L).  Defendants seek to operate their NewCos (including the a UK-based entity they started, known as the "London NewCo," and the California NewCo) under the Actum name.

45.   Once their plan was finalized, Defendants pulled the trigger on a public blitz:

a.   On October 1, 2021, Defendant Nunez formalized his separation with Mercury effective immediately, and accompanied his departure with a three-page letter filled with false and, inflammatory list of perceived grievances.  Defendant Goncharenko followed a few days later with an equally baseless diatribe purporting to explain their misconduct.

---

[7] On information and belief, and as described more fully below, Defendants appear to have formed the California NewCo in preparation to compete with Mercury in violation of the Protective Covenants.

Neither Defendant complied with the resignation notice period in their respective employment contracts, which was 180 days for Defendant Goncharenko and 90 days for Defendant Nunez.

b.     In their resignation letters, Defendants made allegations that were not only defamatory and false, but in clear disregard of their contractual obligations, the years of good faith Mercury had shown them, and the millions of dollars they received from the relationship.  In addition, by walking out the door immediately Defendants did not even provide Mercury the basic courtesy of complying with required notice period for resignations under their employment contracts.

c.     Concurrently, at least *twenty three* other individuals employed by Mercury resigned in a mass exodus orchestrated by Defendants.  As one of Defendants' business partners, stated "All our clients are coming with us."  *See* "Former Officials Nunez, Boxer and Villaraigosa Lead Exodus From Powerful Lobbying Firm," *Los Angeles Times*, Oct. 7, 2021.  (Ex. N).   This coordinated action was, on information and belief, meant to cripple Mercury's business.

d.     Then, at least *eleven major Mercury clients* informed Mercury that they were cancelling their contracts with Mercury, presumably on Defendants' prodding.  These clients include:  California Academy of Eye Physicians and Surgeons, Progrexion, Lexington Law, CVS Aetna (Sutter Health), California Exposition & State Fair, Braille Institute, CCSA Advocates, The Producer's Health Benefits Plan; Citrus Heights Water District, Downtown Women's Center, and City Year Los Angeles.

e.     Removing any doubt about whether the client terminations of their Mercury contracts were orchestrated by Defendants, at least two of the terminations notices copied

Defendant Nunez.

46.     Defendants were still not done.  They decided to double-down on their scheme by trying to get a court to bless it.  They filed a short, meritless complaint in California state court against Mercury, requesting that the California court invalidate the Protective Covenants and hold them to be unenforceable.  *See Nunez et al. v. Mercury Public Affairs LLC, et al.*, Case No. 21STCV36104 (Cal. Super. Ct.) (Ex. M).

47.     Defendants admit, in their California pleading, to violating the Protective Covenants, stating that they "now intend to continue conducting their business" through the London and California NewCos as the Actum entities Actum UK Opco LLC and Actum CA Opco LLC, respectively; and that this gives rise to "an actual controversy between [them] and Mercury relating to [their] entitlement to continue conducting business through the Newcos following the termination of their employment[]."  Their complaint also concedes:  "[Defendants Goncharenko and Nunez] need to continue to seek and develop relationships with employees and clients in California, which is hindered by [the 2015 Protective Covenant and other contracts under which they sued]."  (Ex. M).

48.     Notably, Defendants' California action does ***not*** mention the forum selection clauses or the choice of law provisions in the contracts under which Defendants sued.  This is plainly an effort to avoid having the appropriate court—this Court—consider all of the operative agreements and all of the facts.

## FIRST CLAIM FOR RELIEF
### Declaratory Judgment
### (Against Defendants Goncharenko and Nunez)

49.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 47 as if set forth herein.

50.     As mentioned, Defendants are signatories to the Mercury LLC Agreement.  (Ex. A).  Defendant Goncharenko separately is a signatory to the 2013 Protective Covenant and the 2015 Protective Covenant.  (Exs. G, I).  Likewise, Defendant Nunez is a signatory to the 2013 Protective Covenant and the 2015 Protective Covenant.  (Exs. H, J).  Plaintiff Mercury is a signatory to all five agreements, and Plaintiff MPA Holdings is a signatory to the Mercury LLC Agreement.

51.     These agreements explicitly prohibit Defendants from soliciting Mercury clients *or* employees for a minimum of two years following Defendants' termination of their employment with Mercury.  (*See, e.g.*, Exs. A, G, H, I, J)

52.     As applicable, Plaintiffs performed all material terms and conditions of the foregoing agreements except to the extent that their performance was waived, prevented or excused by the acts, conduct, and/or omissions of Defendants.

