# EXHIBIT 5

**SECOND AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HIGH STAKES HOLDING CO. LLC**

**THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "**Agreement**") of **HIGH STAKES HOLDING CO. LLC** (the "**Company**"), dated December 18, 2018 and effective as of August 1, 2017 (the "**Effective Date**") is made and entered into by and among the individuals or entities identified as Members on Schedule I attached hereto and who have executed a counterpart of this Agreement as Members (each a "**Member**" and, collectively, the "**Members**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article XII.

**WITNESSETH:**

**WHEREAS,** the Members desire to enter into this Agreement to (i) supersede the prior limited liability company agreement of the Company, as amended and restated (the "**Prior LLC Agreement**"), (ii) recapitalize the membership interests of the Company into Class 1 Units, Class 2 Units and Class 3 Units, (iii) admit Michael Soliman and Ashley Walker as new Class 1 Members to the Company, and John Lonergan and Duncan McFetridge as Class 2 Members to the Company, (iv) ratify distributions made to the Members prior to the Effective Date, (v) provide for the management of the Company and its affairs and the conduct of the Company's business, (vi) set forth the respective rights, powers and interests of the Members with respect to the Company and their respective membership interests in the Company, and (vii) promote their interests and those of the Company by making provisions in this Agreement to govern their relations as Members.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members do hereby agree as follows:

**ARTICLE I**

**FORMATION OF LIMITED LIABILITY COMPANY**

**Section 1.1**     **Formation**.   The Company was formed as a limited liability company under the laws of the State of Delaware on July 9, 2013, by the filing with the Secretary of State of Delaware of the Certificate of Formation (as such certificate may be amended from time to time, the "**Certificate**").

**Section 1.2**     **Purpose**.   The Company may engage in any lawful business of every kind and character for which a limited liability company may be organized under the Act or any successor statute, including, without limitation, the ownership of

membership interests in Mercury Public Affairs LLC, a Delaware limited liability company ("**MPA**").  The Company shall have all of the powers provided for a limited liability company under the Act.

          **Section 1.3**      **Offices; Registered Agent**.  The principal place of business of the Company shall be in such location as the Members may from time to time determine.  The Company may have, in addition to such office, such other offices and places of business at such locations, both within and without the State of Delaware, as the Members may from time to time determine.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person as the Members may designate from time to time in the manner provided by law.

          **Section 1.4**      **Filings and Foreign Qualification**.  The Members shall promptly execute and deliver all such certificates and other instruments conforming hereto as shall be necessary for the Members to accomplish all filing, recording, publishing and other acts appropriate to comply with all requirements for the formation and operation of a limited liability company under the laws of the State of Delaware and for the qualification and operation of a limited liability company in all other jurisdictions where the Company shall propose to conduct business.

          **Section 1.5**      **Term**.  The term of the Company shall commence on the date set forth in the Certificate and shall continue in full force and effect until terminated in accordance with the provisions of this Agreement.

## ARTICLE II

## MEMBERS; MEMBERSHIP INTERESTS; UNITS

          **Section 2.1**      **Members and Membership Interests; Units**.  The membership interests in the Company (a) which were authorized for issuance immediately prior to the date hereof shall be converted, as of the Effective Date, without any further action of any Member or the Company, into an aggregate of 1,000 Class 1 units of interest (the "**Class 1 Units**"), 1,000 Class 2 units of interest (the "**Class 2 Units**") and 1,000 Class 3 units (the "**Class 3 Units**"; and together with the Class 1 Units and Class 2 Units, the "**Units**"), and (b) which were owned by the Members prior to the date hereof shall be converted, as of the Effective Date, without any further action of any Member or the Company, into the number and class of Units for each such Member as set forth in Schedule I hereof attached hereto.  Each Member hereby agrees that unless consented to in writing by MPA Holdings Inc., a Delaware corporation and the MPA Class A Member of MPA (the "**MPA Class A Member**"), in accordance with Section 11.2 of that certain Fourth Amended and Restated Limited Liability Company Agreement of MPA dated as of December 31, 2013 (the "**MPA Agreement**"), by and among the MPA Class A Member, the Company and the principals listed therein, as the same may hereafter be amended or modified from time to time, or unless otherwise permitted in accordance with such Section 11.2 of the MPA Agreement, (i) no additional Person may be admitted as a Member of the Company and (ii) no Units shall be issued, sold, transferred, assigned, pledged or otherwise disposed of, in

whole or in part, directly or indirectly, to any Person other than an existing Member or the Company.  No Member's existing Capital Account shall be diminished or otherwise affected by the reclassification of Units affected hereof.

(a)　　Class 1 Units.  Each holder of Class 1 Units (each, a "**Class 1 Member**") shall be entitled to receive a base draw ("**Class 1 Base Draw**"), the amount of such Class 1 Base Draw as determined by a Supermajority of the Members or specified in a writing or other instrument outlining the Company's Member guidelines, as approved by a Supermajority of the Members and as modified from time to time (the "**Company Member Guidelines**"), payable in accordance with the Company's customary practice for paying Members their base draws.  In addition, for each fiscal year of the Company, each Class 1 Member shall be entitled to receive a pro rata share of the Profits of the Company, if any, up to the sum of (i) the Class 2 Profit Percentage attributable to such Class 1 Member as specified by the Company in advance of each year (and as to 2017, as determined on or before the Effective Date) multiplied by the Class 2 Base Profit (all as determined under clause (b) below, as if the Class 1 Member was a Class 2 Member) (the "**Deemed Class 2 Allocation**") and (ii) the product of the Company's PBT for such year and the result of (A) 66% of the Company's PBT (as such term is defined in Section 10.5 hereof) attributable to such Class 1 Member less (B) the Class 1 Member's Deemed Class 2 Allocation (the "**Additional Class 1 Allocation**"), all as consistently calculated and conclusively determined by a Supermajority of the Members or the Company Member Guidelines.  Further, each Class 2 Member shall be eligible for additional discretionary bonus allocations, as determined by a Supermajority of the Members (the "**Class 1 Discretionary Allocation**").  The Class 1 Members shall be entitled to such voting rights as shall be hereinafter provided. Additionally, each Class 1 Member shall be obligated, as a condition to remaining a Class 1 Member, to contribute capital into any newly organized Newco or into the Company for investment into any such Newco, an amount, as determined, and at such times required, by a Supermajority of the Members (the "**Newco Capital Contributions**").  The Company shall be entitled to offset any Profits otherwise payable from time to time by the Company to any Class 1 Member who fails to contribute his or her Newco Capital Contributions as set forth in this Section 2.1(a).  To the extent any Newco Capital Contributions are made directly by a Class 1 Member to the applicable Newco, the Company may repurchase a Class 1 Member's equity in such Newco upon termination of any Class 1 Member from the Company for the applicable Repurchase Price set forth in Section 9.2 below.

(b)　　Class 2 Units.  Each holder of Class 2 Units (each, a "**Class 2 Member**") shall be entitled to receive a base draw (the "**Class 2 Base Draw**"), the amount of such Class 2 Base Draw as determined by a Supermajority of the Members or as specified for Class 2 Members in the Company Member Guidelines, payable in accordance with the Company's customary practice for paying Members their base draws.  In addition, for each fiscal year of the Company, each Class 2 Unit shall be entitled to a special allocation of a pro rata share of the Profits of the Company, if any, up to an aggregate amount (the "**Class 2 Allocation**") equal to (i) a percentage of the PBT of the Company attributable to such Class 2 Member as specified by the Company in advance of each year (and as to 2017, as determined on or before the Effective Date) (the "**Class 2 Profit Percentage**") less (ii) the Class 2 Base Draw of such Class 2 Member, all as consistently calculated and conclusively determined by a Supermajority of the Members (the

"**Class 2 Base Profit**").   Further, each Class 2 Member shall be eligible for additional discretionary bonus allocations, as determined by a Supermajority of the Members (the "**Class 2 Discretionary Allocation**").  Each Newco hereinafter organized shall provide that the Class 2 Members shall be entitled to share in the Newco Base Profits of such Newco, such share to be equal to such Class 2 Member's Class 2 Profit Percentage, as specified in advance of the year. Class 2 Members shall also be entitled to additional discretionary bonuses, as determined in the sole discretion of the Supermajority of the Members.  The Class 2 Members shall be entitled to such voting rights as shall be hereinafter provided.

(c)     <u>Class 3 Units</u>.  Each holder of Class 3 Units (each, a "**Class 3 Member**") shall be entitled to receive a base draw (the "**Class 3 Base Draw**", and together with the Class 1 Base Draw and the Class 2 Base Draw, the "**Draws**"), the amount of such Class 3 Base Draw as determined by a Supermajority of the Members or as specified for Class 3 Members in the Company Member Guidelines, payable in accordance with the Company's customary practice for paying Members their base draws.  In addition, the Company may, but shall not be obligated to, consider additional allocations to be made to a Class 3 Member in excess of his or her Class 3 Base Draw (the "**Class 3 Discretionary Allocation**", and together with the Class 1 Discretionary Allocation and the Class 2 Discretionary Allocation, the "**Discretionary Allocations**").  Each Class 3 Unit shall represent an interest in the Company that is designated as a Class 3 Unit of the Company, which shall have the powers, preferences, rights, and restrictions set forth in this Agreement for the Class 3 Units. The Class 3 Members shall have no voting rights on any Company matter.

