# EXHIBIT 6

# FIRST AMENDMENT TO THE
# SECOND AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY
# AGREEMENT
# OF
# HIGH STAKES HOLDING CO. LLC

**First Amendment** (this "Amendment") dated December __, 2019, to the Second Amended and Restated Limited Liability Company Agreement, effective as of August 1, 2017 (the "Operating Agreement") of High Stakes Holding Co. LLC, a Delaware limited liability company (the "Company").  Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Operating Agreement.

**WHEREAS**, pursuant to Sections 2.1(d) and 2.3 of the Operating Agreement, Schedule I to the Operating Agreement shall be amended from time to time to reflect the admission of Additional Persons and the transfer and reallocation of Membership Interests;

**WHEREAS**, the Voting Percentages of each Voting Member of the Company are subject to recalculation annually as of each immediately preceding December 31;

**WHEREAS**, pursuant to Section 13.4 of the Operating Agreement, the Operating Agreement may be amended by a Supermajority of the Members; and

**WHEREAS**, the undersigned Members, constituting at least a Supermajority of the Members, wish to amend (1) Schedule I of the Operating Agreement to reflect changes in the number and types of Units held by, and the Percentage Interest in the Company of, each Member, (2) Schedule IV of the Operating Agreement to reflect changes in the Voting Percentages of each Voting Member of the Company, (3) the repurchase provisions set forth in Section 9.2 of the Operating Agreement, and (4) such other provisions of the Operating Agreement as set forth herein.

**NOW, THEREFORE**:

1.      Section 2.3 of the Operating Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

> **Section 2.3 Additional Members and Membership Interests**.  Additional Persons may be admitted to the Company as Members and Membership Interests may be created and issued to such Persons on such terms and conditions, consistent with Section 3.1 hereof, as a Supermajority of the Members shall approve, and consistent with Section 2.1 of this Agreement and the requirements of the MPA Agreement. The Members agree to execute an amendment to this Agreement in accordance with Section 13.4 hereof to reflect the transfer and reallocation of Membership Interests (Class 1 Units, Class 2 Units and Class 3 Units) upon the

occurrence of such an admission or the repurchase of Units as provided in this Agreement, including, without limitation, (i) as a pro rata dilution of all of the existing Members' Percentage Interests, (ii) as a reallocation of the Terminated Member's Percentage (as such term is defined in Section 9.2(a) hereof) to reflect the remainder of the Terminated Member's Percentage Interests a terminating Member may continue to hold with respect to his or her Terminated Member's Percentage Interests determined under Section 9.2(c) hereof or (iii) as a result of a reallocation of Percentage Interests, as agreed upon by a Supermajority of the Members; provided, however, that in the absence of such amendment, such transfer and reallocation shall be deemed to have occurred as of the date of such admission or repurchase.  For the avoidance of doubt, any amendment to Schedule I and Schedule IV of this Agreement may be approved by a Supermajority of the Members.  The terms of admission or issuance may specify the creation of different classes or groups of Members having different rights, powers and duties.  The creation of any new class or group of Members shall be indicated in an amendment to this Agreement in accordance with Section 13.4 hereof and such amendment shall indicate the different rights, powers and duties of the classes or groups of Members.

2. Section 6.4 of the Operating Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

> **Section 6.4  Tax Matters Person.**  The Equity Members shall designate one of the Members as the tax matters partner under Section 6231 of the Code, provided that for tax years commencing after 2017, such person shall be the partnership representative (each, a "**Representative**") under Section 6223 of the Code, and until the Equity Members shall appoint another Equity Member, such Representative shall be Kieran Mahoney. The Representative shall inform each other Equity Member of all significant tax matters that may come to its attention (including, without limitation, any tax audits of the Company) and shall forward to each other Equity Member copies of all written communications it may receive in that capacity.  Nothing in this Section 6.4 shall limit the ability of any Member to take any action in its individual capacity with respect to tax audit matters that is left to the determination of an individual Member under Sections 6221 through 6233 of the Code or under any similar state or local provision.  The Representative shall be entitled to the indemnification provided by the Company as set forth in Article X.