53.     In early October 2021, both Defendants abruptly departed their roles as Principals and officers in management at Mercury, after plotting explicitly to violate the Protective Covenants, steal Mercury's employees and clients, and otherwise harm Mercury's business.

54.     Indeed, Defendants concede in their complaint in California state court that "an actual controversy between [them] and Mercury relating to [their] entitlement to continue conducting business through the Newcos following the termination of their employments with Mercury."  (Ex. M).

55.     In their California complaint, Defendants seek to have various of the Protective Covenants declared void.  As explained herein, the five Protective Covenants all uniformly preclude Defendants from:  (a) "during the [period of two years after employment] . . . solicit[ing], render[ing] services to or for, or accept[ing] from, anyone who is a Restricted Client,

18

any Restricted Business of the type performed by [Mercury], or persuad[ing] or attempt in any manner to persuade any Restricted Client to cease to do any business of the type performed by [Mercury]"; or "during the [period of two years after employment] . . . soliciting for employment as an employee or retain[ing] as a consultant, any individual who is then or at any time during the one-year period prior to the Termination Date [an employee of Mercury]."  (Ex. G; *see also* Exs. A, H, I, J (same).)

56.     Rather than complying with the terms of these Protective Covenants, Defendants have engaged a deliberate and calculated scheme to steal Mercury's employees and business.

57.     In particular, Defendants have successfully solicited no less than twenty three Mercury employees and no less than eleven Mercury clients in the span of weeks.  Moreover, Defendants intend, *inter alia*, to utilize the London and California NewCos to unlawfully compete with Mercury in violation of the Protective Covenants through the use of a new entity named "Actum."  As one of Defendants' business partners, stated "All our clients are coming with us." (*See* Ex. N).

58.     Defendants' California complaint makes clear that they "need to continue to seek and develop relationships with employees and clients in California, which is hindered by [the 2015 Protective Covenants and other contracts under which they sued]."  (Ex. M).

59.     Because Defendants effectively concede that their intended actions violate the Protective Covenants, there is an actual and substantial controversy between Mercury and Defendants regarding their obligations under the 2013 and 2015 Protective Covenants and the Mercury LLC Agreement.  This controversy is immediate and warrants issuance of a declaratory judgment.

60.     The Protective Covenants were executed by Defendants and Mercury for a simple

reason: to ensure that Mercury's business was protected from precisely the conduct in which Defendants have engaged. Defendants sought substantial leeway from Mercury to conduct NewCo activities and successfully obtained significant compensation in consideration for the Protective Covenants. Under applicable law, these Protective Covenants are more than reasonable in geographic scope, time, and content. Notably, the Protective Covenants largely permit Defendants to continue working unrestricted in the public affairs industry—even after leaving Mercury—only prohibiting them for a limited period of time from soliciting Mercury's clients and employees.

61. Mercury is thus entitled to a declaration from this Court that:

a. The 2013 Protective Covenants (for both Defendants Goncharenko and Nunez) are valid and enforceable against Defendants as a matter of law.

b. The 2015 Protective Covenants (for both Defendants Goncharenko and Nunez) are valid and enforceable against Defendants as a matter of law.

c. The Protective Covenant contained in the Mercury LLC Agreement is valid and enforceable against Defendants as a matter of law.

d. There is no legal or equitable basis for Defendants to solicit Mercury employees or clients in violation of the Protective Covenants, and all efforts to date to so solicit are unlawful.

62. Pursuant to Section 3001 of the New York Consolidated Laws, such a declaration is necessary and appropriate.

## SECOND CLAIM FOR RELIEF
### Breach of Contract: Protective Covenants
### (Against Defendants Goncharenko and Nunez)

63. Plaintiffs reallege and incorporates by reference the allegations in paragraphs 1

through 61 as if set forth herein.

64.     As mentioned, Defendants are signatories to the Mercury LLC Agreement.  (Ex. A).  Defendant Goncharenko separately is a signatory to the 2013 Protective Covenant and the 2015 Protective Covenant.  (Exs. G, I).  Likewise, Defendant Nunez is a signatory to the 2013 Protective Covenant and the 2015 Protective Covenant.  (Exs. H, J).  Plaintiff Mercury is a signatory to all five agreements, and Plaintiff MPA Holdings is a signatory to the Mercury LLC Agreement. [8]

65.     Those agreements explicitly prohibit Defendants from soliciting Mercury clients *or* employees for a minimum of two years following Defendants' termination of their employment with Mercury.  (*See* Exs. A, G, H, I, J).

66.     As applicable, Plaintiffs performed all material terms and conditions of the foregoing agreements except to the extent that their performance was waived, prevented or excused by the acts, conduct, and/or omissions of Defendants.