(d)     <u>Other Unit Characteristics</u>. As of the Effective Date, each Member's Percentage Interest in the Units shall be as set forth in <u>Schedule I</u> attached hereto, and Voting Percentages and rights as set forth in this Agreement.  The name, address and number of Units of each Member, in the aggregate, are set forth on <u>Schedule I</u> hereto, as the same may be updated from time to time by the Members to reflect any change in the number of Units held by any Member, and the Members shall have the rights to allocation of Profits, Losses, distributions and other relevant items as set forth herein. Each Member's Units shall be conditioned upon: (i) the Member's continued employment with MPA or any Newco, as applicable; (ii), such Member's personal economic performance, as determined in the sole discretion of a Supermajority of the Members; (iii) adherence to the rules and regulations of the Company and DAS and (iv) adherence to the Protective Covenants as set forth in Section 7.2 and any other agreement to which the Member and the Company or any Newco have entered into. Failure of a Member to adhere to the foregoing shall give rise to the Company's repurchase rights as set forth in Section 9.2. The Draws applicable to each class of Units shall be subject to adjustment, as determined by a Supermajority of the Members.

(e)     <u>Admission as a Member</u>. Admission criteria to become a holder of Units of a particular class in the Company will be determined by a Supermajority of the Members or as specified in the Company Member Guidelines, as modified from time to time.

**Section 2.2**     **Redemption of Membership Interests**.  If a Member sells, transfers, assigns, pledges or otherwise disposes of all or a portion of his or its Membership Interests pursuant to Article IX hereof, then effective as of the date of such sale, transfer,

assignment, pledge or disposition, as the case may be, and subject to compliance and in accordance with Article IX hereof, such Member shall automatically cease to be a Member in the Company as to such sold Membership Interests and/or Units.

**Section 2.3** **Additional Members and Membership Interests**. Additional Persons may be admitted to the Company as Members and Membership Interests may be created and issued to such Persons on such terms and conditions, consistent with Section 3.1 hereof, as a Supermajority of the Members shall approve, and consistent with Section 2.1 of this Agreement and the requirements of the MPA Agreement. The Members agree to execute an amendment to this Agreement in accordance with Section 13.4 hereof to reflect the transfer and reallocation of Membership Interests (Class 1 Units, Class 2 Units and Class 3 Units) upon the occurrence of such an admission, including, without limitation, (i) as a pro rata dilution of all of the existing Members' Percentage Interests, (ii) as a reallocation of the Terminated Member's Percentage (as such term is defined in Section 9.2(a) hereof) to reflect the remainder of the Terminated Member's Percentage Interests a terminating Member may continue to hold with respect to his or her Terminated Member's Percentage Interests determined under Section 9.2(c) hereof or (iii) as a result of a reallocation of Percentage Interests, as agreed upon by a Supermajority of the Members. The terms of admission or issuance may specify the creation of different classes or groups of Members having different rights, powers and duties. The creation of any new class or group of Members shall be indicated in an amendment to this Agreement in accordance with Section 13.4 hereof and such amendment shall indicate the different rights, powers and duties of the classes or groups of Members.

**Section 2.4** **Liability of Member**. No Member shall be liable for the debts, liabilities, contracts or other obligations of the Company except to the extent of any unpaid Capital Contributions that the Member has agreed herein or otherwise in writing to make to the Company; and in all events, a Member shall be liable and obligated to make payments of its Capital Contributions only as and when such payments are due in accordance with the terms of this Agreement. Except as otherwise provided in this Agreement, no Member shall be required to make any loans to the Company. Subject to the limitations and conditions provided for in Article X hereof and the Act, the Company shall indemnify and hold harmless a Member in the event a Member becomes liable, notwithstanding the preceding sentence, for any debt, liability, contract or other obligation of the Company except to the extent expressly provided in this Section 2.4.

**Section 2.5** **Limitations on Members**. Other than as specifically provided for in this Agreement or the Act, no Member shall: (a) be permitted to take part in the business or control of the business or affairs of the Company; (b) have any voice in the management or operation of any Company property; or (c) have the authority or power to act as agent for or on behalf of the Company or any other Member, to do any act which would be binding on the Company or any other Member, or to incur any expenditures, debts, liabilities or obligations on behalf of or with respect to the Company.

## ARTICLE III

## CAPITAL CONTRIBUTIONS; ALLOCATIONS; AND DISTRIBUTION

**Section 3.1** **Capital Account; Capital Contributions; Co-Investments**. Each Class 1 Member's "Capital Contribution" shall be an amount equal to the product of (1) 2.0 and (2) the Profit attributable to such Class 1 Member (as determined by a Supermajority of the Members) less $125,000 (the "**Class 1 Capital Contribution**"). The Class 1 Capital Contribution shall be payable in the determination of the Class 1 Member in good funds upon admission, or good funds on a monthly basis, over a five-year period, with accrued interest thereon. All deferred payments under the immediately preceding sentence shall bear interest at a rate equal to 6% per annum, with accrued interest being payable contemporaneously with each payment of a Class 1 Capital Contribution. The Company also shall be entitled to offset any Profits otherwise payable from time to time by the Company to such Class 1 Member, until the full Class 1 Capital Contribution has been paid in full, together with accrued interest thereon as provided in this Section 3.1. No Member shall be obligated to make any additional Capital Contributions, and the Class 2 Members and the Class 3 Members shall not be obligated to make any Capital Contributions. The Capital Accounts (as defined in Section 6.2) of the Members shall be computed in accordance with Section 6.2 below.

**Section 3.2** **Withdrawal and Return of Capital Contribution**. No Member shall have the right to receive or withdraw its Capital Contribution, except to the extent, if any, that any distribution made pursuant to the express terms of this Agreement may be considered as such by law or as expressly provided for in this Agreement.

**Section 3.3** **Allocation of Profits and Losses**.

(a) Except as otherwise provided in Sections 2.1, 3.1 and 3.3(b) – (h) below, all Profits and Losses of the Company for each fiscal year of the Company (which is net of all Company Expenses) shall be allocated and charged to the Class 1 Members and Class 2 Members (the "**Equity Members**") in a manner that causes each Equity Member's Capital Account balance after such allocation to equal the amount that would be distributed to such Member pursuant to Section 8.2 hereof upon a liquidation of the Company in accordance with Section 8.1 hereof and (without limited the foregoing) to reflect the annual Draws provided for in Section 2.1(a) through (c) and of amounts payable under Section 3.5. Class 3 Members shall only be allocated the amounts set forth in Section 2.1(c) of this Agreement.

(b) In the case of any property contributed to the Company by any Equity Member which at the time of contribution has an adjusted tax basis which differs from its fair market value, items of Profits, Losses, income, gain and deduction for income tax purposes shall be allocated as required under Section 704(c) of the Code to take into account such difference. The parties hereto agree to adopt the traditional method of allocation within the meaning of Treasury Regulation Section 1.704-3.

(c)     Any item of taxable income, gain, loss or deduction of the Company (as well as any credits or the basis of property to which such credits apply) as determined for federal income tax purposes shall be allocated in the same manner as the corresponding income, gain, loss, or deduction is allocated under Section 3.3(a) (as modified by Section 3.3(b) hereof). Allocations pursuant to this Section 3.3(c) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Equity Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

(d)     (1)     If an Equity Member unexpectedly receives in any taxable year any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) which causes or increases an Adjusted Capital Account Deficit of such Equity Member, items of Company income and gain shall be specially allocated to such Equity Member in such taxable year (and, if necessary in subsequent taxable years), in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Equity Member as quickly as possible.

(2)     Notwithstanding the provisions of Section 3.3(a), in no event shall Losses of the Company be allocated to an Equity Member if such allocation would result in such Equity Member having an Adjusted Capital Account Deficit at the end of any taxable year.  All Losses in excess of the limitation set forth in this Section 3.3(d)(2) shall be allocated to the Equity Members with positive balances in their Adjusted Capital Accounts, as a class pro rata in proportion to such positive balances.

(3)     The allocations set forth in Sections 3.3(d)(1) and (2) (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulations promulgated under Section 704 of the Code.  The Regulatory Allocations shall be taken into account in allocating other Profits, Losses, and items of income, gain, loss, and deduction to each Equity Member so that, to the extent possible, and to the extent permitted by Treasury Regulations, the net amount of such allocations of other Profits, Losses, and other items and the Regulatory Allocations to each Equity Member shall be equal to the net amount that would have been allocated to each Equity Member if the Regulatory Allocations had not been made.

(4)     The respective interests of the Equity Members in the Profits, Losses, or items thereof shall remain as set forth above unless changed by amendment to this Agreement or by an assignment of a Membership Interest authorized by the terms of this Agreement.  Except as otherwise provided herein, for tax purposes, all items of income, gain, loss, deduction, or credit shall be allocated to the Equity Members in the same manner as are Profits and Losses; provided, however, that with respect to property contributed to the Company by an Equity Member, such items shall be shared among the Members so as to take into account the variation between the basis of such property and its fair market value at the time of contribution in accordance with Section 704(c) of the Code and the "traditional method" with respect thereto as provided in the Regulations thereunder.

(5)     The Capital Accounts of all Members shall be adjusted pursuant to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) upon the circumstances set forth in Treasury Regulation Section 1.704-1(b)(2)(iv)(f)(5).  Corresponding adjustments shall be made as provided for under Treasury Regulation 1.704-1(b)(2), including Section 1.704-1(b)(2)(iv)(g).

(e)     The following special allocations shall be made in the following order:

(1)     Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in Company Minimum Gain during any fiscal year, each Equity Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Equity Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Equity Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 3.3(e)(1) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(2)     Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Section 3.3, if there is a net decrease in Equity Member Nonrecourse Debt Minimum Gain attributable to an Equity Member Nonrecourse Debt during any fiscal year, each Equity Member who has a share of the Equity Member Nonrecourse Debt Minimum Gain attributable to such Equity Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Equity Member's share of the net decrease in Equity Member Nonrecourse Debt Minimum Gain attributable to such Equity Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Equity Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 3.3(e)(2) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(3)     Nonrecourse Deductions for any fiscal year shall be specially allocated among the Equity Members in proportion to their Units.