3. Section 9.2 of the Operating Agreement is hereby amended by deleting it in its entirety and replacing it with the following:

> **Section 9.2       Repurchase of Units.**
>
> (a) **Repurchase**. Except as provided in Section 9.2(e) below, upon termination of a Member's employment by MPA or any Newco, as applicable, for any reason, the Company shall have the right to repurchase, or cause to be repurchased, (i) such Member's Units (each such percentage

represented by such Units the "**Terminated Member's Percentage**") from the Member and (ii) any units, membership interests or other equity interests that such Member owns in any Newco or Affiliate of the Company for the applicable purchase price set forth in this Section 9.2 (the "**Repurchase Price**"); provided that, solely with respect to Equity Members, if such Equity Member has a business unit with an economic structure based on such Equity Member's personal performance as determined by a Supermajority of the Members, the Repurchase Price shall be reduced if such unit's annual performance declines below 90% of the Class 2 Base Profit for the year prior to the termination of such Equity Member's employment (the "**Base Level**"). Such adjustment would reduce the Repurchase Price payable each year by the full amount of any shortfall in such unit's performance below the Base Level provided, however, that in no such event shall the Repurchase Price be less than $0. Any Repurchase Price paid in excess of such terminated Member's Capital Account shall be treated as Guaranteed Payments under the Code and shall be treated as ordinary income. Upon the repurchase of any Units or any membership interests, units or other equity interests that such Member owns in any Newco or Affiliate of the Company pursuant to this Section 9.2, the terminated Member shall transfer those interests to the Company or as directed by the Company, and such interests shall be deemed transferred.

(b) **Termination for Cause / Resignation by Member**. Except as provided in Section 9.2(e) below, if (i) the Member's employment with MPA or any Newco, as applicable, is terminated by MPA or such Newco for Cause (as such term is defined in such Member's employment agreement with MPA or Newco, as applicable, if any, or if such Member does not have an employment agreement with MPA or Newco, as applicable, as such term is defined on Schedule III attached hereto) or (ii) the Member voluntarily resigns his or her employment with MPA or Newco, as applicable, other than due to Retirement, the Repurchase Price shall be equal to the sum of (1) $1.00 and (2) if an Equity Member, the Member's Capital Contribution, if any, payable quarterly over a five-year period from the Termination Date, with interest accruing at 6% per annum, less any unpaid Capital Contribution due and owing to the Company from such terminated Member; provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Member).

(c) **Termination without Cause (other than for Underperformance) / Death / Disability / Retirement.**

(1) *Equity Members*. Except as provided in Section 9.2(e) below, if an Equity Member's employment with MPA or any Newco, as applicable, is terminated (i) by MPA or such Newco without Cause (other than for Underperformance) (a "**Termination without Cause**"), or (ii) in the event of the death, Disability, or Retirement of the Equity Member (as such terms are defined in such Equity Member's employment agreement with MPA or Newco,

if any, or if such Equity Member does not have an employment agreement with MPA or any Newco, as applicable, as such terms are defined on Schedule III attached hereto), the Repurchase Price shall be an amount equal to the sum of (A) $1.00 and (B) the positive balance, if any, in the Equity Member's Capital Account, payable quarterly, within 30 days after the end of each quarter, in good funds over a five-year period from the Termination Date, with interest at a rate of 6% per annum; provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Member). If the Equity Member's employment with MPA (1) is a Termination without Cause (other than for Underperformance), or (2) upon the death, Disability or Retirement of the Equity Member, an additional amount shall be payable to such terminated Equity Member equal to such Equity Member's pro rata allocation of any Profits of the Company for a five-year period following the Termination Date, payable annually within 90 days after the close of each fiscal year during such five-year period; provided that any such payments for Profits earned in the year in which an Equity Member is terminated shall be less any Profits applicable to such year that were previously distributed to such Equity Member prior to his or her termination; provided, that the Company may prepay the payment of such Repurchase Price at any time without penalty or any requirement to pay any prepayment, with such amount calculated as the number of years (or partial years) remaining in the five-year period multiplied by such terminated Equity Member's pro rata allocation of the average of (a) Profits earned in the year preceding the Termination Date and (b) the forecast of the Profits for the year of termination using a present value discount rate and risk reduction discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Member).