67.     In early October 2021, both Defendants abruptly departed their roles as Principals in management at Mercury, after plotting to violate the Protective Covenants, steal Mercury's employees and clients, and otherwise harm Mercury's business.  As one of Defendants' business partners, stated "All our clients are coming with us." (*See* Exs. N).

68.     Rather than complying with the terms of the Protective Covenants, Defendants have now engaged a deliberate and calculated scheme to steal Mercury's employees and business.

---

[8] In 2008, Defendant Goncharenko executed a separate protective covenant agreement.  This agreement contains substantially similar terms as those contained in the 2013 and 2015 protective covenant agreements Defendant Goncharenko signed and should likewise be enforced against him.

69.     In the span of weeks, Defendants have successfully solicited no less than twenty three Mercury employees and no less than eleven Mercury clients who are explicitly covered by the Protective Covenants.  Defendants' California complaint makes plain that Defendants understand the Protective Covenants to apply to their solicitations.  (Ex. M).  Indeed, at a minimum, Defendants intend, *inter alia*, to utilize the London and California NewCos to unlawfully compete with Mercury in violation of the Protective Covenants using their new "Actum" entity.

70.     The Protective Covenants were executed by Defendants and Mercury to ensure that Mercury's business was protected from precisely the conduct in which Defendants have engaged.  Defendants sought substantial leeway from Mercury to conduct NewCo activities and successfully obtained significant compensation in consideration for the Protective Covenants.  Under applicable law, these Protective Covenants are more than reasonable in geographic scope, time, and content, as they permit Defendants to continue working unrestricted in the public affairs industry—even after leaving Mercury—and only prohibit them for a limited period of time (*i.e.*, two years) from soliciting Mercury's clients and employees.

71.     All five of the foregoing contracts contain substantially similar protective covenants that prohibit Defendants from soliciting certain employees and clients of Mercury during and for two years after their employment at Mercury ends.  (Exs. A, G, H, I, J).

72.     Defendants' employment at Mercury ended in early October 2021, which is less than two years ago.  Nevertheless, Defendants have solicited Mercury employees to leave Mercury and join Defendants' competitor entities, and solicited Mercury clients to suspend their business with Mercury and take it to Defendants' competitor entity.  Therefore, Defendants are in material breach of the Protective Covenants.

22

73.     Because Defendants have taken affirmative steps to interfere with Mercury's business, including soliciting employees and clients in violation of their contractual obligations, Plaintiffs also seek specific performance of the Protective Covenants in the form of an order prohibiting Defendants from competing with Mercury in violation of the Protective Covenants. If Defendants are not so ordered, Plaintiffs will suffer injury for which they have no adequate remedy at law, and any judgment against Defendants will be rendered ineffectual.  Plaintiffs, therefore, also seek temporary and permanent injunctive relief as this Court may deem just and proper.

74.     In the alternative, Defendants' breaches of the parties' Protective Covenants have directly and proximately caused Plaintiff damages in an amount to be determined at trial, but in an amount far greater than $75,000.

75.     In addition, Plaintiffs specifically request attorneys' fees and costs, as permitted by the relevant agreements.

### THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**(Plaintiff Mercury Against Defendants Goncharenko and Nunez)**

76.     Plaintiff Mercury realleges and incorporates by reference the allegations in paragraphs 1 through 74 as if set forth herein.

77.     Until their resignation from Mercury, Defendants were at all relevant times "Principals" of Mercury.  The Mercury LLC Agreement specifically identifies Defendants as holding that role and makes plain that they are also employees of the company.  They are officers and managers, including as specifically assigned via the LLC Agreement by Mercury.  (*See* Ex. A).  During their tenure with Mercury, Defendants were key managers of the company's business, and exercised significant decision-making authority over operations, including

managing employees, clients, firm finances, and strategic objectives.

78.     By virtue of holding these positions, Defendants owed Mercury the strictest duty of loyalty to act solely for its benefit.  Defendants were required, under applicable law, to act in the highest good faith toward Mercury, to act in Mercury's best interests, and to account for Mercury's assets (including its clients), and not to divert resources and clients away from Mercury through covert plotting and scheming.  Defendants' duty of loyalty to Mercury also prohibited them from exploiting their positions for personal benefit.

79.     As set forth herein, Defendants breached their duty of loyalty by, without limitation, intentionally and capriciously plotting in secret and in violation of the Protective Covenants to set up a competing firm (Actum) and implementing a calculated scheme to harm and otherwise undermine Mercury's business.  On information and belief, Defendants planned and intended to strip Mercury of its operational resources and clients, and otherwise harm the company so that it could not fairly compete with Defendants' new Actum entities.  As one of Defendants' business partners, stated "All our clients are coming with us."  (*See* Ex. N).  And Defendants did all of this in secret, while they were still salaried employees of Mercury, with significant profits stake in the company's business.