(4)     Any Equity Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Equity Member who bears the economic risk of loss with respect to the Equity Member Nonrecourse Debt to which such Equity Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations (it being understood that any amount loaned to the Company by any Equity Member or an Affiliate of such Equity Member, or any amount loaned by a third party and guaranteed by an

Equity Member or an Affiliate of such Equity Member shall be deemed to be Equity Member Nonrecourse Debt loaned by the applicable Equity Member, and any deductions attributable to use of the proceeds of such debt shall be deemed to be Equity Member Nonrecourse Deductions attributable to such Equity Member Nonrecourse Debt).

(5) Solely for purposes of determining an Equity Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, the Equity Members' interests in Company profits are in proportion to their Percentage Interests, and, for purposes of allocating Company Nonrecourse Liabilities among the Equity Members pursuant to Treasury Regulation Section 1.752-3(a)(3), the parties agree that each Equity Member's interest in Company profits shall equal its Percentage Interests.

(6) To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Equity Members shall endeavor to treat distributions of funds as having been made from the proceeds of a Company Nonrecourse Liability or an Equity Member Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Equity Member.

(7) For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Equity Members pursuant to this Section 3.3, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Equity Members in the proportion which (i) the amount of depreciation previously allocated to each Equity Member bears to (ii) the total of such depreciation allocated to all Equity Members.  This Section 3.3(e)(7) shall not alter the amount of allocations among the Equity Members pursuant to this Section 3.3, but merely the character of income so allocated.

(f) The Equity Members are aware of the income tax consequences of the allocations described, and hereby agree to be bound by the provisions of Section 3.3(d) and (e) in reporting their respective shares of Company income and loss for income tax purposes.

(g) It is the intention of the Company and its Equity Members that the Company be taxed as a partnership for all purposes of the Code and similar income tax laws.

(h) All matters concerning the valuation of securities, the allocation of profits, gains and losses among the Equity Members, including the taxes on those profits, gains and losses, and accounting procedures, not specifically and expressly provided for by the terms of this Agreement, shall be determined in good faith by the Equity Members.

### Section 3.4 <u>Distributions.</u>

(a) To the extent permitted under the Act, the Profits of the Company available for distribution to Members determined for periods after admission to the Company (other than as provided in Section 3.5 of this Agreement, and other than Profits (net of Company

Expenses) used to make Tax Distributions (as defined in clause (b) below)), shall be made on a cash basis and shall be distributed in the following order of priority:

(1)     first, to each of the Members, on a monthly basis, up to the amount of the Draws (including any remaining unpaid Draws) each is to receive on such monthly basis, pro rata amongst the Members based on the amount of such Member's monthly Draws owed to him in relation to the aggregate amount of all monthly Draws owed to all the Members;

(2)     second, to each of the Class 1 and Class 2 Members, up to the amount of all unpaid (A) Deemed Class 2 Allocations and Additional Class 1 Allocations or (B) Class 2 Allocations (as the case may be) each such Member is entitled to receive, until the cumulative amounts of Deemed Class 2 Allocations, Additional Class 1 Allocations and Class 2 Allocations have been made, pro rata amongst such Class 1 Members and Class 2 Members, based on the amount of such (X) Deemed Class 2 Allocation and Additional Class 1 Allocation or (Y) Class 2 Allocation (as the case may be) to the aggregate unpaid Deemed Class 2 Allocations, Additional Class 1 Allocations and Class 2 Allocations;

(3)     third, to each of the Members, up to the amount of all unpaid Discretionary Allocations (including any remaining unpaid Discretionary Allocations) each is to receive, pro rata amongst the Members based on the amount of such Member's Class 1 Discretionary Allocations, Class 2 Discretionary Allocations or Class 3 Discretionary Allocations owed to him in relation to the aggregate amount of all Discretionary Allocations owed to all the Members; and

(4)     thereafter, to the Class 1 Members and Class 2 Members pro rata in accordance with their respective Percentage Interests to all Percentage Interests of the Equity Members, such that, subject to the payment of the Draws and the Discretionary Allocations, 100% of the Profits available for distribution (as determined by the Company based upon the then current financial reports of the Company) for each calendar year, shall be distributed to the Equity Members on a semi-annual basis, six months in arrears; provided, however, any such distributions shall be subject to retention of any amount deemed necessary or desirable for the working capital needs and the on-going operations of the Company. Notwithstanding any provision of this clause (4) to the contrary, no distributions shall be made to any Member who has not personally earned revenues for the Company in an amount equal to or greater than his or her Draw and, if applicable, any remaining unpaid Discretionary Allocations, shall not receive any distributions under this clause (4) until he or she has personally earned such revenues, all as determined in accordance with the Company Member Guidelines, or as otherwise determined by a Supermajority of the Members.

(b)     Notwithstanding anything in this Agreement to the contrary, in preference to any other distributions pursuant to this Section 3.4, the Members shall cause the Company to distribute cash of the Company to Equity Members on a quarterly (or other reasonable) basis at least sufficient for each Equity Member to meet such Equity Member's required federal, state and estimated local income tax payments (so as to avoid any penalties) in respect of such Member's allocable share of the Company's taxable income and any allocation of income, if any, for the current or the prior fiscal year (net of the excess, if any, of the aggregate of any losses allocated

to the Equity Member in respect of prior fiscal years over the aggregate income allocated to such Equity Member for such period) calculated at the maximum aggregate individual federal, state and local tax rate for residents of New York City (regardless of the actual residence of any Member) (the "**Tax Distributions**").

(c)       Notwithstanding anything in this Agreement to the contrary, the amounts distributable under Section 3.4(a)(2) – (4) shall be subject to adjustment, as determined by a Supermajority of the Members, to (1) reflect Company Profits and Losses received from any Newcos into which the Company has invested, to reflect the relative contributions of the individual Members to the Company for the purposes of establishing or providing additional capital to such Newcos, as otherwise herein contemplated, and (2) reflect the fulfillment of Member commitments to provide such funding (whether directly into such Newcos, in compliance with Company Member Guidelines, or as otherwise agreed upon by a Supermajority of the Members), or to provide other services to such Newcos, provide guarantees or other credit support, or to provide other services to or for the benefit of such Newcos.  Allocations and distributions of profits and losses of Newcos into which Members directly contribute shall be subject to the terms and conditions of the applicable operating agreements or other governing documents of such Newcos, subject to the adjustments otherwise provided in this clause (c).

(d)       Any distribution of funds to Members (whether pursuant to Section 3.4 or Section 3.5) made prior to the end of the fiscal year in which such funds came into possession of the Company shall be treated as a non-interest-bearing loan from the Company to each Member receiving such amounts and shall be deemed to be repaid by reducing the amount of each subsequent distribution to the Member receiving such amount pursuant to this Section 3.4(c) by the lesser of (i) the entire amount otherwise distributable to the Member receiving such amount, and (ii) the entire amount of any unrepaid amounts pursuant to this Section 3.4(c).

(e)       All amounts withheld pursuant to the Code and Tax Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 3.4 for all purposes under this Agreement.  The Company is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, or local government any amounts required to be so withheld pursuant to the Code and Tax Regulations or any provisions of any other federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

(f)       Allocations and distributions of Profits and Losses of the Company prior to the Effective Date shall be made to the Members as of the applicable dates, in accordance with the Prior LLC Agreement, and from and after the Effective Date, shall be made in accordance with the terms and conditions of this Agreement.  All of the Members, by their executions of this Agreement below, acknowledge, confirm and agree that all allocations and distributions to the Members were properly made in accordance with the Prior LLC Agreement, and waive and release any claims with respect thereto. For the avoidance of doubt, newly admitted Members shall not be entitled to share in the allocations and distributions of Profits and Losses of the Company earned or incurred prior to the date of such new Member's admittance to the Company and all calculations of any allocations and distributions of Profits and Losses to be made to such

new Member shall commence as of the date such new Member becomes a Member of any class of the Company.

Section 3.5 **Success Fee**.  In connection with any distribution by the Company to its Members relating to a one-time "success fee" for such activities (payable by a Newco, either before or after its acquisition), and in such amounts as agreed upon by a Supermajority of the Members (each a "**Success Fee**"), such Success Fee shall be distributed by the Company as follows: (a) for the first $1,000,000 of any such applicable Success Fees, such Success Fees shall be specially allocated and distributed based on the Percentage Interests of the Equity Members to the Percentage Interests held by all the Equity Members as of the date of receipt by the Company of such Success Fee, and (b) for any Success Fees in excess of the first $1,000,000 of any such applicable Success Fees (the "**Excess Success Fees**"), the Excess Success Fees shall be payable (i) 67% to the person who is deemed, by a Supermajority of the Members on behalf of the Company, to be the "originator" of the business relating to such Success Fee and (y) 33%, to the Equity Members (inclusive of any such Equity Member who may be the person described in clause (i) hereof) pro rata in accordance with their respective Percentage Interests to the Percentage Interests held by all the Equity Members as of the date of receipt by the Company of such Success Fee.

## ARTICLE IV
## MEMBERS

Section 4.1 <u>**Management of the Company**</u>. Except to the extent otherwise provided for herein, the powers of the Company shall be exercised by and under the authority of, and the business and affairs of the Company shall be managed under, the direction of the Equity Members.  All decisions of the Company and the Equity Members shall be deemed to have been made by a Supermajority of the Members.