(2) *Class 3 Members*. Each Class 3 Member hereby acknowledges and agrees that he or she shall be an "at-will" employee of MPA or Newco, as applicable. If a Class 3 Member's employment with MPA or any Newco, as applicable, is terminated by MPA or such Newco without Cause or in the event of the death, Disability, or Retirement of the Class 3 Member (as such terms are defined in such Class 3 Member's employment agreement with MPA or Newco, if any, or if such Class 3 Member does not have an employment agreement with MPA or Newco, as applicable, as such terms are defined on Schedule III attached hereto), the Repurchase Price shall be an amount in good funds equal to the sum of (i) $1.00, and (ii) if the Class 3 Member's employment with MPA or Newco, as applicable, is a Termination without Cause, six months of such Class 3 Member's Class 3 Base Draw with MPA, payable on the same basis as if such person was still a Class 3 Member, and a prorated bonus for the year of termination, payable within 90 days of the end of such year, all as determined by a Supermajority of the Members, subject to any appropriate offsets, as permitted by applicable law, for debts or money due to the Company, any Newco or Affiliate or for other earned income, as applicable (collectively, "**Offsets**"); provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value

discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Member). A terminated Class 3 Member shall use reasonable efforts to mitigate damages hereunder, and if a Class 3 Member obtains any other employment or consulting arrangement, any compensation and benefits paid to the Class 3 Member therefrom shall reduce the Company's payments under this Section 9.2(c)(2).

(d) **Termination for Underperformance**. Notwithstanding the foregoing and except as provided in Section 9.2(e) below, if any Member's employment with MPA or Newco, as applicable, is terminated by MPA for Underperformance, the Repurchase Price shall be equal to the sum of (i) $1.00 and (ii), if such terminated Member is an Equity Member, such Equity Member's Capital Contribution, as herein provided, less any unpaid Capital Contribution due and owing to the Company from such Equity Member, plus an amount equal to the taxes due on any allocation of income for the period ending on Termination Date, such taxes calculated on the basis of the highest marginal combined effective tax rate on ordinary income and allocated pro rata among the Company's various state tax returns. Capital Contributions paid to a terminated Equity Member for Termination without Cause for Underperformance hereunder shall be payable quarterly over a five-year period from the Termination Date, with interest accruing at 6% per annum, less any unpaid Capital Contribution due and owing to the Company from such terminated Equity Member; provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value discount rate as reasonably determined by a Supermajority of the Members (other than the terminated Equity Member).

(e) **Termination of Kieran Mahoney.**

(1) Notwithstanding anything to the contrary in this Section 9.2, if Kieran Mahoney's ("**Mahoney**") employment with MPA is terminated by MPA for any reason other than Mahoney Cause (as defined in Schedule III), the Company shall (A) employ Mahoney as an executive officer for the five-year period immediately following his Termination Date (the "**Employment Period**") and shall pay him a monthly advance against the Repurchase Price he is entitled to receive pursuant to this Section 9.2(e) in an amount equal to the monthly salary he received from MPA immediately prior to his Termination Date for services rendered during the Employment Period, (B) pay a monthly severance to Mahoney for the two-year period immediately following the Employment Period in an amount equal to the monthly salary he received from MPA immediately prior to his Termination Date and (C) repurchase the Units held by Mahoney in accordance with this Section 9.2(e). Following his Termination Date, Mahoney will no longer be entitled to participate in, or receive any payments of, the Aggregate Bonus Amount (as defined in the MPA Agreement) payable to the Company pursuant to the terms of the MPA Agreement.

(2) *Termination without Mahoney Cause or / Death / Disability or Retirement.* If Mahoney's employment with MPA is terminated by MPA for any reason other than Mahoney Cause, or in the event of the death, Disability, or Retirement of Mahoney, the Repurchase Price for his Units shall be an amount equal to the sum of (A) $1.00, (B) his pro rata allocation of any Profits of the Company for a five-year period following his Termination Date, payable annually within 90 days after the close of each fiscal year during such five-year period; provided, that any such payments for Profits (i) earned in the year in which Mahoney is terminated by MPA shall be less any Profits applicable to such year that were previously distributed to him prior to his termination; and (ii) for each year during such five-year period shall be less the sum of Mahoney's severance, if, any, payable by MPA, and Mahoney's annual advance or severance payments, as applicable, payable in accordance with this Section 9.6(e); and provided further, that the Company may prepay the payment of such Repurchase Price at any time without penalty or any requirement to pay any prepayment, with such amount calculated as the number of years (or partial years) remaining in the five-year period multiplied by Mahoney's pro rata allocation of the average of (a) Profits earned in the year preceding his Termination Date and (b) the forecast of the Profits for the year of termination using a present value discount rate and risk reduction discount rate as reasonably determined by a Supermajority of the Members (other than Mahoney) and (C), his Capital Contribution, if any, payable quarterly over a five year period from his Termination Date, with interest accruing at 6% per annum, less any unpaid Capital Contribution due and owing to the Company from Mahoney[; provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value discount rate as reasonably determined by a Supermajority of the Members (other than Mahoney).