80.     Similarly, on information and belief, Defendants breached their duty of loyalty by diverting and wrongfully using and concealing company funds and assets without Mercury's consent and otherwise engaging in reckless and intentional conduct and knowing violations of law.  For example, Defendants accomplished their scheme to unlawfully solicit Mercury's clients and employees in part by using Mercury's digital facilities, such as email services.  They also used company funds and other resources to reach out to Mercury clients in advance of their departure, to convince those clients to terminate their relationship with Mercury and start a

relationship with Actum.

81.     At least one of the Actum entities were formally registered by Defendants with the state of Delaware no later than September 30, 2021, while Defendants were still employed with Mercury.  (Ex. L).  On information and belief, Defendants are members, managers, owners, and operators of Actum.  Moreover, Actum is the entity through which Defendants intend to operate their new illicit business, using clients and employees they stole from Mercury.

82.     As a result of Defendants' actions, Mercury has suffered, and continues to suffer, significant damages.  Indeed, Mercury has lost, at a minimum, over two dozen employees and eleven clients.

83.     Moreover, if Defendants are not enjoined from continuing to breach their fiduciary duties, Mercury will suffer injury for which it has no adequate remedy and law, and any judgment against Defendants will be rendered ineffectual.  Mercury, therefore, also seeks temporary and permanent injunctive relief as this Court may deem just and proper.

84.     Further, Defendants acted with oppression, fraud, and malice in taking the actions described herein, and willfully breaching their duties to Mercury.  Mercury is thus entitled to all exemplary and punitive damages available as a matter of applicable law.

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Breach of Fiduciary Duty
### (Plaintiff Mercury Against Defendants)

85.     Plaintiff Mercury realleges and incorporates by reference the allegations in paragraphs 1 through 83 as if set forth herein.

86.     As noted, until their resignation, Defendants were at all relevant times "Principals" of Mercury.  The Mercury LLC Agreement specifically identifies Defendants as holding that role and makes plain that they are also employees of the company.  They are officers

and managers, as specifically assigned via the LLC Agreement by Mercury. (*See* Ex. A). During their tenure with Mercury, Defendants were key managers of the company's business, and exercised significant decision-making authority over operations, including managing employees, clients, firm finances, and strategic objectives.

87.     By virtue of holding these positions at Mercury, Defendants owed Mercury the strictest duty of loyalty to act solely for its benefit. Defendants were required, under applicable law, to act in the highest good faith toward Mercury, to act in Mercury's best interests, and to account for Mercury's assets (including its clients), and not to divert resources and clients away from Mercury through covert plotting and scheming. Defendants' duty of loyalty to Mercury also prohibited them from exploiting their positions for personal benefit.

88.     As set forth herein, Defendants breached their duty of loyalty by, without limitation, intentionally and capriciously planning in secret and in violation of the Protective Covenants to set up a competing firm (Actum) and implementing a calculated scheme to harm and otherwise undermine Mercury's business. In particular, on information and belief, Defendants intended to strip Mercury of its operational resources and clients, and otherwise harm the company so that it could not fairly compete with Defendants' new Actum entities. As one of Defendants' business partners, stated "All our clients are coming with us." (*See* Exs. N). And Defendants did all of this in secret, while they were still salaried employees of Mercury, with significant profits stake in the company's business.

89.     Similarly, on information and belief, Defendants breached their duty of loyalty by diverting and wrongfully using and concealing company funds and assets without Mercury's consent and otherwise engaging in reckless and intentional conduct and knowing violations of law. For example, Defendants accomplished their scheme to unlawfully solicit Mercury's clients

and employees in part by using Mercury's digital facilities, such as email services.  They also used company funds and other resources to reach out to Mercury clients in advance of their departure, to convince those clients to terminate their relationship with Mercury and start a relationship with Actum.

90.     At least one of the Actum entities was formally registered by Defendants with the state of Delaware no later than September 30, 2021, while Defendants were still employed with Mercury.  (Ex. L).  On information and belief, Defendants are members, managers, owners, and operators of Actum.  Moreover, Actum is the entity through which Defendants intend to operate their new illicit business, using clients and employees they stole from Mercury.

91.     Each Defendant aided and abetted the other in the other's breach of their fiduciary duties.  Each Defendant schemed and conspired with the other in secret, and then acted on their plans, with each serving as a force multiplier for their collective effort to poach as many Mercury clients and employees as possible.