Section 4.2 <u>**Quorum of and Action by Members**</u>. Except as otherwise provided in this Agreement, with respect to any matter brought before the Equity Members, the holders of a Supermajority of the Members, present in person or represented by proxy shall constitute a quorum of each meeting of the Equity Members for the transaction of business with respect to that matter.  With respect to any matter brought before the Equity Members, except as otherwise provided in this Agreement or by applicable law, the affirmative vote of the holders of a majority of the Voting Percentages entitled to vote on that matter and represented in person or by proxy at a meeting of the Equity Members at which a quorum is present shall be required to approve such matter shall be required to approve such matter.  Meetings of the Equity Members may be called by a majority of the Voting Percentages entitled to vote thereon.  Written or printed notice stating the place, day and hour of each meeting of the Members shall be delivered not less than two nor more than 50 days before the date of the meeting, either personally or by mail, to each Equity Member entitled to vote at the meeting; <u>provided</u>, <u>however</u>, that notice of any meeting shall not be required if all Equity Members waive any and all requirements for giving notice of a meeting of the Members.

Section 4.3        **Action Without a Meeting; Telephone Meetings**. Any action taken by the Equity Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Equity Members holding a Supermajority of the Members, and the other Equity Members receive written notice of all actions taken by such consent or consents as soon as practicable following the date on which such action is taken.   A telegram, telex, cablegram or similar transmission by an Equity Member, or a photocopy, facsimile or similar reproduction of a writing signed by the Equity Member, shall be regarded as signed by the Equity Member for purposes of this Section 4.3.   An Equity Member may participate in any meeting by using conference telephone or similar communications equipment by means of which all individuals participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 4.3 shall constitute presence in person at such meeting, except when a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

## ARTICLE V

## OFFICERS

Section 5.1        **Officers.**  The Equity Members may designate one or more individuals (who must be Members) to serve as officers of the Company.   Any two or more offices may be held by the same individual.   An officer of the Company shall have the duties and responsibilities consistent with his or her position and shall perform such duties and responsibilities as shall from time to time be prescribed or delegated to him or her by the Equity Members, subject to the terms of any employment agreement with the Company to which such officer is a party. The Equity Members hereby initially designate Kieran Mahoney as Principal of the Company and Kirill Goncharenko as Principal of the Company.

## ARTICLE VI

## ACCOUNTING AND TAX MATTERS; REPORTS; BANKING

Section 6.1        **Books and Records.** At all times during the continuance of the Company, the Company shall maintain, at its principal place of business or such other place designated by the Equity Members, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business, at the election of a Supermajority of the Members, (i) in accordance with generally accepted accounting principles ("**GAAP**") or (ii) on a cash accounting basis, and, to the extent inconsistent therewith, in accordance with this Agreement.   A copy of this Agreement and the Certificate shall at all times be maintained at the principal place of business of the Company. The Company's books and records shall be open to inspection and examination upon reasonable advance notice during normal business hours by each Equity Member and/or its or his duly authorized representative for any purpose reasonably related to such Equity Member's interest as a Member of the Company.

**Section 6.2**          **Capital Accounts.** An individual capital account (the "**Capital Account**") shall be maintained by the Company for each Member as provided below:

(a)          Each Class 1 Member's Capital Contributions when made shall be credited to such Member's Capital Account for such Member's Class 1 Units. The Capital Account of each Member shall, except as otherwise provided herein, be (i) credited with the amount of cash and the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), (ii) credited with the amount of any item of taxable income or gain and the amount of any item of income or gain exempt from tax allocated to such Member for federal income tax purposes, (iii) debited by the amount of any item of deduction or loss allocated to such Member for federal income tax purposes, (iv) debited by such Member's allocable share of expenditures of the Company not deductible in computing the Company's taxable income and not properly chargeable as capital expenditures, including any nondeductible book amortization of capitalized costs, and (v) debited by the amount of cash or the fair market value of any property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code).  Immediately prior to any distribution of property by the Company, the Members' Capital Accounts shall be adjusted, as required by Regulation 1.704-1(b)(2).

(b)          Any adjustments of basis of Company property provided for under Sections 734 and 743 of the Code and comparable provisions of state law (resulting from an election under Section 754 of the Code or comparable provisions of state law) shall not affect the Capital Accounts of the Members except to the extent required by Regulation § 1.704-1(b)(2)(iv)(m), and the Members' Capital Accounts shall be debited or credited pursuant to the terms of this Section 6.2 as if no such election had been made.

(c)          It is the intention of the parties that the Capital Account of each Member be kept in the manner required under Regulation § 1.704-1(b)(2)(iv).

(d)          Capital Accounts shall be adjusted, in a manner consistent with this Section 6.2, to reflect any adjustments in items of Company Profits, Losses, income, gain or deduction that result from amended returns filed by the Company or pursuant to an agreement by the Company with the Internal Revenue Service or a final court decision.

(e)          The Capital Account with respect to any Unit (Class 1 Unit, Class 2 Unit or Class 3 Unit) owned by a Member shall be equal to the Capital Account of such Member divided by the number of Units owned by such Member, but subject to the preservation of Capital Accounts existing as of the date hereof.  Upon a transfer of Units pursuant to Article X hereof, unless paid to the transferor as therein provided, an allocable portion of the Member's Capital Account with respect to such Units shall be transferred to the purchaser of such Units.

**Section 6.3**          **Tax Returns.** The Equity Members shall prepare or cause to be prepared and timely file all federal, state and local income and other tax returns and

reports as may be required as a result of the business of the Company as a partnership for federal income tax purposes.

Section 6.4     **Tax Matters Person.** The Equity Members shall appoint one of the Members as the tax matters partner under Section 6231 of the Code, provided that for tax years commencing after 2017, such person shall be the tax matters representative (each, a "**TMR**") under Section 6223 of the Code, and until the Equity Members shall appoint another Equity Member, such TMR shall be Kieran Mahoney. The TMR shall inform each other Equity Member of all significant tax matters that may come to its attention (including, without limitation, any tax audits of the Company) and shall forward to each other Equity Member copies of all written communications it may receive in that capacity. Nothing in this Section 6.4 shall limit the ability of any Member to take any action in its individual capacity with respect to tax audit matters that is left to the determination of an individual Member under Sections 6221 through 6233 of the Code or under any similar state or local provision.   The TMR shall be entitled to the indemnification provided by the Company as set forth in Article X.

Section 6.5     **Tax Elections.**  The Company shall:

(a)     Elect the fiscal year ending December 31 as the Company's fiscal year;

(b)     Elect the cash basis method of accounting and partnership tax treatment, unless the tax matters partner elects otherwise;

(c)     Elect, in accordance with Sections 195 and 709 of the Code and applicable Regulations and comparable state law provisions, to treat all organization costs of the Company as deferred expenses amortizable over 60 months;

(d)     Elect under Section 754 of the Code to adjust the basis of the Company's assets pursuant to Sections 734 and 743 of the Code;

(e)     If available for tax years after 2017, elect under Code Section 6221(a); and

(f)     Elect with respect to such other federal, state and local tax matters as the Members shall determine from time to time.

Section 6.6     **Bank Accounts; Investment of Company Funds.**  The Equity Members shall cause one or more accounts to be maintained in the name of the Company in one or more banks, which accounts shall be used for the payment of expenditures incurred in connection with the business of the Company and in which shall be deposited any and all revenues of the Company.  All amounts shall be and remain the property of the Company and shall be received, held and disbursed for the purposes specified in this Agreement.  The Equity Members may invest or cause to be invested the Company funds in any manner which the Equity Members deem appropriate, in their discretion, which is in the best interest of the Company and the Members.

Section 6.7 **Signature of Negotiable Instruments.** All bills, notes, checks or other instruments for the payment of money shall be signed or countersigned by such officer, officers, agent or agents, and in such manner, as are permitted by this Agreement and as from time to time may be prescribed by resolution (whether general or special) of the Equity Members.

## ARTICLE VII

## COVENANTS AND AGREEMENTS OF THE MEMBERS

Section 7.1 **Independent Accountants.** The Equity Members shall appoint the independent public accountants of the Company (the "**Accountants**").

Section 7.2 **Protective Covenants.**

(a) Each of the Members acknowledges that (i) the Company was formed to own a membership interest in MPA and (ii) each of the Members by virtue of his or her ownership of Membership Interests of the Company and/or his or her position within MPA will become privy to confidential information relating to the operations and servicing of Clients of MPA. Accordingly, each Member agrees that for so long as he or she (x) owns, directly or indirectly, any Membership Interests of the Company, or has a right to payments under Section 9.2(c) of this Agreement (including, but not limited to, the right to vote, directly or indirectly, any Membership Interest, or consent, directly or indirectly, to the taking of any actions) (the "**Ownership Period**") or (y) remains an employee of MPA (the "**Employment Period**"), and for a period of two years thereafter, he or she will not directly or indirectly:

(i) solicit, render services to or for, or accept from, anyone who is a Restricted Client, any business of the type performed by MPA on behalf of such Restricted Client, or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with MPA; and

(ii) employ as an employee or retain as a consultant any Person who is then or at any time during one-year period immediately preceding the Termination Date, was an employee of or exclusive consultant to the Company and/or MPA; or persuade or attempt to persuade any employee of or exclusive consultant to MPA to leave the employ of MPA, as the case may be, or to become employed as an employee or retained as a consultant by any other Person; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of MPA, as the case may be, shall not be deemed to be a breach of this provision.

(b) Definitions. As used throughout this Agreement, the following terms shall have the meanings set forth below:

(i) "**Client**" means any Person to whom at any time during the Ownership Period or the Employment Period, MPA rendered services or made a Pitch.

(ii)      "**Pitch**" means a new business presentation or similar offering of specific services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch.