(3) *Termination for Mahoney Cause/ Resignation other than Retirement or for Good Reason.* If Mahoney's employment with MPA is terminated by MPA for Mahoney Cause, or upon Mahoney's resignation other than for Retirement or for Good Reason, the Repurchase Price for Mahoney's Units shall be an amount equal to the sum of (A) $1.00 and (B) his Capital Contribution, if any, payable quarterly over a five-year period from his Termination Date, with interest accruing at 6% per annum, less any unpaid Capital Contribution due and owing to the Company from Mahoney[; provided, that the Company may prepay such amount at any time without penalty or any requirement to pay any prepayment, using a present value discount rate as reasonably determined by a Supermajority of the Members (other than Mahoney).

(4) *Effect of Termination on Newco Interests.* Following the termination of Mahoney's employment with MPA for any reason, Mahoney would maintain the limited liability company membership interests held by him in

any Newco as of his Termination Date (a "**Participating Newco**"), and in connection therewith, he will be entitled to continue to participate in (A) the profits in each such Participating Newco and (B) the sale of all or substantially all of the assets or at least a majority of the membership interests of each Participating Newco to any third party, including but not limited to Omnicom Group Inc., DAS Holdings Inc., or their respective subsidiaries, provided, that for the avoidance of doubt, Mahoney will not be entitled to hold membership interests in, or otherwise participate in, any Newco formed after his Termination Date.

(5) *Effect of Termination on Protective Covenants.* Following the termination of Mahoney's employment with MPA or the Company for any reason, the Protective Covenants as provided in Section 7.2 shall no longer be applicable to Mahoney; provided, however, that he shall remain subject, to the extent applicable, to any protective covenant obligations owed to MPA pursuant to any written agreement between Mahoney and MPA, including without limitation, that certain Employment Agreement, dated October 1, 2003, by and between Mahoney and MPA, as amended, and the MPA Agreement.

(f)     **Breach of Protective Covenants**.  Subject to Section 9.2(e)(3), if a Member breaches any of his or her obligations under Section 7.2 of this Agreement or any other applicable protective covenants between such Member and MPA, including, but not limited to, the protective covenants under Section 7.3 of the MPA LLC Agreement (as defined below), in addition to other remedies available to the Company, the Company may (i) if the Member is holding Units, immediately repurchase the Units for a Repurchase Price of $1.00 or (ii) if the Units have been acquired hereunder pursuant to this Section 9.2, the Company's obligation to make any remaining payments of Repurchase Price shall immediately terminate.

(g)     **Binding Obligation to Sell**.  Upon exercise by the Company of its rights to repurchase the Units under this Section 9.2, which shall be exercised by delivery of written notice to the Member (an "Exercise Notice"), the Member shall be obligated to sell the Units to the Company, and shall be deemed to have sold such Units, for the applicable Repurchase Price set forth in this Section 9.2.  The effective date of such repurchase shall be the date set forth in the Exercise Notice, which shall not be earlier than the date such Exercise Notice is delivered.  Upon repurchase by the Company of the Units, the Member shall no longer be a Member of the Company and shall no longer have any rights as a Member of the Company, under this Agreement or otherwise, including any rights to receive distributions of any amounts from the Company, except as provided under this Section 9.2.

4.     Schedule I of the Operating Agreement is hereby amended by deleting it in its entirety and replacing it with <u>Schedule I</u> annexed hereto, effective as of the date set forth therein.

5.      Schedule III of the Operating Agreement is hereby amended by deleting it in its entirety and replacing it with <u>Schedule III</u> annexed hereto, effective as of the date set forth therein.

6.      Schedule IV of the Operating Agreement is hereby amended by deleting it in its entirety and replacing it with <u>Schedule IV</u> annexed hereto, effective as of the date set forth therein.