92.     As a result of Defendants' actions, Mercury has suffered, and continues to suffer, significant damages.  Specifically, Mercury has lost, at a minimum, over two dozen employees and eleven clients.

93.     Moreover, if Defendants are not enjoined from continuing to aid and abet each other's breach of their fiduciary duties, Mercury will suffer injury for which it has no adequate remedy and law, and any judgment against Defendants will be rendered ineffectual.  Mercury, therefore, also seeks temporary and permanent injunctive relief as this Court may deem just and proper.

94.     Further, Defendants acted with oppression, fraud, and malice in taking the actions described herein, and willfully assisting Defendants in breaching their duties to Mercury.

Mercury is thus entitled to all exemplary and punitive damages available as a matter of applicable law.

### FIFTH CLAIM FOR RELIEF
**Tortious Interference With Prospective Business Relations**
**(Plaintiff Mercury Against All Defendants)**

95.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 93 as if set forth herein.

96.     Until recently, Mercury had a business relationship to provide public affairs and government relations services to California Academy of Eye Physicians and Surgeons, Progrexion, Lexington Law, CVS Aetna (Sutter Health), California Exposition & State Fair, Braille Institute, CCSA Advocates, The Producer's Health Benefits Plan; Citrus Heights Water District, Downtown Women's Center, and City Year Los Angeles.

97.     By virtue of their position as Mercury principals, Defendants knew of Mercury's relationship with the foregoing entities.

98.     On information and belief, Defendants secretly contacted representatives of the foregoing entities to solicit them to cancel their contracts with Mercury.  Moreover, as explained above, Defendants contacted representatives of the foregoing entities covertly and in furtherance of a scheme which violated their fiduciary duties to Mercury and the Protective Covenants.  Such misconduct was independently tortious.  As one of Defendants' business partners, stated "All our clients are coming with us." (*See* Ex. N).  As set for the herein, the conduct violated Defendants' fiduciary duties.  In addition, Defendants contacted representatives of the foregoing entities in retaliation for and out of malice for their NewCo initiation and acquisition proposals being rejected.

99.     Defendants' interference worked:  the foregoing entities all cancelled their

contracts with Mercury after Defendants' solicitation, thereby injuring Mercury's relationship with the entities.

100.     As a result of Defendants' actions, Mercury has suffered, and will continue to suffer, significant damages.  Of note, Mercury has lost the aforementioned clients.

101.     Moreover, if Defendants are not enjoined from continuing to breach their fiduciary duties, Mercury will suffer injury for which it has no adequate remedy and law, and any judgment against Defendants will be rendered ineffectual, and Defendants and Actum will continue to unlawfully solicit Mercury clients.  Mercury, therefore, also seeks temporary and permanent injunctive relief as this Court may deem just and proper.

102.     Finally, Defendants and Actum acted with oppression, fraud, and malice in taking the actions described herein, and willfully breaching their duties to Mercury.  Mercury is thus entitled to all exemplary and punitive damages available as a matter of applicable law.

**WHEREFORE**, Plaintiffs pray for the following relief:

**1.** That the Court enter an order a declaratory judgment as requested in the First Claim for Relief;

**2.** That the Court issue a temporary, preliminary and, thereafter, permanent injunction against Defendants, and all others in active concert or participation with Defendants, enjoining and restraining them from the following breaching their fiduciary duties and violating the Protective Covenants;

**3.** That the Court order Defendants to pay to Plaintiffs general, special, actual and/or statutory damages, according to proof at trial;

**4.** That the Court order Defendants to pay restitution of Defendants' gains and/or Plaintiffs' lost profits from the above-described activities;

**5.** That the Court order Defendants to pay to Plaintiffs both the costs of this action and the reasonable attorneys' fees incurred by Plaintiffs in prosecuting this action;

**6.** That the Court order Defendants to pay to Plaintiffs punitive and exemplary damages in a sum to be ascertained at trial;

7.      That the Court order Defendants to pay to Plaintiffs interest at the legal rate; and

8.      That the Court order such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims herein.

Dated: October, 7, 2021
New York, New York

/s/ Jeff G. Hammel
_____

Jeff G. Hammel
Joseph B. Farrell (*pro hac forthcoming*)
Nima H. Mohebbi (*pro hac forthcoming*)
Justin S. Kirschner

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel:  (212) 906-1200
Fax:  (212) 751-4864
E-mail address: Jeff.Hammel@lw.com
              Joe.Farrell@lw.com
              Nima.Mohebbi@lw.com
              Justin.Kirschner@lw.com

*Attorneys for Plaintiffs*

30