(iii)      "**Restricted Client**" means (x) anyone who is a Client of MPA at any time during the one-year period immediately preceding the Termination Date, (y) any prospective Client to whom MPA made a Pitch at any time during the one-year period prior to the Termination Date, and (z) any prospective Client to whom MPA made a Pitch at any time during the six month period immediately following, the Termination Date *but only if during the Ownership Period or the Employment Period, such Member had knowledge that MPA, as the case may be, intended to make a Pitch to such prospective Client*. In addition, if the Restricted Client is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "**Client Group**"), the term "Restricted Client" as used herein shall include each entity, division and operating unit of the Client Group where the same management group of the Client Group has the decision making authority or significant influence with respect to contracting for services of the type rendered by MPA, as the case may be.

(iv)      "**Termination Date**" means the last day of the later of (x) the Ownership Period or (y) the Employment Period.

(c)      **Acknowledgements.**  Each Member acknowledges that (i) the type and periods of restriction imposed in the provisions of this Section 7.2 are fair and reasonable and are reasonably required to protect and maintain the proprietary interests of MPA other legitimate business interests of MPA and the goodwill associated with the business of MPA in which the Company has made substantial investments, and the goodwill associated with the business of MPA in which the Company relies upon to render services to its Clients; and (ii) the time, scope, geographic area and other provisions of this Section 7.2 have been specifically negotiated by sophisticated commercial parties, represented by legal counsel.  It is further understood and agreed that the Clients of MPA may be serviced from any location and accordingly it is reasonable that the covenants set forth herein are not limited by narrow geographic area but generally by the location of such Clients and potential Clients.  In the event that any covenant contained in this Agreement shall be determined by any court or other tribunal of competent jurisdiction to be unenforceable by reason of its extending for too great a period of time or over too great a geographical area or by reason of its being too extensive in any other respect, (x) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which it may be enforceable, all as determined by such court or other tribunal making such determination, and (y) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made.  In the event any provision of this Section 7.2 is found to be void and unenforceable by a court or other tribunal of competent jurisdiction, the remaining provisions of this Section 7.2 shall nevertheless be binding upon the parties hereto with the same effect as though the void or unenforceable part had never been a part hereof or had been severed and deleted or reformed to be enforceable.  Each of the covenants and agreements contained in this

Section 7.2 (collectively, the "**Protective Covenants**") is separate, distinct and severable.  All rights, remedies and benefits expressly provided for in this Section 7.2 are cumulative and are not exclusive of any rights, remedies or benefits provided for by law, this Section 7.2 or otherwise, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived).  The existence of any claim, demand, action or cause of action that any Member has against the Company and/or MPA, whether predicated on this Section 7.2 or otherwise, shall not constitute a defense to the enforcement of each Protective Covenant or any other provision or provisions of this Agreement.  The unenforceability of any Protective Covenant shall not affect the validity or enforceability of any other Protective Covenant or any other provision or provisions of this Agreement.  The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which an arbitrator or other court or tribunal having equity jurisdiction determines that a Member is in violation of any of the Protective Covenants, and all restrictions shall automatically be extended by the period of such Member's violation of any such restrictions.

Section 7.3     **Sabbatical; Leave of Absence**.  Any proposed sabbatical and/or leave of absence by any Member with respect to such Member's involvement with the Company or any of its divisions or subsidiaries, if any, shall be prohibited unless such Member has received the prior written approval of a Supermajority of the Members (excluding the Member requesting such sabbatical and/or leave of absence).

Section 7.4     **Other LLC Agreements.**  By their respective executions of this Agreement below, each of the Members agrees that each other limited liability company or operating agreement (each, an "**LLC Agreement**") relating to a company engaged in a public affairs or similar business, in which the Members would constitute a sufficient number of members or would hold a sufficient aggregate percentage interest to amend the applicable LLC Agreement, shall hereby be deemed to have so approved an amendment to such LLC Agreement to provide for the same terms and conditions as provided in this Agreement as to all matters herein described, except as the same relate to distributions and allocations of profits and losses or to the name of the applicable company, which shall continue to be governed by the terms and conditions of the existing LLC Agreement.  Each such LLC Agreement shall be deemed to have been amended as provided in this Section 7.4, and the Members shall notify each such limited liability company to reflect such amendments in their respective books and records.

## ARTICLE VIII

## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 8.1     **Dissolution.**  The Company shall be dissolved upon the first to occur of (i) the affirmative vote or written consent of a Supermajority of the Members or (ii) the entry of a decree of judicial dissolution under the Act.  As promptly as possible following the occurrence of any of the foregoing events effecting the dissolution of the Company, the Equity Members of the Company shall cause the Company to file such documents and take such action as may be required under the Act to effectuate such dissolution.

**Section 8.2** **Liquidation.** Upon dissolution of the Company, the Equity Members shall appoint a mutually agreed upon liquidating trustee, who shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation. After making payment or provision for all debts and liabilities of the Company (including liabilities to one or more of the Members), if determined to be necessary under the circumstances by the Equity Members, the Members' Capital Accounts shall be adjusted by debiting or crediting each Member's Capital Account with its respective share of the hypothetical gains or losses resulting from the assumed sale of all remaining assets of the Company for cash at their respective fair market values as of the date of dissolution of the Company in the same manner as gains and losses on actual sales of such properties are allocated under Section 3.3 hereof. The liquidating trustee shall then by payment of cash or property make distributions to the Members in accordance with the provisions set forth in Sections 3.1, 3.4 and 3.5, and if any funds remain undistributed, in accordance with the positive balances of their respective Capital Accounts and any amount remaining shall be distributed in accordance with the number of Units owned by them. Any distribution to the Members in liquidation of the Company shall be made by the later of the end of the taxable year in which the liquidation occurs or 90 days after the date of such liquidation. Notwithstanding any provisions in this Agreement to the contrary, no Member shall be obligated to restore a deficit balance in its Capital Account at any time. The Members shall continue to share Profits and Losses during liquidation in the same proportions, as specified in Section 3.3 hereof, as before liquidation. If such Member is unable to perform in its capacity as liquidating trustee due to bankruptcy, dissolution, death, adjudicated incompetency or any other termination of such Member as an entity, the liquidating trustee shall be a Person appointed by a Supermajority of the Members. With respect to this provision, the term "liquidation" shall have the same meaning as set forth in Regulation §1.704-1(b)(2)(ii) as in effect at such time, provided that the events specified in Article IX shall not be deemed a "liquidation".

**Section 8.3** **Termination.** The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in this Article VIII, and the Certificate shall have been canceled in the manner required by the Act.

**Section 8.4** **Claims of the Members.** Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

**ARTICLE IX**

**RESTRICTIONS ON TRANSFERS**

**Section 9.1**        <u>**Assignment by Member**</u>.  Except as otherwise provided in this Article IX, no Member shall have the right to sell, transfer, assign, pledge or otherwise dispose of, in whole or in part (a "**Transfer**"), all or any portion of its Units, without the prior written consent of a Supermajority of the Members, which consent may be withheld in each such non-transferring Member's sole and absolute discretion for any or no reason.  Any purported Transfer of Units, any purported assignment by any Member of any of its rights under this Agreement, and any purported delegation by a Member of any of its duties or obligations under this Agreement, in contravention of any of the provisions of this Agreement, will be null and void *ab initio* and of no force and effect.  For greater certainty, the provisions of Sections 3.1, 3.3, 3.4 and 3.5 hereof shall apply to holders of Units for the prorated period of any year up to and until the date of any Transfer under this Article IX of a transferring Member's Units, and distributions (if any) under Section 3.4 or Section 3.5 may be made to such transferring Member after the date of such Transfer.

**Section 9.2**        <u>**Repurchase of Units**</u>.

(a)        <u>**Repurchase**</u>.  Upon termination of a Member's employment by MPA or any Newco, as applicable, for any reason, the Company shall have the right to repurchase (i) such Member's Units, each such percentage the "**Terminated Member's Percentage**" from the Member and (ii) any units, membership interests or other equity interests that such Member owns in any Newco or Affiliate of the Company for the applicable purchase price set forth in this Section 9.2 (the "**Repurchase Price**"); provided that, solely with respect to Equity Members, if such Equity Member has a business unit with an economic structure based on such Equity Member's personal performance as determined by a Supermajority of the Members, the Repurchase Price will be reduced if such unit's annual performance declines below 90% of the Class 2 Base Profit for the year prior to the termination of such Equity Member's employment (the "**Base Level**").  Such adjustment would reduce the Repurchase Price payable each year by the full amount of any shortfall in such unit's performance below the Base Level.   Any Repurchase Price paid in excess of such terminated Member's Capital Account shall be treated as Guaranteed Payments under the Code and shall be treated as ordinary income.  Upon the repurchase of any Units or any membership interests, units or other equity interests that such Member owns in any Newco or Affiliate of the Company pursuant to this Section 9.2, the terminated Member shall transfer those interests to the Company or as directed by the Company, and such interests shall be deemed transferred.

(b)        <u>**Termination for Cause / Resignation by Member**</u>.  If the Member's employment with MPA or any Newco, as applicable, is terminated by MPA or such Newco for Cause (as such term is defined in such Member's employment agreement with MPA or Newco, as applicable, if any, or if such Member does not have an employment agreement with MPA or Newco, as applicable, as such term is defined on <u>Schedule III</u> attached hereto), or if the Member

voluntarily resigns his or her employment with MPA or Newco, as applicable, other than due to Retirement, or as to a Class 1 Member, is terminated by the Company for Underperformance, the Repurchase Price shall be equal to the sum of (i) $1.00 and (ii) if an Equity Member, the Member's Capital Contribution, if any, payable quarterly over a five-year period from the Termination Date, with interest accruing at 6% per annum, less any unpaid Capital Contribution due and owing to the Company from such terminated Member; provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Member).