7.      This Amendment sets forth amendments to the Operating Agreement that have been approved in accordance with the Operating Agreement.  In the event of inconsistency between the provisions of this Amendment and the Operating Agreement (and whether or not any such inconsistent provisions are specifically referred to herein) the provisions of this Amendment shall take precedence and shall govern.

8.      The General Provisions of Article 13 of the Operating Agreement are hereby incorporated by reference to the extent that this Amendment is silent as to any provision thereto.

9.      This Amendment may be executed in any number of counterparts with the same effect as if all parties had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.  Delivery of an executed signature page of this Amendment by any electronic means that reproduces an image of the actual executed signature page shall be as effective as delivery of a manually executed counterpart of this Amendment.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the undersigned have executed this Amendment as of the date first above written.

**MEMBERS:**

_____
**Kieran Mahoney**

_____
**Kirill Goncharenko**

_____
**Fabian Nunez**

_____
**Michael McKeon**

_____
**Thomas Doherty**

_____
**Michael DuHaime**

_____
**John V. Weber**

_____
**Morris Reid**

_____
**Stefan Friedman**

_____
**Michael Soliman**

_____
**Ashley Walker**

_____
**John Lonergan**

_____
**Duncan McFetridge**

_____
**John Gallagher**

4040380v9 014581.0101

DocuSigned by:

*Paul Bauer*

**Paul Bauer**
309B71072506449...

## SCHEDULE I

### As of December 31, 2018

| Members and Addresses | Class 1 Units | Class 2 Units | Class 3 Units | Percentage Interest in the Company |
|---|---|---|---|---|
| Kieran Mahoney<br>4706 Rue Bordeaux<br>Lutz, Florida  33558 | 216.04 | | | 21.604% |
| Kirill Goncharenko<br>285 Lafayette Street<br>Apt. 6E<br>New York, New York  10012 | 133.25 | | | 13.325% |
| Fabian Nunez<br>8249 Marmont Lane<br>Los Angeles, CA 90069 | 203.60 | | | 20.360% |
| Michael McKeon<br>134 Circle Drive<br>Manhasset, New York  11030 | 102.33 | | | 10.233% |
| Thomas Doherty<br>130 Sylvan Street<br>Rutherford, New Jersey 07070 | 40.82 | | | 4.082% |
| Michael DuHaime<br>515 Parkview Avenue<br>Westfield, New Jersey 07090 | 133.88 | | | 13.388% |
| John V. Weber<br>7701 Ridgecrest Drive<br>Alexandria, Virginia  22308 | 4.06 | | | 0.406% |

4040380v9 014581.0101

| | | | | |
|---|---|---|---|---|
| Morris Reid<br>3030 K Street, NW<br>PH 301<br>Washington, DC 20007 | .72 | | | 0.072% |
| Stefan Friedman<br>367 V. Van Ness Avenue<br>Los Angeles, California 90004 | 49.42 | | | 4.942% |
| Michael Soliman<br>38 Rea Avenue Ext.<br>Hawthorne, New Jersey 07506 | 45.16 | | | 4.516% |
| Ashley Walker<br>2630 NE 15th Street<br>Fort Lauderdale, Florida 33304 | 21.48 | | | 2.148% |
| John Lonergan<br>5115 52nd Street NW<br>Washington, DC 20016 | | | 12.94 | 1.294% |
| Duncan McFetridge<br>2907 24th Street<br>Sacramento, California 95818 | | | 14.49 | 1.449% |
| John Gallagher<br>420 W. 25th St.<br>Apt. 6E<br>New York, NY 10001 | | | 13.11 | 1.311% |
| Paul Bauer<br>3771 College Ave.<br>Sacramento, CA 95818 | | 8.690 | | 0.869% |
| Total: | 950.76 | 8.690 | 40.54 | 100% |