(c)    <strong><u>Termination without Cause / Death / Disability / Retirement</u></strong>.

(1)    <u>Equity Members</u>.  If an Equity Member's employment with MPA or any Newco, as applicable, is terminated by MPA or such Newco without Cause (other than for Underperformance by a Class Member), or for Underperformance, with respect to a Class 2 Member, or in the event of the death, Disability, or Retirement of the Equity Member (as such terms are defined in such Equity Member's employment agreement with MPA or Newco, if any, or if such Equity Member does not have an employment agreement with MPA or any Newco, as applicable, as such terms are defined on <u>Schedule III</u> attached hereto), the Repurchase Price shall be an amount equal to the sum of (i) $1.00, (ii) the positive balance, if any, in the Equity Member's Capital Account and (iii) in the instance where the Equity Member's employment with MPA is terminated by MPA or Newco without Cause (other than in the instance where such employment termination was due to Underperformance of a Class 2 Member) (a "**Termination without Cause**"), or upon the death, Disability or Retirement of the Equity Member, an amount in good funds equal to the Member's pro rata allocation of any Profits of the Company for a six-year period following the Termination Date, payable annually within 90 days after the close of each year of the period. If the Repurchase Price is due to the Equity Member's Termination without Cause (other than due to Underperformance by a Class 2 Member) or upon the death, Disability or Retirement of the Equity Member, the Repurchase Price shall be payable quarterly, within 30 days after the end of each quarter, in good funds over a five-year period from the Termination Date, with interest at a rate of 6% per annum; provided, that the Company may prepay the payment of such Repurchase Price at any time without penalty or any requirement to pay any prepayment, with such amount calculated as the number of years (or partial years) remaining in the five-year period multiplied by such terminated Class 2 Member's pro rata allocation of the average of (a) Profits earned in the year preceding the Termination Date and (b) the forecast of the Profits for the year of termination using a present value discount rate and risk reduction discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Member). Notwithstanding the foregoing, if any Member's employment with MPA or Newco, as applicable, is terminated by MPA for Underperformance, the Company shall pay to such Member such Member's Capital Contribution, if any, in full in good funds, less any unpaid Capital Contribution due and owing to the Company from such Member, plus an amount equal to the taxes due on any allocation of income for the period ending on Termination Date, such taxes calculated on the basis of the highest marginal combined effective tax rate on ordinary income and allocated pro rata among the Company's various state tax returns.

(2)    Class 3 Members. Each Class 3 Member hereby acknowledges and agrees that he or she shall be an at-will employee of MPA or Newco, as applicable. If a Class 3 Member's employment with MPA or any Newco, as applicable, is terminated by MPA or such Newco without Cause or in the event of the death, Disability, or Retirement of the Class 3 Member (as such terms are defined in such Class 3 Member's employment agreement with MPA or Newco, if any, or if such Class 3 Member does not have an employment agreement with MPA or Newco, as applicable, as such terms are defined on Schedule III attached hereto), the Repurchase Price shall be an amount in good funds equal to the sum of (i) $1.00, and (ii) in the instance where the Class 3 Member's employment with MPA or Newco, as applicable, is terminated by MPA or such Newco without Cause (other than in the instance where such employment termination was due to Underperformance, as determined by a Supermajority of the Members, other than the terminated Class 3 Member, unless otherwise agreed upon by such Supermajority of the Members) (a "**Termination without Cause**"), six months of such Class 3 Member's Class 3 Base Draw with MPA, payable on the same basis as if such person was still a Class 3 Member, and a prorated bonus for the year of termination, payable within 90 days of the end of such year, all as determined by a Supermajority of the Members, subject to any appropriate offsets, as permitted by applicable law, for debts or money due to the Company, any Newco or Affiliate or for other earned income, as applicable (collectively, "**Offsets**"); provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Member). A terminated Class 3 Member shall use reasonable efforts to mitigate damages hereunder, and if a Class C Member obtains any other employment or consulting arrangement, any compensation and benefits paid to the Class C Member therefrom shall reduce the Company's payments under this Section 9.2(c)(2).

(d)    **Breach of Protective Covenants**.  If a Member breaches any of his or her obligations under Section 7.2 of this Agreement or any other applicable protective covenants between such Member and MPA, including, but not limited to, the protective covenants under Section 7.3 of the MPA LLC Agreement (as defined below), in addition to other remedies available to the Company, the Company may (i) if the Member is holding Units, immediately repurchase the Units for a Repurchase Price of $1.00 or (ii) if the Units have been acquired hereunder pursuant to this Section 9.2, the Company's obligation to make any remaining payments of Repurchase Price shall immediately terminate.

(e)    **Binding Obligation to Sell**.  Upon exercise by the Company of its rights to repurchase the Units under this Section 9.2, which shall be exercised by delivery of written notice to the Member (an "**Exercise Notice**"), the Member shall be obligated to sell the Units to the Company, and shall be deemed to have sold such Units, for the applicable Repurchase Price set forth in this Section 9.2.  The effective date of such repurchase shall be the date set forth in the Exercise Notice, which shall not be earlier than the date such Exercise Notice is delivered. Upon repurchase by the Company of the Units, the Member shall no longer be a Member of the Company and shall no longer have any rights as a Member of the Company, under this Agreement or otherwise, including any rights to receive distributions of any amounts from the Company, except as provided under this Section 9.2.

## ARTICLE X

## INDEMNIFICATION

**Section 10.1**      **Indemnification of Managers and Members.**      The Company shall indemnify and advance expenses to a Person who was or is threatened to be made a named defendant or respondent in a proceeding because the individual is or was a Manager or Member to the fullest extent permitted or authorized by the laws of the State of Delaware as if the Company was a corporation organized under the laws of Delaware.  This indemnification provision shall inure to each of the Managers and Members of the Company, and other Persons serving at the request of the Company (as provided in this Article), and in the event of his or her death shall extend to his or her legal representatives; but such rights shall not be exclusive of any other rights to which he or she may be entitled.

**Section 10.2**      **Others.**      The Company may indemnify and advance expenses to an officer, employee or agent of the Company to the same extent that it is required to indemnify and advance expenses to Managers or Members under this Agreement or by statute.  The Company may indemnify and advance expenses to Persons who are not or were not officers, employees or agents of the Company but who are or were "serving at the request of the Company" (as defined in Section 10.5(f)) as a director, officer, partner, manager, member, venturer, proprietor, trustee, employee, agent or similar functionary of another limited liability company, corporation, partnership, employee benefit plan, or other enterprise or entity (individually, an "**Other Entity**") to the same extent that the Company is required to indemnify and advance expenses to Managers or Members under this Article or by statute.  The Company may indemnify and advance expenses to an employee, agent or other Person serving at the request of the Company (as described above in this Section 10.2) who is not a Manager to such further extent, consistent with law, as may be provided by the Certificate, this Agreement, general or specific action of the Managers, or contract or as permitted or required by common law.

**Section 10.3**      **Insurance and Other Arrangements.**  The Company may purchase and maintain insurance, including key man insurance (the proceeds of which can be used to fund any Repurchase Price payable under this Agreement), or establish and maintain another arrangement on behalf of any Person who is or was a Manager, officer, employee, Member or agent of the Company or who is or was serving at the request of the Company as a director, officer, partner, manager, member, venturer, proprietor, trustee, employee, agent or similar functionary of an Other Entity, against or in respect of any liability asserted against him or her and incurred by him or her in such a capacity or arising out of his or her status as such an individual, whether or not the Company would have the power to indemnify him or her against that liability under this Agreement or by statute.  If the insurance or other arrangement is with a Person that is not regularly engaged in the business of providing insurance coverage, the insurance or other arrangement may provide for payment of a liability with respect to which the Company would not have the power to indemnify the Person only if including coverage for the additional liability has been approved by the Members of the Company.  Without limiting the power of the Company to purchase, procure, establish or maintain any kind of insurance or other arrangement, the Company may, for the benefit of

persons indemnified by the Company, (a) create a trust fund; (b) establish any form of self-insurance; (c) secure its indemnity obligation by grant of a security interest or other lien on the assets of the Company; or (d) establish a letter of credit, guaranty or surety arrangement. The insurance or other arrangement may be purchased, procured, maintained or established within the Company or with any insurer or other Person deemed appropriate by the Managers regardless of whether all or part of the stock or other securities of the insurer or other Person are owned in whole or part by the Company.  In the absence of fraud, the judgment of the Managers as to the terms and conditions of the insurance or other arrangement and the identity of the insurer or other Person participating in an arrangement shall be conclusive and the insurance or arrangement shall not be voidable and shall not subject the Managers approving the insurance or arrangement to liability, on any ground, regardless of whether Managers participating in the approval are beneficiaries of the insurance or arrangement. Upon termination from the Company, a Member shall have a right, exercisable within 60 days after such termination, to purchase any such policy on his life from the Company for the pro-rated premium for the year.