4040380v9 014581.0101

# SCHEDULE III

## Certain Definitions

1. If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Cause**", then "**Cause**" shall mean: (i) the Member's failure to perform his/her job duties and responsibilities satisfactorily if such failure is not cured (if curable) within 10 days after written notice thereof to the Member by the Company; provided, that following the second of such notice, the Member shall not be entitled to any cure periods for any such further failure; (ii) the misappropriation of MPA's or Newco's, as applicable, funds or property; (iii) use of alcohol or illegal drugs interfering with the Member's performance of his/her duties and responsibilities; (iv) conviction (or entry of a plea of guilty or nolo contendere) of a felony or of any crime involving moral turpitude, fraud or misrepresentation; (v) the commission by the Member of any act which could reasonably be expected to injure the reputation, business or business relationships of MPA, Newco or the Company; (vi) the breach by the Member of any provision of this Agreement or the MPA LLC Agreement if such breach is not cured (if curable) within 10 days after written notice thereof to the Member by the Company; provided, that following the second of such notice, the Member shall not be entitled to any cure periods for any such further breach and provided further, that any breach of the protective covenants contained therein shall not be subject to any cure period; or (vii) the material nonconformance with the standard business practices and policies of the Company, Newco or MPA which have been made known to the Member, including without limitation, policies against racial or sexual discrimination or harassment, shall be deemed a termination for Cause of such Member. Whether or not a Member has an employment agreement, "**Cause**" shall include the failure of a Member to execute and deliver any documentation required in connection with a financing or other transaction entered into by the Company, including covenants and representations and warranties of such Member, provided that such documentation is equal to or less burdensome than is required of Kieran Mahoney and Kirill Goncharenko.

The determination of whether a Member's termination of employment was for Cause shall be made by a Supermajority of the Members, other than such affected Member, in their absolute discretion, which determination shall be final, binding and conclusive on all Members, and other interested parties for purposes of this Agreement.

2. If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Disability**", then "**Disability**" shall mean the Member's inability to perform his/her duties under the Member's employment arrangement with MPA or Newco (whether or not set forth within a written contract) by virtue of illness or physical or mental incapacity or disability (from any cause or causes whatsoever) in substantially the manner and to the extent required under such employment arrangement.

4040380v9 014581.0101

The determination of whether a Member's termination is for Disability shall be made by a Supermajority of the Members, other than such affected Member, in their absolute discretion, which determination shall be final, binding and conclusive on all Members, and other interested parties for purposes of this Agreement.

3.  If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Retirement**", then, unless such Member and the Company have otherwise agreed in writing, "**Retirement**" shall mean a Member who has (i) attained the age of 63 or more; (ii) has fully retired from MPA or Newco, as applicable, and from the public affairs industry, including, without limitation, not performing public affairs services as an employee or consultant of any MPA Client; and (iii) has been employed by MPA or any predecessor of MPA or Newco, as applicable, for a period of not less than 20 years prior to the date of Retirement.

4.  If the Member does not have an employment agreement with MPA or any Newco currently in effect or if such agreement does not have a definition of "**Underperformance**", then, unless such Member and the Company have otherwise agreed in writing, "**Underperformance**" shall mean a failure to achieve an average personal Profit over a two calendar year period that is equal to or greater than 80% of such Member's Profit for the immediately preceding calendar year prior to the date of admission in the class of Membership of such Member to the Company, all as determined by a Supermajority of the Members (other than such terminated Members), as such definition may change from time to time, as determined by a Supermajority of the Members.

5.  As used in Section 9.2(e) of the Agreement, "**Mahoney Cause**" shall mean (i) the willful misappropriation of the funds or property of the Company; (ii) the use of alcohol or illegal drugs, interfering with the performance of Mahoney's obligations under this Agreement; (iii) the conviction in a court of law of, or entering a plea of guilty or no contest to, any felony or any crime involving moral turpitude, dishonesty or theft; (iv) the material nonconformance with the Company's standard business practices and policies, including without limitation, policies against racial or sexual discrimination or harassment, which nonconformance is not cured (if curable) within 10 days after written notice to Mahoney by the Company or (v) Mahoney's resignation without Good Reason (as defined in Mahoney's employment agreement with MPA, but without respect to any notice or cure provisions for such Good Reason as may be provided therein).

## SCHEDULE IV

**Effective as of:**

**January 1, 2019**

| Members | Voting Percentages |
|---|---|
| Kieran Mahoney | 43.35% |
| Kirill Goncharenko | 21.19% |
| Fabian Nunez | 5.35% |
| Michael McKeon | 12.04% |
| Thomas Doherty | 9.67% |
| Michael DuHaime | 3.70% |
| John V. Weber | 3.00% |
| Morris Reid | 0.19% |
| Stefan Friedman | 0.80% |
| Ashley Walker | 0.19% |
| Michael Soliman | 0.38% |
| John Lonergan | 0.07% |
| Duncan McFetridge | 0.07% |
| Total: | 100% |