Section 10.4    **Report to Members.**  Any indemnification of or advance of expenses to a Manager, Member or other Person in accordance with this Article or the provisions of any statute shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to the Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

Section 10.5    **Definitions.**  For purposes of this Article X:

(a)    The term "**expenses**" includes court costs and attorneys' fees;

(b)    The term "**proceeding**" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, any appeal in such an action, suit or proceeding, and any inquiry or investigation that could lead to such an action, suit or proceeding;

(c)    The term "**Manager**" means anyone who is or was a Manager of the Company and anyone who, while a Manager of the Company, is or was serving at the request of the Company as a director, officer, partner, manager, member, venturer, proprietor, trustee, employee, agent or similar functionary of an Other Entity;

(d)    The term "**Company**" includes any domestic or foreign predecessor entity of the Company in a merger, consolidation or other transaction in which the liabilities of the predecessor are transferred to the Company by operation of law and in any other transaction in which the Company assumes the liabilities of the predecessor but does not specifically exclude liabilities that are the subject matter of this Article X;

(e)    The term "**PBT**" for any relevant calendar year shall be determined by the Chief Financial Officer of MPA in his or her sole and absolute discretion and shall mean the consolidated net income (loss) of the Company, before provision for all federal, state and local

income taxes and any unincorporated business tax or any other entity level taxes imposed on the Company for such period, determined in accordance with generally accepted principles consistently applied; provided, however, in making such determination:

(1)   neither the proceeds from nor any dividends or refunds with respect to, nor any increases in the cash surrender value of, any life insurance policy under which the Company is the named beneficiary or otherwise entitled to recovery, shall be included as income, and the premium expense related to any such life insurance policy shall not be treated as an expense; and

(2)   inter-company management fees (if any) charged by Omnicom to the Company and/or any Newco, including, without limitation, with respect to accounting or other services, or under any applicable license agreements, shall not be treated as an expense;

(f)      The term "**official capacity**" means, when used with respect to a Manager, the office of Manager in the Company and, when used with respect to a Person other than a Manager, the elective or appointive office in the Company held by the officer or the employment or agency relationship undertaken by the employee or agent on behalf of the Company, but does not include service for any Other Entity; and

(g)      The term "**serving at the request of the Company**" as used above shall include any service as a Manager, director, officer, employee or agent of the Company or where any such Person performs duties on or otherwise involves services with respect to an employee benefit plan, or the participants or beneficiaries of the employee benefit plan sponsored by the Company.  Excise taxes assessed on a Manager with respect to an employee benefit plan pursuant to applicable law are deemed fines.  Action taken or omitted to be taken by a Manager with respect to an employee benefit plan in the performance of his or her duties for a purpose reasonably believed by him or her to be in the interest of the participants and beneficiaries of the plan is deemed to be for a purpose which is not opposed to the best interests of the Company.

**Section 10.6**      **Severability.**  The provisions of this Article are intended to comply with the Act.  To the extent that any provision of this Article authorizes or requires indemnification or the advancement of expenses contrary to such statute or the Certificate, the Company's power to indemnify or advance expenses under such provision shall be limited to that permitted by such statute and the Certificate and any limitation required by such statute or the Certificate shall not affect the validity of any other provision of this Article X.

**Section 10.7**      **Nonexclusivity of Rights.**  The right to indemnification and the advancement and payment of expenses conferred in this Article X shall not be exclusive of any other right that a Manager or other Person indemnified pursuant hereto may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement or otherwise.

## ARTICLE XI

## OTHER AGREEMENTS

**Section 11.1** **"High Stakes Holding" Name**. The Members hereby agree that all right, title and interest in the trade name "High Stakes Holding", or any variation thereof, belongs to the Company and not any individual Member and may not be transferred without the unanimous approval of the Members.

**Section 11.2** **Sale Transaction**.  The (x) sale, lease or other disposition of all or substantially all of the assets or business of the Company or any of its subsidiaries or of any division of the Company and (y) the merger, consolidation, liquidation or amalgamation of the Company or any of its subsidiaries with and into another Person or of another Person with and into the Company or any of its subsidiaries, shall require the prior written approval of a Supermajority of the Members.

**Section 11.3** **New Entities**.  Each of the Members acknowledges and agrees that the Company, any of its affiliates, or members of its management may, from time to time, establish Newcos as new subsidiaries, affiliates, or other entities which may engage in businesses similar to the business conducted by MPA or its affiliates.  Such Newcos may issue membership or economic interests therein, issue rights to acquire membership or economic interests therein or permit persons to participate therein which may or may not include the Company or all of the Members of the Company, and which may be in differing percentages than the Percentage Interests held by the Members in the Company.

**Section 11.4** **Further Assurances**.  Each of the Members agree to execute and deliver any and all further documents which may be necessary in the event of a financing or other transaction entered into by the Company, including without limitation covenants and representations and warranties of such Member, provided that such documentation is equal to or less burdensome than what is required of Kieran Mahoney and Kirill Goncharenko. Failure to provide such documentation as required shall be deemed a termination for Cause of such Member.

## ARTICLE XII

## OTHER DEFINITIONS

**Section 12.1** **Other Definitions.**  When used herein, the following terms shall have the following meanings:

"**Adjusted Capital Account Deficit**" with respect to any Member means the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is otherwise treated as being obligated to restore under Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     Debit to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Adjusted Capital Account**" with respect to any Member shall mean such Member's Capital Account, increased or decreased to reflect the adjustments set forth in clauses (i) and (ii) of the definition of Adjusted Capital Account Deficit.

"**Affiliate**" of any Person shall mean any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such Person.

"**Base Profits**" means the total PBT of the Company for any given period.

"**Company Minimum Gain**" shall have the meaning for "**Partnership Minimum Gain**" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Capital Contribution**" shall mean the contribution of a Member and any subsequent contributions of capital made by that Member to the Company as set forth in Article III.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.

"**DAS**" means the Diversified Agency Services Division of Omnicom Group Inc.

"**Depreciation**" means for each fiscal year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such fiscal year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such fiscal year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

"**Gross Asset Value**" with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)        Subject to the final sentence of this definition, the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by reference to Section 3.1 and Section 6.2(a).

(ii)       The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined under Section 3.3(h), as of the following times: (a) the acquisition of additional Units and/or Membership Interests by any new or existing Member in exchange for a Capital Contribution; (b) the distribution by the Company to a Member of Property as consideration for a Membership Interest and/or Unit; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);  provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Equity Members reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)      The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined under Section 3.3(h);  and

(iv)      The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and clause (vi) of the definition of Profits and Losses  herein; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Members determine that an adjustment pursuant to clause (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Member**" shall mean any Person having all of the rights of a holder of a Membership Interest and/or Units in the Company either originally upon formation of the Company or acquiring such interest in accordance with this Agreement.

"**Member Nonrecourse Debt**" shall have the meaning for "Partner Nonrecourse Debt" set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" shall-mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" shall have the meaning set forth in Section 1.704-2(i)(2) of the Treasury Regulations.

"**Membership Interests**" shall mean such Member's percentage of the total Units of the Company (including, without limitation, such Member's interest in Profits and Losses, distributions, voting, and management, all as specified in this Agreement).

"**Newco**" shall mean an Affiliate of the Company, which Members of the Company have directly or indirectly formed to conduct business similar to the type of business conducted by MPA, and which is permitted by the MPA Agreement.

"**Newco Base Profits**" shall mean the sum of the profits (as conclusively determined by a Supermajority of the Members) which would have been paid to the Company from MPA as bonuses or profit distributions (if such would have been available for payment or distribution by MPA, following the completion of any applicable earn-out calculation period), of each Newco acquired from and after January 1, 2015 by MPA, DAS. or any Affiliate of Omnicom Group Inc. for the last 12 full months of any earn-out calculation period related to the acquisition of such Newco.

"**Nonrecourse Deductions**" shall have the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"**Nonrecourse Liability**" shall have the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Percentage Interests**" shall mean, with respect to any Member, the percentage of the total outstanding Units or class of Units, as the case may be, held by such Member.

"**Person**" shall mean an individual, partnership, limited partnership, limited liability company, trust, estate, corporation, custodian, trustee, executor, administrator, nominee or entity in a representative capacity.

"**Profits and Losses**", shall mean, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, or Company Expenses, and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(iii)     If the Gross Asset Value of any Company asset is adjusted pursuant to clauses (ii) or (iii) of the definition of "Gross Asset Value" herein, the amount of such

adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)    Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition thereof;

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for the purposes of computing Profits or Losses; and

(vii)    Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 3.3(d) or (e) or Section 3.5 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 3.3(d) and (e) or Section 3.5 shall be determined by applying rules analogous to those set forth in clauses (i) through (vii) above. The Profits utilized in Section 9.2(c)(1) shall be determined as otherwise provided in this definition, but the Profits otherwise available for allocation to the Members, including pursuant to Section 3.3, shall be determined after taking into account the payment of any Draws, the Deemed Class 2 Allocation, the Additional Class 1 Allocation and the Class 2 Allocation, as set forth in Section 2.1.

"**Regulations**" shall mean final regulations issued by the Department of the Treasury interpreting the Code.

"**Supermajority of the Members**" shall mean Persons comprising at least 67% in Voting Percentages of the then Voting Members.

"**Units**" shall mean the Units.

"**Voting Members**" shall mean the Equity Members that are entitled to vote.

"**Voting Percentage**" shall mean, regardless of the Percentage Interests represented by the Voting Member's Units, the result of (i) the sum of the percentage of the total amount of cash revenues attributable to the applicable Voting Member for the Company for each calendar year

from and after the sale of MPA to DAS, in 2003, and from whatever source (as determined by a Supermajority of the Members, based on the prior year's Voting Percentages), to the total amount of all such cash revenues attributable to all then-current Voting Members of the Company for such calendar year (with such Voting Member having 0% in any year in which he or she did not have any such cash revenues attributable to him or her, whether due to actual results or because such Voting Member was a Member of the Company as of such year), divided by (ii) the number of years elapsed since the sale of MPA to DAS in 2003.  By way of example, if a Voting Member became a Member of the Company in 2010, then his Voting Percentage for years prior to 2010 would be 0%.  Further, if someone who was a Voting Member is no longer a Member of the Company, then the calculation of Voting Percentages relating to the other Voting Members for prior years shall be determined as if such person who is no longer a Voting Member was not involved with the Company in any of such prior years (i.e., each Voting Member's calculation for each year shall only have his gross revenues be divided by the aggregate of his gross revenues for such prior year together with the gross revenues of all other then-current Voting Members, without regard to the gross revenues of any such person who is no longer a Voting Member).  As of the Effective Date, the Voting Percentages of each Voting Member of the Company are as set forth on <u>Schedule IV</u> hereto, and are subject to recalculation annually, as of each immediately preceding December 31.

**ARTICLE XIII**

**<u>MISCELLANEOUS</u>**

        **Section 13.1**        **<u>Manner of Giving Notice</u>.**  Whenever under the provisions of the Act, the Certificate or this Agreement, notice is required to be given to the Company or any Member, and no provision is made as to how such notice shall be given, it shall not be construed to mean only personal notice, but any such notice may be given and shall be deemed received (a) upon personal delivery, if delivered by hand or courier, (b) three days after the date of deposit in the mails, certified, return receipt requested and postage prepaid, or (c) the next business day if sent by a prepaid overnight courier service, and in each case at the respective addresses set forth below or such other address as such party may have fixed by notice:

        If to the Company, to:

        Mercury Public Affairs LLC
        509 Guisando de Avila
        Suite 100
        Tampa, Florida  33613
        Attention: Mr. Kieran Mahoney

            <u>with a copy to:</u>

        Moses & Singer LLP
        405 Lexington Avenue

New York, New York 10174
Attention: Jeffrey M. Davis, Esq.

If to the Members to:

The addresses of each respective Member as each such Member has designated in writing to the Company.

Any party may change the address to which notices are to be sent by giving notice of such change of address to the other party in the manner herein provided for giving notice.

Section 13.2    **Waiver of Notice.**  Whenever any notice is required to be given to any Member under the provisions of the Act, the Certificate or this Agreement, a waiver thereof in writing signed by the Person or Persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

Section 13.3    **No Company Seal.**  The Company shall not have a Company seal, and no agreement, instrument or other document executed on behalf of the Company that would otherwise be valid and binding on the Company shall be invalid or not binding on the Company solely because no Company seal is affixed thereto.

Section 13.4    **Amendment or Modification.**  The power to adopt, alter, amend or repeal this Agreement is vested solely in the Voting Members.  This Agreement may be amended only by a Supermajority of the Members.  Notwithstanding the foregoing in this Section 13.4, any adoption, alteration, amendment or repeal of this Agreement which a Supermajority of the Members believes in good faith could have a material adverse effect on DAS and/or Omnicom Group Inc., shall not be affected absent the written approval of the President of DAS, and any such adoption, alteration, amendment or repeal shall be null and void absent such written approval.

Section 13.5    **Binding Effect**.  Subject to the restrictions on transfer and assignment set forth in Article IX of this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective successors and permitted assigns and their personal representatives in the case of their death or disability.

Section 13.6    **Governing Law; Severability.**  This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware without regard to the principles of conflict of laws thereof.  In the event of a direct conflict between the provisions of this Agreement and any provision in the Certificate or any mandatory provision of the Act, the applicable provisions of the Certificate or the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances are not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

**Section 13.7**     **Counterparts.**   This Agreement may be executed by the parties hereto in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co. LLC]

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co. LLC]

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co. LLC]

DocuSign Envelope ID: 29BC403C-D274-4CA5-AFF9-BCB9F79CF001

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co. LLC]

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co, LLC]

**IN WITNESS WHEREOF**, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

**MEMBERS:**

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John Weber
Gareth Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co. LLC]

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co. LLC]

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co, LLC]

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

_____
John Lonergan

_____
Duncan McFetridge

11/25/17

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of High Stakes Holding Co. LLC]

IN WITNESS WHEREOF, the undersigned have executed this Second Amended and Restated Limited Liability Company Agreement, as of the day and year first above written.

MEMBERS:

_____
Kieran Mahoney

_____
Kirill Goncharenko

_____
Fabian Nunez

_____
Michael McKeon

_____
Thomas Doherty

_____
Michael DuHaime

_____
John V. Weber

_____
Morris Reid

_____
Stefan Friedman

_____
Michael Soliman

_____
Ashley Walker

**Schedule I**

**As of the Effective Date: August 1, 2017**

| Members and Addresses | Class 1 Units | Class 2 Units | Class 3 Units | Percentage Interest in the Company |
|---|---|---|---|---|
| Kieran Mahoney<br>4706 Rue Bordeaux<br>Lutz, Florida  33558 | 267.404 | | | 26.7404% |
| Kirill Goncharenko<br>285 Lafayette Street<br>Apt. 6E<br>New York, New York  10012 | 164.335 | | | 16.4335% |
| Fabian Nunez<br>1331 Belfast Drive<br>Los Angeles, California  90069 | 267.885 | | | 26.7885% |
| Michael McKeon<br>134 Circle Drive<br>Manhasset, New York  11030 | 117.321 | | | 11.7321% |
| Thomas Doherty<br>130 Sylvan Street<br>Rutherford, New Jersey 07070 | 34.112 | | | 3.4112% |
| Michael DuHaime<br>515 Parkview Avenue<br>Westfield, New Jersey 07090 | 4.867 | | | 0.4867% |
| John V. Weber<br>7701 Ridgecrest Drive<br>Alexandria, Virginia  22308 | 5.486 | | | 0.5486 |

| | | | |
|---|---|---|---|
| Morris Reid<br>3030 K Street, NW<br>PH 301<br>Washington, DC  20007 | 0.972 | | 0.0972% |
| Stefan Friedman<br>367 V. Van Ness Avenue<br>Los Angeles, California  90004 | 66.848 | | 6.6848% |
| Michael Soliman<br>38 Rea Avenue Ext.<br>Hawthorne, New Jersey 07506 | 0 | | 0% |
| Ashley Walker<br>2630 NE 15th Street<br>Fort Lauderdale, Florida 33304 | 29.060 | | 2.9060% |
| John Lonergan<br>5115 52nd Street NW<br>Washington, DC 20016 | | 20.855 | 2.0855% |
| Duncan McFetridge<br>2907 24th Street<br>Sacramento, California 95818 | | 20.855 | 2.0855% |
| Total: | 958.290 | 41.710 | 0 | 100% |
| | | | |
| | | | |
| | | | |
| | | | |

## Schedule II

**MPA LLC Agreement**

## Schedule III

## Certain Definitions

1.  If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Cause**", then "**Cause**" shall mean: (i) the Member's failure to perform his/her job duties and responsibilities satisfactorily; (ii) the misappropriation of MPA's or Newco's, as applicable, funds or property; (iii) use of alcohol or illegal drugs interfering with the Member's performance of his/her duties and responsibilities; (iv) conviction (or entry of a plea of guilty or nolo contendere) of a felony or of any crime involving moral turpitude, fraud or misrepresentation; (v) the commission by the Member of any act which could reasonably be expected to injure the reputation, business or business relationships of MPA, Newco or the Company; (vi) the breach by the Member of any provision of this Agreement or the MPA LLC Agreement; or (vii) the material nonconformance with the standard business practices and policies of the Company, Newco or MPA which have been made known to the Member, including without limitation, policies against racial or sexual discrimination or harassment, shall be deemed a termination for Cause of such Member. Whether or not a Member has an employment agreement, "**Cause**" shall include the failure of a Member to execute and deliver any documentation required in connection with a financing or other transaction entered into by the Company, including covenants and representations and warranties of such Member, provided that such documentation is equal to or less burdensome than is required of Kieran Mahoney and Kirill Goncharenko.

The determination of whether a Member's termination of employment was for Cause shall be made by a Supermajority of the Members, other than such affected Member, in their absolute discretion, which determination shall be final, binding and conclusive on all Members, and other interested parties for purposes of this Agreement.

2.  If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Disability**", then "**Disability**" shall mean the Member's inability to perform his/her duties under the Member's employment arrangement with MPA or Newco (whether or not set forth within a written contract) by virtue of illness or physical or mental incapacity or disability (from any cause or causes whatsoever) in substantially the manner and to the extent required under such employment arrangement.

The determination of whether a Member's termination is for Disability shall be made by a Supermajority of the Members, other than such affected Member, in their absolute discretion, which determination shall be final, binding and conclusive on all Members, and other interested parties for purposes of this Agreement.

3.  If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Retirement**", then, unless such Member and the Company have otherwise agreed in writing, "**Retirement**" shall mean a Member who has (i) attained the age of 63 or more; (ii) has fully retired from MPA or Newco, as applicable, and from the public affairs industry, including, without limitation, not performing

public affairs services as an employee or consultant of any MPA Client; and (iii) has been employed by MPA or any predecessor of MPA or Newco, as applicable, for a period of not less than 20 years prior to the date of Retirement.

4.  If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Underperformance**", then, unless such Member and the Company have otherwise agreed in writing, "**Underperformance**" shall mean a failure to achieve an average personal Profit over a two calendar year period that is equal to or greater than 80% of such Member's Profit for the immediately preceding calendar year prior to the date of admission in the class of Membership of such  Member to the Company, all as determined by a Supermajority of the Members (other than such terminated Members), as such definition may change from time to time, as determined by a Supermajority of the Members.

**Schedule IV**

**Current Voting Percentages**

**Effective as of: July 1, 2017**

| Members | Voting Percentages |
|---|---|
| Kieran Mahoney | 42.60% |
| Kirill Goncharenko | 19.21% |
| Fabian Nunez | 5.08% |
| Michael McKeon | 13.76% |
| Thomas Doherty | 11.32% |
| Michael DuHaime | 3.33% |
| John V. Weber | 3.57% |
| Morris Reid | 0.22% |
| Stefan Friedman | 0.64% |
| Ashley Walker | 0.09% |
| Michael Soliman | 0.18% |
| Total: | 100% |

|  |  |
|--|--|